*To be Argued by:*
JAMES KOUSOUROS, ESQ.

---

## SUPREME COURT OF THE STATE OF NEW YORK

### APPELLATE DIVISION - SECOND DEPARTMENT

---

### THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

-against-

### LAMAR WHITEHEAD,

*Defendant- Appellant.*

---

**BRIEF FOR DEFENDANT-APPELLANT**
Ind. No. 539-2007
Appellate Docket 2008-7307

---

JAMES KOUSOUROS, ESQ.
*Attorney for Defendant-Respondent*
*LAMAR WHITEHEAD*
260 Madison Ave. 22nd Fl.
New York, NY 10016
212-532-1935

# TABLE OF CONTENTS

PAGE

Table of Authorities ................................................................... ii

Statement Pursuant to C.P.L.R. § 450.15 .................................... vi

Preliminary Statement ................................................................ vii

Questions Presented .................................................................... viii

Statement of Facts ...................................................................... 1

Legal Argument

    Point I ................................................................................ 33

    Point II ............................................................................... 42

    Point III .............................................................................. 51

    Point IV .............................................................................. 54

    Point V ............................................................................... 64

    Point VI .............................................................................. 65

    Point VII ............................................................................ 67

    Point VIII ........................................................................... 69

    Point IX .............................................................................. 71

Conclusion ................................................................................ 80

Printing Specifications Statement ............................................... 81

i

## Table of Authorities

**Cases**                                                                   **Page**

Hecht v. Managhan, 307 N.Y. 461 (1958)……………………..………51

People v. Archer, 238 A.D.2d 183 (1st Dept. 1997)……………………..…44

People v. Artuso, 87 A.D.2d 873 (2nd Dept. 1982)……………………...…72

People v. Burghardt, 17 A.D.2d 912 (4th Dept. 1962)………………….…...72

People v. Chanowitz, 298 A.D.2d 767 (3rd Dept. 2002)………………….....39

People v. Copeland, 70 A.D.2d 884 (2nd Dept. 1979)……………………...51

People v. Contes, 60 N.Y.2d 620 (1983)………………………………….…41

People v. Cosgrove, 102 A.D.2d 947 (3rd Dept. 1984)…………………….....72

People v. D'Anna, 163 A.D.2d 810 (4th Dept. 1990)……………………….68

People v. Davis, 267 A.D.2d 597 (3rd Dept. 1999)………………………….79

People v. Discala, 45 N.Y.2d 38 (1978)………………………………….....71

People v. Dowdell, 88 A.D.2d 239 (1st Dept. 1982)…………………..……..65

People v. Garcia, 186 A.D.2d 221 (2nd Dept. 1992)……………………….44

People v. George, 255 A.D.2d 881 (4th Dept. 1998)……………………….44

People v. Gerstenfeld, 14 A.D.2d 517 (1ˢᵗ Dept. 1961)..........................73

People v. Gittleson, 25 A.D.2d 265 (1ˢᵗ Dept. 1966)...........................72

People v. Horner, 300 A.D.2d 841 (3ʳᵈ Dept. 2002)........................39

People v. Kelly, 76 N.Y.2d 1013 (1990)..................................65

People v. Maggio, 114 A.D.2d 522 (2nd Dept. 1985)......................74

People v. Mohammed 126 A.D.2d 673 (2d  Dept. 1987).................69

People v. Molineux, 168 N.Y. 264 (1901)..............................57

People v. Notey, 72 A.D.2d 279 (2d Dept. 1980).....................73

People v. Pedrazza, 66 N.Y.2d 626 (1985)............................72

People v. Peters, 71 A.D.2d 641 (2nd Dept. 1979).....................51

People v. Resek, 3 N.Y. 3d 385 (2004)..............................56

People v. Richard, 65 A.D.2d 595 (2nd Dept. 1978)....................72

People v. Rizzo, 246 N.Y. 334 (1927)................................35

People v. Sanchez, 84 N.Y.2d 440, 445..............................44

People v. Sanoguet, 157 Misc.2d 771 (Supr. Ct. Bronx County, 1993).......39

People v. Sayers, 64 A.D.3d 728 (2nd Dept. 2009)......................66

iii

People v. Scafo, 77 A.D.2d 668 (2nd Dept. 1980)...............................73

People v. Sheppard, 273 A.D.2d 498 (3rd Dept. 2000)........................79

People v. Smalls, 115 A.D.2d 783 (2nd Dept. 1985)...........................78

People v. Smith, 141 A.D.2d 988 (3rd Dept. 1988)............................72

People v. Spivey, 81 N.Y.2d 356 at 361(1993)................................65

People v. Sturgis, 69 N.Y.2d 816 (1987).....................................69

People v. Vasquez, 464 N.Y.S.2d 685 (Sup. Ct. New York Co., 1984).........52

People v. Warren, 66 N.Y.2d 831, at 832 (1985)..............................35

People v. Wlasiuk, 32 A.D.3d 674 (3rd Dept. 2006)...........................65

U.S. v. Wozniak, 126 F.3d 105 (2nd Cir. 1997)..............................64

**Statutes and Other Authority**

C.P.L. §60.20..............................................................53

C.P.L. §300.10.............................................................44

C.P.L. §200.50.............................................................43

Criminal Procedure Law Sections 390.30 …………...……………………...73

Criminal Procedure Law Sections 390.50…………………………….......73

Criminal Procedure Law Section 450.15(3)…………………………...71

Identity Theft in the First Degree (P.L. §190.80(3))……………………..33

Penal Law §70.25(2)……………………………………………………..67

Penal Law §120.00 et seq………………………………………………..52

v

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
_____X
THE PEOPLE OF THE STATE OF NEW YORK,

*Appellant*

-against-                                                    Ind. No.539-2007

LAMAR WHITEHEAD,

*Defendant- Respondent.*
_____X

## STATEMENT PURSUANT TO *C.P.L.R. § 450.15*

1.    The indictment number in the court below was I539-07

2.    The full names of the original parties were People of the State of New York against LAMAR WHITEHEAD.   There has been no change of parties on this appeal.

3.    This action was commenced in County Court, Suffolk County.

4.    This action was commenced by the filing of an indictment.

5.    This appeal is taken by the defendant from a judgment of conviction entered on April 1, 2008 in which the defendant was sentenced to an indeterminate term of imprisonment of ten to twenty years.

6.    The appendix method is being used.

vi

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
_____X

THE PEOPLE OF THE STATE OF NEW YORK,

<em>Appellant,</em>

-against-                                          Ind. No. 539-2007


LAMAR WHITEHEAD

<em>Defendant-Respondent.</em>
_____X

## PRELIMINARY STATEMENT

This is an appeal from a decision and order filed and entered in the County Court, Suffolk County, on April 1, 2008, convicting defendant of the crimes of Scheme to Defraud in the First Degree (Count 1), Attempted Grand Larceny in the Second Degree (Count 10), Identity Theft in the First Degree (Counts 3, 4, 8, 9, 11, 12, 14, 15, 17, 18, 21, 24 and 27) and Identity Theft in the Third Degree (Counts 5 and 16) . This followed a jury trial at which Mr. Whitehead was acquitted of seventeen of the thirty four charges against him and convicted of seventeen of the thirty four charges against him. Mr. Whitehead was sentenced to an indeterminate term of ten to twenty years of imprisonment. Timely notice of appeal was filed by appellant on July 16, 2008. Mr. Whitehead is currently serving his sentence at Sing Sing Correctional Facility in Ossining, NY.

vii

## Questions Presented

1. Whether the evidence presented on Counts 4, 8, 12, 14, 17, 18, 21, 24, and 27 was sufficient to constitute an attempt to commit grand larceny.

2. Whether there any meaningful possibility of appellate review to ensure that a jury returned unanimous verdicts on Counts 5, 8 and 27 based on the same conduct.

3. Whether allowing a witness to resume testimony with no admonition that he is still under oath constitutes receipt of unsworn testimony.

4. Whether the defendant's trial was prejudiced by the admission of improper evidence and the denial of <u>Brady</u> material.

5. Whether the jury received an improper instruction as to Grand Larceny in the Second Degree.

6. Whether the verdict sheet contained an improper notation of statutory elements.

7. Whether Mr. Whitehead was sentenced to consecutive terms of imprisonment where concurrent terms were required.

8. Whether Mr. Whitehead was sentenced on counts of acquittal and not sentenced on counts of conviction.

9. Whether the sentence as imposed was harsh and excessive.

<u>Statement of Facts</u>

<u>Overview of The People's Theory of the Case.</u>

Lamar Whitehead is alleged to have stolen the identities of several people and to have used those identities in order to request loans intended to be used to purchase vehicles or to obtain currency. He is alleged to have received the personal identifying information of these individuals - including their names, addresses, dates of birth and Social Security numbers - from a former girlfriend, Valerie Rodriguez, who was an employee of Baron Honda in Patchogue, New York and who allegedly had access to the computer program used to check the credit of Baron Honda's customers. Most individuals whose identities were stolen were customers of Baron Honda who had provided their names, addresses, dates of birth and Social Security numbers to Baron Honda as part of the process of purchasing a vehicle on credit.

It is alleged that Mr. Whitehead created email accounts in the names of the individuals through Yahoo and that these email accounts were then

1

provided as contact information on loan applications made in the names of the individuals whose identities were assumed. The assumed identities were used to file loan applications either online or over the phone with E-loan, Capital One, M&T Bank and Chase Bank.  Mr. Whitehead is also alleged to have set up the voicemail boxes that were used as contact telephone numbers for these applications through a company called Aero-Beep, which provides voicemail box services.

Some of these applications were set up to provide funding directly to dealerships in exchange for vehicles and some were set up for individual to individual sales. In the case of funds being provided directly to dealerships, Mr. Whitehead or an accomplice allegedly went to the dealerships and impersonated the individual whose identity had been assumed in order to take delivery of the vehicles. In the case of loans for individual to individual transactions, an application for a loan was filed in the name of an assumed identity and another account was created as the intended recipient in the name of a second assumed identity, allowing a

2

transfer of funds between two stolen identities. One check was received as a result of these applications, which was deposited but did not clear. Anita Bryant, an alleged accomplice of Mr. Whitehead's, then attempted to withdraw funds from the account in the name of the second individual, but was frightened off by the bank's delay in handling the withdrawal. Ms. Bryant was thereafter apprehended.

During the investigation, three identification procedures were conducted.  A photographic array was shown to Frank Wall, who worked at Kings Cycles and sold a motorcycle to a woman using the name Maria Macarle who had come to the location with a man accompanying her (A:104-110) [1]. A photographic identification was also conducted with a single photograph with Nigel Defreitas - whose internet connection had been used to file several of the applications- and Tunde Ojo - who worked at Kwik Copy center and identified several documents as having been faxed from his store and who described the man who faxed them as an

_____

[1] This appeal is being prosecuted by the appendix method, as such all citations are citations to the appendix and are preceded by the letter "A."

3

African-American male of medium build (A: 112-122). Each of these individuals identified Mr. Whitehead, however, the identification by Mr. Wall was withdrawn after the People informed the court that Detective Gabriele had provided him with Mr. Whitehead's name prior to showing him the array and that he had then looked up a picture of Mr. Whitehead.

Mr. Whitehead was arrested in his car in the early afternoon of January 25, 2006 shortly after crossing the George Washington Bridge from New Jersey into New York.  In January of 2007, he was arraigned on Indictment No. I539-07, which accused him of fifty-seven (57) numbered counts of crimes related to identity theft.  He is alleged to have made statements upon his arrest to the detectives, requesting that his sister be permitted to pick up the car. A series of pre-trial hearings were held in this matter and the trial took place between February and April, 2008.

## Pre-Trial Motions and Hearings

Prior to trial, Mr. Whitehead's first attorney, Robert A. Macedonio, filed a demand for discovery on March 24, 2006.[2] On September 20, 2006, Camille Russell, Mr. Whitehead's second attorney, filed an omnibus motion seeking, among other things, suppression of all property and statements obtained in derogation of Mr. Whitehead's constitutional rights. Notwithstanding counsel's motion to suppress physical property, prior to trial, the trial court denied as time barred trial counsel's motion to litigate the propriety of the search warrant authorizing the search of Mr. Whitehead's home in New Jersey. In this search warrant Detective Gabriele, relying on a fingerprint examination report, stated that Mr. Whitehead had become a suspect in this case in November of 2004. This report, generated in 2004, which indicated that Mr. Whitehead's fingerprints were on loan documents in issue, was never turned over to the defense prior to trial. Appellate counsel requested and received the report

---

[2] Mr. Whitehead had a total of four attorneys prior to trial.  Mr. Macedonio had legal troubles which resulted in a guilty plea, disbarment and prison sentence in Suffolk County last

5

during the pendency of this appeal. This issue, as well as the propriety of the search which yielded much of the evidence relied upon by the People at this trial, was never litigated prior to the commencement of the trial.[3]

At the end of the hearings, the hearing court found the identifications of Mr. Whitehead admissible on the grounds they were not unduly suggestive (A: 101-102). The statements allegedly made by Mr. Whitehead to law enforcement personnel were ruled admissible as not the product of custodial interrogation. With respect to proffered <u>Molineux</u> evidence, the court ruled that testimony concerning the stop of Mr. Whitehead while in possession of the motorcycle obtained from King's Cycles was permissible as evidence that Mr. Whitehead had been in possession of a motorcycle obtained from Kings Cycles using Maria Macarle's identity, but precluded testimony as to the nature of the stop because there had been no conviction as a result of the Brooklyn arrest, and the case had apparently been dismissed. With respect to the admissibility of the documents in Mr.

year.
[3] A separate motion pursuant to C.P.L. 440.10 has been filed with respect to this issue.

Whitehead's possession – some containing identifying information and some which were allegedly altered documents concerning uncharged victims – the Court declined to rule, stating it would decide the issue of admissibility at trial, however, the evidence was admitted later in the trial without a specific ruling (A: 99-102).

On February 5, 2008, prior to the commencement of the trial, the indictment was amended by order of the court upon the People's motion dismissing twenty-three of the 57 counts of the original indictment and amending the venue allegation of Counts 9 and 10.

Jury Selection was held on February 5, 6, 7 and 11 of 2008. Trial commenced on February 13, 2008.

