1

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK - PART 7
----------------------------------------x
PEOPLE OF THE STATE OF NEW YORK,

                            Case No.:
                            539-07

        -against-

LAMAR WHITEHEAD,

                    Defendant
----------------------------------------x
                TRIAL TRANSCRIPT
                            March 25, 2008
                            210 Center Drive
                            Riverhead, New York


B E F O R E :

        THE HONORABLE JAMES HUDSON,
        Suffolk County Judge

For the People:

        THOMAS J. SPOTA, ESQ.
        District Attorney of Suffolk County
        Economic Crimes Bureau
        North County Complex
        Building 77, Veterans Memorial Highway
        Hauppauge, New York 1788
        BY: RAPHAEL PEARL, ESQ.,
        BY: JODI FRANZESE, ESQ.,
        Assistant District Attorneys

For the Defendant:

        The Law Offices of
        WILLIAM KEAHON, ESQ.
        One Suffolk Square
        Islandia, New York

Reported By:
    Jennifer Maue,
    Senior Court Reporter

**FILED**

NOV 13 2009

CLERK OF SUFFOLK COUNTY

Jennifer Maue, Senior Court Reporter   (631)852-2153

People v. Lamar Whitehead

        (The following occurred outside the presence of the jury):

        THE CLERK:  Case on trial, People versus Whitehead.  All parties present outside the presence of the jury.

        THE COURT:  This is Juror No. 9.

        I understand that you have -- I'm shown a statement from our -- Medical Center Fort Salonga Road, Northport.

        Again, I'm very sorry to have to even go into your physical condition at all. Its is a private matter, I have a note from Muia Nicola, indicating that Juror No. 9 has strep throat and this is a request to excuse Juror No. 9 from jury duty from today, that is -- from March 24th.  To return on the 26th.

        The question is, do you feel as a result -- have you been told that you're contagious?

        JUROR NO. 9:  Yes.

        THE COURT:  You're going to be in a closed room with our other jurors.

        JUROR NO. 9:  I did ask, because they did -- the quick test I said -- I told

Jennifer Maue, Senior Court Reporter   (631)852-2153

People v. Lamar Whitehead

them I had jury duty.  I said if it comes back with a sore throat, he said no, with the antibiotics, it will be fine.  You could go back.  But he said if it comes back strep, you're still contagious for another few days even though you're on antibiotics.

THE COURT:  I could tell you don't seem to be feeling very good, you're in a lot of pain.

JUROR NO. 9:  Yes.

THE COURT:  Sorry to bring you in. Any questions from counsel.

MR. KEAHON:  I have none.  Hope you feel better.  I want to express all of our thanks to you, for sitting on this jury.

JUROR NO. 9:  Thank you.

MR. KEAHON:  You're a trooper.

THE COURT:  Do we have a consent to substitution?

MR. KEAHON:  You have my consent.

MR. PEARL:  (Nods)

THE COURT:  We have consent for a substitution.

(Juror No. 9 was excused)

People v. Lamar Whitehead

1
2                    (The following occurred in open

3        court):

4                    THE CLERK:  Come to order, please,

5        this court is back in session.

6                    (Pause)

7                    THE CLERK:  Remain seated, come to

8        order.

9                    Case on trial, People versus

10       Whitehead.  All parties present outside the

11       presence of the jury.

12                   THE COURT:  Thank you.

13                   The record will reflect after

14       conference with Juror No. 9, she established

15       to the satisfaction of counsel, that she was

16       ill and unable to continue in her duties.

17       Counsel for both the defense and the people

18       stipulate to her being discharged and a

19       substitution of alternate number one.

20                   So agreed, counsel?

21                   MR. KEAHON:  Judge, she produced a

22       letter from a doctor asking her to be excused.

23       She indicated to us, that because of the

24       condition and the medication she was

25       taking -- I forget the word that she used, if

People v. Lamar Whitehead

1
2      she had to sit with a group of people she
3      could --
4           THE COURT:  She was quite
5      contagious.
6           MR. KEAHON:  Contagious, yes.
7           THE COURT:  The people consent, as
8      well, to her removal?
9           MR. PEARL:  Yes, your Honor.
10          THE COURT:  Thank you.
11          We'll bring in our jury unless
12      there is something else to place on the
13      record.
14          MR. KEAHON:  Yes, judge.  I have to
15      go through some of these charts with the
16      court.
17          THE COURT:  Yes.
18          MR. KEAHON:  Number one -- if we
19      could close that door.
20          THE COURT:  Thank you.
21          MR. KEAHON:  People's proposed
22      Exhibit 189.  It indicates, as the court can
23      see, Wachnik E-Loan auto loan application
24      paperwork, and then it recites as if it is a
25      witness, the address on the application is 925

People v. Lamar Whitehead

1
2      Prospect.  Same street address, Maria Marcale,
3      David Ridenour.  Same street address as Nerina
4      Sperl E-Loan.
5              It is actually a speaking exhibit,
6      and I object to it.
7              THE COURT:  Do you intend to offer
8      this as an exhibit or keep this for your
9      closing remarks?
10             MR. PEARL:  I was going to offer
11     this one as a demonstrative aid.  It is
12     eliciting statements from documents that are
13     in evidence.  In this case, it is the actual
14     application.  The Wachnik E-Loan application,
15     is People's 40, I think, 41.  Then the rest of
16     the ones were based on the phone records we
17     went over.
18             THE COURT:  I have to reserve
19     decision, Mr. Keahon.  I don't know what the
20     testimony is that will be offered to lay the
21     groundwork for the possible introduction of
22     that, and whether or not the witness will be
23     able to testify.  As to whether or not that
24     will assist you in their testimony, or whether
25     or not it would impermissibly be marshaling

People v. Lamar Whitehead

1

2      other evidence.  If I feel it to be the

3      latter, I would exclude it.

4              MR. KEAHON:  Respectfully, judge,

5      the witness cannot testify, it is my position,

6      from the stand, that an address on an

7      application is 925 Prospect.

8              THE COURT:  Which witness would

9      this be?

10             MR. PEARL:  Det. Gabriele.

11             So we can get moving, I won't use

12     this one.  I'll just use the phone spray

13     analysis.

14             THE COURT:  Thank you.  I do feel

15     it is somewhat problematic.  I'm obliged to

16     you.

17             THE COURT OFFICER:  That was

18     Exhibit 189.

19             MR. KEAHON:  Exhibit 195 is marked

20     for identification, judge.  Once again, it is

21     a speaking exhibit.  I'd object.

22             THE COURT:  Do you also intend to

23     introduce this through Det. Gabriele?

24             MR. PEARL:  Correct, your Honor.

25             THE COURT:  For the same reason

People v. Lamar Whitehead

that the court expressed its concern under 189, the same problem could result under 195. It is premature for the court to rule in the absence of the preliminary questions leading up to same.

Be guided by the court, Mr. Pearl, when it comes to that. If I consider this as marshaling evidence, it would be excluded.

MR. PEARL: Based on our conference last Friday, there was a difference between these charts, and the charts that demonstrate the spray analysis.

THE COURT: Correct.

MR. KEAHON: Your Honor, People's Exhibit 190, it indicates Lamar Whitehead's cell phone. If anything, it should say "subscriber Lamar Whitehead".

The word choice on the chart, the way it is placed, infers very clearly that Lamar Whitehead is the only one that ever used the phone and had possession of it.

THE COURT: Last week, I thought the objection was to use of the word "personal".

People v. Lamar Whitehead

1

2          MR. KEAHON:  It was, until I saw

3     this.

4          THE COURT:  As far as that

5     reference itself, Mr. Keahon, your argument

6     does not -- your exception would be noted.

7          Is there any other aspect to that

8     chart?

9          MR. KEAHON:  Down on the same

10    chart, it says, in a little box, it says

11    "Lamar Whitehead's cell phone".  It should say

12    the "subscriber cell phone in the name of

13    Lamar Whitehead".

14          THE COURT:  We have to agree to

15    disagree, Mr. Keahon.  The use of the term

16    "personal", I agree, is a characterization.

17          The use of the term "Lamar

18    Whitehead cell phone" and "subscriber Lamar

19    Whitehead" is a difference without a

20    distinction, and I would note your exception.

21          MR. KEAHON:  Thank you, judge.

22          I make the same argument on

23    People's 197, as far as Lamar Whitehead's cell

24    phone.  The court has already ruled.  But for

25    the record, I'm objecting.

People v. Lamar Whitehead

        THE COURT:  Thank you.  For the reasons stated heretofore, that is not a characterization but merely a recitation of evidence, and if the witness could testify that that would assist them in explaining their testimony before the jury, then it would be used as a demonstrative exhibit.  With that, at the conclusion of the case and during the court's instruction, the jury will be admonished it does not constitute evidence in and of itself.

        MR. PEARL:  On the exhibit it says "telephone number", crossed out in black, with "M & T Auto" blanked out, E-loan application in Michael Nolan's name.  It is a speaking exhibit.  I object.

        THE COURT:  Mr. Pearl, that reference, that language in the lower left hand corner of that exhibit, once again, the number?

        MR. KEAHON:  197.

        THE COURT:  Thank you.

        MR. PEARL:  Last week I think we used the word "associated".  I redacted the

People v. Lamar Whitehead

word "associated". I didn't think there was
an issue with the telephone number. I could
pull the exhibit, show it to the detective,
and ask, "What number is on this application?
Did you see this number anywhere else?" And
go through how the phone spray analysis is.
I'm just short-circuiting through a chart.

I would have removed it, if -- on
Friday, if I knew Mr. Keahon didn't want it in
there.

THE COURT: Once again, it becomes
a matter of whether or not the witness can
properly testify that this would assist them
in explaining their testimony. If I consider
it marshaling evidence, I'll exclude it at
that point in time.

MR. KEAHON: Thank you, judge.

Once again, 199, the same
objection. Where it says Lamar Whitehead's
cell phone, another area it says Lamar
Whitehead's cell phone. I know the court has
ruled on the previous exhibits, but I am, for
the record, objecting.

THE COURT: Thank you.

Jennifer Maue, Senior Court Reporter   (631)852-2153

People v. Lamar Whitehead

MR. KEAHON:  Once again, in the same exhibit, it says E-Loan Auto Loan application, in Nerina Sperl's name, Aero Beep telephone number (212)591-0575 is listed.

It is a speaking exhibit.

THE COURT:  Thank you.  As far as ruling on its admissibility, as a demonstrative exhibit, once again I would have to wait to hear the witness' testimony.  If you could confine your objections to new matters, Mr. Keahon.

You were very eloquent, as always, on behalf of your client, in stating your objections to certain portions of these proposed exhibits last week.  I think to allow reargument once again, at this point in time, I think would be inappropriate.  So any new matters?

MR. KEAHON:  All right, judge.

With the remaining exhibits, 206, 208, 194, 193, 196, 209, 205, 207, and 198, they all contain the word "Lamar Whitehead's cell phone".  I object to that.  And they all contain speaking exhibits with printed matter

People v. Lamar Whitehead

on it, relating to other exhibits and what
they are and where they are not.

So with that, I take objection to
each of the exhibits that I have placed on the
record.

THE COURT:  So noted.  As
indicated, the court has ruled as to a portion
of that, particularly the reference to the
cell phone number allegedly subscribed to by
Mr. Whitehead.  The other information
contained therein, I would have to hear the
witness' testimony leading up to the attempt
to introduce this as a demonstrative exhibit.
If I feel it will assist them in explaining
their testimony, it will be admitted.  If I
feel it is marshaling evidence, it will be
whatever.

THE COURT:  Do you have anything
else to place on the record?

MR. KEAHON:  I'm going to object to
any question by Mr. Pearl that indicates,
"What is the significance of", when he asks
the detective to relate these charts.  I think
that is improper.

Jennifer Maue, Senior Court Reporter   (631)852-2153

People v. Lamar Whitehead

        Secondly, again, that the cell phone where my client is the subscriber is in fact his personal cell phone. I would object to that. And that is it, judge.

        THE COURT: Thank you. I'll take that as a motion *in limine*, seeking an order to seek to limit the people from using the term "significance of" and information regarding the cell phone.

        MR. PEARL: Judge, I stood in our in conference in chambers, and I told Det. Gabriele to try to remember to refrain from referring to defendant's personal cell phone as such. Just to remind him. Outside. I hope it doesn't offend any court's issue. You gave him an order in chambers.

        He's going to try. I'll word my questions so it doesn't happen.

        THE COURT: The court is obliged to you carrying out the court's will in directing the witness to refrain from such statements in in front of the jury, which I feel is a characterization of evidence and not a recitation of evidence. Thank you.

Jennifer Maue, Senior Court Reporter   (631)852-2153

15

People v. Lamar Whitehead

           Is there anything else to place on the record?

           MR. KEAHON:  Nothing, your Honor.

           THE COURT:  All that will remain is alternate one will be seated and has been instructed to take number nine's seat.  There will be the formal substitution on the record at this time.

           MR. KEAHON:  Great.

           THE COURT:  Thank you.

           MR. PEARL:  Judge, I want to make sure I have the right charts I took out.  I have the numbers, and I just wanted to make sure that...

           THE COURT:  Officer, my compliments to the jury.  Their presence is requested.

           THE COURT OFFICER:  Yes, your Honor.

           190, 193, 194, 195, 196, 197, 198, 199, 205, 206, 207, 208 and 209.

           (Pause)

           THE COURT OFFICER:  The jury is entering.

           THE COURT:  All rise, please.

People v. Lamar Whitehead

            (The following occurred with the jury present):

            THE CLERK:  Case on trial, People versus Whitehead.  The jury and all parties are present.  Counsel waive the roll.

            THE COURT:  Thank you all, once again.

            As you can see, we have a substitution.  And the record should reflect, Mr. Avitabile, the substitution of Alternate No. 1 for Juror No. 9, who has been discharged.

            THE CLERK:  Yes.

            THE COURT:  The people are ready to proceed.

            MR. PEARL:  Yes, your Honor, thank you.

            THE COURT:  You may recall your witness to the stand.

            MR. PEARL:  Det. Gabriele, your Honor.

            THE COURT:  You may inquire of the witness.

            THE CLERK:  Detective, I remind

DIRECT/Gabriele

1

2          you you are still under oath.

CONTINUING DIRECT EXAMINATION

BY MR PEARL:

5          Q.   Detective, did there come a time that you

had an opportunity to review the Sprint cell phone

record with the subscriber, Lamar Whitehead?

8          A.   Yes, there was.

9          Q.   Did there also come a time you reviewed

the Sprint cell phone with the name of Wojcieh

Wachnik?

12          A.   Yes, there was.

13          Q.   Did there also come a time you reviewed

phone records concerning a T-Mobile phone?

15          A.   Yes, I did.

16          Q.   In fact those are the records you

previously prepared phone spray analysis charts on?

18          A.   Yes, they were.

19          Q.   There also came a time I asked you on

Friday, you reviewed all the financial records,

involved in this case?

22          A.   That is correct.

23          Q.   From E-Loan, from M & T, from Chase, and

from Commerce?

25          A.   That is correct.

DIRECT/Gabriele

Q.   Did there come a time that you prepared charts, with the phone records and financial institutions?

A.   Yes, there was.

MR. PEARL:  Your Honor, may I have People's 190, 193, 194, 195, 196, 197, 198, 199, 205, 206, 207, 208 and 209 and show them to Det. Gabriele, please.

THE COURT:  Thank you.  You may step down off the stand to review that.

(The Witness exits the stand)

Q.   Detective, do you recognize those documents?

A.   Yes, I do.

Q.   What if any do you recognize those exhibits to be?

A.   Those are the charts that I prepared.

Q.   And they are based on the evidence -- that has already been introduced at trial?

A.   Yes, they are.

Q.   And in fact, would those charts assist you in testifying before the jury today about the relationship of those various phone records with the financial institutions?

```
1    DIRECT/Gabriele

2            A.   Yes, they would.

3                     MR. PEARL:  Your Honor, based on

4    that foundation, People would move those

5    exhibits into evidence.

6                     THE COURT:  Thank you.

7                     MR. PEARL:  As demonstrative

8    exhibits only.

9                     MR. KEAHON:  No foundation has been

10   laid.  I object.

11                    THE COURT:  Sustain the objection.

12           Q.   Detective, what if anything did you

13   prepare those exhibits on, base those exhibits on?

14           A.   I based those exhibits on bank records,

15   financial institution records, cell phone record.

16           Q.   Specifically what bank records?

17           A.   M & T Bank, Chase Bank, Commerce Bank,

18   First Internet Bank, E-Loan, Capital One Auto

19   Finance.

20           Q.   What phone records did you base those

21   records on?

22           A.   Sprint, Sprint-Nextel, T-Mobile.

23           Q.   What if anything did you do with those

24   records in conjunction with those charts?

25           A.   Could you rephrase the question?  I'm not
```

Jennifer Maue, Senior Court Reporter   (631)852-2153

DIRECT/Gabriele

sure I understand.

Q.  Upon reviewing those records, what if anything did you do with those records in conjunction with those charts?

A.  I matched up the corresponding phone numbers with the information that I was able to garner off the bank record.

Q.  Did you prepare spray analysis charts concerning the various bank institutions in conjunction with the phone records?

A.  Yes, I did.

Q.  With those exhibits, those spray analysis charts that you prepared, would they assist you in testifying today?

A.  Yes, they will.

Q.  How if at all will they assist you?

A.  I will be able to look at the charts and link the particular phone numbers with the particular bank documents.

MR. PEARL:  Your Honor, based on that foundation, People once again move to introduce those same exhibit numbers into evidence.  As demonstrative aids.

MR. KEAHON:  I object.

Jennifer Maue, Senior Court Reporter   (631)852-2153

DIRECT/Gabriele

THE COURT:  If I could see counsel at side bar, please.

(The following occurred at side bar):

THE COURT:  It is the same objection pursuant to *People vs. Bell*.  I'll explain the reason for the court's ruling. Pursuant to the CJI charge, a demonstrative exhibit is impermissible to explain other exhibits.

What other exhibits does this explain?

MR. PEARL:  The phone record, and the bank records.

THE COURT:  I haven't heard reference to some -- I have heard no reference to any exhibits.  I've heard reference to phone records.

MR. PEARL:  I'm sorry.  I'm rushing, trying to get us moving.  I shouldn't be doing that.  I'll refer to the specific exhibit numbers if you want me to.

THE COURT:  Hasty justice is the mother of misfortune.

DIRECT/Gabriele

1

2            MR. PEARL:  I apologize.

3            THE COURT:  Thank you.

4            (The following occurred in open

5       court):

6            MR. PEARL:  Can I have 47, 48 and

7       49 shown to Det. Gabriele, please?    Exhibits

8       47, 48 and 49.

9                 (Handing)

10 BY MR. PEARL:

11       Q.   Detective, please take a look at those

12  exhibits and can you tell the jury if you recognize

13  them?

14       A.   Yes, I do.

15       Q.   What do you recognize -- what is the first

16  exhibit in your hand, what number?

17       A.   This is 47.

18       Q.   What do you recognize 47 to be?

19       A.   They're the T-Mobile phone records.

20       Q.   What is the phone number associated with

21  that T-Mobile phone record?

22       A.   (917)213-9228.

23       Q.   And in fact, what if anything did you do

24  with those records concerning the charts, the exhibit

25  numbers I previously placed on the record?

DIRECT/Gabriele

A.   I linked up the phone numbers that appeared on the phone records with the numbers that were off the of the financial institution's records.

Q.   Take a look at People's 48, please?  Do you recognize People's 48.

A.   Yes, I do.

Q.   What do you recognize People's 48 to be?

A.   They're Nextel -- Sprint-Nextel records in the name of Lamar Whitehead.

Q.   And did you analyze those records?

A.   Yes, I did.

Q.   What if anything did you do with that analysis concerning those same exhibit numbers that we have before you?

A.   I linked up the phone -- phone records off of the Sprint-Nextel phone records, to any other phones involved, as well as the banking records.

Q.   Can you take a look at the next exhibit, please?  What number is that, for the record?

A.   49.

Q.   And what is People's 49, specifically?

A.   It's Sprint records in the name of Wojcieh Wachnik.

Q.   What is the next exhibit in your hand,

DIRECT/Gabriele

Det. Gabriele?

    A.   49.

    Q.   What if anything is 49?

    A.   It is a Sprint record in the name of Wojcieh Wachnik.

    Q.   What is the phone number associated with those records?

    A.   (347)623-1549.

    Q.   What if anything did you do with those records concerning the charts that were before you, 190 through 209?

    A.   I linked up this phone number with any numbers that I was able to take off the banking institution records.

    Q.   Thank you.

        MR. PEARL:  Can I have People's 14, 15, 16, 17, 18 and 19.  Those are I believe Chase records.  I think they would be in the next pile over.

        THE COURT OFFICER: People's Exhibits 14 through 19, being shown to the witness.

        (Handing)

        MR. PEARL:  Thank you.

DIRECT/Gabriele

1
2              MR. PEARL:   Officer, in the
3     meantime, I'll be needing 26, 30, 31, 32 and
4     40.  When you have a chance?
5 BY MR. PEARL:
6        Q.   Detective, do you recognize People's 14
7  through 19?
8        A.   Yes, I do.
9        Q.   What do you recognize -- what if anything
10 do you recognize those exhibits to be?
11       A.   They are bank records from Chase Bank.
12       Q.   What is the first exhibit you have in your
13 hand, the number, please?
14       A.   Fourteen.
15       Q.   And what if anything specifically is that
16 Chase bank record -- who is that Chase record applied
17 to?
18       A.   Michael Nolan.
19       Q.   Let's look at 15, please.  What if
20 anything is 15 specifically?
21       A.   It is a Chase bank record in the name of
22 Eric Besso.
23       Q.   16, please?
24       A.   Chase Bank record, in the name of Brenda
25 Foley.

DIRECT/Gabriele

1

2      Q.   Can you go to the next record, please,

3  what is the number on the back, please?

4      A.   17.

5      Q.   What is that specifically?

6      A.   That is a Chase bank record in the name of

7  Kathleen March.

8      Q.   The next record, please, just refer to the

9  number on the back?

10     A.   18.   Chase bank record in the name of

11  Brian Foley.

12     Q.   The next exhibit, please?

13     A.   Number 19, is a Chase Bank record in the

14  name of Thomas Palladino.

15           MR. PEARL:   Can I have those last

16       few exhibits shown to Det. Gabriele, please?

17           THE COURT OFFICER:   People's

18       Exhibits 26, 30, 31 and 32 and 42, being shown

19       to the witness.

20     Q.   Detective, what is People's 26?   Make

21  sure, check the back for the number?