7

## The Trial

The trial included testimony of over fifty witnesses. The witnesses fell into several main groups. The individuals whose identities were used fraudulently testified that they had not given anyone else permission to use their identities but that, in most cases, there had been applications made in their names by other people.  In other cases, individuals whose identities had been used to create accounts for the receipt of funds from the fraudulent loans testified. Staff members of Baron Honda, where the activity in this case originated, explained their internal processes. Bank representatives testified as to applications made in the names of the witnesses who had testified that they had neither given permission to another to use their identities nor made the applications themselves. Service providers, primarily telecommunications service providers, testified as to the ways in which their services were used to file the applications. Representatives of two dealerships testified as to attempts to purchase vehicles from them. Individuals who were connected to the

8

frauds told of their alleged involvement and links to Mr. Whitehead. Police witnesses testified as to the evidence which had caused them to believe that Mr. Whitehead was implicated in the activity.

In order to present the trial evidence and testimony coherently, the following is a broad summary of what each group testified to. In addition to that summary, there is a detailed summary of the testimony of Detective Gabriele, who was the lead investigator in this case and, as such, the witness who explained the People's theory of the case to the jury; indeed, nearly every other witness's testimony served as background to his testimony.

The Identity Theft Victims

Maria Macarle had purchased a vehicle from Baron Honda, and subsequently discovered that her identity had been used to apply for credit to purchase other vehicles and that a motorcycle had been obtained in her name. She identified several documents as containing her correct name and Social Security Number, but incorrect contact information (A: 122-130).

9

Joseph Sweeney, also a former customer at Baron Honda, testified that his identification had been used to obtain a vehicle (A: 132-139) Nerina and Raymond Sperl were also past customers of Baron Honda whose identities had been used for unsuccessful applications to purchase vehicles (A: 141-161). Similar accounts were provided by Eric Besso (A: 162-168), Gloria Conaty (A: 169-178) , Briton Lawlor (A: 179-186), Michael Nolan (A: 187-195), Brian Foley (A: 196-261), Thomas Palladino (A: 206-217), and Kathleen March (A: 218-227). Wojcieh Wachnik testified as well that his identity had been used for fraudulent applications and he also testified that he had not subscribed to several cellular telephones that had been placed in his name (A: 229-236). Brian Smith testified that he bought a vehicle at Baron Honda and later discovered that unauthorized applications for credit to purchase another vehicle were made in his name. Smith, unlike the other victims, was also an employee of Baron Honda (A: 237-243).

Rhonda Ghassabian testified that she had never been involved in a transaction for which the certificate of title listed her as a vehicle seller (A:

245-250). Kristina Brooks and David Ridenour testified similarly (A: 256-263, 265-269). These individuals all testified as the purported second party in person-to-person transactions. This testimony was given to explain how someone could receive currency as a result of creating a fraudulent person-to-person transaction, by creating a bank account in the name of a purported seller to which the identity thief could deposit and then withdraw the vehicle purchase funds. Nouri Khabieh, who was not connected to Baron Honda, testified that vehicle purchase documents such as a contract of sale and proof of insurance in his name, but prepared without his permission, had been delivered to Land Rover of Massapequa.

Brenda Ridenour, David Ridenour's former wife, gave the same account as those of Rhonda Ghassabian and Kristina Brooks, except that in her instance no application or transaction in her name was charged in the case (A: 276-277). Similarly, Katherine Reid testified, over the objection of trial counsel, that her name was the same as one used in an answering machine message allegedly utilized in furtherance of the scheme, that her

name was present on documents in the process of being altered and that she had never given anyone permission to use her identity (A: 278-280). No additional information was presented to explain why this Katherine Reid had been called to testify as opposed to any other Katherine Reid in the country as no additional identifying information beside her name was allegedly used or found in connection with this case. Her testimony was admitted to show method, but in effect this testimony showed an *anticipated future fraud*. This was testimony related to an uncharged crime and did not properly fall within a <u>Molineux</u> exception.

It was stipulated that Gerald Thurman [Counts 28 and 29] and Brenda Foley [Count 31]would have testified in a similar manner to that of the named victims who testified that they had purchased vehicles at Baron Honda and subsequently discovered that someone had unsuccessfully tried to use credit in their names.

<u>The Baron Honda Staff</u>

Gloria Tricario was the controller of Baron Honda at the time that the identities of Baron Honda customers were used (A: 282). She explained the computer program, called Dealer-Track, which was used by vehicle dealerships to get credit information about potential customers (A: 283-286, 309-311). Ordinarily, only managers have access to Dealer Track (A: 313). She then identified purchase records maintained at Baron Honda for:

• Maria Macarle, August 25, 2004 (A: 294-295)

• Raymond and Nerina Sperl, October 16, 2004 (A: 295-297)

• Wendy and Thomas Palladino, October 16, 2004 (A: 297-298);

• Brian and Lisa Smith, August 27, 2004 (A: 299)

• Kathleen Suhr and Michael Nolan, August 27, 2004 (A: 300-301)

• Joseph Sweeney, August 31, 2004 (A: 301-302)

• Eric Besso, September 4, 2004 (A: 302-303)

• Kathleen March, September 5, 2004 (A: 303-304)

• Briton Lawlor, August 30, 2004 (A: 304-305)

13

• Brian and Brenda Foley, September 11, 2004 (A: 305-306)

• Gloria Conaty, October 6, (A: 306-307)

• Gerald Thurman, September 5, 2004 (A: 307-308)

Valerie Rodriguez testified that she was a former salesperson at Baron Honda and a former girlfriend of Mr. Whitehead. She had access to the Dealer-Track system and explained it to Mr. Whitehead, providing him business leads from it.   She identified several voicemail recordings as containing Mr. Whitehead's voice but using different names.[4] (A: 314-371,434-510).

The Bank Representatives

Kenneth Scales, a senior fraud investigator for Chase, explained that an individual seeking a loan from Chase Auto Finance could apply either at a dealership, online or over the phone, and that for any of these methods, identifying information must be provided. This information was then used to make an initial determination if the applicant was eligible for

---

[4] Ms. Rodriguez had at one point been considered as a possible suspect due to her connection to the Dealer-Track system.

a loan (A: 532-534). He identified a series of documents as Chase applications for auto loans which were in the names of various named victims, and testified that all of them had been denied (A: 534-545). [5] Kevin Lee, a legal recourse manager for Capital One, testified similarly, adding that a loan application could be made for funds to purchase a vehicle from another individual, as opposed to a dealership. Two applications made to Capital One were initially approved but then cancelled, prior to being funded, due to fraud alerts; one loan was actually funded (A: 549-590). [6] He also stated that two person-to-person checks cleared (A: 607-609). Her further explained that a loan application may result in a check being sent to a customer, but that funds were only presently obtainable with such checks after they had received final approval (A: 597-598).

---

[5] These documents consisted of a purchase contract in the name of Nauri Khabieh and loan applications for Briton Lawlor dated October 4, 2004, for Eric Besso dated October 7, 2004 Brian Foley on October 2004 and for Brenda Foley dated October 7, 2004.

[6] These were loan applications for a person-to-person loan from Nerina Sperl to Kristina Brooks dated February 15, 2005, a loan application for Gloria Conaty dated February 15, 2005, which were initially approved but then cancelled due to fraud alerts, a loan application for Gerald Thurman dated February 22, 2005 which was declined, loan applications for Wojcieh Wachnik dated October 30, 2004 which was approved and allegedly funded, and a loan application for a person-to-person transaction from David Ridenour to Maria Macarle dated January 27, 2005.

Kelly Thomas of the First Internet Bank of Indiana testified that an account had been opened in the name of Maria Macarle (A: 619-629). Henry Waite of Commerce Bank testified as to an account being opened in Maria Macarle's name at a branch in Queens, New York. An attempt was made to withdraw $17,000 from this account the day before a check from a person-to-person transaction was deposited. He identified this check as having been deposited to the account, and having been returned to the issuing institution prior to clearing successfully. While Commerce Bank's representative Henry Waite testified that this check had not cleared, this was the same Capital One check which Kevin Lee had testified had been funded (A: 635-655). James Eriksen of M&T Bank testified concerning several applications made in the name of identified victims in this case, all of which were denied (A: 657-675). Nancy Carraveo of E-loan testified as to applications made and denied and one application which was approved (A: 680-722).

The Service Providers

James Carrick of Verizon testified that the MCI residential customer database indicated that Tiesha Lamont had been an MCI residential customer with the phone number of 718-230-4369 at the address of 385 Lexington Avenue, Apartment 4B, Brooklyn, NY 11216 from July 28, 2004 to July 25, 2005(A: 736-740). This address had been used as the home address in several of the applications and Teisha Lamont was the sister of Anita Bryant, an alleged accomplice of Mr. Whitehead's.

Dan Jensen of Sprint/Nextel identified 718-772-6498 as a phone number registered to Lamar Whitehead, 347-623-1549 and 347-228-4956 as phone numbers registered to Woycieh Wachnik which were cancelled due to fraud, and 917-604-0969 as a phone registered to Ieshah Williams (A: 743-756). Erik Larson of Verizon identified several phone numbers as belonging to individuals who shared Mr. whitehead's last name (A: 1926-1946). He also identified a phone which was recovered as having the same serial number as one of the phones issued in the name of Mr. Wachnik.

17

Anne Cheung of Yahoo identified several Yahoo accounts as having been set up in the names of named victims (A: 774-787). Robert Egan of Cablevision identified the IP address of the computer used to set up some of the Yahoo accounts as that of Nigel Defreitas (A: 789-799). Christine Gardener of Verizon identified the other IP address as having been assigned to Michael Redman (A: 800-808). Kris Taneja of Aero-Beep and Voicemail Services identified the contact numbers used on the loan applications as belonging to three blocks of numbers Aero-Beep had been sold to accounts in the names of Henry Black, John Willson and Anthony Williams for use as voicemail boxes and testified that Mr. Whitehead had an account in his own name with the company which was not related to any of the charged conduct (A: 811-846). Tunde Ojo of Kwik Copy Center identified several documents as having been faxed from his store and described the man who faxed them as an African-American male of medium build (A: 111-121).

## The Dealership Representatives

Robert O'Shinsky of Land Rover of Massapequa testified that a man had sought to arrange the purchase of a vehicle for his aunt in the name of Nouri Khabieh. The Suffolk County Police contacted him regarding this sale being fraudulent, and he accordingly turned the purchase documents over to Detective Peeker of the Suffolk County Police (A: 847-902). Frank Wall of Kings Cycles testified that he had sold a motorcycle to a woman, who was accompanied by a man, using the name Maria Macarle[7].

## Individuals Connected to the Case

Anita Bryant testified that she is the sister of Teisha Lamont and had a close relationship to Mr. Whitehead. Her testimony was given pursuant to a cooperation agreement with the Suffolk District Attorney's office

---

[7] The Suffolk District Attorney's Office had originally proposed that Wall be allowed to make an in-court identification of Mr. Whitehead, but this had been precluded after it was discovered that Detective Gabriele had provided him with Mr. Whitehead's name, and that Mr. Wall had googled the name and seen a picture of Mr. Whitehead prior to being interviewed in person by Detective Gabriele  (A: 903).

which allowed her to avoid any prison sentence as a result of her involvement in the charged identity thefts. She claimed that Mr. Whitehead had directed her to purchase a motorcycle in the name of Maria Macarle at Kings Cycles in March of 2005. She also claimed that he had instructed her to withdraw $17,000 from an account in the name of Maria Macarle at Commerce Bank. She left behind identification documents at the bank after becoming frightened, and these documents were used to identify and apprehend her (A: 905-1021)). The People thus relied heavily on Ms. Bryant's testimony with regard to Count One, the Scheme to Defraud as well as the specific counts relating to Maria Macarle.

The Police Witnesses

Police Officer Frank Gallagher of the New York City Police testified that he stopped Mr. Whitehead while he was operating a motorcycle reported stolen by Kings Cycles on June 7, 2005 (A: 1090-1101). He was not permitted to describe the motivation or results of this stop as Judge

Hudson precluded this testimony as concerning an arrest for a crime for which Mr. Whitehead had never been convicted and which had been dismissed.

Karen Ensalata of the Suffolk County Police identification unit testified that she had compared Mr. Whitehead's fingerprints taken by Detective Hayes to fingerprints on the documents turned over to Detective Peeker by Robert O'Shinsky of Land Rover of Massapequa, and that she matched four fingerprints on those documents to those of Mr. Whitehead. She identified the existence of cracks in Mr. Whitehead's fingerprints as taken by Detective Hayes of the Suffolk County Police but not present on the recovered documents and opined that they were due to dry skin and potentially temporary. Throughout her testimony, Ms. Ensalata made reference only to a report of a comparison she had made in 2008 in preparation for trial. At no point did she disclose that there was in existence a report from 2004, concerning the same fingerprints, which had not been turned over to the defense (A: 1102-1269).  It was later learned

21

that this report from 2004 formed the partial basis for the issuance of a search warrant of appellant's home. This report listed the exact locations on the documents from which the comparison prints had been lifted and contained the names of other suspects whose fingerprints the Suffolk Police had requested to be compared to those on the purchase documents.

<u>Detective Thomas Gabriele</u>

Detective Thomas Gabriele, the People's main law enforcement witness, testified that he has been a detective with the Suffolk County Police Department Identity Theft Unit since April of 2004, and that the Unit's duty is to investigate all identity theft cases in Suffolk County (A: 1271-1272).  He stated that he also knows Lamar Whitehead by the names "Lamor Whitehead" and "Lamor Miller" (A: 1272). He became involved in this investigation on May 5, 2005 after receiving a complaint that Maria Macarle's identity had been used to obtain a loan to purchase a motorcycle (A: 1272-1274).  In response to her complaint, Detective Gabriele interviewed Maria Macarle and then visited Kings Cycles on Utica Avenue

in Brooklyn on June 2, 2005 (A: 1276). Rocco Gargano, the owner of Kings Cycles, gave him a purchase agreement for a motorcycle and a copy of a New York State picture license that had been used to effectuate the purchase of the motorcycle (A: 1278). The picture on the license was not a picture of Maria Macarle but a picture of the People's cooperating witness, Anita Bryant (A: 1281).

In the course of his investigation Gabriele contacted E-Loan, Capital One Auto Finance, Chase Bank, M&T Bank, Commerce Bank and Internet Bank (A: 1285-1286). He contacted these financial institutions pursuant to information he obtained from Maria Macarle when he asked her to identify any activity on her credit report which she did not recognize (A: 1287-1288). He visited Commerce Bank in Brooklyn and received two checks, for which payment had been stopped, from Capital One Auto Finance as well as a Florida driver's license with a picture of Anita Bryant (A: 1289-1293).