22     A.   26, is a Capital One Auto Finance record

23  in the name of Wojcieh Wachnik.

24     Q.   Can you look at the next exhibit, please?

25  What if anything is that exhibit number?

DIRECT/Gabriele

A.   30.  Is an M & T Bank record, in the name of Brian Foley.

Q.   The next records, please, which is number --

A.   Thirty-one.

Q.   No. 31?

Q.   M & T Bank record, in the name of Briton Lawler?

Q.   Next exhibit, please?

A.   32, M & T Bank record in the name of Michael Nolan.

Q.   The next record, please?

A.   42, is an E-Loan record in the name of Raymond Sperl.

Q.   What if anything did you do with all those exhibits that you just testified to, the financial institution records, in conjunction with the phone records?

A.   I analyzed each one of the records for known numbers, and I pulled the phone numbers corresponding to each record off of it, and I matched it up to the aforementioned phone numbers that we had.

Q.   In fact, did you prepare your charts based

DIRECT/Gabriele

on the records that you just described?

    A.   Yes, I did.

    Q.   And would those charts assist you in testifying today before this jury?

    A.   Yes, they would.

             MR. PEARL:  At this time, the people move those exhibits into evidence.

             THE COURT:  As demonstrative exhibits.

             MR. PEARL:  Only as demonstrative exhibits.

             THE COURT:  Do you wish to be heard further, Mr. Keahon?

             MR. KEAHON:  Yes, I do.  I object.

             THE COURT:  With your objection being noted, they're being allowed in as demonstrative exhibits.  If you would mark them so.

             MR. PEARL:  After they are marked, judge, can I have Det. Gabriele step off the stand and use the charts to...

             THE COURT:  Yes.

             THE COURT OFFICER:  People's Exhibits 193, 194, 195, 196, 197, 198, 199,

DIRECT/Gabriele

and People's Exhibits 205, 206, 207, 208, 209, and 210, marked and received into evidence.

(People's Exhibits 193-199, and 205-210, marked for identification and received in evidence)

THE COURT:  Thank you.  They are marked as demonstrative exhibits.

MR. PEARL:  Exhibit 190 is in evidence.

THE CLERK:  I believe it is 190, not 210.

THE COURT:  Correct.

THE COURT OFFICER:  193, excuse me.

MR. PEARL:  As 190.  The charts up there, 190, 193, 194, 195, 196, 197.

THE COURT OFFICER:  190 is also marked and received into evidence.

MR. PEARL:  So I'm clear 205, 206 207, 208, 209.

THE COURT:  Correct.

MR. PEARL:  Not 210.

THE COURT:  Yes.

(People's Exhibit 210, previously noted as received in evidence, marked for

DIRECT/Gabriele

identification only)

MR. PEARL:  Your Honor, may I use those charts to publish them to the jury and have Det. Gabriele step off the stand?

THE COURT:  Yes.

Ladies and gentlemen of the jury, I will charge you once again, when you are fully instructed on the law, that these constitute not proof or evidence in themselves as they explain other evidence.  You're not to consider them as evidence in and of themselves.

MR. PEARL:  Judge, I ask if the jury can't see.

A JUROR: No.  Too far.

THE COURT:  Mr. Keahon, feel free.

MR. KEAHON:  I'd like my client to be able to see.

THE COURT:  Perhaps we can move the chairs down, officer.

Can we coordinate with Mr. Keahon and Mr.  Whitehead, the gentlemen can move down, so they can see the exhibits, as well?

MR. PEARL:  Can everybody see the

1    DIRECT/Gabriele

2              charts.

3                        A JUROR:  That is better.

4                        THE COURT:  Detective, please.

5                        (The Witness exits the witness

6         stand)

7    BY MR. PEARL:

8         Q.   Det. Gabriele, what if anything is

9    People's 190?

10        A.   This particular chart is a chart of

11   Wojcieh Wachnik, Capital One case, in the amount of

12   $65,000, on 10/13/04.

13             In this particular case, there is a

14   Capital One auto loan application in the name of

15   Wojcieh Wachnik.  The address listed on the

16   application is 385 Lexington Avenue, Apartment 4-B,

17   in Brooklyn.  There is an address of Teisha Lamont,

18   with a phone number --

19        Q.   Detective.  Was there a phone number

20   listed on the Capital One Wojcieh Wachnik case?

21        A.   (718)512-5016 was the number that was

22   listed on the Capital One auto loan application.

23        Q.   What if anything did your analysis show in

24   conjunction with the phone records that are People's

25   47, 48, and 49, that you've previously just

Jennifer Maue, Senior Court Reporter    (631)852-2153

1    DIRECT/Gabriele

2    identified?

3        A.   Three particular phone numbers, 346 -- the

4    Sprint Wojcieh Wachnik Sprint phone (347)623-1549.

5        Q.   For the records, that is the Sprint phone,

6    with the subscriber Wojcieh Wachnik?

7        A.   Correct, correct.

8             That particular phone called into the

9    (718)512-5016 number, 35 times.

10       Q.   For the record, what is (718)512-5016?

11       A.   That is one of the AeroBeep voicemail

12   boxes.

13       Q.   There is a T-Mobile phone listed with the

14   number of (917)213-9228?

15       A.   The (917)213-9228 number, T-Mobile phone

16   called into that particular AeroBeep number

17   (718)512-5016, on eleven separate occasions.

18       Q.   There is a phone number (718)772-6498,

19   with a subscriber of Lamar Whitehead, correct?

20       A.   That is correct.

21       Q.   What if anything did the phone analysis

22   show in reference to that phone number?

23       A.   That particular phone number, called into

24   the (718)512-5016 number, listed on the Wojcieh

25   Wachnik Capital One auto loan application, on one

DIRECT/Gabriele

occasion.

        Q.   And did that cell phone, with the subscriber of Lamar Whitehead, call any other numbers on that chart?

        A.   There are fifteen phone calls between the T-Mobile phone, (917)213-9228 and (718)772-6498.

        Q.   That is the phone record contained in People's 48, correct?

        A.   That is correct.

        Q.   Now I'd like to show you --

                MR. KEAHON:  Judge, can we approach for a minute, please.

                THE COURT:  Yes.

                (The following occurred at side bar):

                THE COURT:  Yes, Mr. Keahon.

                MR. KEAHON:  I object.  These items on the left side of the exhibits, have not been set as a foundation for this exhibit.

                THE COURT:  What number is this again.

                MR. PEARL:  190.

                THE COURT:  190.

                MR. PEARL:  Judge, we reviewed

Jennifer Maue, Senior Court Reporter   (631)852-2153

DIRECT/Gabriele

these twice now, and they were put into evidence.

That is our information that came off the exhibits in evidence, Teisha Lamont. It is People's 37.

Do you want me to pull off the exhibits and attach them?

THE COURT:  They are already in.

I heard your objection twice, Mr. Keahon.  And the telephone is also your exception.  All you have to do is to preserve your rights for the record.

MR. KEAHON:  I object to every exhibit that follows, that contains information that was not recited by the witness, as foundation for these charts.

THE COURT:  Thank you.

(The following occurred in open court):

(Pause)

MR. PEARL:   Judge, I'm publishing People's 193.  In evidence.

BY MR. PEARL:

Q.  Detective, tell the jury specifically what

1   DIRECT/Gabriele

2   is People's 193?

3        A.   Analysis of Briton Lawler's M & T Bank

4   case in the amount of $59,000 on 9/28/04.

5             On this particular case, Britton Lawler's

6   M & T Bank case, we have a phone number

7   (212)561-1799, appearing on the application, it is an

8   AeroBeep telephone number.

9             This particular phone number, the

10  (347)623-1549 number, that is the Sprint number in

11  the name of Wojcieh Wachnik, calls into that

12  particular number on two separate occasions.

13            Then we have the T-Mobile number

14  (917)213-9228 number.  That particular phone is

15  calling into the number listed on the Briton Lawler

16  M & T Bank case, on two separate occasion.

17            Then we have the fifteen calls between the

18  defendant's cell phone --

19        Q.   The phone with the subscriber in the name

20  of Lamar Whitehead.

21        A.   Yes, correct.

22            And the T-Mobile phone.

23        Q.   And that No. 15, that is for the same time

24  period on all the charts between the T-Mobile?

25        A.   Between the T-Mobile records, correct.

Jennifer Maue, Senior Court Reporter   (631)852-2153

DIRECT/Gabriele

Q.   Detective, just for the record, you have had an opportunity to review People's Exhibit 66, the AeroBeep records?

A.   Yes, I have.

Q.   Showing you what's been placed in evidence as People's 194.  Do you recognize People's 194?

A.   Yes, I do.

Q.   What if anything is People's 194 specifically?

A.   Brian Foley Chase bank case, in the amount of $58,000, occurring 10/4/04.  On this particular application, there were two phone numbers, (516)394-0555, and (914)730-9240.

Both numbers are AeroBeep numbers.

Q.   And did you prepare a spray analysis concerning the phone records with the subscriber of Lamar Whitehead and the T-Mobile records in conjunction with those phone numbers?

A.   Yes, I did.

Q.   Can you tell the jury what your chart displays?

A.   The phone number (718)772-6498 and the subscriber name of Lamar Whitehead, calls into this particular AeroBeep number on one occasion.  The

DIRECT/Gabriele

T-Mobile cell phone (917)213-9228, calls into the same AeroBeep number on four separate occasions, as well as calling into that particular AeroBeep number, on seven separate occasions.

In addition, there is the link between the (718)772-6498 cell phone, subscriber of Lamar Whitehead, calling back and forth to the T-Mobile phone on fifteen separate occasions.

Q.   Detective, you indicated on the Brian Foley Chase bank, there is a date of 10/4/04.  Where if anywhere is that date coming from?

A.   The bank records.

Q.   Is that the date the application was made?

A.   Correct.

Q.   Showing you what is in evidence as People's 195.  Tell the jurors specifically what is People's 195?

A.   It is a chart, Brian Foley, M & T Bank. $58,000.  And listed on the particular application, the telephone number (516)394-0555.

Q.   That is an AeroBeep phone number?

A.   That is correct.

Q.   I'd like to show you what is in evidence as People's 196.  The same question, can you tell the

DIRECT/Gabriele

jury specifically what is People's 196?

    A.  It is a chart of the Brian Smith M & T Bank case, in the amount of $56,000.  On that particular -- on that particular application, this case phone number, which is an AeroBeep phone number, (212)726-0513.  That particular number, the T-Mobile phone calls in, nine separate times.  That particular phone, (718)772-6498 number, calls in fifteen times. And then with the linkage, the fifteen numbers called between the T-Mobile phone and the (718)772-6498 number.

    Q.  The line between the T-Mobile phone and the phone with the subscriber of Lamar Whitehead, what does it mean when the arrow is double arrowed?

    A.  There are phone calls back and forth.

    Q.  Totaling fifteen?

    A.  Correct.

    Q.  People's 197.  Can you tell the jury what if anything specifically is People's 197?

    A.  Michael Nolan M & T Bank case.  The particular phone number (516)512-5016 appears on the Michael Nolan M & T Bank case.  And that particular AeroBeep number is called by the Sprint phone in the name of Wojcieh Wachnik, thirty-five separate times.

DIRECT/Gabriele

1  It is called by the T-Mobile cell phone, eleven

2  separate times, and it is also called by the

3  (718)772-6498 numbers and the subscriber is Lamar

4  Whitehead, on one occasion.

5         Q.   Showing you what is in evidence as

6  People's 198.  Can you tell the jury specifically

7  what is People's 198?

8         A.   It's Michael Nolan Chase bank case, in the

9  amount of $59,000.  On the application was a phone

10  number (718)512-5016, it is an AeroBeep phone number,

11  that particular AeroBeep phone number was called by

12  the Wojcieh Wachnik Sprint phone on thirty-five

13  separate occasions.  By the T-Mobile phone on eleven

14  separate occasions.  And by the cell phone of the

15  subscriber of Lamar Whitehead on one occasion.  Then

16  we have the link, again, between the cell phone in

17  the subscriber name of Lamar Whitehead and the

18  T-Mobile phone.

19         Q.   I'd like to show you what is in evidence

20  as People's 199.  What if anything is specifically in

21  reference to People's 199?

22         A.   199 is the Raymond Sperl E-Loan auto loan

23  application in the amount of $73,000.

24         Q.   What is 10/18/04 without the line?

Jennifer Maue, Senior Court Reporter   (631)852-2153

DIRECT/Gabriele

A.   10/18 on this particular E-Loan
application, in the name of Raymond Sperl, there is
an AeroBeep telephone number (212)591-0575, that
particular AeroBeep phone number is called on five
separate occasions by the T-Mobile phone.  Then
again, the link between the cell phone subscriber of
Lamar Whitehead and the T-Mobile phone.

Q.   Showing you what is in evidence as
People's 205.  What if anything is People's 205?

A.   Eric Besso, Chase bank case in the amount
of $59,000.  On this particular Chase bank records,
there is a T-Mobile phone, appearing on the records.
As well as an AeroBeep phone of (516)394-0848.  In
this particular case, cell phone, the subscriber of
Lamar Whitehead, calls into the AeroBeep number on
three separate occasions, and then again we have the
link between the T-Mobile phone and the 772-6498
phone, with fifteen phone calls.

Q.   Showing you what is in evidence as
People's 206.  What if anything is People's 206?

A.   The Brenda Foley Chase bank case.  On this
particular case, on the bank records there, is listed
a telephone number (914)730-9240.  Again, it is an
AeroBeep phone number.  This particular AeroBeep

Jennifer Maue, Senior Court Reporter   (631)852-2153

DIRECT/Gabriele

phone number was called by the T-Mobile phone on four

separate occasions.  It was called by the phone

(718)772-6498, subscriber name of Lamar Whitehead, on

one separate occasion.

Once again we have the link between the

T-Mobile phone (718)772-6498 number.

Q.   There is a last box on this chart?

A.   This particular Brenda Foley case, the

name Brenda Foley was used, but the Social Security

number of Eric Besso was listed on the application.

Q.   Detective, I'm showing you what is in

evidence for demonstrative purposes as People's 207.

Specifically what is People's 207?

A.   People's 207 is the Kathleen March Chase

case.  This particular case, this particular

application, there are two phone numbers that appear

(516)394-0848 (212)726-0513.  Both of which are

AeroBeep numbers.

The number ending in 0848, called on three

separate occasions by the next telephone of

(718)772-6498, subscriber of Lamar Whitehead, as well

as that same phone number, (718)772-6498, calls into

the second number that is listed on the Chase Bank

records, on nine separate occasions.

Jennifer Maue, Senior Court Reporter    (631)852-2153

DIRECT/Gabriele

                The T-Mobile phone, (917)213-9228, calls
into that AeroBeep number on fifteen separate
occasions, and then we have the link between the cell
phone, the subscriber of Lamar Whitehead, and the
T-Mobile phone with fifteen phone calls.

        Q.    The date of the Kathleen March case, was
what date?

        A.    October 13th, 2004.

        Q.    The application was in the amount of
$50,000?

        A.    That is correct.

        Q.    I'm showing you what is in evidence for
demonstrative purposes as 208.  What if anything is
208?

        A.    Thomas Palladino Chase case, amount,
$46,500.  On this particular application, there is
an AeroBeep telephone number, (516)394-0848, that
particular number is called on three separate
occasions, from the cell phone (718)772-6498, the
subscriber of Lamar Whitehead.

        Q.    I'd like to show you the final chart,
People's 209, that is in evidence for demonstrative
purposes.  Specifically, what is 209?

        A.    209, is the Michael Ciccaro Chase case in

DIRECT/Gabriele

the amount of $46,000.  On this particular

application, there is the phone number (914)730-9303.

An AeroBeep telephone number, and on this particular

case, T-Mobile phone called into that particular

AeroBeep number on four separate occasions.  Again,

we have the link between the T-Mobile phone and the

phone with the subscriber of Lamar Whitehead.

          MR. PEARL:  Thank you, detective.

          THE COURT:  Thank you, detective.

You may resume your seat.

          (The Witness returns to the witness

stand)

          MR. PEARL:  Detective, I have no

further questions.  Thank you very much, your

Honor.

          THE COURT:  Thank you.  In light of

the time, detective, you'll be asked to stand

down and you'll resume your seat at 2:00

o'clock this afternoon.  I direct you not to

discuss your testimony with anybody as you're

in the middle of your examination.

          At that point in time, Mr. Keahon,

you may begin your inquiry of the witness.

          MR. KEAHON:  That's great, thank

People v. Lamar Whitehead

you.

THE COURT:  The jury will be excused for lunch.

I remind you not to form or express an opinion about the case until submitted to you for deliberations.  As I've told you, do not discuss this case or any matter connected to the trial amongst yourselves or with anyone else.  Nor may you allow it to be discussed in your presence.

Don't read or listen to accounts reported in the news media, don't visit or view the place or places where the offense charged was allegedly committed or any other place involved in this case, and promptly report to the court by way of coming to me personally, through a court officer, any incident within your knowledge involving any attempt to influence any member of the jury.

You may not request, accept, agree to accept or discuss with anyone, the receiving or accepting of any payment or benefit for supplying information about the case.  Promptly report to the court any

```
 1    People v. Lamar Whitehead

 2           attempt by anyone to discuss any aspect of the

 3           case with you, or to improperly influence you.

 4                   Thank you very much again enjoy

 5           your lunch see you at 2:00 o'clock.

 6                   (The Jury is excused)

 7                   THE COURT:  Is there anything to

 8           place on the record before the court recesses

 9           for lunch?

10                   MR. KEAHON:  No, your Honor.

11                   THE COURT:  Thank you, very much,

12           again.  Mr. Whitehead, I'll see you at 2:00

13           o'clock.  Counsel, thank you again.

14                           -o0o-

15

16

17

18           A F T E R N O O N    S E S S I O N

19                                      2:00 p.m.

20                                  24 March 2008

21                   THE CLERK:  This is the case on

22           trial, People versus Lamar Whitehead.  All

23           parties present outside the presence of the

24           jury.

25                   THE COURT:  Thank you.
```

People v. Lamar Whitehead

       As the jury was being brought in from lunch, one of the jurors said we have a flight on Friday.  We don't want anyone feeling pressure as far as the case goes.

       MR. PEARL:  Is it possible to do it at the end of the day.

       THE COURT:  If we have a juror who has a flight on Friday, I'm anticipating ending testimony today, closings tomorrow.  If we get to the charge -- to the court's instruction, the charge might be Thursday morning.  If we have a juror then who is thinking of a flight on Friday, then that can create a problem so.  You might want to consider a substitution at this point in time rather than hold the person past that.

       MR. PEARL:  You might be right about that.  I thought we could start the cross of Det. Gabriele.

       THE COURT:  We have three alternates left.  We can discuss it at a later time.

       Do you want to start the testimony, Mr. Keahon?

People v. Lamar Whitehead

MR. KEAHON:  Yes.

Do we know who the juror is?

THE COURT:  Juror No. 5

Is there anything before we bring the jury out and continue with Det. Gabriele?

MR. KEAHON:  No.

Is there any way that the fellas could do it over there, and I could get going on my cross?

THE COURT:  Are you going to need them during the cross?

MR. KEAHON:  Yes, but I can get going on my cross.  We have them all pulled. They were kind enough to do it earlier.

THE COURT OFFICER:  We can do it out here.

THE COURT:  Thank you very much, officers.

MR. PEARL:  Judge, can we approach off the record.

(Side bar discussion held off the record)

THE COURT:  If the jury is ready, we'll proceed.

48

People v. Lamar Whitehead

1

2              THE COURT OFFICER:  Jury entering.

3              THE COURT:  All rise, please.

4              (The following occurred with the

5   jury present):

6              THE COURT:  Please be seated.

7              THE CLERK:  Case on trial, People

8   versus Whitehead.  Counsel and all parties are

9   present.  Counsel waive the roll.

10             THE COURT:  Thank you all, once

11  again.

12             Recall Det. Gabriele to the stand,

13  please.

14             Good afternoon, detective, you may

15  resume your seat.

16             (The Witness resumes the stand)

17             THE CLERK:  Detective, I remind

18  you, you're testifying under oath.

19             THE COURT:  Please.

20             Thank you, Mr. Keahon.  You may

21  inquire.

22             MR. KEAHON:  Thank you, judge.

23  CROSS-EXAMINATION

24  BY MR. KEAHON:

25        Q.   Good afternoon, detective?

Jennifer Maue, Senior Court Reporter   (631)852-2153

CROSS/Gabriele

1

2          A.   Good afternoon, Mr. Keahon.

3          Q.   Detective, you have been with the Suffolk

4    County Police Department for how long?

5          A.   Approximately 16 years.

6          Q.   You have been a detective for how many

7    years?

8          A.   Approximately six years.

9          Q.   And what other assignments did you have in

10   the Suffolk County Police Department before becoming

11   a member of the Identity Theft Unit?

12         A.   I was a patrol officer and I was also in

13   plainclothes.

14         Q.   When you say "plainclothes", did you do

15   narcotics?

16         A.   Limited narcotics, yes.  If we found

17   something on a car stop.  Not actual narcotics

18   investigations.

19         Q.   Detective, let's talk about Baron Honda.

20   You're familiar with that place?

21         A.   Yes, I am.

22         Q.   And you paid visits there, have you?

23         A.   Yes, I have.

24         Q.   And when for the first time did you go to

25   Baron Honda?

CROSS/Gabriele

1

2       A.   I would have to look at my notes.  I don't

3  remember exactly offhand.

4       Q.   Approximately?

5       A.   The first time I went -- sometime maybe

6  2006?  2007?   I'm not -- I'm not exactly sure.

7       Q.   You're familiar with the name Gilda

8  Tricaro?

9       A.   Gilda Tricaro, yes.

10      Q.   When is the first time you spoke with her?

11      A.   I have to look at my note.

12      Q.   She was a witness at this case?

13      A.   Yes.

14      Q.   Did you take a statement from her?

15      A.   No, I did not.

16      Q.   Did you make any notes, do any interviews

17  of her?

18      A.   If I can refer to my notes, if there is

19  anything in there?  I'm not sure if there is, or not.

20      Q.   Uh-hum.

21      A.   No, I didn't have any notes from speaking

22  with Mrs. Tricaro.

23      Q.   You know she testified at this trial?

24      A.   Correct, yes.

25      Q.   Have you read her transcript of both

51

CROSS/Gabriele

direct and cross-examination at this trial?

     A.  No, I have not.

     Q.  In your conversations with her, did you ask her whether or not Valerie Rodriguez had access to any Dealer Track Program?