Detective Gabriele visited Kings Cycle on June 2, 2005 and he testified that appellant became a known suspect on June 8, 2005 after he

spoke to Police Officer Frank Gallagher who had arrested Mr. Whitehead while he was riding the Kings Cycle motorcycle. (A: 1319-1320). After obtaining the Florida driver's license, Detective Gabriele placed it on Crime Stoppers (A: 1320-1321). Chris Strom responded to the Crime Stoppers information by identifying Anita Bryant and Gabriele interviewed him as a result, leading to the arrest of Anita Bryant (A: 1321). The foregoing testimony was taken on February 28, 2008. Detective Gabriel did not retake the stand and between this date and March 14, 2008 nineteen intervening witnesses testified.

On March 14, 2008 Detective Gabriele returned to testify without re-taking a testimonial oath or being admonished that his previous oath was still in effect (A: 1371).

Detective Gabriele testified that he arrested Mr. Whitehead on January 25, 2006, after surveiling his home on January 23 and 24, 2006 (A: 1397-1401). He stated that at all times Mr. Whitehead was driving a maroon

24

Range Rover with Pennsylvania license plate GFG-2947 (A: 1401; People's Exhibit 96-107).

The detective visited AeroBeep and showed Mr. Taneja a picture of Mr. Whitehead. Taneja did not recognize Mr. Whitehead and Detective Gabriele informed the District Attorney's Office of this. This information had not been turned over to trial counsel. Trial counsel moved for a mistrial on the basis of this Brady violation. Judge Hudson suggested re-calling Mr. Taneja as the appropriate cure for this, which trial counsel declined, arguing that Mr. Taneja would now have had the opportunity to review the testimony of other witnesses, making this an insufficient remedy (A: 1536-1549).

## Verdict and Sentence

The jury rendered its verdict as illustrated below: (A: 1811-1827)

| Indictment Count | Class | Verdict | Identity and Date |
|---|---|---|---|
| 1 - Scheme to Defraud - 1st degree | E Fel. | Guilty | No identity, 9/04-5/05 |
| 2 - Identity Theft - 1st degree | D Fel. | Acquitted | Maria Macarle, 2/15/05 |
| 3 - Identity Theft - 1st degree | D Fel. | Guilty | Maria Macarle, 2/15/05 |
| 4 - Identity Theft - 1st degree | D Fel. | Guilty | Maria Macarle, 2/17/05 |
| 5 - Identity Theft - 3rd degree | A Mis. | Guilty | Maria Macarle, 3/25/05 |
| 6 - Identity Theft - 3rd degree | A Mis. | Acquitted | Maria Macarle, 3/25/05 |
| 7 - Identity Theft - 1st degree | D Fel. | Acquitted | Nerina Sperl, 2/15/05 |
| 8 - Identity Theft - 1st degree | D Fel. | Guilty | Nerina Sperl, 2/15/05 |
| 9 - Identity Theft - 1st degree | D Fel. | Guilty | Nauri Khabieh, 10/14/04 |
| 10 - Grand Larceny - 2nd degree | D Fel. | Guilty | Land Rover of Massapequa, 10/14/04 |
| 11- Identity Theft - 1st degree | D Fel. | Guilty | Joseph Sweeney, 10/13/04 |
| 12 - Identity Theft - 1st degree | D Fel. | Guilty | Joseph Sweeney, 10/13/04 |
| 13 - Identity Theft - 1st degree | D Fel. | Acquitted | Woycieh Wachnik, 10/28/04 |
| 14 - Identity Theft - 1st degree | D Fel. | Guilty | Woycieh Wachnik, 10/13/04 |
| 15 - Identity Theft - 1st degree | D Fel. | Guilty | Woycieh Wachnik, 10/13/04 |
| 16 - Identity Theft - 3rd degree | A Mis. | Guilty | Woycieh Wachnik, 10/14/04 |
| 17 - Identity Theft - 1st degree | D Fel. | Guilty | Briton Lawlor, 10/4/04 |
| 18 - Identity Theft - 1st degree | D Fel. | Guilty | Briton Lawlor, 9/28/04 |
| 19 - Identity Theft - 1st degree | D Fel. | Acquitted | Brian Foley, 10/4/04 |

26

| 20 - Identity Theft - 1st degree | D Fel. | Acquitted | Brian Foley, 9/28/04 |
|---|---|---|---|
| 21 - Identity Theft - 1st degree | D Fel. | Guilty | Brian Smith, 9/28/04 |
| 22 - Identity Theft - 1st degree | D Fel. | Acquitted | Michael Nolan, 9/28/04 |
| 23 - Identity Theft - 1st degree | D Fel. | Acquitted | Michael Nolan, 10/7/04 |
| 24 - Identity Theft - 1st degree | D Fel. | Guilty | Raymond Sperl, 10/18/04 |
| 25 - Identity Theft - 1st degree | D. Fel. | Acquitted | Raymond Sperl, 2/24/05 |
| 26 - Identity Theft - 1st degree | D. Fel. | Acquitted | Gloria Conaty, 2/15/05 |
| 27 - Identity Theft - 1st degree | D Fel. | Guilty | Gloria Conaty, 2/15/05 |
| 28 - Identity Theft - 1st degree | D Fel. | Acquitted | Gerald Thurman, 2/22/05 |
| 29 - Identity Theft - 1st degree | D Fel. | Acquitted | Gerald Thurman, 2/22/05 |
| 30 - Identity Theft - 1st degree | D Fel. | Acquitted | Eric Besso, 10/7/04 |
| 31 - Identity Theft - 1st degree | D Fel. | Acquitted | Brenda Foley, 10/7/04 |
| 32 - Identity Theft - 1st degree | D Fel. | Acquitted | Kathleen March, 10/13/04 |
| 33 - Identity Theft - 1st degree | D Fel. | Acquitted | Thomas Palladino, 10/27/04 |
| 34 - Identity Theft - 1st degree | D Fel. | Acquitted | Michael Tricario, 10/24/04 |

On June 30, 2008, Judge Hudson sentenced Mr. Whitehead to concurrent terms for each count of conviction pertaining to one single identity. For instance, Mr. Whitehead was sentenced to concurrent terms for each count related to the use of Maria Macarle's identity, and concurrent terms for each count related to the use of Wojcieh Wachnik's

identity. These concurrent terms for the counts related to each individual were then run consecutively to the others.   This included ordering consecutive terms for the scheme to defraud, which encompassed all charged conduct and the other counts and ordering consecutive terms for the Identity Theft of Nauri Khabieh and the attempted larceny from Land Rover of Massapequa which had served as one of the elements of the Khabieh identity theft. This resulted in an aggregate sentence of ten to thirty years, which was deemed a sentence of ten to twenty years as a result of the operation of Penal Law §70.30(c).

Post-Trial Motions

Following trial, Mr. Whitehead retained this office to litigate his appeal. Three post-trial motions have been made by appellate counsel. Appellate counsel first moved, pursuant to C.P.L. §440.20(1) to vacate the sentence and for resentencing of Mr. Whitehead. Essentially the court seemingly reverted back to the original 57 count indictment when rendering sentence and referred to the counts as they were enumerated in the original indictment and not as they were enumerated in the paired down document created after the dismissal of counts prior to trial.  As such, the sentence was not in comportment with the verdict sheet or the document upon which Mr. Whitehead was actually tried. It thus appeared as though Mr. Whitehead had been sentenced on acquitted counts. The sentence as imposed and resultant confusion are set forth below (A: 1947-1953):

29

| Indictment Count | Class | Verdict | Sentence |
|---|---|---|---|
| 1 - Scheme to Defraud - 1st degree | E Fel. | Guilty | 1 1/3 to 4 |
| 2 - Identity Theft - 1st degree | D Fel. | Acquitted | |
| 3 - Identity Theft - 1st degree | D Fel. | Guilty | 1 to 3 |
| 4 - Identity Theft - 1st degree | D Fel. | Guilty | 1 to 3 |
| 5 - Identity Theft - 3rd degree | A Mis. | Guilty | Not sentenced |
| 6 - Identity Theft - 3rd degree | A Mis. | Acquitted | 1 year |
| 7 - Identity Theft - 1st degree | D Fel. | Acquitted | |
| 8 - Identity Theft - 1st degree | D Fel. | Guilty | Not sentenced |
| 9 - Identity Theft - 1st degree | D Fel. | Guilty | Not sentenced |
| 10 - Grand Larceny - 2nd degree | D Fel. | Guilty | 1 to 3 for wrong charge of Identity Theft , 1st degree |
| 11 - Identity Theft - 1st degree | D Fel. | Guilty | Not sentenced |
| 12 - Identity Theft - 1st degree | D Fel. | Guilty | 1 to 3 |
| 13 - Identity Theft - 1st degree | D Fel. | Acquitted | |
| 14 - Identity Theft - 1st degree | D Fel. | Guilty | 1 to 3 for wrong charge of Attempted Grand Larceny, 2nd degree |
| 15 - Identity Theft - 1st degree | D Fel. | Guilty | 1 to 3 |
| 16 - Identity Theft - 3rd degree | A Mis. | Guilty | Unauthorized sentence of 1 to 3 |
| 17 - Identity Theft - 1st degree | D Fel. | Guilty | Not sentenced |
| 18 - Identity Theft - 1st degree | D Fel. | Guilty | Not sentenced |
| 19 - Identity Theft - 1st degree | D Fel. | Acquitted | Illegal sentence of 1 to 3 |
| 20 - Identity Theft - 1st degree | D Fel. | Acquitted | Illegal sentence of 1 to 3 |
| 21 - Identity Theft - 1st degree | D Fel. | Guilty | 1 year for wrong charge of Identity Theft, 3rd degree |
| 22 - Identity Theft - 1st degree | D Fel. | Acquitted | Illegal sentence of 1 to 3 |

30

| 23 - Identity Theft - 1st degree | D Fel. | Acquitted | |
|---|---|---|---|
| 24 - Identity Theft - 1st degree | D Fel. | Guilty | 1 to 3 |
| 25 - Identity Theft - 1st degree | D. Fel. | Acquitted | |
| 26 - Identity Theft - 1st degree | D. Fel. | Acquitted | |
| 27 - Identity Theft - 1st degree | D Fel. | Guilty | Not sentenced |
| 28 - Identity Theft - 1st degree | D Fel. | Acquitted | |
| 29 - Identity Theft - 1st degree | D Fel. | Acquitted | |
| 30 - Identity Theft - 1st degree | D Fel. | Acquitted | Illegal sentence of 1 to 3 |
| 31 - Identity Theft - 1st degree | D Fel. | Acquitted | |
| 32 - Identity Theft - 1st degree | D Fel. | Acquitted | |
| 33 - Identity Theft - 1st degree | D Fel. | Acquitted | |
| 34 - Identity Theft - 1st degree | D Fel. | Acquitted | |
| 36 - Identity Theft - 1st degree | D Fel. | No such count considered by jury | Unauthorized sentence of 1 to 3 |
| 42 - Identity Theft - 1st degree | D Fel. | No such count considered by jury | Unauthorized sentence of 1 to 3 |

The motion was denied (A: 1959-1960). Appellate counsel also moved for bail pending appeal for Mr. Whitehead during the lengthy delay in receiving the full trial transcripts, which was denied. Finally, appellant has filed a motion pursuant to C.P.L.§440.10(g) and (h), arguing that the failure to provide Karen Ensalata's 2004 fingerprint analysis report to the defense at trial violated both the Rosario and Brady rules (A: 1963-1976). This

31

motion is currently pending before the Honorable Judge Hudson of Suffolk

County Court.

## POINT ONE

## FILING A FRAUDULENT LOAN APPLICATION WHICH IS THEN DENIED BY THE LENDING INSTITUTION DOES NOT CONSTITUTE ATTEMPTED GRAND LARCENY

Appellant was convicted on nine counts of Identity Theft in the First

Degree (P.L. §190.80(3)) which requires that a defendant be found to have

committed or to have attempted to commit a Class D level felony or higher

using the identity of another. [8] In the instant case, the felony alleged for

each count of the indictment was Grand Larceny and Attempted Grand

Larceny in the third degree. As to Counts 4, 8, 12, 14, 17, 18, 21, 24, and 27,

the class D felony alleged was Attempted Grand Larceny, and the conduct

underlying this charge, as evidenced both by the facts adduced at trial and

by the trial court's charge to the jury, was the filing of an application for a

loan while assuming the identity of another.[9]  The charge of "attempt" as

---

[8]   A person is guilty of identity theft in the first degree when he or she knowingly and with intent to defraud assumes the identity of another person by presenting himself or herself as that other person, or by acting as that other person or by using personal identifying information of that other person, and thereby:
(3)commits or attempts to commit a class D felony or higher level crime or acts as an accessory in the commission of a class D or higher level felony.
[9] In its charge to the jury in this regard, the Court stated:
One of these elements is the commission of a separate crime, either grand larceny in the third

33

opposed to the completed crime was predicated upon the denial of the application which of course prevented the receipt of the funds and/or products for which the funds would have been used to procure. Appellant respectfully submits that this evidence falls short of the requisite "dangerous proximity" requirement necessary to establish an attempt to commit a crime and that, as such, the convictions on Counts 4, 8, 12, 14, 17, 18, 21, 24, and 27 must be reversed.  Appellant further contends there can be no finding of an attempt to commit a crime where the crime itself – in this case the obtaining of a vehicle or a fraudulent loan - was rendered impossible due to the denial of the loan application.

In order to establish an attempt to commit a crime, New York State requires that an individual bring a plan to commit a crime to within

---

degree or attempted grand larceny in the third degree. So you would have to find the defendant guilty of a separate crime, with all of its elements, as one of the elements of identity theft in the first degree under these counts. The reason I emphasize this to you is so you understand that in regards to these counts, 3, 4, 7, 8, 9, 12, 13, 14, and 17 through 34, the crime of grand larceny in the third degree and/or attempted grand larceny in the third degree, is subsumed or contained within the charge of identity theft in the first degree, that your ultimate finding of guilty or not guilty will address identity theft in the first degree. The verdict sheet with which you'll be provided will not have a separate column to reflect your finding for grand larceny in the third degree, or attempted grand larceny in the third degree under Counts 3, 4, 7, 8, 9, 12, 13, 14, and 17 through 34, because it is only an element of identity theft in the first degree.