     A.  No, I did not.

     Q.  Do you know the questions she was asked about that during this trial?

     A.  No, I do not, counsel.

     Q.  Do you know the answers she gave on cross-examination?

     A.  No, I do not.

     Q.  Brian Smith, he's a victim in this case?

     A.  Yes, he is.

     Q.  He was an employee of Baron Honda?

     A.  Yes, he was.

     Q.  When was the first time you spoke with him, sir?

     A.  The day I took an affidavit from him.

     Q.  Did you question him at all as to whether or not he knew Valerie Rodriguez while she was an employee at Baron Honda?

     A.  No, I did not.

     Q.  Up until today's date, did you know

CROSS/Gabriele

1  whether or not they were friends?

2        A.   No, I do not.

3        Q.   Up until today's date, do you know whether
4  or not Brian Smith was an employee of Baron Honda
5  during the same time period as Valerie Rodriguez?

6        A.   Yes, he was.

7        Q.   Did you have any conversations with
8  Valerie Rodriguez when you interviewed her, as to her
9  friendship with Brian Smith?

10        A.   No, I did not.

11        Q.   Up until today's date.

12        A.   I haven't had any conversations with
13  reference to Brian Smith and Valerie Rodriguez, no.

14        Q.   Do you know the name of Valerie Rodriguez'
15  boss?

16        A.   Yes.

17        Q.   What was it?

18        A.   Gentleman by the name of Eddie Regis, was
19  a direct supervisor, and Nicolas La Moen (ph) was the
20  overall supervisor of the B Team finance.

21        Q.   Did Gilda Tricaro ever tell you that
22  Valerie Rodriguez did not have access to the Dealer
23  Track Program?

24        A.   No.

CROSS/Gabriele

Q.   Were you present at all when she was interviewed by the district attorney's office prior to her testimony at this trial?

A.   Yes, I was.

Q.   Do you recall any questions being asked of Ms. Tricaro, as to whether or not --

A.   Excuse me, counsel.  Are you speaking of Ms. Tricaro or Ms. Rodriguez.

Q.   Ms. Tricaro?

A.   No, I was not present at Ms. Tricaro's interview with the district attorney's office.

Q.   Well, you've prepared this case with Mr. Pearl, have you not?

A.   That is correct.

Q.   Has anyone made you aware that Ms. Tricaro says that Valerie Rodriguez did not have access to the Dealer Track Program?

MR. PEARL:  Objection.

THE COURT:  Sustained.

Q.   When you interviewed Ms. Rodriguez, did she tell you that an individual's credit report only stayed on the Dealer Track Program for 30 days?

A.   No, she did not.

Q.   Do you know she testified in this

CROSS/Gabriele

courtroom about that?

     A.   No, I do not, counsel.

     Q.   Did you even ask her, when you interviewed her, how long a period of time someone's credit report would stay on that Dealer Track Program?

     A.   I don't believe I did, no.

     Q.   You were present when she was prepared by the assistant district attorney prior to her testimony?

     A.   Are you referring to when I took a statement from her, or prior to her testifying in trial.

     Q.   Prior to her testifying in trial?

     A.   No, I was not.

     Q.   When you spoke to Ms. Rodriguez, did you speak to her about when she first got a password for the Dealer Track Program?

     A.   I would have to refer to the statement that I took from her?

     Q.   Sure.

            THE WITNESS:  Can you ask me the question again?  I completely lost what you asked me?

     Q.   When you spoke to Ms. Rodriguez, did you

1    CROSS/Gabriele

2    ask her how long an individual's credit report was

3    kept on the Dealer Track Program?

4         A.   No, I did not.

5         Q.   Did you ask her when is the first time she

6    claimed to have gotten the password for the Dealer

7    Track Program?

8         A.   I don't believe I did, no.

9         Q.   Have you read her cross-examination as to

10   that specific point, that is, when she claimed she

11   first got the Dealer Track Program password?

12        A.   No, sir, I have not.

13        Q.   Has anyone indicated to you that she

14   indicated that she got that password in November or

15   December of 2004?

16        A.   No, sir, they have not.

17        Q.   I think you told us her immediate boss was

18   Eddie J. Regis?

19        A.   That is correct.

20        Q.   Initials "EJRegis"?

21        A.   That is correct.

22        Q.   Did you take that statement from him?

23        A.   No, I did not.

24        Q.   Do you have any notes of any interview of

25   him?

Jennifer Maue, Senior Court Reporter   (631)852-2153

1  CROSS/Gabriele

2          A.   No, I do not.

3          Q.   Did you ask him specifically who had the

4  password for the Dealer Track Program?

5          A.   No, I did not.

6          Q.   Maria Macarle, did she buy a vehicle from

7  Baron Honda?

8          A.   Yes, she did.

9          Q.   Do you know when she filled out that

10  credit report?

11          A.   She filled out a credit report or

12  application.

13          Q.   Application for a credit report?

14          A.   I have to look at the file.  I don't know

15  the exact date, no, sir.

16          Q.   Would August of 2004 refresh your

17  recollection?

18          A.   I have to look at the document.  I can't

19  off the top of my head.

20          Q.   30 days after August of 2004, would be

21  September of 2004, right?

22          A.   That is correct, yes.

23          Q.   If Ms. Rodriguez claims that she didn't

24  get the password until November or December of 2004,

25  then that credit report would have been gone, right?

CROSS/Gabriele

A.   There is a file in Baron Honda.  They keep actual physical files, yes.

Q.   Well, Ms. Rodriguez never told you that she went through a series of files, did she?

A.   No, she didn't.  No.

Q.   Now Brian Smith, do you know when he filled out his credit report?

A.   Again, I'd have to look at the application from Baron Honda.  I do not know off the top of my head, no.

Q.   Would August 27 of 2004 refresh your recollection?

A.   Counsel, I have to look at the documents. I don't know off the top of my head.

Q.   Thirty days after that would be in September, right?

A.   Yes, it would.

Q.   What about Mike Nolan, do you know when he filled out a credit report?

A.   No, I do not.

Q.   August 27, 2004, does that refresh your recollection?

A.   Again, I have to look at the Baron Honda documents.  I don't have that information at the tip

CROSS/Gabriele

of my tongue, no.

        Q.   What about Joseph Sweeney, do you know
when he filled out the application for the credit
report?

        A.   The application for credit.

        Q.   Yeah?

        A.   Through Honda?  No, I'd have to look at
the document.

        Q.   Would August 26th, 2004, refresh your
recollection?

        A.   No, it wouldn't.  Unless I can see the
document.

        Q.   What about Eric Besso.

        A.   It's the same.  I have to look at the
document.

        Q.   Does the date of August 26th, 2004,
refresh your recollection?

        A.   Again, counsel, I'd have to look at the
document.

        Q.   Kathleen March, do you know when she
filled out a credit report?

        A.   Again, I'd have to look at the Baron Honda
exhibit.

        Q.   September 5th of 2004, does that refresh

CROSS/Gabriele

1

2  your recollection?

3          A.   Again, counselor, I'd have to look at the

4  document.

5          Q.   Briton Lawler, you're familiar with that

6  name?

7          A.   Yes, I am.

8          Q.   Do you know when he filled out the credit

9  report?

10          A.   Again, I'd have to look at the Baron Honda

11  exhibit.

12          Q.   Does August 30th of 2004 refresh your

13  recollection?

14          A.   No, it doesn't.

15          Q.   What about Brian and Brenda Foley.  You

16  gave some testimony today about them?

17          A.   I gave testimony as far as their.

18          Q.   Chart?

19          A.   Spray charts?

20          Q.   Yes?

21          A.   Yes, I did.

22          Q.   When might they have filled out that

23  credit report?

24          A.   Again, I'd have to look at the Baron Honda

25  exhibit.

CROSS/Gabriele

Q.   Would September 5th of 2004 refresh your recollection?

A.   I'm sure if you're telling me that, I would take it as gospel, Mr. Keahon.

Q.   Can they --

MR. KEAHON:   Thank you for that answer, sir.

Q.   What about Gloria Conaty.

A.   Again, I'd have to look at the exhibit.

Q.   September 19th of 2004, does that refresh your recollection?

A.   Again, I have to lock at the exhibit.

Q.   Gerard (sic) Thurman.   He was a victim in this case, was he not?

A.   That is correct.

Q.   His credit report was filled out when, do you know?

A.   The application for credit through Honda? Again, I'd have to look at the exhibit.

Q.   September 11th, 2004, does that refresh your recollection?

A.   I'd have to look at the exhibit.

Q.   Thomas Palladino.   Do you know when he filled out a credit report?

CROSS/Gabriele

A.   No.   I do not.

Q.   October 13th, 2004.   Does that refresh your recollection?

A.   I'd have to once again look at the Baron Honda exhibits.

Q.   Wojcieh Wachnik.   Did he buy a car from Baron Honda?

A.   I believe he did, yes.

Q.   Do you know when he did the credit report?

A.   No, I do not.

Q.   Nor do I.  Raymond and Nerina Sperl, do you know when they did the credit report?

A.   When they did the credit application.

Q.   Yes?

A.   No, I do not.

Q.   Does 10/16/04 refresh your recollection?

A.   I would again have to look at the Baron Honda exhibit.

Q.   You talked to us about the Wojcieh Wachnik Sprint-Nextel phone, cellular phone?

A.   Correct.

Q.   Do you recall a Dan Jensen, from Sprint-Nextel, testifying?

A.   I know that there was a Sprint

CROSS/Gabriele

representative testifying, yes.

Q.   Are you aware that the amount paid for Mr.
Wachnik's Sprint-Nextel cellular phone bill, the
record was not produced of how, when, or the method
of payment?

A.   Are you asking me if I know what Dan
Jensen said?

Q.   Yeah?

A.   As far as that?

Q.   Yes?

A.   No, I have not idea what Dan Jensen said.

Q.   Did you ever see a document how Mr.
Wachnik's Sprint-Nextel bill was paid?

A.   No.

Q.   Or when it was paid?

A.   No.

Q.   Or the method of it being paid?

A.   No.

Q.   You spoke with Ms. Rodriguez for the first
time when, sir?

A.   I believe it was 1/27/06.  1/27/07 was the
first time I spoke with her.

Q.   And that was by phone?

A.   Yes, it was.

CROSS/Gabriele

Q.   You called her?

A.   Yes.

Q.   When you spoke with her, did you tell her you'd like to meet with her?

A.   Yes, I did.

Q.   And that was on February 6th, 2007, wasn't it?

A.   The meeting with her was on February 6th of 2007.

Q.   No, the phone call I'm asking you?

A.   No, if I can refresh my memory from my notes.

Q.   Sure.

A.   1/26/07, was when I spoke with her the first time.

Q.   When you spoke with her, she was a person of interest for you?

A.   Yes, she was.

Q.   You knew she worked for Baron Honda.

A.   Yes, I did.

Q.   You knew that she was part of the B Finance Team?

A.   B Team Finance.

Q.   She dealt with used vehicles?

CROSS/Gabriele

    A.   Yes.

    Q.   And when you spoke to her for the first time on that phone, on the date you've just told us, you told her that there was some problems with loans, am I correct?

    A.   That's correct, yes.

    Q.   That had been taken out and that many of the individuals involved have been at Baron Honda?

    A.   Had purchased vehicles at Baron Honda, yes.

    Q.   You told her that you found issues with phone records between her and Mr. Lamar Whitehead?

    A.   That's correct.

    Q.   And you wanted to discuss the situation with her, right?

    A.   Yes.

    Q.   You also told her, that you believe through your investigation, that she had been in possession of credit reports which were the subject of the fraud?

    A.   Could you repeat that question again, counsel?

    Q.   Sure?   You've given testimony before, where I've asked you questions in this case, right?

CROSS/Gabriele

A.   That is correct, yes.

Q.   You've reviewed that testimony, have you?

A.   Yes, I have.

Q.   You were provided with a transcript of that?

A.   Yes.

Q.   You told her, did you not, sir, that you believed through your investigation that she had been in possession of credit reports which were the subject of a fraud.

A.   I would have to look at those minutes to a specific thing, what you're describing, there.

MR. KEAHON:  Okay.

THE WITNESS:  If I could.

Q.   I'm calling your attention to page 156 and 157 of the transcript, and your answer was, "Yes, I told her there was some problems with loans that had been taken out and that many of the individuals involved had been at Baron Honda and that we had found some issues with phone records between her and Mr. Lamar Whitehead and we wanted to discuss the situation with her."

A.   Correct.

Q.   Okay.  And that is what I had asked you?

CROSS/Gabriele

A.   You asked me if I had asked her if there was actual credit reports involved.

Q.   And what did she say when you said that to her?

A.   When I said what to her, that we believed?

Q.   Just what I read back?

A.   There was something involved with her and Mr. Whitehead.

Q.   Yeah?

A.   We discussed -- and I told her I wanted to meet with her.

Q.   Well, didn't you also tell her that you believed, through your investigation, that she had been in possession of information on credit reports which were the subject of the fraud?

A.   Again, I have to look at the context of the testimony.

MR. KEAHON:  I'll read it to you again.

MR. PEARL:  I object.  If he wants to refresh his recollection, to the detective, do it properly.

THE COURT:  If you could note the line for your colleague.

CROSS/Gabriele

1

2          Q.    The last line on Page 156, down to Line

3     10, on Page 157:

4                "Answer:  Yes, I told her there was

5           some problems with loans that had been taken

6           out and that many of the individuals involved

7           had been at Baron Honda and we had found some

8           issues with phone records between her and Mr.

9           Lamar Whitehead and we wanted to discuss the

10          situation with her.

11               "Question:  Did you also tell her

12          that you believed through your investigation

13          that she had been in possession of information

14          on credit reports which were the subject of

15          the fraud?

16               "Answer:  We asked her, yes."

17          A.    Yes, that is correct.

18          Q.    Did she tell you, "Yes, she had been in

19    possession of those credit reports"?

20          A.    Had she been in possession of those credit

21    reports.

22          Q.    Yeah?

23          A.    I don't recall whether she did or not, no.

24          Q.    Page 157, Line 13:

25               "Question:  Did she tell you, yes, she

Jennifer Maue, Senior Court Reporter    (631)852-2153

CROSS/Gabriele

1  had?

2          "Answer:   No, she did not."

3          Is that correct?

4      A.   That's correct, yes.

5      Q.   Did she ever deny ever having knowledge of

6  any credit reports?

7      A.   At which time, in the initial conference?

8      Q.   Yes, yes?

9      A.   No.

10     Q.   Well, did she ever indicate to you, yes,

11  she did have those credit reports?

12     A.   No, she did not.

13     Q.   She told you she didn't want to speak to

14  you anymore, didn't she?

15     A.   She admitted to me that she would like to

16  meet with me, and then after that, we stopped the

17  conversation and she did not seem to want to go any

18  further from that point on.

19     Q.   Well, after you made those comments to

20  her, she didn't speak to you anymore, did she?

21     A.   That's correct.

22     Q.   Then you were supposed to meet her that

23  afternoon?

24     A.   Not that afternoon but a day later, I

1   CROSS/Gabriele

2   believe.

3          Q.   Well, weren't you supposed to meet her

4   later that day?

5          A.   No, not later that day.

6          Q.   Page 157:

7               "Question:   She told you she wanted to

8   get a lawyer?

9               "Answer:   She didn't tell me she wanted

10  to get a lawyer that day.  I found out later that

11  day, when I was supposed to meet her, she had

12  retained a lawyer."

13         A.   I believe I corrected myself after that,

14  counsel.

15                    MR. KEAHON:  Can I approach,

16         please?

17                    THE COURT:  Yes.

18                    (The following occurred at side

19         bar):

20                    THE COURT:  You wish to approach

21         the witness, Mr. Keahon?

22                    You have the court's leave.

23                    (The following occurred in open

24         court):

25  BY MR. KEAHON:

CROSS/Gabriele

Q.   Page 157, detective, the bottom of the page, three-quarters of the way down the page?

A.   Yes.

Q.   I think you said you corrected yourself?

A.   Yes, I did not meet -- I did not find out that she had retained a lawyer that day.  No, I did not.

Q.   No?

A.   No.

Q.   The question was, weren't you supposed to meet her that day?  And you said no?

A.   No, I was not supposed to meet her that day.

Q.   What does the transcript say?

A.   The transcript said I was going to meet her that day.

Q.   So let's clear it up.

My question to you was, were you supposed to meet her that day?  You said "no"?

A.   That is correct.

Q.   Your transcript says "yes"?

A.   If you look at my direct, the direct examination is very clear that I said a couple of days later, yes.

CROSS/Gabriele

1

2      Q.    I'm asking you about the

3  cross-examination?

4                  MR. PEARL:   Objection.

5                  THE COURT:   Sustained.

6                  Mr. Keahon, if you would be so kind

7          as to use the specific reference to the page

8          and line.

9                  MR. KEAHON:   Okay.

10     Q.    Is there any confusion when you looked at

11  this transcript?

12     A.    No, there was not.

13     Q.    Clearly, I asked you on cross-examination,

14  on Page 157, whether or not you were supposed to meet

15  her that day, and you said no, correct?  Later that

16  day?

17     A.    Correct.

18     Q.    When I showed you that transcript, you saw

19  that you testified -- Page 157, Line 18:

20          "Question:  She told you she wanted to get

21  a lawyer?

22          "Answer:   She didn't tell me she wanted

23  to get a lawyer that day.  I found out later that day

24  when I was supposed to meet her"?

25     A.    Correct.

CROSS/Gabriele

Q.   That she had retained a lawyer?

A.   That is correct.

Q.   So you were supposed to meet her later that day?

A.   No, I wasn't.

Q.   Was this testimony wrong?

MR. PEARL:  Judge, objection.

THE COURT:  Sustained.  Form. Rephrase.

Q.   "I found out later that day when I was supposed to meet her"?

A.   If you back up, I did not meet her that day.

If you back up a few lines, there, counselor.

Q.   Obviously, you didn't meet her that date because she got a lawyer, right?

A.   I didn't meet her that date because we were scheduled to meet sometime after that day.

Q.   You said, back up a few lines.  Would you take a look at Page 157?

A.   She didn't tell me she wanted to get a lawyer that day, I answered.

Q.   Go ahead?

CROSS/Gabriele

A.   Then I said I found out later that day, when I was supposed to meet her, that she had retained a lawyer.

Q.   So you're saying, in that record, that you were supposed to meet her later that day?

A.   That's what it says but that was not the case, no.

Q.   It took us a long time to get there. Okay, thank you.

So notwithstanding what the transcript says, you weren't supposed to meet her that day?

A.   No, I was not supposed to meet her that day.

Q.   But later that day you did find out that she had retained an attorney?

A.   No, the next day I found out or a day after that. Not that same day. That same day I did not find out that she had retained an attorney.

Q.   When you found out she had an attorney, how did you find that out?

A.   When I came back to work, I attempted to contact her, and she told me she had retained an attorney.

Q.   Did she give you the attorney's name?

Jennifer Maue, Senior Court Reporter   (631)852-2153

CROSS/Gabriele

A.   Yeah, a Mr. Earl Roberts.

Q.   You gave that name to the district attorney's office?

A.   Yes, I did.

Q.   They reached out to Mr. Earl Roberts and asked him to come in?

A.   Correct.

Q.   They asked him to come in with her?

A.   Yes.

Q.   The four of you met?

A.   Yes.

Q.   The first thing that you did, when you met with her and her attorney, and Mr. Pearl, was have her sign a proffer agreement?

A.   No.

Q.   Did she sign a proffer agreement?

A.   Yes, she did.

Q.   Did she sign it that day?

A.   Yes, she did.

MR. KEAHON:   I don't know what number that is, defense either C or D.

THE COURT OFFICER:   Defendant's Exhibit C.

MR. KEAHON:   Thank you very much.

1    CROSS/Gabriele

2            Q.   Defendant's Exhibit C?

3                    THE COURT:   Officer, if we could

4    have the lights turned off for a minute,

5    please.

6            Q.   This is the proffer agreement of February

7    6th?

8            A.   That's correct.

9            Q.   And the first paragraph says "any

10   prosecution against Valerie Rodriguez"?

11           A.   Yes.  Did you want me to read that

12   counselor?

13                "In any prosecution against Valerie

14   Rodriguez by the Suffolk County District Attorney's

15   office, the Suffolk County District Attorney's office

16   will not offer in evidence in its case in chief or at

17   sentencing any statements made by Valerie Rodriguez

18   at the aforementioned meeting", right?

19           A.   Correct.

20           Q.   Second paragraph.

21                    MR. PEARL:   That is not the end of

22           that paragraph, I don't think.

23           Q.   "Made by Valerie Rodriguez in the

24   aforementioned meeting except in prosecution for

25   false statements, obstruction of justice or perjury",

Jennifer Maue, Senior Court Reporter   (631)852-2153

CROSS/Gabriele

correct?

     A.   That is correct.

     Q.   The second paragraph deals with the Suffolk County District Attorney's office -- may use any information derived directly or indirect?

     A.   The Suffolk County District Attorney's office.  It doesn't say "I".

     Q.   "The Suffolk County District Attorney's office may use statements made by Valerie Rodriguez at the meeting and all evidence obtained directly or indirectly for the purpose of cross-examination should Valerie Rodriguez testify contrary to her statements", correct?

     A.   That is correct.

     Q.   "It is further understood that this agreement is limited to the oral statements made at the meeting and does not apply to any oral written or recorded statements" by her at any other time, right?

     A.   That is correct.

     Q.   "It is understood that the purpose of this meeting is to determine whether Valerie Rodriguez will be permitted to cooperate with the Suffolk County District Attorney's office." Right?

     A.   Yes, that is correct.

CROSS/Gabriele

Q.   "Five, It is understood that pending a determination whether Valerie Rodriguez will be permitted to cooperate with the Suffolk County District Attorney's office, she has to waive her speedy trial rights", right?

A.   Yes.

Q.   Speedy trial rights,  right?

A.   Yes.

Q.   The second page is "No understandings, promises or agreements have been entered into with respect to this meeting other than those set forth in this agreement and none will be entered into unless in writing and signed by the parties", right?

A.   Yes.

Q.   She signed it.  Her attorney signed it and Mr. Pearl signed it?

A.   That is correct.

Q.   You didn't have any conversations about what she knew or didn't know prior to having her sign that document, did you?

A.   I didn't even know that document was signed.

Q.   Were you present when that was discussed?

A.   The proffer agreement that we just looked

CROSS/Gabriele

at.

Q.   Yeah?

A.   No, I was not.

Q.   I thought you investigated -- you were present for that meeting?

A.   I was but not for the proffer agreement. I had no knowledge that that proffer agreement had been signed.

Q.   Well, the first thing that you did, individually, was you read her her rights?

A.   That's correct.

Q.   What rights did you tell her she had?

A.   Would you like me to read them off the statement.

Q.   The statement?

A.   "You have the right to remain silent.

"Anything you say can and will be used against you in a Court of Law.