34

"dangerous proximity" of completion thereof (See e.g., <u>People v. Warren</u>, 66 N.Y.2d 831, at 832 (1985)).[10] This definition of an "attempt" follows that delineated in a series of cases beginning with, <u>People v. Rizzo</u>, 246 N.Y 334 (1927) in which the Court of Appeals held that a group of armed men driving around an area of New York City looking for, but failing to find a particular individual in order to rob him, could not be convicted of attempted robbery because their conduct had not come sufficiently near the completion of the crime. The Court of Appeals classified these actions as *preparation to commit the crime* however insufficient to constitute an attempt within the law.   We respectfully submit that in the case at bar, the filing of an application alone is nothing more than preparatory and thus cannot suffice to establish an attempt.

The method of theft underlying the charge of Attempted Grand Larceny in the Third Degree was complex and required several steps for

---

[10] This standard is at variance with the less demanding federal standard.  In the Federal system or in jurisdictions that have adopted the standard for attempts found in the Model Penal Code, an overt act carried out with the intent to commit a crime is sufficient to establish an attempt.

completion. As the alleged thefts involved the procurement of loans to purchase items, an application was first required for the credit and for the loan. This application had to be preliminarily approved by the financial institution. The financial institution then had to make a more thorough review of the application, at which time additional documentation from the purchaser would be required. The financial institution next had to make a final determination of credit-worthiness. The financial institution then had to issue a check which could then be presented to a vehicle dealership or individual selling a vehicle. This check then had to be accepted by the seller, and then a final review of the loan was necessary prior to its being funded. To be clear, even the initial approval of the credit application was by no means sufficient to effectuate the completion of the theft. Finally, the vehicle had to actually be provided or the funds had to actually be transferred (A: 532-548, 549-609, 657-675, 680-722). In this case, however, on the counts of conviction herein challenged, the applications were denied thus foreclosing the commission of the substantive crime or an attempt to

36

commit same and illustrating the preparatory nature of the act itself.

Specifically, with respect to Count 8, Kevin Lee of Capital One testified that the loan made in the name of Nerina Sperl was approved and then denied with a follow-up letter (A: 570). No check or other instrument capable of being used to procure a vehicle was provided. As to Count 17 or 18, James Eriksen testified that the loan application made to M&T Bank in the name of Briton Lawlor had been denied. (A: 670). He further testified that the loan application in the name of Brian Smith, the basis for Mr. Whitehead's conviction on Count 21, was denied (A: 675). As to Count 3, Nancy Carraveo testified that the E-loan application made in the name of Maria Macarle had been denied (A: 714). She also stated that the loan application in the name of Gloria Conaty, the basis of Mr. Whitehead's conviction on Count 27, had been denied. Ms. Carraveo also testified that the loan application in the name of Nerina Sperl was denied, but this apparently was the basis of Mr. Whitehead's acquittal on Count 7. She likewise testified that the loan application in the name of Raymond Sperl

[Counts 24 and 25] had been denied (A: 715-716).  Kevin Lee, who had testified regarding the loan to Nerina Sperl, also testified as to an application in the name of Gloria Conaty, which was apparently the basis for the acquittal on Count 26 (A: 570).

We respectfully submit that the denial of these applications prevented appellant from coming sufficiently close in time and proximity to committing the crime of Grand Larceny in the Third Degree to sustain the convictions which ensued. Rather, appellant's conduct is analogous to the preparatory steps taken in the cases herein cited and was thus insufficient to sustain the convictions in issue. Indeed, while the acts proven may be categorized as overt acts towards the ultimate commission of the crime, they do not, as required by New York Law, place the actor at the precipice of the commission of the crime.

In People v. Warren, supra, 66 N.Y.2d, at 832, the Court of Appeals found that the defendant's conduct of bringing additional cash to a meeting with an undercover, who had himself brought additional cocaine

for the defendant to buy, and the further conduct of the defendant agreeing to purchase the cocaine, was not sufficient to establish an attempt to possess the cocaine because the transaction was to be consummated at a different time and location. In People v. Chanowitz, 298 A.D.2d 767 (3rd Dept. 2002), the Appellate Division held that rigging a noose, covering the windows of a garage, blindfolding an intended murder victim and leading her to the garage where the murder was intended to be committed were acts that constituted preparation to commit murder but were not sufficient to establish an attempt. It was only once the defendant actually placed the noose around the neck of the intended victim that the defendant had come sufficiently close to committing murder such that his actions could be classified as an attempt (id.). In People v Horner, 300 A.D.2d 841 (3rd Dept. 2002) the Court held that a request that a minor pose nude in order to allow an adult to take pictures of him constituted mere preparation for the crime of use of a minor in a sexual performance and did not rise to the level of an attempt. In People v. Sanoguet, 157 Misc.2d 771 (Supr. Ct. Bronx

County, 1993) the defendant had attempted to bribe an official to commit a crime, but the official had refused to accept the bribe. The question for the Court was whether that conduct constituted an attempt to bribe only, or whether it could have been found to have also constituted an attempt to commit the crime being paid for. The Court found that because the official refused to accept the bribe, the briber was prevented from reaching the point of dangerous proximity to completing the offense required to constitute an attempt.

These cases all involve conduct clearly committed in furtherance of an unmistakable and identifiable criminal goal and yet were determined to be preparatory only. Likewise in the case at bar, while applications were submitted, this conducted was the first step after the procurement of the identity towards the ultimate goal of receiving the stolen goods. As this conduct is far removed both logistically and temporally from the actual commission of the theft, the submitting of the applications in this case was preparatory and insufficient to establish an attempt to commit grand

40

larceny.[11]

Separate and distinct from the preparatory classification of the conduct herein, the denial of the applications rendered the ultimate larceny impossible thus precluding a legal finding of an attempt.

Based upon the foregoing, and viewing the evidence in the light most favorable to the People, as we must, <u>People. v. Contes</u>, 60 N.Y.2d 620 (1983) the evidence presented with respect to Counts 4, 8, 12, 14, 17, 18, 21, 24, and 27 was insufficient to sustain the convictions for the crime of Attempted Grand Larceny in the First Degree.[12]

---

[11] This Court does not need to decide at what point in that process the defendant would actually be deemed to be within dangerous proximity to committing the larceny, but rather only that the filing of the application and the denial thereof are certainly not sufficient.

[12] Indeed, Mr. Whitehead could only have been convicted of Identity Theft in the Third Degree. At the time the loan applications were filed, Mr. Whitehead could have been found to have committed the crime of False Impersonation in the Second Degree, but without further action on his part, he could not be found to have committed Attempted Grand Larceny in any degree.

# POINT TWO

## IT IS IMPOSSIBLE ON THIS RECORD TO ASCERTAIN WHETHER THE JURY REACHED A UNANIMOUS VERDICT CONCERNING THE SAME CONDUCT FOR SEVERAL COUNTS

The indictment pursuant to which appellant was tried contained numerous counts which were differentiated only by their dates. These dates were extremely close to one another and were couched as approximate dates using the language "on or about." For example, Counts 3 and 4 of Indictment I539-07#2 allege that the defendant committed acts constituting identity theft "on or about February 15, 2005" and "on or about February 17, 2005" respectively. In addition, many of the counts of the indictment were differentiated only by a statement that the conduct in the count was "other than as alleged in [the prior count]." For example Counts 5 and 6 of Indictment I539-07#2 are differentiated only by the insertion of the words "other than as alleged in Count 5 of this Indictment" into Count 6. In the jury charge, the trial court grouped together all offenses charged under any given section of the Penal Law and defined the elements

42

necessary to establish a violation of that section, but, like the indictment, provided no information which could have been used to differentiate between charges with overlapping dates and conduct. As such it is impossible to determine the unanimity or lack thereof as to these counts as determined by the jury on the record before the court.

While an indictment need not contain an exhaustive recitation of facts explaining each count charged therein, an indictment must provide sufficient information to apprise the defendant of the conduct for which he is being charged in each count. (see C.P.L. §200.50(7)) This serves several purposes, all of which are frustrated here. First, the indictment must allow a defendant a reasonable opportunity to prepare his defense with knowledge of that which he stands accused. Second, an indictment must contain sufficient information to demonstrate that a defendant is tried only for the conduct for which the grand jury indicted him. Third, an indictment must provide information sufficient for a defendant to demonstrate that he has already been tried for particular conduct in order to serve as a bar to a

43

second prosecution for that conduct (See C.P.L. §200.50; <u>People v. Sanchez</u>, 84 N.Y.2d 440, 445). Fourth, and most pertinent here, the indictment must provide information which will allow appellate review of a conviction should one be obtained (See, <u>People v. George</u>, 255 A.D.2d 881 (4th Dept. 1998); <u>People v. Archer</u>, 238 A.D.2d 183 (1st Dept. 1997); <u>People v. Garcia</u>, 186 A.D.2d 221 (2nd Dept. 1992))

With respect to the jury charge as it can be relied upon to further clarify any ambiguity from a charging instrument while C.P.L. §300.10 does not require a judge to marshal evidence, it does require a judge to provide a charge to the jury that will allow them to apply the law to the facts as they relate to each charge in an indictment. This serves the purpose of ensuring that, where the jury reaches a unanimous verdict as to a given count, there is certainty that the verdict is being reached with all of the jurors considering the same conduct. This requirement also, like the requirement that an indictment contain sufficient information to differentiate its counts, serves the purpose of allowing meaningful

appellate review of a conviction should one be obtained.

The facts alleged in this case were that the defendant had filed online applications for vehicle loans and person to person loans using the identities of other people. The online loan applications were submitted to Chase, M&T Bank, Capital One Auto Finance and E-Loan. While the multiple counts charging the defendant with assuming a specific identity were presumably different in that they refer to applications to different banks, this is not reflected in the indictment, verdict sheet or jury charge. Based upon the indictment, verdict sheet or the jury charge, there is no means with which to determine whether the jury unanimously found that the defendant had attempted to defraud Bank A but did not unanimously find that he had attempted to defraud Bank B or vice versa. This creates the possibility that some jurors found that he had attempted to defraud Bank A while others found he had attempted to defraud Bank B, but they had all voted to convict on one count. For instance, there is no way to be sure from the record that Mr. Whitehead's conviction on Count 27 was the result of

six jurors believing he was guilty of filing a fraudulent application with Capital One Bank in the name of Gloria Conaty while the other six jurors believed him to have fraudulently filed an application with E-loan in her name. Because Mr. Whitehead was both convicted (under Count 27) and acquitted (under Count 26) of the identity theft of Gloria Conaty on February 15, 2005 some means of differentiating these counts in the minds of the jurors was necessary and yet not provided.

This places the defendant in exactly the same position as the defendant in People v. Archer, 238 A.D.2d 183 (1st Dept. 1997), in which a defendant was tried for three counts of weapon possession, related to three guns, and convicted on one count only. In that case, the Appellate Division held that on the record, there was no means of determining whether or not all twelve jurors had unanimously found the defendant guilty of possessing any one of the guns. Instead, due to the possibility that the jurors had been considering different guns as the basis of their findings, the Appellate Division reversed the conviction. The Appellate Division, Fourth

Department reached a similar conclusion in <u>People v. George</u>, 255 A.D.2d 881 (4th Dept. 1998), in which evidence was presented regarding two rapes occurring on one day, but the indictment only charged the defendant with one. The Appellate Division once again held that where there is no indication as to which conduct served as the basis of the jury's finding the defendant guilty, the conviction must be overturned.

The Second Department has established comparable case-law. In <u>People v. Garcia</u>, 186 A.D.2d 221 (2nd Dept. 1992), the Appellate Division, Second Department held that where meaningful appellate review of a conviction was impossible due to a lack of specificity in the counts charged the reversal of a conviction was warranted. In <u>Garcia</u>, the defendant had been charged with numerous counts of sexual abuse. The defendant in <u>Garcia</u> was found guilty of six counts of sexual abuse and acquitted of fourteen others. The counts had never been linked sequentially or in any other way that would allow an appellate court to identify which charged conduct had formed the basis of the guilty verdicts and which charged

47

conduct had been the subject of the acquittals. As a result of this, the six counts for which the defendant had been convicted were dismissed.

In the instant case, the defendant was charged with thirty two counts related to identity theft. The counts were differentiated by approximate dates and by the names of the individuals whose identities were allegedly assumed, but the counts were never differentiated either sequentially or by reference to the face amounts of the requested loans or the banks to which applications were made. Indeed Counts 7 and 8 do not even have this degree of differentiation as they allege conduct on the same date with the same identity allegedly assumed.

With respect to Counts 5 and 6, 7 and 8, and 26 and 27, no differentiation was made whatsoever.   In each of these counts, Mr. Whitehead was accused of committing identity theft by assuming an individual's identity on a particular date.  For counts 5 and 6, the identity stolen was that of Maria Marcale and the date for both counts was March 25, 2005, a date which did not correspond exactly to any application filed.

Mr. Whitehead was convicted on Count 5 but acquitted on Count 6.   On counts 7 and 8, the identity assumed was that of Nerina Sperl on February 15, 2005.   Again there was a conviction on Count 8 and an acquittal of count 7.   For counts 26 and 27 the victim Gloria Conaty and the date was February 15, 2005 and the jury convicted on Count 27 and acquitted on Count 26.   There is no way to discern which conduct Mr. Whitehead was convicted of or acquitted of based upon this record. There is simply no way that meaningful appellate review is possible where, as in this case, the named victim and approximate date do not vary within the two counts. The indictment and the jury charge upon which this jury relied in connecting the evidence adduced at trial to the charges were entirely bereft of any guidance as to what conduct specifically applied to the separate counts charged. This brings the instant case exactly within the holding in Garcia, *supra*, and thus merits a reversal of his conviction on the referenced counts.

The People may claim that any lack of specificity and direction for the jury and this Court upon review was cured by the prosecutor's summation. We respectfully disagree. A prosecutor's summation is not evidence.  It cannot be relied upon as such.   A jury must rely on the evidence adduced at trial in conjunction with a court's instructions as to how to apply which facts to the law.  In this case, given the dearth of any specificity contained in the charges themselves, absent an instruction with respect to each count and the allegations of proof related thereto, meaningful appellate review is not possible.

## POINT THREE

## TESTIMONY OF A COMPETENT WITNESS OVER THE AGE OF TWELVE WAS RECEIVED WITHOUT GIVING THE DEFENDANT THE SAFEGUARD OF A TESTIMONIAL OATH

The defense contends that the failure to either swear in Detective Gabriele after an over two week break between his testimony, or to admonish him that he remained under oath, violated due process and therefore constituted reversible error.