"You have the right to talk to a lawyer right now and have him present with you while you're being questioned.

"If you cannot afford a lawyer and want one a lawyer will be appointed for you by the court before any questioning.  If you decide to answer

CROSS/Gabriele

1  questions now, without a lawyer present, you will

2  have the right to stop the questioning at any time

3  until you talk to a lawyer."

4  

5      Q.   After you read her her rights, did you

6  tell her that you were interested in any information

7  that she had that referenced Mr. Whitehead concerning

8  identity fraud?

9      A.   Yes, I did.

10     Q.   Did you ask her details about Mr.

11  Whitehead?

12     A.   Yes, I did.

13     Q.   Did you then tell her that he was the

14  individual that you were investigating as part of

15  this fraud investigation?

16     A.   Yes, I did.

17     Q.   That same day she testified in the grand

18  jury, didn't she?

19     A.   Yes, she did.

20     Q.   So the first time you speak to her, you

21  tell her what you're interested in, she says she

22  doesn't want to talk to you and hangs up, right?

23     A.   No, she didn't hang up the phone.  She did

24  not want to talk, no.  But she did not hang up the

25  phone on me.

1   CROSS/Gabriele

2           Q.   After she told you she didn't want to talk

3   to you she hung up the phone?

4           A.   She didn't slam the receiver down, Mr.

5   Keahon.  She hung up the phone.

6           Q.   Then you were supposed to meet her later

7   that afternoon?

8           A.   No, not later that afternoon.  The next

9   day.

10          Q.   And she didn't show up the next day?

11          A.   No, I found out she had retained an

12  attorney.

13          Q.   When she does come in with her attorney,

14  she signs that proffer agreement?

15          A.   That is correct.

16          Q.   Which indicates she may be prosecuted,

17  right?

18          A.   Not for what she discussed with us on that

19  particular day, no.

20          Q.   But you hadn't discussed with her anything

21  at the time this proffer agreement was signed?

22          A.   That is correct.

23          Q.   So she signs the proffer agreement, right?

24          A.   That is correct.

25          Q.   Then you read her her rights?

CROSS/Gabriele

     A.   Yes.

     Q.   Then you tell her those things you were interested in about him.

     A.   That's correct, yes.

     Q.   Then you put her in the grand jury.

           MR. PEARL:  Objection.

           THE COURT:  Overruled.

     Q.   She goes in the grand jury that day?

     A.   Yes, she does.

     Q.   She gets immunity?

     A.   I don't know what exactly happens in the grand jury?  I'm not a district attorney.  So, whatever happens in the grand jury, that's what happened that particular day.

     Q.   Did she waive her immunity?

     A.   I wasn't in the grand jury, Mr. Keahon.

     Q.   But you know that, don't you?

     A.   I'm not a lawyer, Mr. Keahon.

     Q.   Are you saying you have to be a lawyer to know working on this case for two years whether or not Valerie Rodriguez got immunity or not?

           MR. PEARL:  Objection.

           THE COURT:  Sustained.

     Q.   Is it your testimony as of today's date,

CROSS/Gabriele

1

2   you don't know that she got immunity in the grand

3   jury?

4          A.   I know she got immunity in the grand jury,

5   but I don't know all the mechanisms that work in the

6   grand jury, no.

7          Q.   Now we know she got immunity in the grand

8   jury, right?

9          A.   Correct.

10         Q.   And that's after that grand jury

11  appearance, is after you told her you thought he did

12  it and you wanted information on him, right?

13                    MR. PEARL:   Objection.

14         Mischaracterization.

15                    THE COURT:   Sustained, form.

16         Please rephrase, Mr. Keahon.

17         Q.   Her grand jury appearance occurred after

18  you told her that you were interested in any

19  information she had against him in fraud, identity

20  theft, yes?

21         A.   That is correct, yes.

22         Q.   Before she testified in the grand jury,

23  did you ask her if she knew a Kylie Copeland?

24         A.   Yes, I did.

25         Q.   Before she testified in the grand jury.

CROSS/Gabriele

A.   Yes, I did.

Q.   Show me one note or report which shows you ever broached that subject with her?

MR. PEARL:   Object.

THE COURT:   Sustained.

Q.   Do you have a note or report that indicates that on that date, when you spoke to her, when she got immunity in the grand jury, you asked her whether or not she ever knew a Kylie Copeland?

A.   No, I don't.

Q.   I didn't hear you?

A.   I said no, I don't.

Q.   You don't what?

A.   I don't have any notes indicating that?

Q.   Do you have any report indicating that?

A.   No, I do not.

Q.   Before she got immunity in the grand jury, did you ask Ms. Rodriguez, whether or not she knew a Desmond DeFreitas?

A.   No, I did not.

Q.   Before she testified and got immunity in the grand jury, did you ask her whether or not she knew a Desmond DeFreitas?

A.   No, I did not.

CROSS/Gabriele

        Q.    Did you ever get Ms. Rodriguez's phone
records for 2004 and 2005?

        A.    I have her phone records.  I don't
remember the exact dates on the phone records, no.
I'd have to look at the phone record.

        Q.    When you say you have her phone records,
did you have her phone records, her cell and home
phone records subpoenaed?

        A.    Yes, I did.

        Q.    For what months and what years do you have
them?

        A.    Mr. Keahon, I'd have to look at the
records.  Off the top of my head, I do not know what
the date range was on those particular phones.

        Q.    Do you have that in your book?

        A.    No, I do not.

        Q.    Where would that be?

        A.    I believe we have it in as an exhibit, two
phone numbers, the two phone numbers from her.

        Q.    Do you recall what exhibit that is?

        A.    No, I do not.

        Q.    It is your testimony that the two phones
that are exhibits, are the full phone records for
Valerie Rodriguez.  Cell and home.

CROSS/Gabriele

1

2          A.   The full phone records for whatever the
3   time span is that the subpoena requested, yes.
4          Q.   Am I correct that when you spoke to to Ms.
5   Rodriguez, you learned she had worked for Baron from
6   September to December of 2004?
7          A.   I had known she had worked there prior to
8   speaking with her.
9          Q.   From September to December?
10          A.   Again, I don't know the exact dates that
11   she worked there, no.
12          Q.   Well, did you discuss that with her when
13   you took a statement from her?
14          A.   I'd have to refer back to the statement.
15          Q.   Please take a look.
16          A.   She states that she became serious with
17   Mr. Whitehead about three months after May of 2004.
18   So somewhere around August or September.
19          Q.   I think I asked you when she worked for
20   Baron Honda?
21          A.   And she indicates that, she says we began
22   getting very serious after about a couple of months.
23   It was at that time I began working as a special
24   finance associate at Baron Honda.
25          Q.   Did you ever learn what months she worked

CROSS/Gabriele

1  at Baron Honda for all these credit reports?

2       A.   I would have to look at the file from

3  Baron Honda, as far as her personnel file.

4       Q.   As you sit here now, you don't know it was

5  from September to December?

6       A.   I'm not going to give you a definitive

7  answer without knowing it.

8       Q.   There came a point in time you asked her

9  to listen to some audio, of those voicemail box

10 recordings, right?

11      A.   That is correct.

12      Q.   Was that that day?

13      A.   If I could refer to the statement.

14      Q.   Sure.

15      A.   Yes, it was.

16      Q.   Prior to asking her to listen to the

17 audios, did you ask her whether or not there was

18 anything unusual about Mr. Whitehead's voice pattern

19 or inflection or word choice?

20      A.   No, I did not.

21      Q.   Did she offer to you that there was

22 anything special about the manner in which he spoke?

23      A.   No, she did not.

24      Q.   Did you check to see whether or not

CROSS/Gabriele

1  Valerie Rodriguez had dealt with any of the victims
2  of the identity frauds, at Baron Honda?

3          A.   No, I did not.

4          Q.   Well, did you show her the names of the
5  victims that had purchased vehicles at Baron Honda
6  and did you ask her whether or not she was familiar
7  with any of those names?

8          A.   No, I did not.

9          Q.   There came a point in time that you went
10 and spoke to a fella by the name of Nigel DeFreitas?

11         A.   That is correct.

12         Q.   Where was that?

13         A.   August 5th of 2005.

14         Q.   You went there with a team of police
15 officers?

16         A.   Yes, I did.

17         Q.   You went there to execute a search
18 warrant?

19         A.   Yes, I did.

20         Q.   You had the search warrant with you?

21         A.   Yes, I did.

22         Q.   You didn't call ahead of time and let them
23 know you were coming?

24         A.   No, Mr. Keahon, I didn't.

CROSS/Gabriele

Q.   You arrived there at the residence?

A.   Yes.

Q.   What time did you get there?

A.   What time did I physically get --

Q.   Yeah?

A.   -- did I get there.

Q.   Did you get there?

A.   Approximately ten.

Q.   That is in the morning?

A.   Yes, it is.

Q.   Did he come outside to meet you?

A.   No, he did not.

Q.   Did you show him identification?

A.   When I had gotten to the house, the house had already been secured by other members of the Identity Theft Unit.

Q.   What time did they get there?

A.   They got there approximately around 9:00 o'clock in the morning.

Q.   Did they inform you as part of the investigation that they wouldn't let them in the house?

A.   No, they did not.

Q.   Did you learn that Mr. DeFrietas came

```
 1    CROSS/Gabriele

 2    outside with his wife and refused to let the fellas

 3    in unless he saw a search warrant?

 4              A.   No, they did not.

 5              Q.   Have you ever learned that?

 6              A.   No, sir.

 7              Q.   Have you ever reviewed Mr. DeFrieta's

 8    cross-examination?

 9              A.   Absolutely not.

10              Q.   In front of this jury?

11              A.   Are you asking me if I reviewed a witness'

12    testimony.

13              Q.   Yes?

14              A.   Absolutely not.  No.

15              Q.   Uh-huh.  Well you know that the district

16    attorney has the transcripts of the witnesses that

17    have testified, don't you?

18              A.   Yes, I do.

19              Q.   You also know that his wife and he both

20    told the officers at the scene that his wife was an

21    assistant district attorney, am I right?

22              A.   They told me that she was an assistant

23    district attorney, yes.

24              Q.   In Nassau County?

25              A.   Yes.
```

CROSS/Gabriele

1
2          Q.   You go inside the house at some point,
3    right?
4          A.   That is correct.
5          Q.   His brother, Desmond, was there?
6          A.   Not when I arrived there, no.
7          Q.   Did you check to determine who lived
8    upstairs?
9          A.   Did I check to determine.
10         Q.   Yeah, yeah?
11         A.   Desmond lives upstairs, yes.
12         Q.   Desmond who?
13         A.   Desmond DeFreitas.
14         Q.   Did you learn that he was there earlier
15   when the detectives arrived?
16         A.   Yes.
17         Q.   Did anyone take a statement from him?
18         A.   No, they did not.
19         Q.   Did anyone question him?
20         A.   No.
21         Q.   Did the detectives tell you that they saw
22   him drive away in a maroon Grand Cherokee Jeep?
23         A.   A maroon Grand Cherokee Jeep?
24         Q.   Jeep, yeah?
25         A.   No.

Jennifer Maue, Senior Court Reporter    (631)852-2153

CROSS/Gabriele

Q.   That day or any following days, did you ever speak with a Desmond DeFreitas?

A.   Yes, I did.

Q.   When was the last time you spoke with him.

A.   About two weeks after the search warrant.

Q.   What about after that?

A.   No.  I never spoke with him after that.

Q.   After Mr. DeFreitas, Nigel DeFreitas testified in court, did you have any conversations with Nigel DeFreitas before he went home after his testimony?   About he and Kylie Copeland and his brother being involved in an identity theft of a vehicle, a maroon Grand Cherokee Jeep?

A.   Absolutely not, no.

Q.   Up until today's date, have you ever called Desmond DeFreitas to ask about that vehicle?

A.   In this investigation, Mr. Keahon, there was --

Q.   Sir, the question i,  did you ever, after Mr. Nigel DeFreitas testified, did you ever call Desmond DeFreitas, after that date of testimony, and ask him the circumstances of him having possession of a particular vehicle?

MR. PEARL:   Objection.   That is not

CROSS/Gabriele

relevant.  It has nothing about a Cherokee in
this indictment.

THE COURT:  I'll see counsel side
bar for a moment, please.  Thank you.

(The following occurred at side
bar):

THE COURT:  Objection, relevance
would have been more than a sufficient offer
of proof, Mr. Keahon.

MR. KEAHON:  Put on notice.  As a
matter of fact, at the time it happened, I
called on the district attorney's office and
the Suffolk County Police Department, to
investigate Nigel DeFreitas.  I want to know
if he did it.

THE COURT:  All right.  We're
dealing with an allegation of criminal
behavior on the part of someone not charged
but --

MR. KEAHON:  Nigel and his brother,
Desmond, were all but accused of doing it with
Kylie Copeland.

MR. PEARL:  It is a completely
collateral issue at the trial.  He's trying to

CROSS/Gabriele

1
2       impeach this witness and trying to impeach two
3       other witnesses through --
4                   MR. KEAHON:  Stop.
5                   THE COURT:  How much longer will
6       you cross-examine about this?
7                   MR. KEAHON:  Another 30 seconds.
8                   It is about the bad act of somebody
9       else.  Even if it is tangentially related to
10      the possibility of exculpatory evidence, we'll
11      allow the inquiry.  He's bound by the answer.
12      Thank you.
13                  (The following occurred in open
14      court):
15      BY MR. KEAHON:
16          Q.   Detective, after Nigel DeFreitas testified
17      in court before this jury, did you have any
18      conversations with him or his brother, about an
19      allegation that his brother and he and Kylie Copeland
20      were involved in an identity fraud on a maroon Grand
21      Cherokee Jeep?
22          A.   I have no idea what you're talking about,
23      Mr. Keahon, absolutely not.
24          Q.   Mr. Pearl never had any conversations with
25      you about the questions that Mr. DeFreitas was asked

94

CROSS/Gabriele

1

2      on the witness stand?

3              A.   No, he did not.

4              Q.   By the way, Mr. DeFreitas testified in the

5      grand jury, didn't he?

6              A.   Yes, he did.

7              Q.   And he testified on two occasions.

8              A.   Right?

9              Q.   Right?

10             A.   I believe it was two occasions, yes.

11             Q.   And he got immunity in the grand jury,

12     didn't he?

13             A.   You'd have to ask the district attorney.

14     If that is what happens in the grand jury, then, yes,

15     he did get immunity.

16             Q.   Is it your testimony, sir, as you sit here

17     now, that you don't know whether he got immunity in

18     the grand jury when he testified?

19             A.   Again --

20             Q.   Is that your testimony?

21             A.   I don't know the inner workings of the

22     grand jury.

23             Q.   Let's not talk about inner workings.  He

24     was a witness that you went and spoke to, yes?

25             A.   That is correct, yes.

95

CROSS/Gabriele

Q.   You did a search warrant on his house, yes?

A.   Yes.

Q.   You played audio, voice mailbox tapes for him, right?

A.   Yes.

Q.   You arranged for him to be subpoenaed, to come out to the grand jury, right?

A.   The district attorney arranged for him to be subpoenaed.

Q.   Sure.  But you were part of that, were you not?

A.   My unit was, yes.  Yes, we were.

Q.   When he came out to testify in the grand jury, you were there.

A.   When he testified in the grand jury.

Q.   You were not in the grand jury, sir?

A.   Okay, I want to make it clear, Mr. Keahon.

Q.   We'll make it clear.  In this building. You were here when he responded to the grand jury, to testify.

A.   Yes.

Q.   Okay.  You're aware that he was called in to the grand jury to testify, right?

1    CROSS/Gabriele

2         A.    That is correct.

3         Q.    You're aware that a person either waives

4    immunity or gets immunity, right?

5         A.    Again, Mr. Keahon, if I were to explain

6    it, I would not be able to give justice to the issue

7    of immunity in the grand jury.  I cannot give a clear

8    answer to that.

9         Q.    You have been a police officer how long?

10        A.    Sixteen years.

11        Q.    You've testified, how many times?

12        A.    Numerous times.

13        Q.    You've testified in the grand jury how

14    many times?

15        A.    Numerous times.

16        Q.    If you don't get immunity in the grand

17    jury when you testify, if you don't waive it, you get

18    it, right?

19                   MR. PEARL:   Judge, I'm just going

20           to object.

21                   THE COURT:   Sustained.

22        Q.    When you spoke with Nigel DeFreitas, you

23    showed him the picture of Lamar Whitehead, right?

24        A.    Yes, I did.

25        Q.    You asked him, is this Lamar Whitehead,

CROSS/Gabriele

1   right?

2

3          A.   Yes.

4          Q.   You told him that you wanted to take any

5   computers that were in the house, am I correct?

6          A.   That is correct.

7          Q.   You told him that you believed his

8   computers were used to assist a crime, yes?

9          A.   Told him that the --

10         Q.   Sir, the question was specific.  Did you

11  tell him that you believed his computers were used to

12  assist a crime?

13         A.   I can't answer that with a yes or no

14  answer, Mr. Keahon.

15         Q.   Page 108 --

16                THE COURT:   Let your colleague

17         finish phrasing the question.

18                Do we have the line and the page?

19                MR. KEAHON:   I was just giving it.

20         Q.   I said Page 108, Line 6:

21                "Question:   Did you tell him that you

22  believed that his computers were used to assist in a

23  crime?

24                "Answer:   Yes, I did."

25                MR. PEARL:   My objection is

98

CROSS/Gabriele

1

2              improper impeachment.  There is no issue to

3              impeach Det. Gabriele.  He said he couldn't

4              answer yes or no.

5                        MR. KEAHON:  He just answered yes.

6                        THE COURT:  Overruled.

7         Q.   You were able to answer when I asked you

8    one time before, weren't you?

9         A.   Yes, I was.

10        Q.   You were able to answer it with a yes,

11   right?

12        A.   Yes.

13        Q.   All right.  Did you tell Mr. DeFreitas

14   that he was under suspicion, himself, for being part

15   of a fraud?

16        A.   That is correct.

17        Q.   Who first brought up the name "Whitehead"?

18        A.   I did.

19        Q.   Did you tell him you believed Lamar

20   Whitehead was involved in a large-scale fraud?

21        A.   Yes, I did.

22        Q.   Did you tell him that it was possible for

23   him to be arrested also?

24        A.   Yes, I did.

25        Q.   Did you tell Mr. DeFreitas that Lamar

Jennifer Maue, Senior Court Reporter    (631)852-2153

CROSS/Gabriele

1  Whitehead is a suspect in a number of identity

3  thefts?

4      A.   Yes, I did.

5      Q.   Did you tell him that you had brought some

6  audiotapes you wanted him to listen to, and see if

7  you can identify Lamar's voice?

8      A.   That is correct.

9      Q.   So you told Mr. DeFreitas that you were

10 investigating fraud cases, right?

11     A.   That is correct.

12     Q.   You told him that he was under suspicion,

13 right?

14     A.   Initially, yes.

15     Q.   You told him that you were taking the

16 computers?

17     A.   That is correct.

18     Q.   You told him he could possibly be arrested

19 himself?

20     A.   That -- yes, that is correct.

21     Q.   You showed him a picture of Lamar

22 Whitehead and asked him to identify it?

23     A.   Yes.

24     Q.   You then tell him that you believe that

25 Lamar Whitehead was involved in a number of identity

CROSS/Gabriele

thefts?

A.   That's correct.

Q.   Then you ask him to listen to some voicemail audios?

A.   Recordings, yes, that is correct.

Q.   You wanted him to identify Lamar's voice, right?

A.   If he could, yes.

Q.   Before playing these audiotapes for him, did you ask him whether or not there was anything specific about the way Mr. Whitehead spoke, the inflection of his voice or the word choice?

A.   No, I did not.

Q.   Did you get Nigel DeFreitas' phone records for 2004 and 2005?

A.   I have Nigel DeFreitas' phone records.  I do not know the exact date range.  I'd have to go back to the record.

Q.   Do you have them for 2004 and 2005?

A.   Again, I'd have to go back and look at the records.

Q.   How about for his brother, Desmond DeFreitas', phone records?

A.   No, I do not.

CROSS/Gabriele

Q.    Do you have them for 2004?

A.    I do not have Desmond DeFreitas' phone records no.

Q.    Do you have them for 2004?

A.    I do not have any of DeFreitas' phone records.

Q.    Do you have any of Kylie Copeland's phone records for 2004?

A.    No, I do not.

Q.    We heard testimony from Anita Bryant, you know her, do you not?

A.    Yes, I do.

Q.    You were the one who arrested her?

A.    That is correct.

Q.    She spent several days in jail, did she?

A.    I don't know the exact amount of time she spent in jail, no.

Q.    She was involved in the Maria Macarle and Christina Brooks and David Ridenour frauds?

A.    She was involved with the Maria Macarle Kings Cycle and then Maria Macarle Commerce Bank.

Q.    What about Christina Brooks?

A.    I only charged her with two counts.

Q.    No, I understand that.  But, was she

CROSS/Gabriele

1   involved in the Christina Brooks?

2   A.   Again, I only charged her with two counts.

3   Those are the only two I'm privy two, that she was

4   involved in.

5       Q.   On that Kings Cycle, she used the license

6   in the name of Maria Macarle?

7       A.   Yes.

8       Q.   She also used the license in the name of

9   Christina Brooks, did she not?

10      A.   I'm not aware of her using anything with

11  Christina Brooks, no.

12      Q.   Well, were checks ever made out to a

13  Christina Brooks in this case?

14      A.   I'd have to go back and look at the

15  particular --

16          THE COURT:  Yes.

17          (Pause)

18      A.   Yes, Christina Brooks and Maria Macarle,

19  yes.  They were both.

20      Q.   So Anita Bryant was involved with

21  Christina Brooks?

22      A.   I charged Maria Macarle with the two we

23  talked about.

24      Q.   I didn't ask you that.  I'm asking you

103

CROSS/Gabriele

1

2    after looking at your records, am I correct that

3    there were checks that went back and forth from Maria

4    Macarle to Christina Brooks?

5            A.   I would have to see the exact exhibit to

6    give you a full answer.

7            Q.   Did you question Anita Bryant about her,

8    Anita Bryant, about her making believe she was

9    Christina Brooks with a check?

10           A.   No, again, I charged her with two -- two

11   counts, and those were the counts that I was

12   interested in.

13           Q.   Fine.  But she's cooperated, hasn't she?

14           A.   Yes.

15           Q.   And as a matter of fact, did you see the

16   agreement that the district attorney's office made

17   with her attorney?