C.P.L. §60.20 requires that any competent witness over the age of twelve be sworn prior to testifying. The Appellate Division, Second Department, has held that the receipt of unsworn testimony is violative of due process (See, People v. Copeland, 70 A.D.2d 884 (2nd Dept. 1979)), and grounds for an automatic reversal of a conviction. (See, People v. Peters, 71 A.D.2d 641 (2nd Dept. 1979)(the receipt of unsworn testimony would have been grounds for an automatic reversal, though a corrected version of the record in that case established the witness was sworn in)(See also, Hecht v. Managhan, 307 N.Y. 461 (1958)(the lack of an oath in a license proceeding

indicated a lack of due process safeguards); <u>People v. Vasquez</u>, 464 N.Y.S.2d 685 (Sup. Ct. New York Co., 1984) (holding that failure to swear in a witness at a Grand Jury proceeding required dismissal of the indictment).

Requiring a witness to swear an oath prior to giving testimony serves two purposes: to highlight the moral duty to tell the truth and to enable the sanction of a perjury prosecution should the witness testify falsely (See, <u>People v. Copeland</u>, supra). Neither of these functions is adequately served by having a witness take an oath on a different date without admonishing the witness that he remains under oath. A witness obviously cannot be reminded of a moral duty by an oath that is not taken. Less obviously, a witness would have a defense to a perjury prosecution relating to any false statement made without such an admonition. Certainly the witness would have a colorable argument that any statement made without an admonition was not a statement made under oath within the meaning of Penal Law §120.00 et seq.

52

In the case at bar, Detective Thomas Gabriele concluded his initial testimony on February 28, 2008. Over the following two and a half weeks, the jury heard from 19 witnesses and on the morning of March 14, 2008 Detective Gabriele testified without being sworn in and without being admonished that he remained under oath, notwithstanding the hiatus between his previous testimony and that of March 14, 2008 (A: 1371). We submit that under these circumstances, the testimony received on the morning of March 14, 2008 was clearly unsworn testimony and that this was an undeniable violation of §60.20 and due process. Stated simply, there was no oath or admonition given to Detective Gabriele on the morning of March 14, 2008 which could have served the required purposes of a testimonial oath. Any subsequent admonitions that the witness remained under oath from his prior testimony would thus be rendered meaningless.

As the purposes of requiring a testimonial oath were frustrated here, the testimony of Detective Gabriele on March 14, 2008 should be held to be unsworn testimony requiring reversal of the instant convictions.

## POINT FOUR

## MR. WHITEHEAD'S TRIAL WAS PREJUDICED BY THE IMPROPER ADMISSION OF OTHER CRIMES EVIDENCE AND THE DENIAL OF BRADY MATERIAL

Evidence concerning several uncharged crimes was received in this case. While the jury was given a general limiting instruction at the end of the case on the uses for which it could consider evidence of uncharged crimes (A: 1718) no such instruction was given contemporaneously with the admission of this evidence. Additionally in the court's final jury charge, the specific evidence, which was plentiful and manifestly prejudicial, was not identified and segregated for the separate uses it was admitted.  As such, this evidence variously interspersed with evidence admitted for its truth, was not properly identified and its use appropriately limited.

The Molineux Evidence

At this trial, the court permitted the introduction of evidence of uncharged crimes of fraudulent activity allegedly committed by Mr. Whitehead.   This evidence was objected to as propensity evidence,

54

however the court permitted same under varying theories (A: 1955-1958). We respectfully submit that there can be no reasonable assurance that this evidence, interwoven into a multi week trial with dozens of witnesses and exhibits, was not used improperly by the jury in its deliberations.

Katherine Reid was not a victim in a charged count.  Documents with that name were purportedly in Mr. Whitehead's possession and a voice mail on Aero-Beep claimed to have been Katherine Reid. Ms. Reid was permitted to identify these documents and to testify that she had not granted anyone permission to use her identity, despite the fact that no means of indentifying her as this particular Katherine Reid as presented (A: 278-280).   No instruction was given at the time of her testimony that this was an uncharged crime admitted for a purpose other than propensity, to wit, common scheme or plan. As such, this jury clearly would have considered this as substantive proof as to the commission of the crimes charged, one of which was the scheme to defraud.[13] Furthermore, her

---

[13] This is an important distinction.  While the People may claim that since Reid was not a victim as to any substantive count, the jury could not have considered her testimony as evidence

55

testimony that her information was present on documents *in the process of being altered* tended to show an anticipated future crime, again an impermissible purpose. Trial counsel vigorously objected to the admission of Katherine Reid's testimony, as there really could be no other purpose other than to show the defendant's propensity to commit fraud (People v. Resek, 3 N.Y. 3d 385 (2004)).

Similarly, Brenda Ridenour was not a victim of any charged offense. Ms. Ridenour's only connection to this case was that she was the ex-wife of a purported seller in a person to person transaction charged as fraudulent in the indictment and an email address similar to her name was found in a file recovered from Mr. Whitehead's alleged computer (A: 1978). Ms. Ridenour testified that she had never given anyone permission to use her identity in the same manner that the named victims and purported sellers in person-to-person transactions testified (A: 276-277). A rational juror presented with Ms. Ridenour's testimony would most likely have come to

---

of a charged count. The Scheme to Defraud charged in Count One, however, is anonymous and this evidence most certainly would have been considered by the jury as substantive evidence on

56

believe that she was either the victim or the purported seller in an additional, uncharged identity theft. Again no limiting instruction was given at the time of the introduction of this evidence. Furthermore, given the sheer volume of evidence presented in this case, jurors may well have been confused to the point that they believed her identity had somehow been involved in one of the charged identity thefts given her ex-husband's name.

In addition, the People repeatedly elicited information concerning redacted portions of People's Exhibit 109, a piece of paper recovered from Mr. Whitehead's home containing the name, date of birth and Social Security number of Anita Bryant. This occurred despite the trial court's ruling that the material was to be redacted pursuant to <u>People v. Molineux</u>, 168 N.Y. 264 (1901) and despite the court's admonitions to avoid questioning witnesses regarding the redacted materials (A: 970-978). This <u>Molineux</u> ruling was based on the premise that the jurors would likely believe that Mr. Whitehead's possession of a paper containing Anita

this count absent a limiting instruction.

Bryant's name, address and Social Security number meant that he had used, or was about to use, Ms. Bryant's identity in a fraudulent manner (A: 970-978). Again, no curative instruction was given concerning this evidence and here, with Ms. Bryant's status as an accomplice, this testimony was surely considered as evidence of guilt on the substantive counts of fraud.

In its jury charge, the trial court recited that evidence of uncharged crimes had been presented, but in no way identified what that evidence was in its limiting instruction (A: 1718). The jury was thereby left to speculate as to which evidence had been admitted for all purposes and what evidence had been admitted for the limited purpose of showing a common scheme or plan or any other non propensity related purpose.

Pursuant to Molineux, evidence of uncharged crimes may only be presented to prove, *inter alia*, method or modus operandi, intent or lack of mistake, identification or a common scheme or plan (Id.). None of these purposes were served by the admission of testimony concerning Ms. Reid's credit status or permission to use her identity, nor the comparable

testimony of Ms. Ridenour or the testimony as to Mr. Whitehead's possession of Ms. Bryant's information. Accordingly, the admission of all of this evidence was improper. Even if this Court were to however find the admission of this evidence was proper, the lack of a contemporaneous limiting instruction left the jury with no guidance whatsoever as to the proper purpose for which this evidence was admitted and could thus be considered. The final jury charge was no more informative as it simply defined evidence of uncharged crimes but did not specify what that evidence was. We submit that the evidence was clearly prejudicial as it did nothing more than provide the jury with evidence of Mr. Whitehead's propensity to commit fraud and the lack of adequate jury instructions vitiated any proper purpose propounded to support its introduction.

Improper Testimony Received

Detective Gabriele testified that Mr. Whitehead is known by the "street name" of "LaLa" (A: 1272). Jurors may have inferred that Mr. Whitehead was a participant in illicit activities from the fact that he had a

59

"street name," particularly as this case was tried in a suburban county in which most law-abiding citizens do not have a "street name." While Judge Hudson struck this testimony upon objection of trial counsel, the presentation of this information to the jury added to the prejudice he faced.

Detective Gabriele testified, while not under oath, regarding why he allowed Valerie Rodriguez to enter into a proffer agreement and stated that the purpose of a proffer agreement is to obtain truthful testimony. Defense counsel objected to this testimony and the trial court overruled this objection on the basis that Detective Gabriele was referring to the text of the proffer agreement, which the court had assumed was in standard form. However, upon being informed that reference to truthful testimony was not included in the text of the agreement, the Court reversed itself and issued a cautionary instruction to the jury. While juries may be presumed to follow such instructions, this further prejudiced Mr. Whitehead's trial by impermissibly bolstering the testimony of a key prosecution witness (A: 1385-1392).

60

Brady Violation

While cross-examining Detective Gabriele, trial counsel elicited the fact that Mr. Whitehead's picture had been shown to Kris Taneja of Aero-Beep who had been unable to identify him, and that Detective Gabriele had shared this information with the District Attorney's Office. This information had never been provided to the defense. The inability of a witness to identify a defendant is potentially exculpatory material which the prosecution has an obligation to provide to the defense. The trial court's proposed remedy for what it acknowledged was a Brady violation of recalling Mr. Taneja was rejected by the defense. At this late stage, additional cross-examination would not have cured the violation or ensuing prejudice (A: 1536-1549).

During Detective Gabriele's testimony several exhibits were also admitted despite the People having withdrawn a previous application to

61

admit them.  Judge Hudson declined to rule on the admissibility of these exhibits after the People offered to withdraw these exhibits (People's Exhibits 203 through 210) from evidence and use them for summation only (A: 1979-1984). However, Detective Gabriele was subsequently the source for the admission of People's Exhibits 205, 206, 207, 208 and 209 over objection of trial counsel(A: 1442-1468). The exhibits in issue contained information not contained on the admitted exhibits from which the information was purportedly culled. Indeed, in these exhibits a phone line was identified as "Lamar Whitehead's Cell Phone" which was a conclusion which the People asserted other evidence supported. These exhibits were thus mistakenly admitted for the truth of their entire contents whereas no such conclusion was properly set forth on the record. In short, these were demonstrative exhibits which could have, had a proper foundation been submitted, been used for summation, as information contained thereon constituted argument.

Trial counsel raised a hearsay objection to the admission of computer

records. The trial court asked the People not to respond, and reserved decision until the court had an opportunity to research the matter independently (A: 1985-1986). Trial court never ultimately ruled on this objection, but the evidence from the computer was eventually admitted. This computer was seized during the search of appellant's home pursuant to a search warrant which trial counsel was not given the opportunity to properly controvert.

## POINT FIVE

## THE JURY RECEIVED AN IMPROPER JURY INSTRUCTION AS TO GRAND LARCENY IN THE SECOND DEGREE

During its charge to the jury, the court defined Grand Larceny in the Second Degree in order to charge the jury regarding Count 10, a charge of Attempted Grand Larceny in the Second Degree. However, the court then informed the jury that if it found all of the elements of Grand Larceny in the Second Degree, it should convict him of Grand Larceny in the Second Degree as opposed to Attempted Grand Larceny in the Second Degree (A: 1758-1759).  This was not the charge in Count 10 and the jury was thus not properly charged as to this count. (See, U.S. v. Wozniak, 126 F.3d 105 (2nd Cir. 1997))

<u>POINT SIX</u>

AN IMPROPER NOTATION OF STATUTORY ELEMENTS WAS
PRESENTED ON THE VERDICT SHEET

Count 10 also contained an improper notation on the verdict sheet.
The New York Court of Appeals has held that " unless the parties agree, it
is reversible error for a trial court to give the jury a verdict sheet that, in
addition to listing the counts, also lists some of the statutory elements of
the counts." (<u>People v. Spivey</u>, 81 N.Y.2d 356 at 361(1993))(See also, <u>People</u>
<u>v. Kelly</u>, 76 N.Y.2d 1013 (1990) Here, Judge Hudson's listing of the element
that Mr. Whitehead must have attempted to take or withhold property was
just such a listing of an element of a crime on the verdict sheet and merits
reversal.

It is axiomatic that even where no particular error in a trial is
sufficient to warrant the reversal of a conviction, an accumulation of errors
must at some point be considered so prejudicial that the trial cannot be
considered fair (<u>People v. Dowdell</u>, 88 A.D.2d 239 (1st Dept. 1982), <u>People v.</u>

<u>Wlasiuk</u>, 32 A.D.3d 674 (3rd Dept. 2006), <u>People v. Sayers</u>, 64 A.D.3d 728 (2nd Dept. 2009).   We respectfully submit that the errors cited in Points Four through Six above, both singularly and cumulatively deprived appellant of a fair trial.

## POINT SEVEN

## MR. WHITEHEAD WAS SENTENCED TO CONSECUTIVE TERMS FOR COUNTS WHICH RELATED TO THE SAME CONDUCT

Penal Law §70.25(2) provides that sentences must run concurrently for convictions arising from a "single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other." In the case at bar, Mr. Whitehead was sentenced to consecutive terms for the fraudulent use of Nauri Khabieh's identity and for attempting to obtain a vehicle in his name from Land Rover of Massapequa, Counts 9 and 10. The attempt to procure a vehicle from Land Rover of Massapequa was the "attempt to commit a Class D felony or higher level crime," which was one of the elements to support appellant's conviction for the identity theft of Nauri Khabieh. Accordingly, concurrent sentences are required for these counts and we respectfully submit that the imposition of consecutive sentences on these counts was error.

Similarly, Mr. Whitehead was sentenced to consecutive terms for all other sentences for his conviction on Count One, Scheme to Defraud. However, the other charged conduct formed the basis of the scheme to defraud conviction. During summation and jury charges, the scheme to defraud was always referred to as encompassing the entire charged conduct. Judge Hudson specifically charged the scheme to defraud as a course of conduct in Suffolk County from September 2004 to March 2005 thus including all other charged conduct within this count (A: 1732-1734). A concurrent sentence is thus necessary for this count as well. (See, <u>People v. D'Anna</u> 163 A.D.2d 810 (4th Dept. 1990))

POINT EIGHT

MR. WHITEHEAD RECEIVED AN ILLEGAL SENTENCE IN THAT
THE COUNTS OF SENTENCING DID NOT COMPORT TO THE
COUNTS OF CONVICTION

As raised previously in a C.P.L. §440.20 motion (A: 1947-1953), Mr.

Whitehead was sentenced on counts which were not counts of conviction,

and Mr. Whitehead was not sentenced on certain counts of conviction. It is

axiomatic that an individual must be sentenced for the crimes for which he

has been found guilty and must not be sentenced for crimes of which he

has been found not guilty.