18           A.   No, I did not.

19           Q.   I think that's D?  Do you see Mr. Philip

20   Murphy?  That was her attorney, was it not?

21           A.   Yes, it was.

22           Q.   And we see *People vs. Anita Bryant*, with a

23   docket number?

24           A.   Yes.

25           Q.   There is actually two docket numbers, am I

CROSS/Gabriele

correct?

    A.   Yes, 51 and 52, yes.

    Q.  "Dear Mr. Murphy, this letter serves to formalize our discussion in court on July 13, 2006. The offer on the above case is to allocute against the co-defendant, Lamar Whitehead, plead guilty to count six, the D Felony, Identity Theft in the Fifth Degree, in violation of Penal Law 190.80(1) and plead guilty to count eight, the A Misdemeanor, of Unlawful Possession of Personal Identification Information in the third degree, in satisfaction of Penal Law 190.80(1).

    "If Ms. Bryant allocutes" -- we know that means testify?

    A.   That is correct.

    Q.  "Against the co-defendant and Lamar Whitehead and agrees to testify at any trial, at the time of sentencing the people will allow Ms. Bryant to withdraw her plea of the felony, and we will agree to dismiss it."  That means it's over, right? Dismiss it?

    A.   That is the district attorney.  Not the police department.

    Q.  "The sentence on the A misdemeanor will be

CROSS/Gabriele

1   a conditional discharge?"

3        A.   That's what it says, yes.

4        Q.   You know what a conditional discharge is?

5   No jail, no probation?

6        A.   Correct.

7        Q.   "If Ms. Bryant fails to continue to

8   cooperate, the people will seek a sentence of six

9   months incarceration and five years probation.

10  Sentencing on Ms. Bryant's plea will be adjourned

11  until the co-defendant's case is resolved."

12            This case isn't resolved yet, is it?

13       A.   No, it's not, Mr. Keahon.

14       Q.   Ms. Bryant hasn't been sentenced yet, has

15  she?

16       A.   Not that I'm aware of, no.

17       Q.   "Should your client fail to resolve this

18  case by the next court date, this case will be marked

19  for trial, where she faces up to two and a half to

20  seven years on the top charge."  Right?

21       A.   That's what it says, yes.

22       Q.   And the top charge is the D felony,

23  Identity Theft in the First Degree, right?

24       A.   Correct.

25       Q.   And he's got about thirty of those charges

Jennifer Maue, Senior Court Reporter   (631)852-2153

CROSS/Gabriele

against him, right?

                MR. PEARL:   Objection, your Honor.

                THE COURT:   Sustained.

    Q.   "Should your client fail to resolve this

case by the next court date, this case will be marked

for trial where she faces up to two and a half to

seven years on the top charge.  If you wish to

discuss the case further, please contact me at the

Economic Crime Bureau at", and a number, right?

    A.   That is correct.  Yes.

    Q.   The district attorney that signed this

letter is Douglas Byrne, right?

    A.   Yes, sir.

    Q.   He worked with you on this case, did he

not?

    A.   Yes, he did.

                THE COURT:   You may continue, Mr.

Keahon.

                MR. KEAHON:   Thank you.

                THE COURT:   You're welcome.

    Q.   Is it the normal procedure when you do a

search warrant, to make note of the name of the

individuals that are present on the property?

    A.   Yes.

CROSS/Gabriele

Q.    You're the lead detective in this case?

A.    Yes, I am.

Q.    As a lead detective, you get all of the paperwork, the reports that are gathered by other detectives that work on the case?

A.    Yes.

Q.    Did you get notes, reports, from any of the other detectives, the police officers that executed the search warrant on Nigel DeFreitas's house, indicating that a Desmond DeFreitas was there, spoken to, and was with his girlfriend?

A.    No.

Q.    To this day are you aware or not aware that Desmond DeFreitas was there when you hit the house?

A.    Yes, he was there.   Okay.

Q.    How do you know that?

A.    Detectives from the Identity Theft Unit advised me of that.

Q.    Did they tell you who he was there with?

A.    He was there with his girlfriend.

Q.    Did they advise you that he was ready to go on a vacation?

A.    Yes, they did.

CROSS/Gabriele

Q. Did they advise you that he drove away from the property in a particular vehicle, a maroon Jeep Grand Cherokee?

A. No, they did not.

Q. Did they indicate to you how he left the property?

A. No, they didn't.

Q. What type of vehicle?

A. No, they didn't.

Q. We've read the agreement the district attorney's offered to Mr. Murphy, on behalf of Mr. Murphy's client, Anita Bryant. Did you ever indicate to her that if she testified against my client, that she'd do better than that written agreement signed by her?

A. No, Mr. Keahon.

Q. That in fact all charges would be dismissed?

A. Absolutely not.

Q. Do you know if the district attorney's office indicated to her that all charges would be dismissed?

A. No.

Q. Have you seen her testimony on

109

CROSS/Gabriele

cross-examination in front of this jury, as to what

she said about all charges being dismissed?

       A.   No, I did not.

       Q.   We've heard some testimony about AeroBeep,

right?

       A.   Correct.

       Q.   Now, I believe on your direct examination

going back days or weeks, when you first took the

stand?

       A.   (Nods)

       Q.   You indicated that there were two blocks

of ten numbers that were purchased at AeroBeep, am I

correct?

       A.   There were two blocks of numbers.  The

first was ten.  I don't believe the second one was

ten, no.

       Q.   Thirteen?

       A.   Somewhere around there.

       Q.   And one block was purchased in the name of

John Willson, and another block was purchased in the

name of Henry Black?

       A.   That is correct.

       Q.   Now, we know that you showed a picture of

my client to Nigel DeFreitas, right?

CROSS/Gabriele

A.   That is correct, yes.

Q.   Did you ever go down to AeroBeep and show a picture of my client to any of the people that worked there?

A.   Yes, I did.

Q.   And who did you speak with?

A.   Mr. Taneja.

Q.   Did you take a statement from him?

A.   No, I did not.

Q.   Was Mr. Taneja the individual who testified at this trial?

A.   Yes, he did.

Q.   You said you did take a statement from him?

A.   I did not take a statement from him, no.

Q.   Did you make any notes as to your interview with him?

A.   No, I did not.

Q.   Was there a reason?

A.   It wasn't necessary.

Q.   He told you nothing of importance?

A.   No, I went there and served him with a subpoena for the AeroBeep records.

Q.   Okay.  Well, did you question him at all?

CROSS/Gabriele

    A.    I simply asked him if he recognized your
client.

    Q.    Did he give you a statement as to that
effect?

    A.    He told me no, that he did not recognize
him, no.

    Q.    Well, did you note that anywhere?

    A.    No, I did not.

    Q.    Did you tell the district attorney's
office that you went there and showed a picture of my
client to the fellow that owned AeroBeep?

    A.    Yes, they knew that I showed him a
picture, yes.

    Q.    Do you know whether or not anybody told me
that?

    A.    I'm telling you now, Mr. Keahon.  I don't
know if anyone told you that before.

            MR. KEAHON:  I have an application
        to make.

            THE COURT:  Thank you.

            See counsel at side bar.

            (The following occurred at side
        bar):

            THE COURT:  Mr. Keahon.

CROSS/Gabriele

1
2          MR. KEAHON:  I was never told about

3      it and the evidence is Brady.

4          MR. PEARL:  All Rosario has been

5      turned over, every piece of paper and note the

6      detective has and it is not Brady, judge.

7          MR. KEAHON:  Could you excuse the

8      jury.  Because I have to put something on the

9      record.

10         THE COURT:  They were going to get

11     a break in about five minutes any way, so...

12         (The following occurred in open

13     court):

14         THE COURT:  The jury will be given

15     a brief recess.  We'll call you back in.

16         I remind you not to form or express

17     an opinion about the case until submitted to

18     you for deliberations.  As I've told you, do

19     not discuss this case or any matter connected

20     to the trial amongst yourselves or with anyone

21     else.  Nor may you allow it to be discussed in

22     your presence.

23         Don't read or listen to accounts

24     reported in the news media, don't visit or

25     view the place or places where the offense

```
1    CROSS/Gabriele
2            charged was allegedly committed or any other
3            place involved in this case, and promptly
4            report to the court by way of coming to me
5            personally, through a court officer, any
6            incident within your knowledge involving any
7            attempt to influence any member of the jury.
8                        (The Jury is excused)
9                        THE COURT:  Thank you, very much.
10                       Please stand down.  You may be
11           recalled to the stand.  Thank you.
12                       (The Witness is excused)
13                       THE COURT:  Please be seated.
14                       Outside of the presence of the
15           jury.
16                       MR. KEAHON:  Judge, I move for a
17           mistrial at this time.
18                       This witness has testified that he
19           interviewed a Mr. Taneja, I believe.  Who
20           testified at this trial.  Mr. Taneja.  He took
21           no notes.  No reports.  And I stumbled into a
22           very extremely dangerous area, which I
23           couldn't go into with the witness because I
24           didn't know whether or not he had been shown a
25           picture of my client, or not.  I never
```

CROSS/Gabriele

1

2      received notification that he was shown a

3      picture of my client, a one picture i.d.

4           It is clearly Brady when he was

5      unable to pick him out.  I never have been

6      notified that such an identification procedure

7      took place.  You, as the judge on this case

8      from the beginning, have never heard that that

9      identification procedure took place.  I would

10     have asked the witness, Mr. Taneja, I would

11     have gone into that at great length, and I was

12     careful of how I did it with this witness,

13     because I didn't think he showed him the

14     picture, and that was the point of the

15     questioning.

16          He showed the picture to Mr. Nigel

17     DeFreitas and yet he chose not to show a

18     picture -- or did you show a picture to Mr.

19     Taneja?  And when he says, yes.  I didn't know

20     what to do.  That is why I followed it up with

21     knowing if he would have taken a positive

22     statement on an i.d. there would be a

23     statement or notes and that is why I diverted

24     myself to, did you take any notes or reports.

25     He said no.  I felt I was on firmer ground at

1    CROSS/Gabriele

2          that point, because had an identification

3          taken place, there would have been notes.

4          Something would have reflected that.

5                And then the witness admitted that

6          he did show the picture to him and he didn't

7          take notes or reports, and I asked him why,

8          and he said because he didn't identify him.

9          Or couldn't identify him.  So.

10               THE COURT:  Your skillful

11         questioning did not indicate at all that you

12         were going through uncharted waters.  My

13         compliments to you, Mr. Keahon.

14               I'm not disbelieving you.  I'm

15         complimenting you because I take your word at

16         face value.  However, your questioning was

17         quite skillful in that regard.

18               What was brought up  at side bar

19         and we're discussing in open court outside the

20         presence of the jury is the people's position.

21               MR. PEARL:  Judge, all Rosario has

22         been turned over, all photographs, everything.

23         Including whether or not there was no notes

24         taken.  So there is no additional Rosario to

25         turn over to the detective.

1    CROSS/Gabriele

2                Mr. Keahon is not prejudiced.   It

3    is not Brady.  He couldn't say he could not

4    identify him.  It is not Brady if a person

5    can't identify him.  You don't have to notice

6    non i.d.s to the defendant under 710.30.  We

7    only have to notice identifications we intend

8    to introduce at trial.  In this case, we did.

9    We noticed everything.  There has been no

10   Rosario violation and there has been no Brady

11   violation.

12                MR. KEAHON:  Could we take a brief

13   recess for five minutes?

14                THE COURT:  We'll take a brief

15   recess and the court will rule.

16                (Brief recess)

17                THE COURT:  If I could see counsel

18   at side bar, please, off the record for just a

19   moment.

20                (Side bar discussion held off the

21   record)

22                THE CLERK:  Case on trial, People

23   versus Whitehead.  All parties present outside

24   the presence of the jury.

25                THE COURT:  Thank you.

CROSS/Gabriele

                    Before we continue after our side
         bar conference, the court's preliminary
         research, *People vs. McDonald* 287 A.D.2d 655
         and 280 A.D.2d 687, that is *People vs.*
         *Robinson.*

                    And *People vs. de la Rosa*, which is
         a slip opinion.  Found at 202 Misc. LEXIS,
         1498.  All that has been gleaned so far, if
         counsel wishes a continuance of trial to
         research this matter more fully, I would allow
         counsel for the defense, or the people that
         continuance, or do you wish to proceed at this
         time, Mr. Keahon?

                    MR. KEAHON:  Judge, the court has
         made its decision not to grant a mistrial
         based upon the cases that have been cited by
         the court.

                    THE COURT:  No.  Mr. Keahon, I do
         apologize.  That was my preliminary research.
         The question is open, if you wish it to be so.
         If you would like that continuance, I would
         grant you that so you could research the
         matter more fully.

                    MR. KEAHON:  Yes, I would.

CROSS/Gabriele

                    THE COURT:  All right.
          Then -- which like.
                    Would the rest of the afternoon be
          sufficient?
                    MR. KEAHON:  Yes.
                    THE COURT:  We'll discharge the
          jury for the day and tell them to come back
          tomorrow morning at eleven o'clock.  All
          right?
                    MR. PEARL:  Judge, just a couple of
          questions.  We still intend on finishing up
          tomorrow.
                    THE COURT:  Yes.
                    MR. PEARL:  And closings.
                    THE COURT:  We'll try it.
                    MR. PEARL:  It is the people's
          position not only is this not Brady.
                    THE COURT:  I suggest, Mr. Pearl,
          that you take advantage of the hiatus which
          your colleague has sought and we'll research
          the matter tonight and the court will rule
          tomorrow.
                    MR. PEARL:  Judge, I want to say my
          case is still open.  Mr. Keahon wants me to

CROSS/Gabriele

1
2    recall Mr. Taneja to cross him on that point.
3    I can bring him in tomorrow if he wants.
4                THE COURT:  If you would have him
5    available for testimony, please.
6                MR. PEARL:  I have to send somebody
7    out to Brooklyn.  Is that what Mr. Keahon
8    wants?
9                MR. KEAHON:  I don't know.
10               THE COURT:  If you have him
11   available for testimony tomorrow, please, the
12   court will be happy to issue a so-ordered
13   subpoena.
14               MR. KEAHON:  Could we approach up
15   to the front of the bench quickly, judge.  Off
16   the record.
17               (Discussion held off the record)
18               THE COURT:  Bring in the jury.
19               THE COURT OFFICER:  Jury is
20   entering.
21               THE COURT:  All rise, please.
22               (The following occurred in open
23   court with the jury present):
24               THE COURT:  Thank you.  Please be
25   seated.  Please be seated, everyone.

CROSS/Gabriele

THE CLERK: Case on trial, *People versus Whitehead*, the jury and all parties are present. Counsel waive the roll.

THE COURT: Recall the witness to the stand, please.

(The Witness resumes the stand)

THE CLERK: Detective, if you could take a seat. I remind you, you're testifying under oath.

THE COURT: You may continue your inquiry Mr. Keahon.

MR. KEAHON: Thank you, judge.

BY MR KEAHON:

Q. We were talking about, detective, your visit to AeroBeep?

A. Yes.

Q. And you spoke with who?

A. Kris Taneja.

Q. He was a witness at this trial?

A. Yes, he was.

Q. And you indicated that you showed him the picture of my client and he couldn't identify him?

A. That is correct.

Q. Was it multiple pictures or one picture?

CROSS/Gabriele

    A.   No, it was just one picture.

    Q.   That is kind of suggestive, isn't it, one
picture?

                    MR. PEARL:  Objection.

                    THE COURT:  Sustained, form.

    Q.   In fairness, when you do a photo display,
don't you normally put six pictures into the photo
display so the person isn't put on notice that you're
interested in this one particular person?

    A.   When you're doing a photo array, correct,
yes.

    Q.   And you told us you made no notes or
reports on the failure of Mr. Taneja to pick out my
client, right?

    A.   That's correct.

    Q.   And when is the first time that you told
the district attorney's office, if you ever did, of
the failure of Mr. Taneja to pick out my client?

    A.   After I returned the subpoenaed
information.

    Q.   Did you attach a note to the district
attorney, that you showed the picture of -- one
picture to Mr. Taneja and he was unable to pick out
my client?

```
 1    CROSS/Gabriele
 2         A.   No, I didn't.
 3         Q.   And who was the district attorney that you
 4    did this with?
 5         A.   Mr. Pearl.
 6         Q.   Have you seen any note that he made,
 7    referencing what you told him?
 8         A.   No.
 9         Q.   Are you aware of whether or not I was ever
10    put on notice of this identification procedure and
11    the failure --
12                   MR. PEARL:  Judge, objection.
13         Q.   Mr. Taneja to -- pick out my client?
14                   THE COURT:  Sustained, form.
15         Rephrase, Mr. Keahon, please.
16         Q.   Have you seen any identification to me by
17    the letter or note or E-mail or fax, that such an
18    identification -- non-identification took place?
19                   MR. PEARL:  Objection, judge.
20                   THE COURT:  Sustained.  Rephrase,
21         Mr. Keahon.
22         Q.   Are you aware of anybody from the district
23    attorney's office, putting me on notice as to what
24    you just told us happened?
25                   MR. PEARL:  Objection, judge.
```

1    CROSS/Gabriele

2                    THE COURT:  It will be opened in

3         the presence of the jury.

4                    THE COURT OFFICER:  No, 125.

5                    THE COURT:  Thank you.

6                    (The following occurred in open

7         court):

8                    THE COURT:  Detective, the record

9         will indicate that the court is directing you

10        to open up that bag, all right?   Thank you.

11                   (The Witness complies)

12   Q.   I want to see it, please?

13                   THE COURT OFFICER: Exhibit 125.

14                   MR. KEAHON:  Thank you.

15   Q.   This is the jacket that you say you found

16   in the back seat?

17   A.   Yes, sir.

18   Q.   Is there any name in it?

19   A.   I don't believe there is, no.

20   Q.   What's the size?

21   A.   I don't know.  I'd have to look at it.

22   Q.   Two extra large?

23   A.   If that's what it says, Mr. Keahon, I take

24   your word for it.

25                   MR. KEAHON:  Judge, I'd like my

CROSS/Gabriele

client to put it on.

MR. PEARL: Judge, I have no objection as long as I get the opportunity to cross-examine. It is testimony at this point.

THE COURT: See counsel side bar, please.

(The following occurred at side bar):

MR. KEAHON: I'm asking for a mistrial. Now. This district attorney stood before this jury and said I have no objection as long as I get a chance to cross-examine him. My client. I'm moving for a mistrial.

THE COURT: Mr. Keahon, he was visually testifying. Case law came up a few months ago, I don't remember the exact case citation, I can get it for you, because we did the research. When a defendant demonstrate his teeth to the jury, he said in front of them and showed his teeth, there was dental work that was done, it is not considered testimony if it is a demonstration like that.

MR. PEARL: This is different. This is trying on a jacket.

CROSS/Gabriele

1

2          THE COURT:   It is a physical

3    demonstration.   It is not considered

4    testimony.

5          All right.   The -- since we're

6    going to have a hiatus tonight anyway, reserve

7    decision on the application for a mistrial.

8    And your client can try that on in the

9    presence of the jury and then take it off and

10   put it back and your cross-examination will

11   continue.   Thank you.

12          (The following occurred in open

13   court):

14 BY MR. KEAHON:

15      Q.   Detective, this jacket has been in your

16 custody or in the police department custody since

17 January 25th of 2006?

18      A.   That is correct.

19          MR. KEAHON:   Judge, could my

20   client.

21          THE COURT:   Yes, Mr. Whitehead?

22          (The Defendant puts on the jacket)

23      Q.   Did you look to see what size this jacket

24 was?

25          MR. PEARL:   Judge, objection to the

1    CROSS/Gabriele

2          questioning now, based on what we just had the

3          side bar on.  The jacket is on.  You can't now

4          question him based on the jacket being on.

5          We're going way over what we just had the side

6          bar on.

7                THE COURT:  Thank you.  Note your

8          exception.

9                Mr. Keahon, I'll hear the question

10         fully framed, please.

11               MR. KEAHON:  Sure.

12   BY MR. KEAHON:

13         Q.   This jacket is the one you found in the

14   back seat?

15         A.   That is correct.

16         Q.   This jacket is two extra large?

17         A.   If that's what the size is, yes.

18         Q.   Would you take a look at the jacket for

19   me, please?   Tell me what the size is?

20               (Handing)?

21         A.   Two XL.

22         Q.   Now, you indicated that you found certain

23   items within that jacket.

24         A.   That's correct.

25         Q.   And I think you told us you found some

CROSS/Gabriele

pieces of paper in a jacket sleeve zipper?

    A.   That's correct.

    Q.   Were any pictures taken indicating that you found something within that area?

    A.   No, there were not.

    Q.   After you do a search warrant on a vehicle, do you have to do a search warrant return?

    A.   Yes.

    Q.   Is a return, is it a piece of paper that indicates what you found?

    A.   Yes, that's correct.

    Q.   And where you found it?

    A.   What we found.  Not where we found it.

    Q.   Is there anywhere in the search warrant return, for the search warrant on that vehicle, that indicates that you found a number of pieces of paper from the jacket sleeve?

    A.   No, there's not.  There is assorted papers on the search warrant return.

    Q.   You're not telling this jury that you or anyone else indicated there were assorted papers found in the jacket sleeve of that jacket, are you?

    A.   Assorted papers.  The search warrant was for the vehicle.

Jennifer Maue, Senior Court Reporter    (631)852-2153

CROSS/Gabriele

Q.   Let's try it again.

I asked you whether or not there's any indication on the search warrant return, that any papers were found in the sleeve of the jacket?

A.   Not on the return, no.

Q.   The return indicated "assorted papers"?

A.   Correct.

Q.   I then asked you, is it your position in front of this jury, that the search warrant return indicated assorted papers were found in the jacket sleeve?

A.   No.

MR. KEAHON:  May I see 126 A, B, C, and D?

Q.   As a matter of fact, sir, nowhere in the return do you indicate assorted papers were found in any portion of the jacket, do you?

A.   No, it's not required.

MR. KEAHON:  Judge, I asked the witness whether or not on the search warrant return it indicated any papers were found within that coat, and he said no, it's not required.  I'd ask you to instruct the witness to merely answer my question.

Jennifer Maue, Senior Court Reporter   (631)852-2153

CROSS/Gabriele

1

2          THE COURT:  Thank you.  There is an

3      objection to the answer.  Sustained.

4          Just answer the question.  If you

5      can, please, do not volunteer additional

6      information.

7          THE WITNESS:  Yes.

8          Yes, your Honor.

9      Q.   One of the items found you say was found

10  in the jacket zipper pocket, was a piece of paper

11  with a long number on the back, the name,

12  "Rhonda Ghassabian", and some other writing on it,

13  right?