A case must be remanded for resentencing where the sentencing

court has failed to render a proper sentence upon each particular count.

People v. Sturgis, 69 N.Y.2d 816 (1987); People v. Mohammed 126 A.D.2d

673, 511 N.Y.S.2d 99 (2d  Dept. 1987). In the case at bar, while the court in

rendering sentence seemingly reverted back to the original indictment

containing 57 counts, the simple fact remains that appellant was tried upon

an indictment containing 34 counts and this was the document upon which

the verdict sheet provided to the jury was predicated. The sentence rendered did not comport with this verdict sheet or the manner in which the evidence was presented and argued. As such, the sentence must be corrected.

## POINT NINE

### THE SENTENCE IMPOSED WAS EXCESSIVE AND IS TANTAMOUNT TO CRUEL AND UNUSUAL PUNISHMENT

Appellant was sentenced to consecutive sentences with respect to all the transactions for which he was convicted. This was a sentence of 10-30 years in prison, which by operation of law is a 10-20 year sentence. This is despite the fact that appellant is a first time felony offender, had little prior contact with the criminal justice system, had strong community ties and a family to support and was offered significantly lower sentences prior to the commencement of trial (of one and a third to four years) and during jury deliberations (of one year).

This court has the power to reduce a sentence that it finds unduly harsh or excessive (Criminal Procedure Law Section 450.15(3); <u>People v. Discala</u>, 45 N.Y.2d 38 (1978)).   Appellant acknowledges that, absent extraordinary circumstances, the Appellate Division generally does not interfere with the discretion of the trial court.   It is also well-established

71

that the determination of what constitutes an appropriate sentence is a matter resting within the discretion of the trial court, and should not be altered unless there is an abuse of discretion (People v. Pedrazza, 66 N.Y.2d 626 (1985); People v. Smith, 141 A.D.2d 988 (3rd Dept. 1988); People v. Cosgrove, 102 A.D.2d 947 (3rd Dept. 1984).

Nevertheless, in arriving at an appropriate sentence, justice generally requires consideration of more than the particular acts by which the crime was committed. The sentencing court should take into account the circumstances of the offense together with the character and propensities of the offender (People v. Gittleson, 25 A.D.2d 265 (1st Dept. 1966)), *aff'd* 18 N.Y.2d 427 (1966); People v. Burghardt, 17 A.D.2d 912 (4th Dept. 1962), People v. Artuso, 87 A.D.2d 873 (2nd Dept. 1982), People v. Richard, 65 A.D.2d 595 (2nd Dept. 1978), .

In weighing the factors that are relevant to a just sentence, a trial court should strive to fit the punishment not to an intractable schedule, but rather to the individual crime and criminal within a flexible, yet carefully

tailored, set of guidelines People v. Gerstenfeld, 14 A.D.2d 517 (1st Dept. 1961). Ideally, in comporting a sentence to an individual situation, many factors must be considered. These include the nature and gravity of the offense, the need to deter others from committing similar crimes, and the chances of rehabilitation of a particular defendant (People v. Gittleson, supra at 272; People v. Burghardt, supra), People v. Scafo, 77 A.D.2d 668 (2nd Dept. 1980).

As a general principle, a sentencing court should be guided by the four objectives for punishment: deterrence, rehabilitation, retribution and isolation. People v. Notey, 72 A.D.2d 279 (2d Dept. 1980); see also People v. Burghardt, supra. In addition, a court should explore and consider the temperament, mental and physical condition, past social history, and economic circumstances of a convicted defendant (See, Criminal Procedure Law Sections 390.30 and 390.50). Moreover, a sentencing court should consider the harm caused or contemplated by a defendant, any excuse or provocation, the possibility of restitution, a defendant's prior criminal

history, the likelihood of recurrence and whether or not imprisonment would result in excessive hardship. Finally, the court must take into consideration the nature of the crime committed, the proof on which the defendant was convicted, and the degree of his participation or involvement in the crime (People v. Burghardt, *supra)*, People v. Maggio, 114 A.D.2d 522 (2nd Dept. 1985).

In the present case, appellant was sentenced to a term of 10-30 years in prison on his conviction for Scheme to Defraud and several separate instances of fraudulent transactions and attempted transactions. The highest degree of felony conviction was for a class D felony. None of the convictions was for a violent crime.

Appellant now asserts that the trial court failed to consider all of the relevant factors prior to sentencing him to an aggregate sentence of 10-30 years state prison for his role in the offenses for which he was convicted. Indeed, the jury acquitted the appellant of several counts charged, some of which were equal to the counts of conviction. Nevertheless, the trial court

74

sentenced him in a fashion that gave no deference to these acquittals, imposing a sentence of up to thirty years in prison which was reduced only by operation of law to 10-20 years. In so doing, it is respectfully submitted that the Court failed to consider the necessary and relevant factors, and instead punished appellant for exercising his right to proceed to trial.

While we in no way detract from the seriousness of the offenses, appellant was not charged or convicted of any violent crimes (cf. Maggio, supra, Richard, supra). His were crimes of larceny which while meriting adequate punishment, did not, in light of appellant's history and personal circumstances, warrant a decades long sentence. Indeed the total amount of restitution ordered in this case was $120,000.00 (A: 1861). Moreover, appellant's sparse criminal history is devoid of any acts of genuine violence. Mr. Whitehead's personal history and circumstances and other mitigating factors warranted consideration by the court were instead swept aside in the pursuit of retribution, the only goal of punishment intended to be served by this sentence.

Indeed, as the sentencing court observed, after Mr. Whitehead was released on bail he was respectful and always appeared as directed (A: 1890-1891). Mr. Whitehead's mother submitted a letter to the court prior to sentencing attesting to her son's importance to her. The court noted that Mr. Whitehead's wife stood by him and that he has a "young son who needs his father" and stated that this "weigh[ed] upon [the court]" (A: 1706). Mr. Whitehead's own father was killed by police officers when Mr. Whitehead was an infant. Mr. Whitehead had become an ordained minister and had performed volunteer work at local churches and schools. Yet despite this recognition, the trial court sentenced appellant to what could result in over a decade in prison because the court did not sense any remorse or repentance by appellant. Appellant proceeded to trial to proclaim his innocence. The fact that he continued to do so should not have been used to enhance his sentence in the face of the other extant mitigating factors. In describing its motivation for the sentence, the Court remarked that it "didn't need a Presentence Report to tell me everything

about you…I watched you the entire trial" and the only emotion the court

noticed was anger and not the "shame, and remorse, and repentance" that

the Court deemed would have been appropriate (A: 1895-1896).  Again, the

Court was seemingly punishing Mr. Whitehead for his lack of remorse

during a trial in which he proclaimed his innocence while displaying the

requisite respect for the Court in his timeliness and diligence in his

representation.  Mr. Whitehead had been through several attorneys. One

was ultimately convicted of a felony and sentenced to prison, one

abandoned him while running for office.   According to trial counsel,

neither attorney made the requisite suppression motions (A: 1835).  Mr.

Whitehead, as per the Court's directive hired trial counsel within days and

the case was tried shortly thereafter.  Mr. Whitehead always did as directed

by the Court and yet his refusal to demonstrate contrition and repentance

during a trial in which he maintained his innocence was a major factor in

the harshness of the sentence imposed.

The imposition of such an extreme sentence of imprisonment was

clearly "harsh and excessive." (People v. Smalls, 115 A.D.2d 783 (2nd Dept. 1985)). A lesser sentence of imprisonment would have been more than adequate to deter appellant from future crimes. The imposition of such a sentence is grossly disproportionate to both appellant's criminal record and the circumstances of the crime. Clearly, a careful review of the record and circumstances of this case demonstrate that appellant could have been adequately punished for his conduct with a less severe period of incarceration. The sentence chosen by the trial court was not proximately linked to the deterrence of future conduct, or as a proportionate punishment for his role in this offense.  Moreover, a concomitant purpose of the imposition of punishment is the rehabilitation of the appellant, so that he might develop into a law-abiding and productive member of society, a factor seemingly discounted by the sentencing court. People v. Gittleson, *supra* at 268. To that end as well, a lesser sentence of imprisonment followed with supervision upon release would amply satisfy the primary sentencing tenets of deterrence and rehabilitation.

This court does have a broad plenary power to modify any sentence in the interest of justice <u>People v. Sheppard</u>, 273 A.D.2d 498 (3rd Dept. 2000); <u>People v. Davis</u>, 267 A.D.2d 597 (3rd Dept. 1999). This Court has the authority to modify appellant's sentence in the interests of justice and should do so.

## CONCLUSION

Wherefore it is respectfully requested that this court grant the appellant a new trial as to each count of conviction, reverse Counts 4, 8, 12, 14, 17, 18, 21, 24, and 27 to as not supported by the evidence adduced at trial, dismiss Counts 5, 8 and 27 and give any other relief this court may deem necessary and proper. In the alternative, appellant requests that this court order that he be resentenced in accordance with the accusatory instrument which he faced at trial and any other relief this court may deem necessary and proper.

## Certification of Compliance

I, Jeremy Scholem, an attorney duly admitted to practice law in the State of New York,  do hereby certify (in accordance with 22 NYCRR 670.10.3(f)) that this brief was prepared on a computer using Palatino Linotype, a proportionally spaced typeface with a poinbt size of 14 and with double line spacing and that the total number of words in the brief, including footnotes and headings but not including pages containing tables of contents, tables of authorities, proof of service, certificate of compliance and appendix is 13,325 . This word count was determined using the "Word Count" tool of Microsoft Word.

Dated: May 23, Queens, NY

_____

Jeremy Scholem

*To be Argued by:*
JAMES KOUSOUROS, ESQ.
20 Minutes Requested

---

# SUPREME COURT OF THE STATE OF NEW YORK

## APPELLATE DIVISION - SECOND DEPARTMENT

---

## THE PEOPLE OF THE STATE OF NEW YORK,

*Appellant,*

-against-

## LAMAR WHITEHEAD,

*Defendant-Respondent.*

---

## REPLY BRIEF FOR DEFENDANT-RESPONDENT
### Ind. No. 539-2007

---

**JAMES KOUSOUROS, ESQ.**
*Attorney for Defendant-Respondent*
*LAMAR WHITEHEAD*
260 Madison Ave. 22nd Fl.
New York, NY 10016
212-532-1935

# TABLE OF CONTENTS

**PAGE**

**Legal Argument**

**Point One[1]**...................................................................................1
Filing a Fraudulent Loan Application Which is then Denied by the Lending Institution Does Not Constitute Attempted Grand Larceny

**Point Two** ..................................................................................4
As Submitted, Counts in this Indictment Were Duplicitous And it Is Impossible to Ascertain Whether The Jury Reached a Unanimous Verdict Concerning the Same Conduct for Several Counts.

**Point Three** ...............................................................................8
Testimony of a Competent Witness Over the Age of Twelve Was Received Without the Administering of the Testimonial Oath

**Point Four** ................................................................................13
The Court Erroneously Received Evidence Of Uncharged Crimes

The Nondisclosure by the Prosecution of a Non-identification...............16
by a Witness-victim Violated Appellant's Due Process Rights

**Point Eight** ..............................................................................22
The Trial Court's Sentencing Procedure Was Violative of the Statutory Mandate as it Did Not Identifiably Comport to the Jury's Verdict


**Conclusion** ...............................................................................25

---

[1] We have numbered these points here, and in the body of this reply, as they are reflected in our original brief.

i

## POINT ONE

## FILING A FRAUDULENT LOAN APPLICATION WHICH IS THEN DENIED BY THE LENDING INSTITUTION DOES NOT CONSTITUTE ATTEMPTED GRAND LARCENY

The People's assertion that appellant's claim on this issue is unpreserved is without merit. Appellant's motion for a trial order of dismissal clearly encompassed this very issue and this was clarified by the Court when the motion was made. Indeed the Court specifically amplified counsel's motion to include the People's failure to prove guilt beyond a reasonable doubt and ruled accordingly (March 26, 2008, pages 105-106). Additionally, the defense request for the inclusion of the Attempted Grand Larceny charge to the jury was in response to the People's contention that it be subsumed into the Identity Theft in the First Degree charge. It was not a tacit acknowledgment as to the validity of the Attempted Grand Larceny but rather a proper request that the separate elements of the crime [Penal Law § 190.80 (3)] charged in the indictment be submitted to the jury. Penal Law § 190.80 (3) specifically requires the assumption of another identity *and* the commission of a class D or higher level crime. Counsel made his motion to dismiss on March 26, 2008, it was denied and then counsel properly requested a charge to the jury which included the larceny. Indeed to have agreed to the People's request would have been more a validation of the charge than demanding its inclusion.

1

Appellant has thus properly asserted on appeal that the evidence adduced at trial was insufficient to prove the requisite larceny attendant to Penal Law §190.80(3) and the People's reliance upon **People v. Conrad**, 102 A.D. 566 (1st. Dept.), *aff'd*, 182 N.Y. 529 (1905) is misplaced as the doctrine of attempt has certainly been more succinctly addressed and clarified by our Courts. We concur that one act may suffice to constitute an attempt, however only if, as the Court of Appeals has stated, this act carries "the project forward within dangerous proximity to the criminal end to be attained" (**People v Bracey**, 41 N.Y. 2d 296, 300 (1977)) and that but for "timely interference" the crime would have been committed (**People v. Mahboubain**, 74 N.Y. 2d 174, 196 (1989). The facts adduced at this trial do not fall within the ambit of these well defined requirements.

As demonstrated in our initial submission, the People's proof in this case was insufficient to have proven the attempted commission of Grand Larceny in the Third Degree as charged. The proof was thus insufficient to support the convictions for Identity Theft in the First Degree. Section 190.80(3) requires the actual commission of two crimes, to wit: the theft of an identity *and* the use of that stolen identity to commit a class D or higher felony which in this case was Grand Larceny in the Third Degree. As we have asserted, the filing of the applications for credit, which were denied, does not bring the conduct alleged dangerously close to the commission of the theft of identity let alone the Grand Larceny. The

People's list of acts in this regard, (See pages 25-26) are acts which can only be properly construed as preparatory with regard to the theft of the identity but not as to the Grand Larceny.