14      A.   Yes.

15      Q.   Was this ever given to your handwriting

16  expert to determine whether or not my client wrote

17  this?

18      A.   No, it was not.

19      Q.   Was this piece of paper ever sent for a

20  fingerprint analysis to see who may have touched this

21  last?

22      A.   No, it was not.

23      Q.   To this day, has it been done?

24      A.   No, it has not.

25      Q.   Are you limited in any fashion as to when

CROSS/Gabriele

1   you can send items of evidence to -- for analysis?

2         A.   No, we're not.

3         Q.   I think you also testified that there was

4   a laptop case, right?

5         A.   Correct.

6         Q.   And a number of items were found within

7   that laptop?

8         A.   That's correct.

9         Q.   Paperwork?

10        A.   Yes.

11        Q.   Were any of those items sent for analysis?

12        A.   No.

13        Q.   Was there anything about the paperwork of

14  the items that were found in the coat sleeve jacket

15  that led you to believe that an analysis wouldn't be

16  successful?

17        A.   It was determined at the time that it

18  wasn't needed, no.

19        Q.   So you chose not to do that?

20        A.   And it had been handled by a number of

21  people.  So, yes, I chose not to do it at that time.

22        Q.   When you say it had been handled "by a

23  number of people",  I asked you whether or not you

24  wore latex gloves prior to doing the search warrant

CROSS/Gabriele

in order not to contaminate any item of evidence and
you said no, you chose not to wear latex gloves,
correct?

    A.   That is correct.

    Q.   What about the other fellas who helped you
with the search?

    A.   No latex gloves.

    Q.   We have a check that was part of the Kylie
Copeland case, with Smithtown Range Rover, that was
sent to identification, and they came up with his
print on it?

    A.   That is correct.

    Q.   So you didn't know whether or not those
items were contaminated or not, did you?

    A.   Which items, sir.

    Q.   The items that you took out of the sleeve
of the jacket?

    A.   No, I did not.

    Q.   I think you told us none of the items that
were taken out of the laptop case were checked for
fingerprints?

    A.   No, they weren't.

    Q.   You told us three phones that you took out
of the car were not?

CROSS/Gabriele

1

2          A.    That's correct.

3          Q.    I think you testified that you took a

4    computer out of 92 -- what was the address?

5          A.    Howland Avenue.

6          Q.    You did a search warrant on that house.

7          A.    Yes, I did.

8          Q.    Did you send that computer to the lab for

9    a fingerprint analysis?

10         A.    Yes, I did.

11         Q.    And whose fingerprints did you find on

12   that computer?

13         A.    No one's.

14         Q.    When you did the search warrant of that

15   house at 92 Howland, was anybody home?

16         A.    No one was home, no.

17         Q.    How did you get in the house?

18         A.    The Teaneck Police Department climbed

19   through the window.  They pryed a window open,

20   climbed through it, and opened the door.

21         Q.    So there was an unlocked window in the

22   house?

23         A.    No, they had to pry the window open.

24         Q.    When you say, "pry it open", what do you

25   mean?

Jennifer Maue, Senior Court Reporter    (631)852-2153

CROSS/Gabriele

1

2       A.   They had to use something to open the

3  window up.

4       Q.   You weren't there when they entered.  You

5  were around front?

6       A.   That's correct.

7       Q.   So you don't know what they had to do?

8       A.   I didn't see them but I know they had to

9  open the window, yes.

10       Q.   Yes, we agree they opened the window.  But

11  you're indicating to the jury that he had to pry it

12  open.  What do you mean by that?

13       A.   They had to force entry into a window.

14       Q.   By pushing the window up?

15       A.   I'm assuming, yes.  I wasn't there -- I

16  wasn't there witnessing them making entry into the

17  window.

18       Q.   The point is the window was not locked,

19  was it?

20       A.   I can't tell that for sure, no.

21       Q.   So when you indicated to the jury just now

22  that they had to pry it open and they had to use

23  something, weren't you kind of inferring to the jury

24  that the windows were locked and they had to somehow

25  use an instrument to get in?

CROSS/Gabriele

A.   Yes.

Q.   But you don't know that, do you?

A.   Yes, I do.

Q.   Oh, you do?

A.   From what the Teaneck Police Department told me, yes.

Q.   What did they tell you?

A.   That they had to open the window, force the window open and someone had to crawl in to open up the door.

Q.   When we say "force the window open", that means taking the hands and pushing it up, right?

MR. PEARL:  Objection.

THE COURT:  Sustained.  Rephrase please, Mr. Keahon.  Thank you.

BY MR. KEAHON:

Q.   Did they tell you the window was locked?

A.   They didn't tell me the window was locked. They told me they had to force the window open.

Q.   When you get inside, at that point in time, do you do a video of what you see in the place?

A.   No, we don't.

Q.   Do you do a video of what you recover and where?

1    CROSS/Gabriele

2          A.   No, we don't.

3          Q.   One of the items you testified about was

4    176-A & B, do you remember that?

5          A.   I don't know the numbers off the top of my

6    head.  You have to tell me what they are.

7          Q.   That is the items you took from the house,

8    that Katherine Reid, and it had a tab with Lamar

9    Whitehead, do you recall that?

10         A.   Yes.  Yes, I do.

11         Q.   I think you told us that you found that in

12   a bag?

13         A.   Yes.

14         Q.   And it had tape on it.

15         A.   Yes.

16         Q.   And that particular item, where was that

17   in the bag?

18         A.   That was towards the bottom of the bag in

19   an envelope.

20         Q.   I see.

21         Q.   Where is the envelope?

22         A.   The envelope is up in the boxes of

23   evidence, up in the office upstairs, I believe.

24         Q.   Was it labeled in some fashion?

25         A.   I'm not sure I'm understanding your

CROSS/Gabriele

question, counsel.

Q.   Yeah.   The envelope that you say you found
that particular item in, that is upstairs, is it
labeled in some fashion?

A.   It's in a box of evidence taken from the
house, yes.

Q.   Is that envelope labeled in such a fashion
that indicates within this envelope we found that
document --

A.   I'd have to go up and look at it.   I don't
know.   I don't know.

Q.   Now, was that particular item sent to any
lab for analysis?

A.   No, it was not.

Q.   Since you fellas didn't use a video
camera, did you at least have pictures taken as you
were removing items, so that we know in fact that you
found a particular item within the house in a
particular area?

A.   The Teaneck Police Department did the
photographing of the house.

Q.   Let's try it again?

MS. FRANZESE:   Objection, your
Honor.

CROSS/Gabriele

                    THE COURT:   Sustained.

        Q.    Okay.   Can you instruct the witness to
answer my question?

                    THE COURT:   If you would ask the
        question again.   If you would, thank you.

                    MR. KEAHON:   Could I have it read
        back, please.

                    THE COURT:   Yes, certainly.

                    (Record read)

        Q.    Did you?

        A.    What do you mean by "you fellas", who are
you talking about?   Me, or the Teaneck Police
Department?

                    Mr. Keahon, can I take these gloves off
now.

                    THE COURT:   Yes.

                    MR. KEAHON:   Yes.

        Q.    I meant generically, were there some
female police officers there?

        A.    I believe there was a female police
officers there.

        Q.    When I meant "you guys", I meant the men
and women who were executing the search warrant?

        A.    Yes.

Jennifer Maue, Senior Court Reporter    (631)852-2153

CROSS/Gabriele

1

2      Q.   Did anyone take pictures, as items were

3  being removed, to memorialize what it is you're

4  finding and where?

5      A.   Yes.

6      Q.   Did anyone take pictures of the paperwork

7  that was inside that bag you told us about, as -- as

8  the items were being removed?

9      A.   No, we moved the bags all by themselves.

10 Just the photographs of the bags in the closet.

11     Q.   My question again is, those bags, were

12 they taken back to the Teaneck Police Department?

13     A.   No.

14     Q.   They were given to you.

15     A.   Yes.

16     Q.   Did anyone go through them from Teaneck,

17 in the house?

18     A.   No, they did not.

19     Q.   So the only one that had knowledge or

20 claimed knowledge of what was in the bag, was you?

21     A.   Yes.

22     Q.   You take the bag and you go where?

23     A.   Back to Suffolk County.

24     Q.   When you go back to Suffolk County, where

25 do you go with the bag?

CROSS/Gabriele

A.   Into our office in Yaphank.

Q.   There were two bags, were there not?

A.   I believe there were three bags.

Q.   You brought all three bags?

A.   Everything came back, yes.

Q.   You go back to your office?

A.   In Yaphank.

Q.   In Yaphank, and that day you go through the bags?

A.   That night, we started to go through the bags.  There was a great deal of paperwork.  It took us more than one night to go through the bags.

Q.   When you say "we went through the bags", it is you and the other two fellas?

A.   Myself and Det. Crane.

Q.   Any notes, reports, from Det. Crane claiming what he had done that night?

A.   No, there is not.

Q.   Next day?

A.   No.

Q.   Or any date thereafter?

A.   Not from Crane, no.

Q.   Was there any piece of paper or report indicating that you found certain items in certain

1  CROSS/Gabriele

2  places and Crane signed off on it as witnessing?

3       A.   No, there's not.

4       Q.   The items of paperwork that were found in

5  the bag, you had mentioned some of them.  Some of

6  them are in evidence.  Was there any bit or any piece

7  of those papers that was sent to the lab for analysis

8  for fingerprints?

9       A.   No, there wasn't.

10      Q.   Were there any pieces of paper within that

11 bag or bags, that are in evidence now, that were sent

12 for handwriting comparison?

13      A.   Yes.

14      Q.   What?

15      A.   I don't recall which bags were sent for

16 handwriting, I don't know.

17           MR. KEAHON:  May he.

18      Q.   We know 176-A and B were not, Kathleen

19 Reid?

20      A.   That is correct.

21      Q.   No fingerprinting or handwriting analysis?

22      A.   That is correct.

23      Q.   Okay.  And we know --

24           MR. KEAHON:  May I see 153, P and

25      Q?

CROSS/Gabriele

1

2          Q.   We have 149, 148, 146, 145, 144, 143, 142,

3     141, 140, 139, 138, 137, 136 and 135, 134 and 133,

4     pictures that were taken at 92 Howland, right?

5          A.   Correct.

6          Q.   At some point during the time that you

7     were doing the search warrant, yes?

8          A.   Yes.

9          Q.   148, and 149 are pictures that were taken

10    from inside the closet, of the bags, am I correct?

11         A.   Yes, that is correct.

12         Q.   There is nothing visible in those pictures

13    of an identifying nature of the items that have been

14    offered into evidence, here, are they?

15         A.   In these particular pictures.

16         Q.   Yes?

17         A.   No, they're not.

18         Q.   When you say "in these particular

19    pictures", am I correct that they're the only two --

20         A.   Of the closet where the bags were removed

21    from.

22         Q.   Yes?

23         A.   Yes, that is correct.

24         Q.   Are there any other pictures that were

25    taken by you fellows, back at Suffolk County Police

```
 1    CROSS/Gabriele
 2    Department, of the bags or their contents?
 3         A.   No, there was not.
 4         Q.   So those are the only two pictures that we
 5    have?
 6         A.   That is correct.
 7         Q.   166, is a card with a picture of Desmond
 8    DeFreitas on it, am I right?  I show you People's
 9    166.  What date would that have been?
10         A.   Approximately two weeks after the search
11    warrant in August of 2005.
12         Q.   I think I asked you, did you take a
13    statement from him?
14         A.   No, I did not.
15         Q.   Are there any notes of your conversation
16    with him?
17         A.   No, there is not.
18         Q.   Was it an in-person interview?
19         A.   No, it was on the phone.
20         Q.   Did you tape record that conversation you
21    had with him?
22         A.   No, I did not.
23              MR. KEAHON:  May I see that item,
24         please.
25         Q.   Desmond DeFreitas, at the time you did a
```

1    CROSS/Gabriele

2    search warrant of Nigel DeFreitas in Desmond's house,

3    Desmond was living upstairs?

4             A.   Correct.

5             Q.   I see.

6                       MR. KEAHON:   Could I just show this

7             to the jury real quick, judge.

8                       THE COURT:   Would you like to

9             publish it with the presenter or physically

10            publish it.

11                      MR. KEAHON:   I'll just show them

12            real quick.

13            Q.   Had you searched the vehicle, I think you

14   said you did that on the 25th of January of 2006?

15            A.   Correct.

16            Q.   Excuse me.  My client was arrested?

17            A.   Yes, he was.

18            Q.   Two days later, on the 27th?   You do the

19   search warrant at 92 Howland?

20            A.   Yes.

21            Q.   At the house?

22            A.   Yes.

23            Q.   My client's in custody?

24            A.   Yes, he is.

25            Q.   When you hit the house and do the search

152

```
1    CROSS/Gabriele
2    warrant, nobody's there?
3          A.   No one is there, no.
4          Q.   Nobody is there the entire time that you
5    fellas are there?
6          A.   No.
7          Q.   You're the only ones that have custody and
8    control of that house.
9          A.   Correct.
10         Q.   The items that you took from the vehicle,
11   what did you do with them?
12         A.   Some of the items were kept in the office.
13   Some of the paperwork.   Other items were -- were put
14   into property.
15         Q.   When you say "some of the items were kept
16   in the office", where in your office?
17         A.   We have a secure location in our office, a
18   property locker.   As we would go through the items,
19   we would put stuff into notebooks in order to present
20   it to the district attorney.
21         Q.   How long did it stay in the office, not in
22   property?
23         A.   It stayed in the office for quite some
24   time but not in property.   I can't give you an exact,
25   exact amount of time.
```

1    CROSS/Gabriele

2          Q.   So there is a property girl within the

3    Suffolk County Police Department?

4          A.   Yes.

5          Q.   You're supposed to log in evidence there,

6    right?

7          A.   I can't answer that, "supposed to".  It

8    depends on the situation.  In a situation like this,

9    we kept the paperwork out because we had to go

10   through the paperwork in order to match it up to the

11   particular fraud cases.

12         Q.   How many months did you keep it within

13   your office not in property?

14         A.   I would have to go to the property section

15   and get the documents from them.

16         Q.   Well, did you then submit to property, on

17   the 25th or 26th of January of 2006, other items, to

18   property?

19         A.   No.

20         Q.   So nothing was submitted to property?

21         A.   No.

22         Q.   Everything was just kept up in your

23   office?

24         A.   Everything was kept up in the office.  It

25   was an ongoing investigation which requires us to

154

CROSS/Gabriele

continue to go through the paperwork.

    Q.   Did you keep some of that paperwork in your case folder?

    A.   Some of the paperwork in my case folder.

    Q.   Yes?

    A.   I explained to you we're making binders up with specific evidence that was germane to the case, yes.

    Q.   So that would be in your case folder?

    A.   Or in a binder, yes.

    Q.   When you did the search of the vehicle, did you find a Bible in it?

    A.   Yes.

    Q.   Where was that?

    A.   It was in the vehicle.

    Q.   Where?

    A.   I don't know specifically where.

    Q.   Did it have a name inside the Bible?

    A.   I don't recall.

    Q.   Well, when you -- you testified on direct examination in front of this jury, you told everybody about the items you found in the vehicle.

    A.   Correct.

    Q.   I didn't hear you mention the bible?

1    CROSS/Gabriele

2                        MR. PEARL:  Objection, judge.

3                        THE COURT:  Sustained.  Rephrase,

4          Mr. Keahon.

5                        MR. KEAHON:  Yes.

6          Q.   Did you indicate on direct that you found

7    a bible in the car?

8          A.   I don't believe I did, no.

9          Q.   You submitted some items to property on

10   March 31st of 2006, right?

11         A.   I would have to look at it to see

12   what -- what you're speaking of, Mr. Keahon.

13         Q.   You indicated a sealed box containing one

14   green bomber jacket, one laptop case, one book, one

15   bible with a case, and assorted papers, right?

16         A.   That's the property receipt, yes.

17                        MR. KEAHON:  Do you want to take a

18         look?

19                        May I have this marked for

20         identification, please.

21                        THE COURT:  Yes, officer, if you

22         would, please.

23                        THE COURT OFFICER: Defendant's

24         Exhibit M, marked for identification only.

25                        (Defendant's Exhibit M, marked for

1    CROSS/Gabriele

2         identification)

3         Q.   Officer, take a look at Defendant's

4    Exhibit M for identification, and tell me if you can

5    identify it?

6         A.   Yes, this is a property receipt.

7         Q.   Is that for all the items that you took

8    out of the car?

9         A.   No, it's not.

10        Q.   Is there another property receipt?

11        A.   Aside from this?

12        A.   Yes.

13        Q.   Yes?

14        A.   Pertaining to the items taken from the car

15   if I'm understanding correctly.

16        Q.   Yeah?

17        A.   No, there's not.

18        Q.   So this is the only property

19   receipt -- indicating what was invoiced with

20   property?

21        A.   No, there is a number of them but on this

22   particular date --

23             THE WITNESS:  I'm not sure I

24        understand what you're asking.

25             MR. KEAHON:  I probably asked a

Jennifer Maue, Senior Court Reporter   (631)852-2153

CROSS/Gabriele

confusing question.

Q. Were there a number of dates that you took items, that you took from the car, to property?

A. There may be. I'd have to look.

Q. Are you aware of whether or not there is any other document that indicates an inventory of property from the car, other than Defendant's M?

A. Not right now, no.

MR. KEAHON: May I see that, please?

Q. I'm correct, am I not, sir, that you submitted a sealed box containing one green bomber jacket?

A. If that is what it says on that, correct?

Q. One laptop case?

A. Yes.

Q. One book?

A. Yes.

Q. One bible with a case and assorted papers?

A. Correct.

Q. This computer that you took out of 92 Howland, did you attempt to determine who the owner of that computer was?

A. I forwarded the computer to computer

1      CROSS/Gabriele

2      crimes but, yes, I did attempt to find out who the

3      owner of the computer was.

4             Q.   Did you attempt to find out when that

5      computer was first made?

6             A.   Yes, I did.

7             Q.   Did you attempt to determine when that

8      computer first hit the United States?

9             A.   Yes, I did.

10            Q.   Was that at my request?

11            A.   Yes, it was.

12            Q.   Now, did you find out that the computer

13     was a Gateway laptop?

14            A.   Yes.

15            Q.   Did you learn at some point through your

16     investigation that the computer was shipped to a

17     retail store in December of 2004?

18            A.   If you do not oppose, I could look back at

19     those notes.

20            Q.   Sure, I have no problem.

21            A.   If you could reask the question so I can

22     make sure I could answer what you're asking.

23                 MR. KEAHON:   Sure.

24            Q.   Am I correct that you determined that,

25     through your investigation, that the computer was

CROSS/Gabriele

shipped to a retail store in December of 2004?

    A.   According to the notes, I spoke with someone from Gateway and they told me that that particular computer was sold in a retail store, between January and March of 2005.

    Q.   I'll get to that.  I'm looking at the first page of your notes.

    A.   Okay.

    Q.   The last sentence in that first paragraph?

    A.   Yes, that was my initial contact with Gateway.  We shipped to a retail store in December of 2004.

    Q.   When is the first time you made an effort to find out the origin of that Gateway computer?

    A.   When you asked us for it.

    Q.   And that would be February 15th of 2008?

    A.   Correct.

    Q.   We were already on trial at that point?

    A.   That is correct.

    Q.   You hadn't tried prior to that date to determine when that computer hit the states?

    A.   No, I didn't.

    Q.   Did you learn that the hard drive was sold to Arimna (ph) Computer Systems, on September 19th,

CROSS/Gabriele

2004?

    A.   That is correct.

    Q.  Did you also find out that after the hard drive in question was purchased on November 19th of 2004, the hard drive was shipped to China?

    A.  Yes, that is correct.

    Q.  Where it was assembled and fit into a Gateway laptop?

    A.  Yes.

    Q.  Then it was shipped back to the United States, in December of 2004?

    A.  That is correct.

    Q.  So at the time that Ms. Macarle and Brian Smith and Mike Nolan and Joseph Sweeney and Eric Besso, Kathleen March, and Briton Lawler and Brian and Brenda Foley, and Gloria Conaty and Gerald Thurman and Thomas Palladino, and the Sperl's and Mr. Wojcieh Wachnik, at the time these people were filling out their credit reports, this computer that you found at 92 Howland, hadn't even been put together yet, right?

    A.  Let me make sure I have -- what you're asking me is clear.  When they're filling out their credit applications at Baron Honda.

161

CROSS/Gabriele

Q.   Yes?

A.   Okay.  When they are filling out their credit applications at Baron Honda?

Q.   Yes?

A.   This computer had not been assembled yet, no.

Q.   Okay.  Some of the alleged frauds, and the paperwork connected with it, that are in this case, were prior to December 29th of 2004, yes?

A.   That is correct, yes.

Q.   So the computer that you took out of 92, certainly wasn't used for those frauds.

A.   It wasn't assembled, Mr. Keahon.  It wasn't used, no, is that correct.

Q.   Thank you.  That might be something important for the jury to know, wouldn't it?

MR. PEARL:  Objection, judge.

THE COURT:  Sustained.  Don't answer the question.

Q.   You also said something to Det. John Freiberg, who is going to be our last witness, right?

A.   Correct.

Q.   He's waiting out in the hall?

A.   If he's still there.   He might not be

CROSS/Gabriele

1       there.

3           Q.   He indicated to you that the Microsoft

4       Windows was installed on this unit, this computer

5       that was taken out of 92 Howland Avenue, Teaneck, New

6       Jersey, that was installed on 12/29/04?

7           A.   Yes.  That's correct.

8           Q.   And then, you tried to -- you spoke with a

9       Shane Curtis, of Gateway corporate offices, who told

10      you that the computer bearing the serial number that

11      we've talked about and shown up on the screen, was

12      sold in a retail store between January and March of

13      2005?

14          A.   Correct.

15          Q.   Between January and March of 2005?

16          A.   Yes, that is correct.

17          Q.   And were they able to tell you where it

18      was sold?

19          A.   No, they were not.

20          Q.   Were they able to tell you who it was sold

21      to?

22          A.   No, they were not.

23          Q.   Did you inquire of them whether or not

24      they kept a record of the serial number of the

25      computer and whether or not a retail store or their

CROSS/Gabriele

records would show who they sold it to?

    A.   Gateway indicated to me, depending on the first few numbers of the serial number, the only thing they are able to tell us was that it was shipped to a retail store.  If it was a different type of serial number, they would have been able to tell us it was shipped from Gateway itself.

    Q.  How is it, did they explain to you that they chose the dates between -- when it was sold in a retail store, between January and March of 2005?