Not only was the simple filing of the fraudulent loan application insufficient, the People failed to produce any witness (save for Count 10) to support a finding as to the requisite ownership or value of the property to be stolen beyond a reasonable doubt (**People v. Hardy**, 57 A.D. 3d (3rd. Dept. 2008); **People v. Colon** 12 A.D. 3d 689 (2d. Dept. 2004). In this case, attempted grand larceny in the third degree was an essential element under 190.80(3), which requires the commission of a class D or higher-level felony.  Under New York State law, there must be sufficient evidence that the value and ownership of the property in issue exceeds $3,000 to support defendant's conviction.  At best the People have proven the lesser crime of False Impersonation in the Second Degree. This Court has the authority to reduce a conviction to that which the proof adduced at trial supported (**People v. Vanderburg**, 254 A.D. 2d 532 (3rd. Dept. 1998); **People v. Duran**, 238 A.D. 2d 351 (2d. Dept. 1997).

**POINT TWO**

**AS SUBMITTED, COUNTS IN THIS INDICTMENT WERE
DUPLICITOUS
AND IT IS IMPOSSIBLE TO ASCERTAIN WHETHER
THE JURY REACHED A UNANIMOUS VERDICT CONCERNING THE
SAME CONDUCT FOR SEVERAL COUNTS**

The argument set forth by the Respondent on this point begs the essential question of the constitutional deficiencies in the manner by which the indictment was submitted to the jury. The People's belated attempt to guide this Court through the exhibits and evidence presented at the trial cannot rectify the defect presented. Stated simply, what was not made constitutional sense of to the trier of fact cannot be clarified to this Court in hindsight.

Section 200.30(1) of the Criminal Procedure Law provides that "[e]ach count of an indictment may charge one offense only." Section 200.50(3) of the Criminal Procedure Law mandates that "[a]n indictment must contain ... [a] separate accusation or count addressed to each offense charged, if there be more than one." This is to ensure that a defendant can mount a separate and distinct defense to each charge and have the trier of fact make its determinations accordingly. A count is duplicitous if it either charges more than one offense or if it fails to specify to what offense it applies.  **People v. Archer**, 238 A.D. 2d 183,184 (1st Dept. 1997); **People v. Jones**, 233 A.D.2d 342 (2nd Dept. 1996); **People v. Jackson**, 174 A.D.2d 444-446 (1st Dept. 1991); **People v. Stanley**, 173

4

A.D.2d 658 (2nd Dept. 1991).

A principal danger presented by a duplicitous count is that some jurors might vote to convict a defendant on the basis of one offense while other jurors might vote to convict on the basis of another offense. **People v. Payne**, 241 A.D.2d 466 (2nd Dept. 1997); **People v. Archer**, 238 A.D. 2d at 184; **People v. Davila**, 198 A.D.2d 371 (2nd Dept. 1993). While the People have responded with the proposition that indictments need only state the bare elements and, "in effect, [parrot] the statute" (See, Respondent's Brief, page 32; *citing*, **People v. Mackey**, 49 N.Y.2d 274, 278 (1980), this assertion ignores the equally relevant and indispensable requirement that an indictment must apprise the defendant of the charges against him in a non duplicitous form and in a manner which permits effective appellate review.  The indictment herein was a complicated array of distinct charges for which the simplicity of this charging instrument and the manner of presentation to the jury by the People and the Court in its charge, as demonstrated herein, was constitutionally deficient.

In **Archer**, a seminal case that cogently illustrates these principles, the defendant was charged with three counts of third-degree criminal possession of a weapon. Archer, 238 A.D. 2d at 183. Three separate guns were involved in the case and none of the weapon-possession charges specified to which gun they applied. **Id.** As in the case at bar, the trial court failed to assign a specific gun to a

specific count; the jury thereafter convicted the defendant of one of the counts. Id. Since none of the charges in the indictment indicated the offense to which it applied, each charge was duplicitous. **Id.** at 184. Moreover, because the court failed to link each charge to a specific weapon (i.e., a specific offense), and it, thus, was impossible to determine, on appeal, whether the jury unanimously convicted the defendant of the same offense, the conviction was reversed. Id.

In the instant case, the de facto merging of identical counts, distinguished only by parenthetical language, evokes the very dangers identified by the **Archer-Jackson** line of cases. For example, the People assert that Counts 14 and 15, which allege crimes in the indictment committed on October 13, 2004, pertain to Exhibits 26 and 190 (loan applications/chart), however these applications are both dated October 30, 2004. Counts 24 and 25 as to victim Raymond Sperl involve two different E-loan accounts but with different amounts. There was never the requisite link to the evidence and the counts and it is thus impossible to discern how the jurors considered the evidence presented.

In addition, the results in this case are the realization of the proposition that where a jury convicts a defendant of certain counts of an indictment and acquits on other identically worded counts, the conviction on all counts must be reversed because appellate review of the conviction is impossible, without implicating the prohibition against double jeopardy. **People v. Sykes**, 22 NY2d 159 (1968);

**People v. George,** 255 A.D.2d 881 (4th Dept 1998); **People v. Ball**, 231 A.D.2d 853 (4th Dept 1996); **People v. McNab**, 167 A.D.2d 858 (4th Dept 1990); **People v. Caliendo**, 158 A.D.2d 531 (2d Dept 1990]. The People assert that the prosecutor's summary of the charges in summation, *which is not evidence*, "allowed the jury" to make otherwise uncharged distinctions and that the convictions and acquittals are evidence of the distinctions (See, Respondent's brief, page 33-34). This is mere speculation and the equally compelling conclusion is that the differing verdicts were the result of the very dangers outlined above. Appellate review is not possible under these circumstances and we submit, the convictions must be reversed.

While the duplicitousness of the counts has not been preserved for review, courts have chosen to review this type of error in the interest of justice because of the "fundamental" taint involved. **People v. Archer**, 238 A.D. 2d at 184; **People v. Jackson**, 174 A.D.2d at 446; **People v. Payne**, 241 A.D.2d 466. Because the taint that occurred in this case was no less fundamental than that in Archer, Jackson, or Payne, we urge review of this issue in the interest of justice.

## POINT THREE

## TESTIMONY OF A COMPETENT WITNESS OVER THE AGE OF TWELVE WAS RECEIVED WITHOUT GIVING THE DEFENDANT THE SAFEGUARD OF A TESTIMONIAL OATH

The People have seemingly conceded that on March 14, 2008 Detective Gabriele was not sworn or reminded of his prior oath and have cited cases which, we submit, are inapplicable to the case at bar in asking this Court to ignore this fundamental departure from well established protocol of constitutional significance. Detective Gabriele testified on February 28, 2008 and did not return to the stand for two weeks. His testimony was labeled as bifurcated and on February 28, the first portion of his testimony was terminated. When he returned two weeks later to begin the second portion of his testimony, the oath was not re-administered nor was he reminded of his initial oath two weeks prior. This failure, we have submitted, made the subsequent reminders on March 17 [twice], March 18 and March 25 of no legal import. The testimony given from March 14, 2008 and thereafter was unsworn testimony provided by the People's most important witness in this case and we submit cannot suffice to sustain the convictions herein.[2] This was an error which affected the integrity of the proceedings, was violative of

---

[2] Detective Gabriele not only provided the majority of testimonial evidence, it was through Detective Gabriele that the People introduced the vast majority of exhibits.

8

C.P.L. 60.20, the Fourth, Fifth, Six and 14th Amendments to the Constitution, and we submit, mandates a reversal.

It is axiomatic that prior to taking of testimony in a criminal proceeding, the Constitution requires that an oath must be administered to the witness. The test in this regard is whether the oath is properly administered in a manner which would permit a charge of perjury in the event that false testimony is given.  This oath is thus a fundamental requirement of significant substance which cannot be overlooked in any instance and an accused cannot be exposed to the loss of liberty through testimony for which an oath is not administered (**People v. Parks**, 41 N.Y. 2d 36 (1976).  We submit that the failure to re-administer the oath to Detective Gabriel in this case was a defect in the proceedings which affected the fairness and integrity of the trial as it violated the dictates of C.P.L. §60.20 and that the United States and New York State Constitutions (**People v. Coons**, 552 N.Y.S. 2d 94 (1990); **People v. Agramonte**, 642 N.Y.S. 2d 594 (1996); **People v. Kelly**, 799 N.Y.S. 2d 763 (2005); **People v. McClean**, 905 N.Y.S. 2d 536 (2010).

The circumstances extant herein are certainly unusual and there is little case law directly on point.  We find the basic principles on the importance of the oath and the need for all witnesses to be properly sworn to have been set forth in early jurisprudence (**Hawks v. Baker**, 6 Green l. 72, 6 Me. 72, 1829 WL 285 [Me.]. There, in a case whose facts resonate to those herein, it was held that where a

9

witness gives testimony without the benefit of the oath, a verdict cannot stand as it is not based upon competent evidence.  It is the duty of the party calling a witness to see that he is duly sworn; hence the defendant should not suffer from a failure of his counsel to object to the receipt of unsworn testimony.   The requirement of this oath serves dual purposes – to alert the witness to the moral duty to testify truthfully and to deter false testimony through the sanction of a perjury prosecution (**People v. Parks**, 41 N.Y. 2d 36 (1976).  "All proceedings of a judicial character connected with a criminal trial must be governed by that requirement" (**People v. Copeland**, 70 A.D. 2d 884 (2d. Dept. 1979) and the lack of an oath violates the requirements of the Due Process Clause (**Matter of Hecht v Monaghan**, 307 N.Y. 461, 464). Every criminal defendant has the constitutional right to presume that the witnesses against him will be duly sworn and thus constrained by the precepts for which the oath is constitutionally mandated.  In the case at bar, the question is whether the failure to re-administer the oath to Detective Gabriele when he re-took the stand after a two week absence rendered the testimony which followed unsworn. We submit that it does.

The trial in this case consisted of dozens of witnesses presented to support what began as a fifty seven count indictment.  Detective Gabriele was, in many respects, the single most important witness as he detailed his investigation and how appellant was identified as the architect of the charged fraud.  His testimony was

10

presented in two discreet and separate segments, each independent of the other. In the two weeks between his appearances, approximately nineteen other witnesses were presented. He returned on March 14, 2008 not so much as to continue his testimony in the more traditional sense, but to begin anew, with what the People described as the second part of his testimony involving separate conduct and evidence. As such, we submit that the peculiar circumstances herein constitutionally required that the oath be re-administered and that even a reminder, under these circumstances, would have been insufficient.

The cases cited by the People in their response, we submit, are inapposite to the case herein and thus do not support the conclusion urged therein.

In **People v. Groff**, 71 N.Y. 2d 101 (1987) the Court of Appeals considered a claim as to the requisite corroboration necessary for the *permissible* unsworn testimony of a four year child. During the grand jury proceedings, the child indicated that she did not know the difference between the truth and a lie, thus requiring adequate corroboration of the testimony. Groff is thus inapplicable to the issue herein. In Groff, the issue for the Court was the requisite corroboration necessary for the receipt of such unsworn testimony. The instant case involves an adult for which unsworn testimony may not be received under any circumstances.[3]

_____

[3] In so far as the People seemingly have urged this Court to conclude that the failure in this case was of a ministerial and inconsequential nature, we hasten to assume that the People would not

11

In **Re Brown v. Ristich**, 36 N.Y.2d 183, (1975), the issue was whether unsworn testimony may be received in an administrative disciplinary hearing under Section 75 of the Civil Service law. In this case two institutionalized patients gave testimony concerning treatment by a ward attendant. After citing the relaxed standards for the admission of evidence at an administrative hearing, the Court noted that the competency of both witnesses was established through testimony of an expert psychologist who was familiar with the witnesses and testified during *voir dire* that the 25 year old witnesses had the IQ of 4-6 year old children. Again, the case at bar does not involve when a witness can testify without the administering of the oath.  Indeed the People do not claim that no oath was necessary – they claim that the failure to re-administer the oath or remind Detective Gabriel of his oath in this case should be overlooked. We submit that in a criminal proceeding, in which a person's liberty is at stake, unsworn testimony cannot form the basis for a finding of guilt.

The testimony of Detective Gabriel from March 14, 2008 and thereafter, we submit, was unsworn and the receipt thereof was a violation of appellant's rights under the United States and New York State Constitutions. 4th 5th 6th and NY 1 and 6.

---

urge such a conclusion if a prosecution or defense witness is not sworn at all, or if, for example, a jury is not properly sworn  (See, **People v. Hoffler**, 53 A.D.3d 116 (3rd. Dept. 2008).

**POINT FOUR**

**THE COURT ERRONEOUSLY RECEIVED EVIDENCE
OF UNCHARGED CRIMES**

Perhaps the most well-worn criminal evidentiary precept is that evidence of uncharged crimes may not be adduced against an accused at trial except to prove motive, intent, the absence of mistake or accident, a common scheme or plan, or the identity of the person charged with the commission of the crime on trial. **People v. Molineux**, 168 N.Y. 264, 313 (1901); **People v. Allweiss**, 48 N.Y.2d 40, 47 (1979). The rationale for disallowing proof of uncharged crimes is rooted in the fear that the jury might more readily convict, even absent proof beyond a reasonable doubt, where it is led to believe that the defendant has previously committed a similar crime. **People v. Ely**, 68 N.Y.2d 520, 529 (1986); **People v. Molineux**, *supra*. This potential prejudice must be balanced against the probative value of the prior crime or crimes to an issue material to the crime to be proved. **People v. Allweiss**, *supra*; **People v. Vails**, 43 N.Y.2d 364 (1977); **People v. Jackson**, 39 N.Y.2d 64 (1976).

Weighing probative value against prejudice "is a delicate business," as there always is the danger that the evidence will "improperly divert the jury from the case at hand," resulting in improper prejudice and an unfair trial. Resek, 3 N.Y.3d at 389. The standard used to determine when the probative value of the evidence

13

outweighs its potential for prejudice is that the evidence must be "directly probative" such that the evidence sought to be admitted is "inextricably interwoven" with the crime to be proved. **People v. Vails**, *supra*.. Thus, the evidence must be explanatory of the acts done or words used in the otherwise admissible part of the evidence and reference to the other crime must be intrinsic to the presentation of the evidence of the crime to be proved such that the value of the evidence clearly outweighs any possible prejudice. **People v. Vails**, *supra*.

Materiality and necessity are the key factors in the determination of to what degree the evidence is inextricably interwoven. **People v. Ventimiglia**, 52 N.Y.2d 350, 359 (1981). Critically, the evidence must be fundamentally necessary to the People's case and not merely cumulative. **People v. Ely**, *supra* at 531, *citing People v. Robinson*, 68 N.Y. 2d 541; **People v. Ventimiglia**, *supra* at 361).