    A.  That was what the technician from the Gateway corporate offices told me.

    Q.  Did you ask them how it is they were able to come up with it?

    A.  By the serial number, is what he indicated.

    Q.  If it was sold in a retail store as early as January of 2005, and as late as March of 2005?

    A.  According to what Mr. Curtis told me, yes.

    Q.  I think you indicated you did this research because I requested it for court?

    A.  That is correct.

    Q.  Had anyone else from the district attorney's office asked you to research that?

CROSS/Gabriele

1

2          A.   No.

3          Q.   From the time this case originated until

4     sometime during this trial, when I made the request,

5     no assistant district attorney asked you to determine

6     that information?

7          A.   No.

8               MR. KEAHON:   May I see 171.

9          Q.   I'm showing you People's 171, detective.

10    It is a piece of paper.  I'm going to hold it up to

11    the jury for you.  Is the name David Ridenour on it?

12         A.   (Nods)

13         Q.   Where is it you say you found this?

14         A.   In the hallway closet.

15         Q.   In what?

16         A.   In one of the bags.

17         Q.   Okay.  Was this sent to handwriting for an

18    analysis?

19         A.   No, it was not.

20         Q.   Was this -- was there anything about the

21    paperwork that made you feel that they couldn't do a

22    handwriting analysis?

23         A.   No, there wasn't.

24         Q.   Was this sent to fingerprint analysis?

25         A.   No, it wasn't.

CROSS/Gabriele

    Q.   Is there anything about this document that made you think that it might not be amenable to fingerprint analysis?

    A.   No.

    Q.   Who was with you when you found that?

    A.   That particular item.

    Q.   Yes?

    A.   It was in my office.  I can't give you the exact detective who was there when we found it.

    Q.   Who was the individual that was with you when you found -- Ms. Ghassabian, Rhonda Ghassabian?

    A.   Det. Crane.

    Q.   Does he have a note or a report that indicates that he sees you find that?

    A.   No, he does not.

         MR. KEAHON:  172, please.

    Q.   This card that says Master Sensei Martin on it, and it has a long number on it?   And above it -- well, it has "W.B.A.", and then a number of letters.

        Where was this found?

    A.   I believe that was found in 92 Howland in Teaneck, New Jersey.

    Q.   Allegedly in one of those bags?

CROSS/Gabriele

1

2      A.   Correct.

3      Q.   Who was with you when you found this?

4      A.   I don't remember who was with me when I

5 actually pulled it out of the bag.

6      Q.   Was this ever catalogued into property if

7 it ever was?

8      A.   It was not.  It was ceased as evidence.

9      Q.   I see.  Did I ask you who was with you

10 when you found this?

11      A.   Yes, you did.

12      Q.   Okay.  Was this sent for handwriting or

13 fingerprinting?

14      A.   No, it was not.

15      Q.   Was there anything about the document

16 itself that led you to believe that a fingerprint

17 analysis could not be done or a handwriting analysis

18 could not be done?

19      A.   No, there is not.

20      Q.   So I guess it -- so it is you that made

21 the determination as to what you wanted to send for

22 fingerprinting, right?

23           MR. PEARL:  Objection.

24           THE COURT:  Overruled.

25           THE COURT:  You can answer the

CROSS/Gabriele

       question.

    A.   Yes, that is correct.

    Q.   And it is you that made the decision as to what you wanted to send for handwriting analysis.

    A.   That is correct.

    Q.   And it is only you that has an awareness of what you claim where documents were found?

    A.   That's correct.

    Q.   When you went in the house at 92 Howland with the search warrant, was the computer on or off?

    A.   The computer was plugged in and the screen was not lit up.  So I'm assuming it was off.

         MR. KEAHON:  May I see 110, 111 and 112, please?

    Q.   People's 110 is a Department of Transportation check for $64.50?

    A.   Yes, sir, it is.

    Q.   With the name Briton Lawler?

    A.   Yes.

    Q.   Signed?

    A.   Yes.

    Q.   This check, Briton Lawler is a victim in this case.

    A.   Yes, he is.

CROSS/Gabriele

Q.   This check was found where?

A.   That check, was recovered from Smithtown Land Rover.

Q.   And you asked that this check be analyzed for a fingerprint?

A.   Det. Peeker sent that up for fingerprint analysis, yes.

Q.   Det. Peeker?

A.   Peeker.

Q.   Not yourself?

A.   No, not myself.

Q.   And Kylie Copeland's fingerprint came back to this check?

A.   Yes, it did.

Q.   And Kylie Copeland was arrested and convicted.

A.   Yes, he was.

Q.   And this check was dated 10/6/04?

A.   If that is what you're telling me the date is, yes.

Q.   Did you ever get handwriting exemplars of Kylie Copeland?

A.   No, I did not.

Q.   Did Det. Peeker ever get handwriting

```
1    CROSS/Gabriele

2    exemplars of Kylie Copeland, to determine if in fact

3    he wrote out what is on this check?

4            A.   No, he did not.

5            Q.   Did you ever get handwriting exemplars

6    from Nigel DeFreitas?

7            A.   No, I did not.

8            Q.   Desmond DeFreitas?

9            A.   No.

10           Q.   Did you ever ask them for their

11   fingerprints?

12           A.   No, I did not.

13           Q.   So 110, Exhibit 110, has Kylie Copeland's

14   fingerprint on it, he was prosecuted for the

15   Smithtown case?

16           A.   Land Rover, correct.

17           Q.   Right?  In the Fall of 2004?

18           A.   Yes.

19           Q.   And no one asked him for his handwriting

20   exemplars?

21           A.   Not at the time, no.

22           Q.   Well, never?

23           A.   Never.  Correct, yes.

24           Q.   You testified to the jury that on January

25   24th of 2006, you were doing a surveillance of 92
```

CROSS/Gabriele

Howland, and that you followed my client's car?

          A.   That's correct.

          Q.   You said it was his car?  The car he was

in?

          A.   The car he was in.

          Q.   Yes?

          A.   Yes.

          Q.   You testified that he stopped in the

middle of the road, abandoned the vehicle and walked

away?

          A.   That's correct.

          Q.   Where did he go?

          A.   He walked up the street to the gas station

on the corner.

          Q.   Did he run out of gas?

          A.   I don't know.  We moved away from where

the car was.

          Q.   Well, when you, you testified in front of

the jury, it sounded like --

                    MR. PEARL:  Objection.  I'm sorry,

          judge, it sounds like it's improper right at

          the start.

                    THE COURT:  Let your colleague

          finish phrasing the question.

CROSS/Gabriele

                    Mr. Keahon?

        Q.   Did you testify, sir, in front of the
jury, that you were telling him on the 24th you saw
the vehicle stop in the middle of the road, he got
out of the car and walked away?

        A.   I'd have to go back to the minutes.  I
don't believe I said we were following him.  We were
sitting at a location surveiling him.  We watched him
pull out of the driveway, pull down the block, stop
the car and get out of the car.

        Q.   I'm talking about when you testified in
front of the jury.

        A.   Yes.  Correct.

        Q.   A-ha?  Did you see him get a gas can out
of the car?

        A.   When he stopped the car, we moved to a
safe location.  We didn't want anybody to see that we
were surveiling the vehicle.

        Q.   Did it appear that the vehicle ran out of
gas?

        A.   That is what we thought at the time, yes.

        Q.   So it wasn't some surreptitious, he spots
you, he's going to abandon the car and dodge into a
gas station?

CROSS/Gabriele

1

2          A.   At the date and time we were there, we

3    weren't sure.

4          Q.   Well, do you recall giving testimony at

5    Page 115, Line 8, "The vehicle drove down the road.

6    It appeared the vehicle ran out of gas"?

7          A.   Which, which hearing was this?

8               That is what we believed it was, that it

9    appeared that it ran out of gas.  He just got out of

10   the car and walked away.

11                    MR. KEAHON:   Okay.

12         Q.   Well, one of the pictures of the vehicle

13   showed a gas can, a red gas can in the trunk, didn't

14   it?

15         A.   Correct.

16         Q.   Okay.  You indicated -- I talked to you

17   about the cell phones that were taken out of the

18   vehicle.  How many cell phones were taken out of the

19   house?

20         A.   Three.

21         Q.   And were they sent for analysis on prints?

22         A.   No, they were not.

23         Q.   You indicated that a Kwik Digital card,

24   People's 95, was found somewhere in the house?

25         A.   Correct.

CROSS/Gabriele

1

2          Q.    Where was that found?

3          A.    In the bags.

4          Q.    No prints, no nothing on that?

5          A.    We did not send it up for analysis, no.

6          Q.    You're the one that claims you found it?

7          A.    Yes.

8          Q.    Is there any note or report from any other

9    detective that you worked with, that supports you

10   finding any particular item in any particular

11   location?

12         A.    No.  It was my case.

13         Q.    So if the guys just -- they work with you,

14   but they don't make notes or reports on what they do?

15         A.    Not in this case, no.  There wasn't a need

16   for it, a necessity for any notes from anyone else.

17         Q.    So it is like they never even worked that

18   day?

19               MR. PEARL:  Objection.

20               THE COURT:  Sustained.

21         Q.    Well, they have no reports, no notes of

22   what they did.  You're the fellow that's doing it.

23   You don't have any notes or reports of what you

24   found.  So how does anybody know what anybody was

25   doing?

```
1   CROSS/Gabriele

2                    MR. PEARL:  Objection.

3                    THE COURT:  Sustained.

4                    MR. KEAHON:  Could I see People's

5        49, please?

6        Q.   People's 49, tell me whether or not you

7   can -- can you make out what this is?

8        A.   If you move it a little bit over.  The

9   other way.  Yeah.  So I can --

10                   MR. KEAHON:  Let me do it quick.

11       Can I hand it up.

12                   THE WITNESS:  That's fine.

13       Q.   You take a look, and I'll ask you what it

14   is, and we can go from there.

15       A.   It's the title page of the phone records

16   for the phone taken out in the name of Wojcieh

17   Wachnik.

18       Q.   And what is the phone number?

19       A.   --

20       Q.   I'll get to that.

21            That is the Wojcieh Wachnik?

22       A.   That is the title page for the account

23   Wojcieh Wachnik.

24                   MR. KEAHON:  Easy for you.

25                   THE WITNESS:  Exactly.
```

Jennifer Maue, Senior Court Reporter   (631)852-2153

CROSS/Gabriele

1

2       Q.    This is a Sprint-Nextel phone?

3       A.    It is a Sprint phone.

4       Q.    Sprint phone.  You see down in the bottom

5  it has the numbers?

6       A.    Left-hand corner.

7       Q.    Yeah, it says below it, "view/change

8  customer"?

9       A.    Yes.

10      Q.    "View/change customer"?

11      A.    Yes.

12      Q.    Does that mean the customer can go on and

13  change those numbers?

14                   MR. PEARL:  Objection, judge.

15                   THE COURT:  Overruled.  If the

16            witness knows.

17      A.    I would have no idea.  That is something

18  you have to ask the Sprint-Nextel people.

19      Q.    If somebody has Sprint, can't they go on

20  at any time and change the address, which is above

21  it?

22                   MR. PEARL:  Objection.

23                   THE COURT:  Sustained.  It's a

24            question of competence, Mr. Keahon, or lay a

25            foundation in your cross.

CROSS/Gabriele

1

2       Q.   Do you have a cell phone?

3       A.   Yes, I do.

4       Q.   Who is your carrier?

5       A.   AT&T, Cingular AT&T.

6       Q.   Do you have the ability to go on the

7 computer and change the address you want --

8           MR. PEARL:  Objection -- sorry.

9       Q.   -- you want the bill to be sent to?

10           MR. PEARL:  Objection.

11           THE COURT:  Overruled.

12       A.   I've never done it.  I don't know.  I have

13 no idea.

14       Q.   Or even to change the number if you

15 choose?

16       A.   Never done it.  I have no idea, sir.

17       Q.   Are you able to see this on Page 2?   See

18 the M.S.I.D. number?

19       A.   Correct.

20       Q.   What is that?

21       A.   I don't know.

22       Q.   Isn't that an internal tracking number for

23 the subscriber?

24       A.   It very well may be, Mr. Keahon.  I do not

25 have the technical knowledge of Sprint-Nextel's

CROSS/Gabriele

1  bills.

2      Q.   Well, it has two numbers there.   You see?

3      A.   Correct.

4      Q.   It has two M.S.I.D. numbers, and then it
   has two telephone numbers?

5      A.   Correct.

6      Q.   What are those two telephone numbers?

7              MR. PEARL:  Objection.

8              THE COURT:  Overruled.  If the
   witness knows.

9      A.   They're two numbers under the same
   account.

10     Q.   So there is two separate phones --

11             MR. PEARL:  Objection.

12             THE COURT:  Overruled.

13     A.   That, I don't know.

14     Q.   Well, if you have two numbers for the same
   account, you have to have two different phones, don't
   you?

15             MR. PEARL:  Objection.

16             THE COURT:  Again, it is a matter
   of if the witness knows.

17     A.   I don't know for a fact.  I would assume
   so.  I don't know for a fact.

CROSS/Gabriele

THE COURT:  Don't speculate.

A.   I don't know for a fact, Mr. Keahon.

Q.   Do you know of any phone that you can call, on two different numbers, and the person will pick up?

MR. PEARL:  Objection.

THE COURT:  Sustained.

Q.   When you looked at this record, did you look at it with the district attorney?

A.   This particular record.

Q.   Yes?

A.   I looked at it with my -- by myself, when I got the subpoenaed records in.

Q.   How many hours would you say you spent with this assistant district attorney in preparation for your testimony and the presentation of this case?

A.   Many, many hours.

Q.   Hundreds and hundreds and hundreds?

A.   I won't say hundreds, but many, many hours.

Q.   If you retired today, based upon the last two years that you have been on this case, we would see your name in the picture --

MR. PEARL:  Objection, judge.

179

CROSS/Gabriele

THE COURT:  Sustained.

Q.   Did you keep a record of how many hours you --

A.   No, Mr. Keahon.

Q.   -- spent out on this case?

A.   No, Mr. Keahon, I did not.

MR. KEAHON:  But you will.

Q.   How much time did you spend on this record, on this Wojcieh Wachnik record, with the district attorney?

A.   The Wojcieh Wachnik records, I spent.

MR. KEAHON:  It is so late, we're not being impolite to his name.

THE COURT:  "Vojcieh Vachnik", it is a "V".

The "W" is pronounced as a "V" in Polish.

Q.   How much time, sir, did you spend on this record?  With the district attorney, trying to figure out what this stuff means?

A.   A minimal amount of time with the district attorney, figuring out what that means.

Q.   Didn't you testify to an electronic serial number?

1    CROSS/Gabriele

2         A.   Yes.

3         Q.   And it had to do with this account?

4         A.   That is correct.

5         Q.   I think you testified, sir, that the two

6    numbers that we see, here, under M.S.I.D., are

7    internal tracking numbers of the subscriber, right?

8         A.   I don't believe ---

9              MR. PEARL:  Objection, judge.  That

10   wasn't his testimony, judge.

11             THE COURT:  Sustained.

12        Q.   Well, next to the first number, it says

13   "authorized user", "Wojcieh Wachnik", "effective date

14   10/14/2004", right?

15        A.   That is correct.

16        Q.   "Expiration date", "11/03/04", correct?

17        A.   Yes.

18        Q.   "Subscription I.D." --

19             MR. KEAHON:  I'm sorry.

20             A JUROR:  Thank you.

21        Q.   "Subscription i.d.," it has a number

22   "0533745505", right?

23        A.   Correct.

24        Q.   Below that, it has another subscription

25   i.d., "0534821298", right?

1    CROSS/Gabriele

2         A.   Correct.

3         Q.   Two phones.

4         A.   Apparently so, yes.

5              MR. PEARL:  Objection.

6              Withdrawn, judge.

7              THE COURT:  Thank you.

8         Q.   You gave testimony as to only one ESN

9    number, right?

10        A.   That is correct, yes.

11        Q.   What is the electronic serial number

12   number for the other phone?

13        A.   Well, if I had the other phone, I could

14   tell you what it was.  I don't have the other phone.

15        Q.   So there is another phone, you don't have

16   it, and we don't have that electronic serial number

17   number, right?

18              MR. PEARL:  Objection, judge.

19              THE COURT:  Sustained.  Form.

20   Rephrase, Mr. Keahon.

21        Q.   You told us that you do agree there was

22   another phone?

23              MR. PEARL:  Objection, judge.

24              THE COURT:  Sustained, form.

25   Rephrase, Mr. Keahon.

CROSS/Gabriele

1

2       Q.   Was it your testimony that you agree now

3  that there was a second phone --

4                    MR. PEARL:  Objection.

5                    THE COURT:  Overruled.

6       A.   It appears that there are two phones on

7  the account, yes.

8       Q.   Okay.  Is this the first time you realized

9  that?

10      A.   No, it is not.

11      Q.   When did you first realize that?

12      A.   When I first got the records.

13      Q.   Did you have any discussions with the

14  district attorney about them being two phones, two

15  different i.d. numbers, two different electronic

16  serial numbers?

17      A.   I don't recall any particular conversation

18  to that effect, no.

19      Q.   Did you have a discussion with the

20  district attorney that you would only present to this

21  jury, one phone, one identification number, and one

22  ESN number?

23                    MR. PEARL:  Objection, judge.

24                    THE COURT:  Sustained.

25      Q.   Did you have a discussion with the

1    CROSS/Gabriele

2    district attorney's office, before you testified,

3    that the question and answer would only involve one

4    phone, and one ESN number?

5         A.   No.

6         Q.   Well, at the day's completion, when you

7    testified about one phone, one ESN number, one i.d.

8    number, did you say to Mr. Pearl, "You forgot the

9    second one"?

10                   MR. PEARL:   Objection.

11        Q.   "Maybe we should tell the jury about that

12   one"?

13                   MR. PEARL:   Judge, objection.

14                   THE COURT:   Sustained.

15        Q.   Did you receive these records from Sprint?

16        A.   Yes, I did.

17        Q.   Was there a cover page addressed to Mr.

18   Pearl?

19        A.   Yes, there was.

20        Q.   And that is not part of this exhibit, is

21   it?

22        A.   I don't -- I don't know what you're

23   showing me.

24        Q.   I'll show it to you.

25                   THE COURT:   Officer, if you would.

184

CROSS/Gabriele

        THE COURT OFFICER: Exhibit 49.

        THE COURT:   Thank you, officer.

    A.   Your question, Mr. Keahon.  What is the
question you asked me?

    Q.   Was there a cover page with the -- a
two-page cover page, sent with the subpoenaed
documents?

    A.   This particular document.

    A.   This particular document is from 2007.  So
there is no cover page with this, what you've just
given me.

    Q.   But you did see one, did you not?

    A.   There usually is one, yes, when it comes
from Sprint.

    Q.   Did you receive with any records, a letter
addressed to Mr. Pearl, that gives two different
electronic serial numbers -- what is an ESN again?

    A.   I believe, I'm not sure, it is electronic
serial number.

    Q.   We talked about what M.S.I.D. is?

    A.   I have no idea what that is.  Some kind of
internal identifier.

    Q.   Yes.  Okay.  And we talked about the two
different numbers, on the record, right?

CROSS/Gabriele

1

2          A.    Correct.

3          Q.    What was the electronic serial number you

4     testified referenced one of the phones, as to Mr.

5     Wojcieh Wachnik?

6          A.    I'd have to look at the document to tell

7     you what the electronic serial number was.

8          Q.    Would you?

9          A.    Would I what?

10         Q.    Is it on that record?

11         A.    I'd have to look.

12              (Pause)

13         A.    No, it's not.

14                   MR. KEAHON:  May I have this marked

15         for identification, please?

16                   THE COURT:  Yes.

17                   MR. KEAHON:  Oh, it's 177.

18                   Thank you very much, Mr. Pearl.

19                   THE COURT:  Do you need that

20         marked, then?

21                   MR. KEAHON:  I may not.

22                   THE COURT:  Thank you.

23         Q.    Would you please look at 177?

24                   (Handing)

25         Q.    Please tell us what the electronic serial

CROSS/Gabriele

number is?

    A.   75CD623.

    Q.   On Exhibit 177?  I ask you to look at what is being marked as Defendant's "N", as in "Nancy". N, for Nancy.  The fifth page, I think.

           THE COURT OFFICER: Defendant's Exhibit N, marked for identification only.

           (Defendant's Exhibit N, marked for identification)

    Q.   I think it is Page 5, sir, either Page 4 or Page 5.  It is with a listed electronic serial number.

           MR. KEAHON:  May I approach, judge, to make this go quicker.

           THE COURT:  Yes.

    Q.   The page before Page 4, do you see a letter addressed to Mr. Pearl?

    A.   Yes, I do.

    Q.   Do you see that letter?

    A.   I don't recall.  I don't recall seeing this, no.

    Q.   What is the date?

           MR. PEARL:  Objection.

           THE COURT:  Sustained.  It is not

CROSS/Gabriele

1
2          in evidence, Mr. Keahon.

3          Q.   Have you, on the records for Mr. Wachnik,

4     in addition to what we've talked about and what is

5     shown on the display, have you seen a record not only

6     with two different M.S.I.D. numbers, and two

7     different phone numbers, but also two different

8     electronic serial numbers?

9                    MR. PEARL:   Objection, judge.

10                   THE COURT:   Overruled.

11         A.   I'm not sure I understand the question,

12    Mr. Keahon.

13         Q.   Okay.  On People's 49, we talked about Mr.

14    Wachnik's Sprint records?

15         A.   Correct.

16         Q.   We talked about the two different M.S.I.D.

17    numbers.

18         A.   (Nods)

19         Q.   We talked about the two different phone

20    numbers?

21         A.   (Nods)

22         Q.   We talked about that apparently being two

23    different phones?

24         A.   Correct.

25         Q.   You've given testimony as to only one.

188

CROSS/Gabriele

A.   I only physically had one.   That's all I know about.

Q.   Okay.   But you had the records, knowing there was a second one?

MR. PEARL:   Objection, judge.

THE COURT:   Overruled.

A.   The call records, is that what you're referring to -- or the subscriber record.

Q.   I'm talking about 49, where we saw in 49?

A.   Correct, yes.

Q.   There were two numbers, two phones?

A.   Yes.

Q.   You never testified on direct about a second phone, did you?

A.   There was only one phone germane to the case.

Q.   Sir, in your testimony, it was never even discussed with you in front of this jury about two phones, two different numbers, was it?

MR. PEARL:   Judge, objection.

THE COURT:   See counsel at side bar, please.

MR. KEAHON:   I'll withdraw.

THE COURT:   Thank you.