In the instant case, the extraneous evidence was not necessary to the presentation of the prosecution's case. There was a staggering quantity of evidence presented by the prosecution for the charged counts. As such, the evidence of uncharged crimes (Katherine Reid, Brenda Ridenour, Anita Bryant [Exhibit 109]) could in no fashion be classified as necessary to the prosecution's case.[4] Indeed, given the wealth of evidence relating to the charged offenses, this

---

[4] The People have asserted that the Ridenour testimony was not objected to. We direct the Court's attention to February 13, 2008, pages 643-644. The Reed testimony was objected to on March 12, 2008, pages 2-7 and the Bryant evidence as objected to on March 10, 2008, pages

other proof would seem to embody the concept of cumulative evidence.  As a result, the prosecution put before the jury evidence that was neither material nor necessary but which served only to prejudice appellant by suggesting his propensity for the very type of crime contained in the charged counts. **People v. Ventimiglia**, *supra*.

Moreover, even if there was some faintly discernable probative value to the proof, it was far outweighed by potential for the jury to see it as nothing more than evidence of the defendant's propensity for fraudulent, document-generated crimes.

Despite the clear genesis of the **Molineux** rule, we submit that, as in the instant case, there has been a gradual but concrete judicial shift towards an inclusionary approach, where it becomes incumbent upon the defense to dispel the court of the presumptive admissibility of the evidence. This trend stands in stark contrast to the remonstration of the Court of Appeals in **People v. Resek**, 3 N.Y.3d 385, 390 (2004).  The court warned that its prior decisions

> should not be interpreted as automatically allowing the prosecution to introduce evidence of uncharged crimes merely because the evidence is said to complete the narrative or furnish background information. On the contrary, under our Molineux jurisprudence, *we begin with the premise that uncharged crimes are inadmissible* and, from there, carve out exceptions.

---

123-124. With regard to the Bryant evidence, this Exhibit (109) was the subject of sidebars and repeated objections as well as a motion for a mistrial based upon the People's insistence upon referring to this evidence notwithstanding the Court's initial to admit same (See, March 10, 2008, pages 127-134).

Due to the extremely prejudicial nature of uncharged crimes evidence, courts have recognized the limited value of even prompt, complete cautionary instructions after the improper elicitation of such evidence. See **People v. Matthews**, 68 N.Y.2d 118, 122 (1986); **People v. Ventimiglia**, 52 N.Y.2d at 362; **People v. Stanard**, 32 N.Y.2d 143, 148 (1973); **People v. Barranco**, 174 A.D.2d 343, 344-45 (1st Dept. 1991); **People v. Gautier**, 148 A.D.2d 280, 285-88 (1st Dept. 1989). Where, as here, the instructions given by the trial court were so generic as to not inform as to the purpose of the receipt of the evidence, they were not of a type to cure the prejudice caused by submission of that evidence to the jury.

## THE NONDISCLOSURE BY THE PROSECUTION OF A NON-IDENTIFICATION BY A WITNESS-VICITM VIOLATED APPELLANT'S DUE PROCESS RIGHTS

In the landmark case of **Brady v. Maryland**, 373 U.S. 83 (1963), the Court crystallized a general and prevailing principle.    The Court concretized the prosecution's obligation to disclose any evidence in its possession that is favorable to the defense or that may "tend to exculpate [the defendant] or reduce the penalty."  Id. at 88.    **Brady** held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. 373 U.S. at 87 (emphasis added).

16

The **Brady** rule is quintessentially truth-seeking.   An individual's right to a fair trial requires that the false or suppressed evidence be disclosed so that a defendant is assured "of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.' " **Crane v. Kentucky**, 476 U.S. 683, 690-91 (1986) quoting **United States v. Cronic**, 466 U.S. 648, 656 (1984).   The truth-seeking policy underlying the **Brady** doctrine mandates that it encompass two situations:   the prosecution's offer of evidence that it knew or should have known to be false and the prosecution's suppression of evidence favorable to the defense.   Because each type of prosecutorial misconduct perverts and "corrupt[s] ... the truth-seeking function of the trial process," **United States v. Agurs**, 427 U.S. 97, 104 (1976), the Court has uniformly and adamantly denounced both.

There are three components of a true **Brady** violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice must ensue from that suppression. **Strickler v. Greene**, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948 (1999).

The Court of Appeals recently opined that

> Prosecutors play a distinctive role in the search for truth in criminal cases.  As public officers they are charged not

17

> simply with seeking convictions but also with ensuring that justice is done.   This role gives rise to special responsibilities - constitutional, statutory, ethical, personal - to safeguard the integrity of criminal proceedings and fairness in the criminal process.

**People v. Santorelli**, 95 N.Y.2d 412, 421 (2000).

The Court also recognized that the **Brady** safeguards mandate a broad reading of the concept of possession or control of exculpatory information, and that "a prosecutor must 'learn of any favorable evidence known to the others acting on the government's behalf in the case' and promptly disclose any such material evidence to the defense. Id., quoting **Kyles v. Whitley**, 514 U.S. 419, 437, 115 S. Ct. 1555 (1999).  A prosecutor is charged with the knowledge of exculpatory information in the possession of the police, and is required to diligently explore whether they are in possession of any such material or information. **People v. Wright**, 86 N.Y.2d 591, 598 (1995); **People v. Novoa**, 70 N.Y.2d 490, 498 (1987).  Indeed, **Brady** mandates disclosure of information that the prosecution acquires during the trial, or even afterward. **Imbler v. Pachtman**, 424 U.S. 409, 4277, n.25, 96 S. Ct. 984 (1976).

It is well-settled that evidence is not suppressed if the defendant had the material with adequate opportunity to utilize it effectively.  **People v. Cortijo**, 70 N.Y.2d 868, 870 (1987) ; **People v. Figueroa**, 213 A.D.2d 669, 670 (2nd Dept. 1995).

18

The most incisive discussion of this concept was set forth by the Second Circuit in **Leka v. Portuondo**, 257 F.3d 89 (2001).[2]  Therein the identity of a potentially exculpatory eye witness was disclosed for the first time three business days before the opening of the trial.  In reversing the denial of the habeas petition, the court expounded upon the significant disadvantages of late disclosure.

> The limited **Brady** material disclosed to Leka could have led to specific exculpatory information only if the defense undertook further investigation.  When such a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired. The defense *may be unable to divert resources from other initiatives and obligations that are or may seem more pressing.  And the defense may be unable to assimilate its case.*

257 F.3d at 101, *emphasis added.*

In the instant case, there was no voluntary disclosure, but instead an unexpected mid-trial revelation.  There was no opportunity for counsel to assimilate the non-identification into his overview of the massive parameters of the case.  As the Second Circuit noted:

> The opportunity for use under Brady is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought . . . *And a responsible lawyer in the midst of the pressures and paranoias of trial may well deploy scarce trial resources doing other things.*

Id. at 103, emphasis added.

19

The mid-trial disclosure of the non-identification of the defendant by a witness-victim, by its very nature, reverberates across the walls of the defense strategy, most certainly as it pertains to that victim. As the Second Circuit recognized, the pressures that inhere to the progress of the trial itself, make more onerous a mid-trial disclosure of exculpatory information.

The Supreme Court has emphasized certain critical aspects of materiality. In the first instance, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. **Kyles v. Whitley**, 514 U.S. 419, 434, 115 S. Ct. 1555 (1995)(emphasis added). Instead, non-disclosed evidence is material if there is "reasonable probability" that had the evidence been timely disclosed to the defense, the result of the proceeding would have been different. **Strickler v. Greene**, 527 U.S. 263, 284, 119 S. Ct. 1936 (1999).

In **People v. Vilardi**, 76 N.Y.2d 67, 77 (1990), however, the Court of Appeals demarcated a less stringent standard for cases where, as here, the defense has made a specific request for a descriptive category of Brady material. The Court reaffirmed its long-standing interpretation of the rule enunciated in United States v. Agurs, 427 U.S. 97, that evidence specifically requested by the defense was material if it "might have affected the outcome of the trial." 427 U.S. at 104. In **Vilardi**, the court reiterated that the prosecution's failure to turn over specifically

20

requested evidence was "seldom, if ever excusable" and "verge[d] on prosecutorial misconduct." 76 N.Y.2d at 74.  Thus, as a matter of state constitutional law, the Court held

> that a showing of a 'reasonable possibility' that the failure to disclose the exculpatory report contributed to the verdict remains the appropriate standard to measure materiality, where the prosecutor was made aware by a specific discovery request that defendant considered the material important to the defense.  As we have previously noted [citation omitted], suppression or even negligent failure to disclose, is more serious in the face of a specific request in its potential to undermine the fairness of the trial, and ought to be given more weight than as simply one of a number of discretionary factors to be considered by a reviewing court.

**Id.** at 77.

Under this standard, had the prosecution disclosed the non-identification by the witness-victim prior to the commencement of the trial, there is a "reasonable possibility" that it could have affected the outcome.

In the case at bar, the People failed to disclose that the owner of Aerobeep, the company which appellant is alleged to have procured voice mail accounts used to commit a vast majority of the crimes charged, failed to identify appellant. As conceded by the People, and found by the Court, this nondisclosure constituted a ***Brady*** violation.  Given the importance of this information, the late disclosure midway through the trial hampered appellant's ability to have used this exculpatory evidence during the pre-trial investigatory phase and thus cultivate an effective and prepared cross examination of this witness and any other employees

of the company.  Again the testimony from representatives of this company was an indispensable component of the proof against appellant and the failure to disclose this exculpatory evidence adversely affected the defense.  Every phone number that was listed on every loan application came from Aerobeep.  Every voice recording that was played numerous times in front of the jury was from Aerobeep. There were over ten charts of phone numbers that linked Aerobeep numbers to banks.  The non disclosure of this evidence, was thus a Brady violation of sufficient consequence.

## POINT EIGHT

### THE TRIAL COURT'S SENTENCING PROCEDURE WAS VIOLATIVE OF THE STATUTORY MANDATE AS IT DID NOT IDENTIFIABLY COMPORT TO THE JURY'S VERDICT

The respondent has engaged in semantic wordplay to sidestep the obvious. There simply is no authority, either in statute, local rule or precedent, which permits the courts to sentence in a manner at odds with the jury's prescribed verdict. The court must consider the jury's verdict, as the counts were submitted to it, and enter judgment in strict accordance with the terms of that verdict. Indeed, the courts have routinely held that, where, as here, the court neglects to sentence for each specific count upon which the jury rendered a verdict, the case must be remanded for re-sentencing. **People v. Sturgis**, 69 N.Y.2d 816, 513 N.Y.S.2d 961

(1987); **People v. Mohammed** 126 A.D.2d 673, 511 N.Y.S.2d 99 (2d Dept. 1987).

There is no ambiguity in the statutory framework governing proceedings from verdict through judgment. The law with regard to submission of charges to the jury and consequent sentencing is delineated in clear and concise statutory terms. The rules governing submission of identifiable counts and offenses to a jury is detailed in C.P.L. Article 300:

> The court must specifically designate and submit, in accordance with the provisions of sections 300.30 and 300.40, those counts and offenses contained and charged in the indictment which the jury are to consider.  Such determination must be made, and the parties informed thereof, prior to the summations.  In its charge, the court must define each offense so submitted and, except as otherwise expressly provided, it must instruct the jury to render a verdict separately and specifically upon each count submitted to it . . .

C.P.L. § 300.10 subd. 4

This statutory provision makes no allowance for some facile re-ordering of the indictment, or renumbering of the counts to comport with some earlier embodiment of the indictment which the jury was not asked to consider. Indeed, according to the statute, "*submission of a count of an indictment means submission of the offense charged therein*, or of a lesser included offense, or submission in the alternative of both the offense charged and a lesser included offense or offenses." C.P.L. § 300.30, subd. 1 (emphasis added).

Moreover the statute specifically contemplates a charging scenario where, as

23

here, the offenses can be grouped together (by victim or offense) so that each group contains concurrent counts, but may be consecutive to other groups of counts. See generally C.P.L. § 300.40, et seq. Nowhere in these provisions either can authority be found for the departure from that procedure, even for the ultimate convenience of the parties during the trial.

The next relevant sequential statutory mandate pertains to the jury's verdict itself. The rules here are as strict and precise as those for submission of the charges to the jury. Since the jury's verdict is the only predicate for judgment of conviction, "[a]fter a verdict has been rendered, it must be recorded on the minutes and read to the jury, and the jurors must be collectively asked whether such is their verdict." C.P.L. § 310.80. The form of the verdict must in all manner correspond to the court's instructions, and reflect a determination of all identified counts submitted to it.

Once the jury's verdict as to the identified counts submitted to it by the court has been recorded, the court must pronounce sentence upon each such count. It is counterintuitive that the sentence must identifiably comport with the offenses for which the jury returned guilty verdicts. As mandated by C.P.L. § 380.20:

> The court must pronounce sentence in every case where a conviction is entered. If an accusatory instrument contains *multiple counts and a conviction is entered on more than one count the court must pronounce sentence on each count.*

(Emphasis added).

24

In the instant matter, the court did not pronounce sentence on every count for which the jury returned a verdict of guilty. In addition, it sentenced the defendant on counts which it expressly submitted to the jury, and for which the jury returned "not guilty" verdicts. Finally, it sentenced the defendant to felony prison sentences for counts which, as it specifically submitted to the jury, were misdemeanors.

The prosecution seems to say that the court had the authority, inherent in its ministerial function, to proceed in this manner. There is absolutely no foundation, either in the relevant statutory guidelines, or stare decisis, for such a notion. Instead, the court's sentence seems a clear departure from the indictment by which the defendant was tried, the counts submitted to the jury, and the recorded verdict. Finally, there is no evidence in the record that the parties stipulated or agreed to depart from the rigid framework prescribed by law, and to proceed to sentencing in a manner at odds with the jury's verdict formal and recorded pronouncement.

## **CONCLUSION**

Based upon the foregoing, appellant respectfully requests that his conviction be vacated and the case remanded for a new trial, and for such other and further relief as this court may deem necessary and proper.

Dated:     New York, New York
           January 18, 2011

                                          Respectfully Submitted

                                          JAMES KOUSOUROS

26

## Certification of Compliance

I, James Kousouros, an attorney duly admitted to practice law in the State of New York, do hereby certify (in accordance with 22 NYCRR 670.10.3(f) that this reply brief was prepared on a computer using Times New Roman, a proportionally spaced typeface with a point size of 14 and with double line spacing and that the total number of words in the brief, including footnotes and headings but not including pages containing tables of contents, tables of authorities, proof of service, certificate of compliance and appendix is 5,886. This word count was determined using the "Word Count" tool of Microsoft Word.

Dated: New York, New York
      January 18, 2011

James Kousouros