Jennifer Maue, Senior Court Reporter    (631)852-2153

CROSS/Gabriele

1

2          Q.   Sir, am I correct that during your direct

3    examination, you spoke only as to one phone, one

4    number, notwithstanding what was in the records of

5    49, right?

6          A.   That is what I was asked, yes.

7          Q.   That is what you were asked by this

8    district attorney, right?

9          A.   That is correct, yes.

10         Q.   Now I'm asking you on that Page 4 and Page

11   5, you see a letter addressed to Mr. Pearl?

12         A.   That is correct.

13         Q.   From Sprint?

14         A.   Yes.

15         Q.   Have you seen that two-page document

16   before?

17         A.   I told you before, Mr. Keahon, I don't

18   recall seeing this particular --

19              MR. KEAHON:  Can we approach,

20         judge?  And could I have that document?

21              (The following occurred at side

22         bar):

23              MR. KEAHON:  I don't know how I got

24         this.  I don't know when you give it to me.

25              MR. PEARL:  Of course I did.  I

CROSS/Gabriele

1
2          turned everything over.

3               MR. KEAHON:  This talks about the
4      dates which we've heard.

5               The second page talks about that's
6      the number you had testified to.  There is a
7      second electronic serial number assigned for a
8      second phone.

9               MR. PEARL:  I turned that over
10     twice to you, to look at the dates.  The dates
11     are outside the Wojcieh Wachnik dates, that's
12     why it wasn't put into evidence.  It wasn't
13     relevant.  I would have introduced it, but it
14     has no relevance to the case, 10/14 to 10/25.
15     Those are the records that are in evidence as
16     49.

17              MR. KEAHON:  But there was other
18     things happening on Wojcieh Wachnik beyond
19     that date.

20              MR. PEARL:  No, there wasn't.

21              MR. KEAHON:  Yes, there was.

22              MR. PEARL:  It goes to another
23     person.

24              MR. KEAHON:  No, that is in
25     January.

1  CROSS/Gabriele

2          MR. PEARL:  This is a different

3  time frame on the records.  The records we put

4  into evidence were germane from the 10/14 to

5  the 10/25 date.  But activity with the Wojcieh

6  Wachnik went beyond that date.

7          THE COURT:  The court may assist

8  you.  Either you cross-examine him, or I'll

9  cross-examine him. I'm allowing

10  cross-examination as to it.  I'm sustaining

11  certain objections as to form.

12          He made motion for a mistrial

13  before, based on Mr. Pearl's comments.  Upon

14  consideration, I'm going to deny the

15  application.  I'll give a cautionary

16  instruction to the jury.

17          First, on the fact that the -- I

18  have -- you'll recall that the defendant's --

19  that the people made a remark in your

20  presence, and the defendant was trying on a

21  jacket to the extent of wishing to

22  cross-examine the defendant, because he would

23  be testifying.  Such a remark is contrary to

24  law, I'm strongly emphasizing this to you,

25  trying on a jacket is not testimony.  It is a

CROSS/Gabriele

demonstration for your consideration.  To call it testimony is not credible and must not be considered as such by you.  As I have charged you, well into the future and now, the decision not to testify by the defendant in a trial is not a decision that you -- is not a factor you can hold against the defendant. You must disregard the comment by the prosecutor.

MR. KEAHON:  Can I let you know tomorrow.

THE COURT:  Yes.

MR. PEARL:  For the record, he did ask questions whether the defendant was wearing the jacket.

THE COURT:  But not of his client.

It is parsing whether a witness puts on a jacket.  Demonstrations are an arcane area of law.  The only reason I know it was done at a trial --

MR. PEARL:  I understand.

THE COURT:  -- is where there is a logical extension of testimony, and it's treated entirely differently by the courts.

Jennifer Maue, Senior Court Reporter   (631)852-2153

CROSS/Gabriele

So anyway.

Can we finish him up?

MR. KEAHON:  I'm almost finished.

MR. PEARL:  I'll finish.

THE COURT:  Let's finish him.

We'll take a brief recess.

MR. KEAHON:  Your Honor, we may be able to finish this witness, both myself and Mr. Pearl, by the 6:00 o'clock hour.

(The following occurred in open court):

THE COURT:  The jury will be given a brief recess.  Remember my admonitions.

I remind you not to form or express an opinion about the case until submitted to you for deliberations.  As I've told you, do not discuss this case or any matter connected to the trial amongst yourselves or with anyone else.  Nor may you allow it to be discussed in your presence.

Don't read or listen to accounts reported in the news media, don't visit or view the place or places where the offense charged was allegedly committed or any other

194

CROSS/Gabriele

1

2        place involved in this case, and promptly

3        report to the court by way of coming to me

4        personally, through a court officer, any

5        incident within your knowledge involving any

6        attempt to influence any member of the jury.

7              THE COURT:  You may stand down,

8        detective.  Do not discuss your testimony.

9              THE WITNESS:  Thank you.

10             (The Witness is excused)

11            THE COURT:  Please bring in the

12        jury.

13            THE COURT OFFICER: Jury is

14        entering.

15            THE COURT:  All rise, please.

16          Thank you, please be seated.

17        Please be seated, everyone.

18            THE CLERK:  Case on trial, People

19        versus Whitehead, the jury and all parties are

20        present.  Counsel waive the roll.

21           MR. KEAHON:  I do.

22           MR. PEARL:  People waive.

23           THE CLERK:  Detective, I remind

24        you, you're testifying under oath.

25  CONTINUING CROSS-EXAMINATION

195

CROSS/Gabriele

BY MR. KEAHON:

    Q.   Detective, we're going to do this in five minutes, okay?

    A.   Okay, Mr. Keahon.

    Q.   How many phones out at the house on the 92 Howland Avenue?

    A.   Three.

    Q.   The pictures that we introduced into evidence, are they the only pictures that were taken that you have?

    A.   That is all that Teaneck gave me.

    Q.   Okay.  How many cell phones were taken out of the house?

    A.   There were three out of the house.

    Q.   Could you show me where they are in these pictures?  It is that whole group, 136, 137, 138, et cetera.

    A.   We have two pictures of cell phones, one on the fireplace mantel, and one in the closet.

    Q.   Where is the picture of the third one?

    A.   I'm sorry.  On People's 140 and 141. There was no picture of the Sprint phone.  From when Teaneck forwarded me these pictures, there is not a picture of it.

CROSS/Gabriele

Q.   We don't have a picture of that?

A.   That is correct.

Q.   Was there a check approved and funded to Christina Brooks?

A.   I believe there was, yes.

Q.   Where was it cashed?

A.   I would have to look back at the Commerce Bank records in order to find that out.

Q.   Was it cashed?

A.   I don't know.  I don't recall.

Q.   Who was it cashed by?

A.   I don't know, I'd have to look at the bank record.

Q.   Oh.  The T-Mobile phone that you talked about, that you've seen on all the diagrams, we had the representative testify from T-Mobile U.S.A.

Did you ever speak with him?

A.   Did I ever speak with him.

Q.   Yeah?

A.   Just when he was upstairs in the office.

Q.   Okay.  Am I correct that they had records for the method of payment, check, cash, credit card, and when, where, and how payment was made, for the T-Mobile phone, but it was never subpoenaed?

CROSS/Gabriele

1

2      A.   The payment records were never subpoenaed.

3      Q.   Yes?

4      A.   No, I never did subpoena the payment

5  records, no.

6      Q.   The Joseph Sweeney check, was that

7  deposited?

8      A.   Yes, it was.

9      Q.   Where and by whom?

10     A.   It was deposited into the account of

11  Hillside Rides.

12     Q.   Yes?  Did someone cash it?

13     A.   I believe Hillside Rides cashed it, yes.

14     Q.   Who dropped it off at Hillside Rides?

15     A.   I don't know who dropped it off at

16  Hillside Rides.

17     Q.   Okay.  Very quickly?  The paperwork from

18  Land Rover Massapequa?

19     A.   Yes.

20     Q.   That was, it was submitted to

21  identification for fingerprints?

22     A.   Yes.

23     Q.   You asked that any fingerprints found on

24  the documents from Massapequa Range Rover, be

25  compared to Jay von Goldson, right?

Jennifer Maue, Senior Court Reporter   (631)852-2153

CROSS/Gabriele

1

2          A.    Yes.

3          Q.    Who is he?

4          A.    Jay von Goldson was a suspect, or he was

5    an arrestee.  He was arrested in Manhattan, for

6    stealing the identity of a gentleman by the name of

7    Germaine Washington.

8          Q.    Francis Rene, you asked?

9          A.    Det. Peeker told me who he is.

10         Q.    Who is he?

11         A.    He was a co-defendant for Goldson on

12   another unrelated case.

13         Q.    The -- am I correct that there was one

14   print unidentified when that comparison was made?

15         A.    I believe there was, yes.

16         Q.    In the Smithtown Range Rover, they also

17   asked that a comparison be done for fingerprints, on

18   that check for Jay von Goldson, right?

19         A.    I'd have to look at it.  Is that the

20   Smithtown.

21         Q.    Yes?

22         A.    I believe, yes, the Smithtown Land Rover

23   was Jay von Goldson as well.

24         Q.    He has an a/k/a of Tremaine Washington?

25         A.    Yes.

1   CROSS/Gabriele

2        Q.   Also France Rene was compared to that,

3   right?

4        A.   Yes.

5        Q.   You also asked that my client, Lamar

6   Whitehead's, fingerprints be compared, did you not?

7        A.   Det. Peeker requested that.

8        Q.   And that was a negative?

9        A.   Correct.

10       Q.   And but it was positive on Kylie Copeland?

11       A.   That is correct.

12       Q.   We did a whole series of charts, 190, 209,

13  and on almost every chart, it showed multiple calls

14  between -- am I correct, that multiple exhibits

15  showed phone calls between subscriber, Lamar

16  Whitehead's cell phone, and the T-Mobile, right?

17       A.   That is correct.

18       Q.   Back and forth?

19       A.   Yes.

20       Q.   Who was on Lamar Whitehead's cell phone

21  when it was calling T-Mobile?

22       A.   I wasn't there, Mr. Keahon, I don't know.

23       Q.   Who was on the T-Mobile when it was

24  calling Lamar Whitehead's cell?

25       A.   I don't know.

Jennifer Maue, Senior Court Reporter   (631)852-2153

200

1  REDIRECT/Gabriele

2              MR. KEAHON:  I have nothing

3       further.  Thank you, very much.

4              THE COURT:  Thank you.  Any

5       redirect?

6              MR. PEARL:  Yes, your Honor, thank

7       you.

8  REDIRECT EXAMINATION

9  BY MR. PEARL:

10       Q.   Detective, Mr. Keahon asked you a series

11  of questions about Nigel DeFreitas?

12       A.   Yes.

13       Q.   How many times was Nigel DeFreitas's house

14  searched on August 5th, 2005?

15       A.   Twice.

16       Q.   And who did the first search?

17       A.   Det. Peeker.

18       Q.   Who did the second search?

19       A.   I did.

20       Q.   And what if anything was found in the

21  house, linking Nigel DeFreitas or Desmond DeFreitas,

22  to any of the identity thefts you were investigating?

23       A.   Absolutely nothing.

24       Q.   Did there come a time that you seized all

25  the computer systems in that house?

1    REDIRECT/Gabriele

2         A.   Yes, Det. Connelly of the computer crimes

3    section did.

4         Q.   Including computers both in the downstairs

5    and in the upstairs apartment of Desmond DeFreitas?

6         A.   Correct.

7         Q.   And Det. Connelly analyzed those

8    computers?

9         A.   Yes, he did.

10        Q.   Was there any information on any of the

11   computer systems recovered from 905 Cleveland St.,

12   linking either Desmond or Nigel DeFreitas to any of

13   the identity thefts you investigated?

14        A.   There was nothing on any of the computers,

15   no.

16        Q.   You indicated -- Mr. Keahon asked you a

17   series of questions about doing a search warrant at

18   92 Howland Avenue?

19        A.   Correct.

20        Q.   And he asked you questions about a BJ's

21   card, I believe, People's 166 in evidence?

22        A.   Yes.

23        Q.   Specifically, you -- on direct, you

24   indicated you found that card in the house, correct?

25        A.   Correct.

REDIRECT/Gabriele

Q.    Specifically where in the house was that card found?

A.    It was in the bags of mail in the hallway closet.

Q.    In the bag?

A.    In the bag, yes.

Q.    Mr. Keahon asked you a series of questions concerning 177, a Sprint cell phone record, with an electronic serial number on it?

A.    Yes.

Q.    As well as People's 49, cell phone records in the name of Wojcieh Wachnik?

A.    Yes.

Q.    The electronic serial number number in 177, was compatible to the Wojcieh Wachnik cell phone records, People's 49?

A.    Yes.

Q.    Where if anywhere was the Sprint cell phone found, with that same electronic serial number number?

A.    92 Howland Avenue, in Teaneck, New Jersey.

Q.    Mr. Keahon asked you a series of questions about handwriting on People's 110; I believe the Briton Lawler check, do you recall that?

REDIRECT/Gabriele

        A.    Yes.

        Q.    Did you forward that check anywhere for
handwriting analysis?

        A.    Yes, I did.

        Q.    To where was it forwarded?

        A.    To Mr.  JeffLuber of the crime lab.

        Q.    Before that, you forwarded it to Karen
Ensalata, for fingerprint analysis?

        A.    That is correct.

        Q.    Who if anyone's fingerprints were on that
check?

        A.    Briton Lawler, a $64 dollars check,
People's 110.   Kylie Copeland.

        Q.    Did you get results from Jeff Luber
regarding whose handwriting was on that check?

        A.    Yes, I did.

        Q.    Who if anybody's handwriting was on
People's 110?

        A.    The defendant's handwriting was on that
check.

        Q.    Mr. Keahon asked you a series of questions
about 176-A and -B, paperwork bearing the name of
Katherine Reid, do you recall?

        A.    Yes.

REDIRECT/Gabriele

1

2          Q.    You indicated that you found that

3    paperwork, where?

4          A.    In the bags, in the hallway closet of 92

5    Howland Avenue, Teaneck, New Jersey.

6          Q.    What if anything was Katherine Reid's

7    paperwork in?

8          A.    It was in an envelope, with other mortgage

9    paperwork.

10               MR. PEARL:   Judge, may I have this

11          marked as People's 210 or 211.

12               MR. KEAHON:   I have no objection to

13          People's 211 going straight into evidence,

14          your Honor.

15               THE COURT:   There being no

16          objection, if you would mark it in evidence as

17          People's Exhibit 211, officer.

18               THE COURT OFFICER:   People's 211,

19          marked and received in evidence.

20               (People's Exhibit 211, marked for

21          identification and received in evidence)

22          Q.    Detective, do you recognize People's 211

23    marked for identification?

24          A.    Yes, that is the envelope that I was

25    talking about, that that document was found in.

REDIRECT/Gabriele

Q.   Are you talking about the Katherine Reid document?

A.   Yes.

Q.   And that is 211 in evidence?

A.   211.

Q.   And the Katherine Reid paperwork was where, specifically?

A.   In 92 Howland Avenue, Teaneck, New Jersey.

Q.   I'm sorry.  It was a poor question.  Where in reference to People's 211?

A.   Inside the envelope.

Q.   Detective, Mr. Keahon asked you a series of questions about Kylie Copeland.  He initially asked you about did you question Valerie Rodriguez in reference to Kylie Copeland.  Do you remember those questions?

A.   Correct, yes.

Q.   Did you ask Valerie Rodriguez if she knew Kylie Copeland?

A.   Yes, I did.

Q.   What if anything did she tell you?

A.   She never had heard of him before.

Q.   A series of these identity theft allegations were for the year 2004 and 2005, correct?

REDIRECT/Gabriele

1
2          A.   Yes.

3          Q.   Mr. Keahon asked you a series of questions

4     about the computer system, and tracking where it was

5     shipped, do you recall that?

6          A.   Yes.

7          Q.   Where was that -- what if anything did you

8     learn from your investigation?

9          A.   That that particular computer, was shipped

10    from China, on December 7th of 2004, it was shipped

11    from a port in China on that particular day.

12         Q.   And he asked you about the Microsoft

13    Windows XP software?

14         A.   Yes.

15         Q.   That had been installed 12/29/04?

16         A.   Yes.

17         Q.   And was there anything --

18                   MR. PEARL:   Withdrawn.

19         Q.   In the year -- from December 2004 through

20    December of 2006, do you know where Kylie Copeland

21    was?

22         A.   Yes, I do.

23         Q.   Where if anywhere was Mr. Copeland?

24         A.   He was in the Suffolk County jail and then

25    he was transferred to a state prison.

```
1    RECROSS /Gabriele
2         Q.   The series of E-Loan fraud allegations
3    that you are investigating, did any occur after Mr.
4    Copeland was in prison?
5         A.   If I could check my notes.
6              MR. PEARL:  With the court's
7         permission.
8              MR. KEAHON:  I have no objection if
9         the district attorney tells him the answer.
10        A.   The majority of the E-Loan applications
11   occurred after January 1st, 2005.
12        Q.   When Mr. Copeland was incarcerated?
13        A.   That is correct.
14             MR. PEARL:  Thank you, detective.
15             MR. KEAHON:  I have a couple of
16        quick ones.  I have four minutes.
17             THE COURT:  Within the parameters
18        of the redirect, if you please, Mr. Keahon.
19             MR. KEAHON:  Yes, I will, judge.
20   RECROSS-EXAMINATION
21   BY MR. KEAHON:
22        Q.   You said the majority of them happened
23   after he was institutionalized, right?
24        A.   Correct.
25        Q.   How many of the fraud loans originated in
```

Jennifer Maue, Senior Court Reporter   (631)852-2153

RECROSS /Gabriele

2004, before he was incarcerated?

    A.   Give me a second.  I'll count them up for you.

    Q.   Sure.

    Q.   I'm talking September, October, November?

    A.   Approximately eighteen.

    Q.   So eighteen of the fraud loans happened while he was still on the street?

    A.   That is correct.

    Q.   Mr. Pearl didn't ask you that?

    A.   Just now.

    Q.   Yes?

    A.   I don't believe so, no.

    Q.   Okay.  This card with Desmond DeFreitas' picture on it, you indicated it was found in the bag?

    A.   In the bags in the hallway closet.

    Q.   But there were no pictures of it anywhere?

    A.   No.

    Q.   There is nothing in writing by you saying you found it any specific place is there?

    A.   No.

    Q.   There is nothing by any other detective saying they saw you found it in any particular location?

RECROSS /Gabriele

A.   No, there is not.

Q.   The Sprint phone that was just asked about on redirect, pictures were taken of the interior of 92 Howland that you told us there is no picture that was taken to memorialize that in fact the Sprint phone was there?

A.   That is correct.

Q.   There is nothing on any written record by you, by Teaneck, by anybody that indicates --

MR. KEAHON:   Withdrawn.

I'll move on.

Q.   The handwriting on the check that you said came back to my client, were you here when Ms. Ensalata testified in court before this jury?

A.   Ms. Ensalata.

Q.   Karen Ensalata?

A.   She's the fingerprint expert.

Q.   Yeah?

A.   No, I was not here when she testified.

Q.   Were you here when the testimony was given by the handwriting expert, Mr. Luber?

A.   No, I was not.

Q.   You indicated on redirect you had a conversation with Valerie Rodriguez about whether or

RECROSS /Gabriele

not she even knew Kylie Copeland?

    A.  Correct.

    Q.  That appears nowhere in the statement you took from her, does it?

    A.  No, it doesn't.

    Q.  That appears nowhere in any note you made?

    A.  No.

    Q.  That appears nowhere in any report you made?

    A.  No.

    Q.  That appears nowhere in the existence of this world, by you or any detective or anybody else?

    A.  No.

        MR. KEAHON:  Okay.

    Q.  Document 211 in evidence, that envelope that I just stipulated to go into evidence?

    A.  Correct.

    Q.  Is there anywhere on that envelope that indicates anything was ever found in it?

    A.  No, there is not.

    Q.  Is there anywhere a note or a report by you, by Teaneck, by anybody else in the world, that says 176-A and -B was found within that envelope that was presented to you, which you testified yes, it

211

1    People v. Lamar Whitehead

2    contained 176-A and -B was in there?

3              A.   No.

4                        MR. KEAHON:   I have nothing

5         further.   Thank you, detective, I appreciate

6         it.

7                        THE COURT:   Detective, this

8         concludes your testimony.   You may stand down.

9                        THE WITNESS:   Okay.

10                       (The Witness is excused)

11                       THE COURT:   Ladies and gentlemen of

12        the jury, I have a question.   You'll be here

13        at 10:00 o'clock tomorrow morning, early.

14        Does that create a problem for anyone, 10:00

15        o'clock?   Does that create a problem for

16        anyone?

17                       Thank you.

18                       MR. KEAHON:   Judge, can we --

19                       THE COURT:   Do you need to approach

20        before the jury is discharged for the day?

21                       (Side bar conference held off the

22        record)

23                       THE COURT:   10:30 tomorrow morning.

24        This trial will resume.   Once again, I'm

25        required to admonish you all.

People v. Lamar Whitehead

   I remind you not to form or express an opinion about the case until submitted to you for deliberations.  As I've told you, do not discuss this case or any matter connected to the trial amongst yourselves or with anyone else.  Nor may you allow it to be discussed in your presence.

   Don't read or listen to accounts reported in the news media, don't visit or view the place or places where the offense charged was allegedly committed or any other place involved in this case, and promptly report to the court by way of coming to me personally, through a court officer, any incident within your knowledge involving any attempt to influence any member of the jury.

   Thank you all, once again, for your hard work.  See you tomorrow morning at 10:30.

   (The Jury is excused)

   THE COURT:  Thank you, please be seated.

   Is there anything to place on the record at this time before the court recesses for the day?

```
 1   People v. Lamar Whitehead
 2                    Mr. Keahon.
 3                    MR. KEAHON:   Nothing, judge.
 4                    THE COURT:   Thanks to counsel for
 5          their hard work.   Mr. Whitehead, see you
 6          tomorrow morning, 10:30, for the resumption of
 7          the case on trial.   The court will adjourn to
 8          reconvene tomorrow morning, at 9:30, for the
 9          call of the calendar.
10                        -o0o-
11
12              C E R T I F I C A T E
13
14              I, JENNIFER MAUE, a Senior Court
15          Reporter, do hereby certify, that the
16          foregoing matter is a true and accurate
17          transcription of my shorthand notes.
18                    IN WITNESS WHEREOF, I have hereunto
19          set my hand.
20
21          _____
22                    JENNIFER MAUE
23
24
25
```

Jennifer Maue, Senior Court Reporter    (631)852-2153