1

2      COUNTY COURT OF THE STATE OF NEW YORK
       COUNTY OF SUFFOLK - PART 7
3      ---------------------------------------x
       PEOPLE OF THE STATE OF NEW YORK,
4
                                    Case No.:
5                                   539-07
              -against-
6
       LAMAR WHITEHEAD,
7
                       Defendant
8      ---------------------------------------x
                       TRIAL TRANSCRIPT
9                                      March 18, 2008
                                      210 Center Drive
10                                   Riverhead, New York

11     B E F O R E :

12            THE HONORABLE JAMES HUDSON,
              Suffolk County Judge
13
       For the People:
14
              THOMAS J. SPOTA, ESQ.
15            District Attorney of Suffolk County
              Economic Crimes Bureau
16            North County Complex
              Building 77, Veterans Memorial Highway
17            Hauppauge, New York 1788
              BY: RAPHAEL PEARL, ESQ.,
18            BY: JODI FRANZESE, ESQ.,
              Assistant District Attorneys
19
       For the Defendant:
20
              The Law Offices of
21            WILLIAM KEAHON, ESQ.
              One Suffolk Square
22            Islandia, New York

23     Reported By:
         Jennifer Maue,
24       Senior Court Reporter

25

FILED
NOV 13 2009
CLERK OF SUFFOLK COUNTY

1  People v. Lamar Whitehead

2                THE CLERK:  Case on trial, People

3        versus Whitehead.  All parties are present

4        outside the presence of the jury.

5                THE COURT:  I have been informed by

6        Sgt. Davis, that one of the jurors informed

7        the officer that because of child care issues,

8        that she can't work after five on either

9        tomorrow or Thursday.  Another one of the

10       jurors has indicated one of the people in the

11       crane accident in the city was a relative or

12       close friend and he needs to take time off for

13       the funeral on Friday.

14                We're reaching the point in time,

15       we do have four alternates, where, as we come

16       close to the end of this trial, particularly

17       when we have a juror who says he can't be here

18       on Friday.  Whether or not you wish to bring

19       the person in, inquire of them or whether or

20       not they should be discharged at that point in

21       time.

22                MR. PEARL:  What about inquiring to

23       the jury whether or not it would be a burdenn

24       for them to be here next week.

25                THE COURT:  As far as coming back

People v. Lamar Whitehead

next week.

           MR. KEAHON:  That might be the solution.  Let them know a few jurors have problems.

           THE COURT:  Right.  We'll tell them that.

           Let's see how far we progress, though.  We'll get to our original date when we informed them that we would be leaving, that the trial would be ending and that they would be free to leave at that point in time but that is not going to happen if it appears that it won't be, and then particularly when we consider the possible length of deliberations in the case and find out who it is going to be a burden for, and we'll inquire individually as to each one we keep in.

           I'm glad we picked four alternates.

           Is there anything to place on the record before we bring in the jury?

           MR. KEAHON:  Yes, judge, I got here at ten minutes of two to look over that book that Ms. Fortune reviewed and identified items from.  I haven't had an opportunity to do

People v. Lamar Whitehead

that.

         THE COURT:  All right.

         MR. KEAHON:  The evidence isn't here yet.

         THE COURT:  All right.

         MR. KEAHON:  Secondly, I had called your chambers at about twelve, asking for permission to come in and do that.  I just have to also make sure that all the items that should have been taken out were taken out.  I went over again last night what I believe were the redactions that were to take place.

         Thirdly, judge, last week and even as of yesterday, I told the court that I wanted any new charts on the handwriting, and both assistant district attorneys said there would be no new charts.  I come in this morning, and there is a different chart.  It is a surprise.  I'm moving to preclude.  I know the court and everyone in this courtroom, is trying to get this case completed, as expeditiously as possible, but I'm being taken advantage of.

         THE COURT:  The question is, how is

People v. Lamar Whitehead

it different?

          MR. KEAHON:  I'll show you.

          THE COURT:  If you would.

          MR. KEAHON:  Before I do that, let me address myself to the other exhibit.

          Is that door closed?

          THE COURT:  Officer, could we close that door, please.

          MR. KEAHON:  Your Honor, this is a chart which is a blow-up of a document that I have.  And this was brought down into the courtroom to be admitted.  Inmates' signature.

          This says "signature of prisoner". They blocked this out.  I want all this out.

          I obviously want "inmate's signature" out.  I mean, how does this happen? If I didn't catch this, this goes into evidence, and we have a mistrial.  Or the court says, no, I'll give a curative charge.

          THE COURT:  The fact remains that you did catch it, for which the court commends you as an advocate, Mr. Keahon.

          How can that be redacted?

          MR. KEAHON:  And let me just show

1    People v. Lamar Whitehead

2         you, if I could.  As far as Mr. Luber and what

3         he's doing.  The original document I was

4         given, a smaller size, doesn't have "inmate's

5         signature" in it.

6              THE COURT:  Thank you.  Thank you.

7              MR. KEAHON:  So when the blowup was

8         done, space was included so that "inmate's

9         signature" could fit in there.  How could he

10        not have spotted that?

11             I feel like I'm being ambushed.  I

12        want to mark as an exhibit, this document as

13        part of the court record, as a court exhibit.

14        I blacked out this.

15             (Indicating) as far as what I

16        wanted out.  Which says, "signature prisoner".

17             THE COURT:  Thank you.

18             MR. KEAHON:  Perhaps we can have

19        the original that was given me without my

20        scratching on it, photostat it, and make it a

21        court exhibit.

22             THE COURT:  Thank you.  Do the

23        people wish to be heard?

24             MR. PEARL:  Judge, the adjective of

25        "ambush", if it was an ambush, it wouldn't be

Jennifer Maue, Senior Court Reporter   (631)852-2153

1    People v. Lamar Whitehead

2         presented to him a day before it is being

3         presented.  Mr. Luber is not scheduled until

4         the very end of today or tomorrow morning.  If

5         it was an ambush, we wouldn't show Mr. Keahon.

6              We have been bending over backwards

7         to do whatever Mr. Keahon asks, including have

8         the detective go out and do an investigation

9         that Mr. Keahon requested.  To use an

10        adjective like "ambush" is not becoming to Mr.

11        Keahon, or something the court should

12        entertain.

13             MR. KEAHON:  We were all told Mr.

14        Luber was testifying today.  We all were told

15        that.  That is why these documents are down

16        here.

17             MS. FRANZESE:  Your Honor, if I

18        just may.  That is not why these documents are

19        down here.  Mr. Luber is anticipated about

20        4:00 o'clock today, based on an average of how

21        each piece of testimony is going.  Those

22        exhibits are not going to be put in until the

23        end of Mr. Luber's direct examination.  I

24        brought those down specifically because Mr.

25        Keahon has requested and indicated that he

1    People v. Lamar Whitehead

2            would need to see all the exhibits one day

3            prior to them being offered into evidence.

4                    I have been trying to keep him

5            abreast of everything.  Every time I get a

6            fax, I copy it and hand it over to him.  What

7            Mr. Pearl was indicating on the record with

8            the investigations by our detective, I did

9            hand counsel, we received it via UPS and I

10           copied the results of the investigation, and

11           handed it to Mr. Keahon.  It should be on his

12           desk right now.

13                   MR. KEAHON:  That is in reference

14           to Mr. Lee's testimony from Capital One.  When

15           I questioned him as to where the reverse of

16           the Wojcieh check was, he said they didn't

17           have it.  I asked him if he would please go

18           back where he comes from, search the records

19           and forward it to me.  That was what was done.

20                   THE COURT:  Now we're mixing

21           issues.

22                   MR. PEARL:  The other issue is Det.

23           Gabriele went out and investigated what Mr.

24           Keahon asked him to do, which was to go out

25           and trace where this computer is sold, as

1    People v. Lamar Whitehead

2         well.  We have been bending over backwards to

3         get what Mr. Keahon asks for, as a courtesy,

4         and whatever he wants, he has been getting

5         from the people.

6              THE COURT:  Thank you.

7              MR. KEAHON:  What Mr. Pearl just

8         spoke to is partially at the direction of the

9         court.  The court, as you recall, I'm sure

10        suggested to the district attorney that if

11        they have the information of when this

12        computer first came into existence, or how it

13        got here in the United States, to let me know

14        if they find out.

15             They did, and I appreciate that,

16        Raphael.  Each night I call the district

17        attorney's, they speak to me and they tell me

18        who their witnesses will be.

19             MR. PEARL:  That is true.

20             THE COURT:  Thank you.

21             This disagreeable exchange by my

22        officers and the court was engendered I must

23        say by your intemperate use of the word

24        "ambush".  You could zealously represent your

25        client's interest and obtain a ruling in your

1    People v. Lamar Whitehead

2             favor without resort to such language.

3                      However, your point is well met.

4             The court will direct that that exhibit,

5             before it is shown to the jury, be redacted or

6             changed to where it reflects the

7             aforementioned exchange documents, which have

8             been shown to you.  In any event, I would have

9             entertained the application to strike that as

10            a possibility of prejudicing the jury, or

11            allowing idle speculation, and there is no

12            necessity for that.

13                     Since it is not going to be shown

14            to the jury at this time, my only question is

15            can it be done without having to prepare an

16            entirely new blow-up document, Ms. Franzese?

17            Mr. Pearl?

18                     MR. PEARL:  I'm sorry, judge.

19                     THE COURT:  The aspect that says.

20                     MR. KEAHON:  "Signature" is okay.

21                     "Of prisoner", I don't want to

22            trust that we scotch tape something over it

23            or...

24                     MS. FRANZESE:  Judge, for the

25            record.

1  People v. Lamar Whitehead

2              THE COURT:  Would a marker work.

3              MS. FRANZESE:  Your Honor, I put

4  that there to -- just to indicate to Mr.

5  Keahon today that I understood what he was

6  saying and I was going to make that a little

7  more permanent and a little more neater.

8              MR. PEARL:  If we can, we'll try to

9  make that chart again by tomorrow morning.

10             THE COURT:  Thank you very much.

11             MR. KEAHON:  Obviously, "inmate's

12  signature" comes out.

13             THE COURT:  Of course.

14             MR. KEAHON:  Turning to the next

15  exhibit.  Is your Honor able to see it?

16             THE COURT:  Yes, I am.  Thank you.

17             MR. KEAHON:  Hillside Rides remains

18  the same.  50,000 zero is the same.  Maria

19  Macarle and 57 remains the same.

20             "Brooklyn" is added.  $3,400.79.

21  The "known writing" of Lamar Whitehead, should

22  be "purported known writing", which was on the

23  original chart.  This is a determination for

24  the jury to make, not for the maker of the

25  exhibit.

1  People v. Lamar Whitehead

2            Below $3,470, is 500 dollars and

3       zero cents, that was in the original one that

4       was given to me.

5            On the original document, it had

6       "FMO" in a block, then "THIS" in a block, then

7       "Magnolia" in a block, then "fight" in a

8       block.

9            Now we have added "Brooklyn", I

10      don't know where that came from, "BBC", I

11      don't know where that came from.  They have

12      "Brooklyn", again. It looks like down here,

13      that wasn't in the original exhibit.

14            Instead in the original exhibit was

15      "M Vickers", mid cap, "Malen" is the same.

16            There was never any "Park Place".

17      That is a new item.

18            Consal -- "CONSALTON" was not in

19      the original.

20            Remember, this is today I'm getting

21      this.  Two hours before he's supposed to

22      testify.  "Lamor" was never in it, I don't

23      know where they got this from.

24            Instead, there was "HRIS" and then

25      a new block of "AMPA"

Jennifer Maue, Senior Court Reporter   (631)852-2153

1    People v. Lamar Whitehead

2              "Park Place", was never in it.   I

3    don't know where these items came from.

4              MS. FRANZESE:   Your Honor, they are

5    labeled and they are labeled on the copy of

6    that chart that I gave to Mr. Keahon today.

7              THE COURT:   Ms. Franzese, the new

8    items that Mr. -- that counsel refers to, are

9    they drawn from other documents, other

10   exhibits which are currently either in

11   evidence or that you reasonably anticipate

12   will be entered into evidence today?

13             MS. FRANZESE:   Yes, your Honor.

14   And this exhibit, they should all be coming

15   from exhibits 153, et al.

16             Your Honor, the reason why counsel

17   has a copy of an older chart, is that is the

18   chart pre the *People vs. Fields* discussion.

19             THE COURT:   Right.

20             MS. FRANZESE:   I provided that to

21   counsels as a courtesy so he would know what

22   the chart would look like.

23             I gave counsel the new chart today

24   because this is the chart post the *People v*

25   *Fields* rulings and discussions.

1    People v. Lamar Whitehead

2              THE COURT:   Thank you.

3              MR. KEAHON:   The point respectfully

4      is at the same time you made the ruling -- I

5      asked if there were going to be new charts as

6      late as yesterday I asked are there going to

7      be any new charts?  Answer:  No.

8              THE COURT:   The charts are not

9      evidence themselves.  They explain other

10     items, what may be entered into evidence.  The

11     question of surprise only becomes viable if

12     the items themselves, which the exhibit

13     purports to depict, were presented to you

14     late.  If they in fact relate to items of

15     evidence that were presented to you earlier,

16     then your argument will not find purchase with

17     the court, with the exception of known writing

18     of Lamar Whitehead.

19              The law in this instance is quite

20     clear.  The absence of an acknowledged

21     signature, that an exhibit or before the jury

22     cannot presume to state a question of ultimate

23     fact to the jury, for the jury to establish

24     whether or not it is in fact known, based upon

25     the testimony of another witness.  So it does

People v. Lamar Whitehead

have to say "purported known" or "alleged known".  It cannot be stated as a conclusion.

THE COURT:  Mr. Keahon, do you wish to be heard further.

MR. KEAHON:  Notwithstanding an hour and a half before the witness is about to testify, they have added new exhibits to a chart that I'm supposed to listen to, what is going on today on another witness and yet be prepared to cross-examine their expert on what he says these new items are, and now they relate to his testimony as to opinions and conclusions, as to who the author of this is, as well as the fraudulent documents.

THE COURT:  When you say "new", if they were truly new by virtue of those items which are related on that exhibit being presented to you, then, of course, the jury -- your argument would prevail.  But unless you can affirm that those new items, as you described them on that exhibit, were not provided to you, then they are not new.  The way they are collated, there, is.  Don't anticipate a contrary ruling from the court.

People v. Lamar Whitehead

    If you require time to examine that, compare that to the other chart, prepare your cross-examination for this witness, I would afford you that at that time.

    MR. KEAHON:  Great.  There is nobody in this courtroom, including Mr. Heilig, that given this new chart at this hour of the day would have been prepared to get up.

    These new additions meant nothing. They weren't related in any of the notes or reports.  Neither Mr. Heilig nor anyone in this court would be able to get up and cross-examine on this.

    THE COURT:  Mr. Keahon, I understand how the presentation of a different demonstrative exhibit could affect your cross-examination.  I'll afford you the courtesy, as additional time as required, to prepare cross-examination.

    MR. KEAHON:  Additionally.

    It is my understanding, also, that this Ms. Fortune, who testified yesterday, is now going to testify as to identification of my client's voice on all of those tapes.  I'm

1   People v. Lamar Whitehead

2           moving to preclude.  I have been given -- I

3           didn't even know she existed until yesterday.

4           As a witness in your case.

5                   MR. PEARL:  She's number one on my

6           witness list.

7                   MR. KEAHON:  You're right.  I take

8           that back.

9                   There is absolutely no discoverable

10          material that I have been given, any notes or

11          reports, and it is my understanding she

12          listened to it last night for the first time.

13                  THE COURT:  People?

14                  MR. PEARL:  That is correct, your

15          Honor.  She wasn't an absolutely anticipated

16          witness on the people's list.  As a result of

17          *People vs. Fields*, the people went out and

18          sought other witnesses.  Ms. Fortune is going

19          to come in and testify as a witness for the

20          hearing.  She's already a witness with the

21          defendant's case.  It is relevant evidence and

22          the people intend on introducing the -- if we

23          can lay the foundation, as we did with the

24          other witnesses, Ms. Bryant, Ms. Rodriguez,

25          and Nigel DeFreitas, if she's familiar with

1      People v. Lamar Whitehead

2             his voice, which she indicated through the

3             hearing, we planned on eliciting that

4             testimony as well.

5                    THE COURT:  Can I see counsel at

6             side bar for a moment, please.

7                    Off the record for a moment.

8                    (Side bar discussion held off the

9             record)

10                   THE COURT:  Now we're on the

11            record.  The difficulty logistically with

12            calling Ms. Fortune to identify the voice

13            recordings is that you have already concludeed

14            your direct examination.

15                   MR. PEARL:  Of who.

16                   THE COURT:  Of Ms. Fortune.

17                   MR. PEARL:  Only as to the

18            handwriting.

19                   THE COURT:  You concluded your

20            direct examination of the witness.  The

21            cross-examination is going to start.  Now.

22                   How are you going to get it in on

23            redirect?

24                   MR. PEARL:  Not -- we had the

25            limited issue of the handwriting.  She's a

1    People v. Lamar Whitehead

2         confirmatory witness.  She said she's known

3         him for 15 years.

4              I don't have to notice a

5         confirmatory voice.

6                   MR. KEAHON:  Sure you do.

7                   MR. PEARL:  No, you don't.  It is

8         confirmatory.

9                   MR. KEAHON:  It is not what you say

10        it is.

11                  THE COURT:  What happens if we

12        have -- the trial goes into next week and we

13        have eleven people show up.

14                  MR. PEARL:  Eleven.

15                  THE COURT:  Jurors report?  What

16        if they just dribble away?  We are going way

17        beyond the anticipated length of this trial.

18                  MR. PEARL:  I understand, that,

19        judge.  But I don't understand -- you make the

20        calls and you're the judge.  It is clear

21        whether it is relevant or not relevant voice

22        testimony.  She can identify his voice.  It is

23        confirmatory testimony.  I wouldn't have to

24        notice this whatsoever under the law of

25        confirmatory identification.  She only

1    People v. Lamar Whitehead

2         testified she's known him 15 years, she dated

3         him knows and she knows him from the

4         neighborhood.

5              I'll lay the foundation as with all

6         the other witness, have you ever spoken to

7         him, did you recognize his voice.  If she says

8         yes to those questions, I'm going to ask the

9         court to allow me to play audiotapes.

10             THE COURT:  We're going to have a

11        day on this one.

12             MR. PEARL:  Why would that be an

13        issue?  I put it -- when I used to work in

14        D.V., we played audio recordings for witnesses

15        all the time.  If you can lay the foundation.

16        You don't have to notice something that is

17        confirmatory.

18             MR. KEAHON:  Respectfully, it is

19        not your decision whether it is confirmatory,

20        or not.  You have to give me notice of a voice

21        identification.  And to give me notice of

22        voice identification that is two days before

23        we complete this case, I think is unfair

24        inappropriate and improper.

25             MR. PEARL:  I don't have to give

People v. Lamar Whitehead

1

2      voice notification if I can lay the proper

3      foundation on the record.

4              THE COURT:  I'm not saying you

5      can't.

6              Your remedy is a continuance, Mr.

7      Keahon.

8              My concern is the jurat at this

9      point in time.

10             And having a jury not show up,

11     I'm -- I want to let you know, I'm not going

12     to issue a warrant for a missing juror.

13             MR. PEARL:  I wouldn't ask you to

14     do that, ever.

15             THE COURT:  Really?  Don't say

16     ever.  It has been asked in the past.  You'll

17     have wasted seven weeks of your time in this

18     case.

19             MR. KEAHON:  I'm going to ask for a

20     continuance.

21             MR. PEARL:  This is a straight

22     forward direct examination.  The witness

23     takes the stand and if I can lay the proper

24     foundation that she is familiar with his

25     voice, it is cross-examination like a typical

People v. Lamar Whitehead

witness.  Where is the prejudice?

          THE COURT:  You won't get the
continuance, Mr. Keahon.  What you'll get is
longer cross-examination, we'll have longer
direct on this person, to what effort.

          If we lose the jury, we lose the
jury.  If we don't lose the jury, then my
fears are groundless.

          MR. KEAHON:  Judge, we're at that
point where I believe there is going to be an
offer from that book that she looked at.

          MR. PEARL:  Just what was
identified.

          MR. KEAHON:  I got here at ten to
two, to review it.  We have been busy ever
since, and the exhibits didn't get here until
2:15.

          THE COURT:  You haven't crossed her
on the preliminary hearing yet.

          MR. KEAHON:  I understand.  But
they will finish Det. Gabriele and --

          MR. PEARL:  I'll offer them subject
to connection.

          THE COURT:  I'll leave it marked

1    People v. Lamar Whitehead

2           i.d. subject to her testifying, again, under

3           cross-examination, and I'll rule on its

4           admissibility, as far as the box with the

5           known as and the unknowns, you mean?

6                    MR. PEARL:  Yes.

7                    THE COURT:  All right.

8                    MR. KEAHON:  I found some more

9           things.  I don't know if they were redacted,

10          or not.

11                   THE COURT:  They haven't been shown

12          to the jury.

13                   MR. PEARL:  I redacted all the

14          E-Loan stuff yesterday, last night.

15                   THE COURT:  All right.  Thank you

16          again.

17                   (The following occurred in open

18          court):

19                   THE COURT:  Is there anything else

20          to place on the record before bringing in the

21          jury?

22                   MR. KEAHON:  No, your Honor

23                   THE COURT:  The jury's presence is

24          requested, please.

25                   THE COURT OFFICER: Jury entering.

1    People v. Lamar Whitehead

2                 (The following occurred with the

3         jury present)

4                 THE COURT:  Thank you.  Please be

5         seated.  Please be seated everyone.

6                 THE CLERK:  Case on trial, People

7         versus Whitehead.  The jury and all parties

8         are present.  Counsel waives the roll.

9                 THE COURT:  Thank you.  Thank you,

10        once again.

11                We'll continue with Det. Gabriele's

12        testimony, please.

13                THE COURT OFFICER: He's not

14        outside.

15                THE COURT:  If you would inquire,

16        thank you.

17                THE CLERK:  He's on his way.

18                THE COURT:  My apologies.

19                While we're waiting for a witness

20        to resume the seat on the stand.  I have been

21        informed by the sergeant there is difficulty

22        with staying after five on two of the days.

23        We'll be able to accommodate you in that

24        regard.  On Friday I'm sorry for the loss that

25        someone has suffered and we'll be able to

1  People v. Lamar Whitehead

2          accommodate you in that regard.

3                  Because of the expected length of

4          the trial and you, yourself, have seen some

5          delays, I have to admonish you you can't

6          speculate on any reason for the delays nor

7          hold it against either party. But it looks at

8          this time like the trial will go into next

9          week.

10                 Because of that, I realize you were

11         told the matter would end on the 20th. This

12         may create an insuprable burden for you,

13         because of vacation plans or your work

14         obligations. So that is something we need to

15         know about now. I know all the time that you

16         have invested in this trial, this is one of

17         the reasons why we have alternates, as well,

18         is because sometimes unexpected things occur

19         during a trial, in addition to things like we

20         stated before, someone not showing up. You

21         all have been so dutiful, so diligent, and

22         attentive. But again, you have sacrificed now

23         seven weeks out of your life. It looks like

24         it will go beyond that. There is a limit to

25         how much we could ask of you. So if there are

People v. Lamar Whitehead

difficulties, I'm not asking anybody to

respond at this point in time.  I don't want

to embarass anyone or make anyone feel

uncomfortable.  When you get a moment, speak

to one of the court officers and we'll discuss

it with the attorneys one on one.

A JUROR: Do you think it will be

longer than next week?

THE COURT:  No, we have been trying

to get it finished this week.

Especially since we were not able

to go late in the evening, and then

having -- because of Friday, as well, that we

would be going into the following week, say,

but not later than that, because that would

give us Tuesday.  Tuesday -- Wednesday and

Thursday, that would give us more than enough

time, especially if we would be able to begin

at eleven and then work as late as it takes

the following day.

Sir, you had a question?

A JUROR:  I think you just answered

it.

I was going to ask as best you

People v. Lamar Whitehead

1
2          guess.
3                    THE COURT:  I realize.
4                    A JUROR:  Are you talking about --
5          going to the jury sometime next week or
6          sometime beyond that?
7                    THE COURT:  No, not beyond next
8          week.
9                    I think we can be confident in that
10         regard.
11                   MR. PEARL:  Yes.
12                   MR. KEAHON:  Yes, judge.
13                   THE COURT:  Consider it.  I don't
14         ask for your comments now.  I don't want to
15         make anyone uncomfortable.  Consider it.  Talk
16         about it with your families, your employers,
17         and let us know.  Thank you all, very much,
18         once again.
19                   THE CLERK:  Detective, I remind
20         you, you're still testifying under oath.
21                   THE COURT:  You may continue your
22         inquiry.
23                   MR. PEARL:  Thank you.
24                   THE COURT OFFICER:  May I have
25         152-A and 177?  May I have 152-A shown to Det.

DIRECT/Gabriele

1                Gabriele and may I use the presenter?

2                        THE COURT:  Yes.

3                        THE COURT OFFICER: The witness is

4        being shown 152-A in evidence.

5                        THE COURT:  Thank you, officer.

6    CONTINUED DIRECT EXAMINATION

7    BY MR. PEARL:

8                Q.    Detective, I think we left off on the

9    Wojcieh Wachnik, Sprint cell phone, in evidence as

10   People's 49.  There was an electronic serial number

11   associated with that account?

12               A.    Correct.

13               Q.    What is the number?

14               A.    75CD623B.

15               Q.    You have in your hand what is 152-A,

16   correct?

17               A.    Yes, I do.

18               Q.    And what is 152-A?

19               A.    152-A, is a Sprint cell phone that was

20   recovered from 92 Howland Avenue in Teaneck, New

21   Jersey on 1/27/06.

22               Q.    From where at that location was the cell

23   phone recovered?

24               A.    From the ledge of the bay window near the

DIRECT/Gabriele

front of the home.

        Q.   Hold the phone up and tell the jury what
type of cell phone that is?

        A.   It is a Sprint phone.

        Q.   Did you have an opportunity to determine
whether or not that cell phone had an electronic
serial number?

        A.   Yes, I did.

        Q.   Where if anywhere was that electronic
serial number?

        A.   When you take the battery back off the
back of the phone, it's on the back of the phone.

        Q.   Can you do that now?

        A.   (Witness complies)

        Q.   Can you hold that up and tell the jury if
you see an electronic serial number on that phone?

        A.   Right above the bar code on the bottom of
the phone.

        Q.   Can you read what that electronic serial
number on that print cell phone, found in defendant's
house, is?

        A.   75CD623B.

        Q.   Okay.

                    MR. PEARL:   May I have People's

DIRECT/Gabriele

1
2          152-A and the lights out, again, please?

3          Q.   Detective, can you see the electronic

4     serial number, it says "ESNHDX", is that correct?

5          A.   Correct.

6          Q.   Is that where the number is that you were

7     reading from?

8          A.   Yes, it is.

9          Q.   From where was this phone recovered?

10         A.   The phone was recovered from 92 Howland

11    Avenue, in Teaneck, New Jersey, on 1/27/06.

12         Q.   Thank you.

13                   MR. PEARL:   Judge, can I have

14         People's 153?   Through, one "A" through "FF".

15                   For the record, I don't believe I

16         moved these exhibits into evidence?

17                   THE CLERK:   Which one?

18                   THE COURT:   153-A through FF.

19                   THE CLERK:   None of 153 went into

20         evidence at this point.

21                   MR. PEARL:   Judge, can I have those

22         shown to Det. Gabriele.

23                   THE COURT:   Yes.

24                   (Handing)

25         Q.   Detective, 153 -- take a look at those

1    DIRECT/Gabriele

2    documents contained within that binder, 153-AA

3    through 153-FF?

4        A.   Yes, these are all documents recovered

5    from the home, 92 Howland Avenue, Teaneck, New

6    Jersey.

7        Q.   Are they all in the same or substantially

8    the same condition as they were when you recovered

9    them on January 27, 2006?

10       A.   Yes, they are.

11               MR. PEARL:   Now may I have

12           People's, your Honor, 154 through 173, I

13           believe.   176-A and B, I'm sorry.   As well as

14           86.

15       Q.   Detective, take a look at all those

16   exhibits.   After you've done that, please look up?

17           Detective, do you recognize those

18   exhibits?

19       A.   Yes, I do.

20       Q.   What if anything do you recognize those

21   exhibits to be?

22       A.   Paperwork I recovered from 92 Howland

23   Avenue, Teaneck, New Jersey, and the fax cover page.

24       Q.   Generally, what is it?   Don't -- where

25   did you recover that from?

DIRECT/Gabriele

A.   This particular item I recovered from the vehicle on 1/25/06.

Q.   That is People's 86?

A.   Yes, it is.

Q.   Finally, People's 179.

A.   This was from the house at 92 Howland Avenue, in Teaneck, New Jersey.

Q.   All those items, with the exception of People's 86, are they in the same or substantially the same condition as they were when you seized them from the house at 92 Howland Avenue?

A.   Yes, it is.

Q.   Is People's 86 in the same or substantially the same condition as when you seized it from the vehicle on January 25th, 2006?

A.   Yes, it is.

MR. PEARL:  Your Honor, People now move all those exhibits into evidence. Obviously, subject to the court's previous ruling.

THE COURT:  Thank you.  Officer, if you can show them to Mr. Keahon, please.

(Handing)

MR. KEAHON:  Could we approach,

DIRECT/Gabriele

please, judge.

THE COURT:  Yes, counsel.

(The following occurred at side bar):

MR. PEARL:  161 and 162 are not offered.

MR. KEAHON:  They are not.

Just this one document in this book.

THE COURT:  I already ruled on 161 and 162, the objection was sustained in our conference the other day, and they'll not be admitted into evidence.

MR. PEARL:  Do you want to take them out of the book so there is no confusion.

THE CLERK:  I ask it be kept in when we know -- log it in at the end of the day.  We know it is in order.

MR. PEARL:  Can we take it out so we don't show it to the detective.

MR. KEAHON:  Everything else is in.

THE CLERK:  Everything from 154 to 176-BB, except for 161 and 162.

MR. PEARL:  People's 167, is

```
1    DIRECT/Gabriele

2           that --

3                    MR. KEAHON:  I just want to be

4           careful on this one.

5                    THE COURT:  The redacted ones, if

6           you just double check that they can't be read

7           through the presenter.

8                    MS. FRANZESE:  That one I redacted

9           and Xeroxed.  Yes, this one.

10                   We'll need a sticker on this one.

11                   MR. KEAHON:  179, is fine, your

12          Honor.

13                   86, is fine.  And.

14                   Whatever is in this book -- is

15          fine.

16                   THE COURT:  Thank you.

17                   MR. KEAHON:  Can I approach, judge,

18          please.

19                   THE COURT:  Yes, counsel.

20                   (The following occurred at side

21          bar):

22                   THE COURT:  Technically violates

23          the double hearsay rule.  In light of the

24          esteem you're held by the court, Mr. Keahon,

25          I'll allow you latitude in this regard.
```

Jennifer Maue, Senior Court Reporter   (631)852-2153

DIRECT/Gabriele

1
2                This is 153, correct?
3          MR. KEAHON:  Yes.
4          THE COURT:  I don't require to hear
5     you as to your objection at this point in
6     time.  I'll leave them for identification.
7          MR. KEAHON:  Okay.
8          THE COURT:  We'll wait until they
9     are offered.  Subject to the next witness,
10    rather than put them in, subject to
11    connection, leave them marked for
12    identification.
13         MR. KEAHON:  Sure.
14         THE COURT:  Let them lay the
15    foundation through Ms. Fortune.
16         All right.
17         (The following occurred in open
18    court):
19         THE COURT:  153-A through FF will
20    remain marked for identification with the
21    exceptions noted.
22         The remaining exhibits will be
23    admitted into evidence.
24         THE COURT OFFICER:  86 is now in
25    evidence.

```
 1    DIRECT/Gabriele
 2                    THE COURT:   Correct.
 3                    THE COURT OFFICER: And 179
 4         previously marked for i.d. is in evidence.
 5                    THE COURT:   Yes.
 6                    MR. PEARL:   Also my understanding,
 7         judge, is People's 154 through 176-A and B,
 8         with the exclusion of 161 and 162, are all
 9         admitted into evidence at this time.
10                    THE COURT:   That is correct.
11                    THE COURT OFFICER: They were
12         previously marked.
13                    THE COURT:   Thank you.
14                    MR. PEARL:   Can I continue now?
15                    THE COURT:   Yes.
16                    MR. PEARL:   Judge, may I use the
17         presenter so I can publish those exhibits to
18         the jury.
19                    THE COURT:   Yes.
20                    MR. PEARL:   Thank you.  At your
21         convenience, officer, if you could turn off
22         the lights.
23                    MR. PEARL:   If I could have those
24         exhibits, officer, please.
25    BY MR. PEARL:
```

DIRECT/Gabriele

1
2       Q.   Detective, I'm showing you what is in
3  evidence as People's 86.
4            Specifically, what is 86?
5       A.   It is a fax cover sheet.
6       Q.   From where did you recover this fax cover
7  sheet?
8       A.   From the maroon Range Rover, on 1/25/06.
9       Q.   You recognize that, how?
10      A.   My initials and date are on the bottom.
11      Q.   Date of 1/25/06?
12      A.   Correct.
13      Q.   And this is a faxed cover sheet addressed
14  to whom?
15      A.   Mr. Whitehead.
16      Q.   Now, did there come a time when you
17  examined the back of this fax cover sheet?
18      A.   Yes.
19      Q.   And did you recognize any of the writing
20  on the back of this document?
21      A.   Yes, I did.
22      Q.   What if anything did you recognize on the
23  back of this document?
24            MR. KEAHON:   I'm going to object.
25        I'd like to approach.

DIRECT/Gabriele

1

2          THE COURT:  Side bar, counsel.

3              (The following occurred at side

4      bar):

5          THE COURT:  What do you anticipate

6      the witness' answer to be?

7          MR. PEARL:  Pursuant to the user

8      name and password, of the Dealer Track.

9          THE COURT:  Similar to?

10         MR. PEARL:  Right, because there

11     was a phonetic spelling.

12         THE COURT:  All right.

13         MR. KEAHON:  I'd like to be heard.

14         THE COURT:  Your objection is

15     sustained.  That is for the jury to draw that

16     similarity.  Thank you.

17             (The following occurred in open

18     court):

19  BY MR. PEARL:

20     Q.   Detective, I want to show you what is now

21  in evidence as People's 109.  Do you recognize this

22  document?

23     A.   If I could take a look at it.

24     Q.   Do you recognize your initials on this

25  document?

DIRECT/Gabriele

1

2       A.   Yes, I do.

3       Q.   Are those in fact your initials?

4       A.   Yes, they are.

5       Q.   When did you place your initials on this

6   document?

7       A.   January 27, 2006.

8       Q.   From where was -- this is an exact

9   reproduction of the original document?

10      A.   From what I can look at, yes, it is.

11      Q.   From where did you recover the original

12  document?

13      A.   92 Howland Avenue, Teaneck, New Jersey.

14      Q.   What if anything was the significance of

15  this item?

16      A.   Written on the piece of paper, there is

17  the name of Anita Bryant.

18      Q.   Who if anyone is Anita Bryant?

19      A.   Anita Bryant is a co-defendant in this

20  particular case.

21      Q.   I'm now showing you what is in evidence as

22  People's 154.  Do you recognize this item?

23      A.   Yes, I do.

24      Q.   What if anything do you recognize this to

25  be?

DIRECT/Gabriele

1

2          A.   It is a towing receipt for a vehicle that

3    was seized from the home at 92 Howland Avenue,

4    Teaneck, New Jersey.

5          Q.   In whose name is this towing receipt?

6          A.   Lamor Whitehead.

7          Q.   What is the -- date of the towing receipt?

8          A.   7/27/05.

9          Q.   What was the make and year of the vehicle?

10         A.   2004 Range Rover.

11         Q.   Do you see the license number?

12         A.   Yes.

13         Q.   What if anything does it say there?

14         A.   DCN7725.

15         Q.   I'd like to show you what is in evidence

16   as People's 155?  Do you recognize this exhibit?

17         A.   Yes, it is a service contract from

18   Manhattan Ford Lincoln Mercury, for repairs done on a

19   vehicle.

20         Q.   What is the date of the invoice?

21         A.   7/29/05.

22         Q.   From where did you recover this item?

23         A.   From the home at 92 Howland Avenue,

24   Teaneck, New Jersey.

25         Q.   In whose name is this invoice?

DIRECT/Gabriele

    A.   Lamar Whitehead.

    Q.   What is the address?

    A.   1305 Park Place, Brooklyn, New York.

    Q.   Do you see a phone number listed?

    A.   Yes.

    Q.   Can you read that phone number into the
record, please?

    A.   (718)772-6498.

    Q.   What if anything is the significance of
that number?

    A.   That is the defendant's personal cell
phone number.

    Q.   What is the year, make, and model of the
vehicle in this service agreement?

    A.   It is a 2004 Land Rover, Range Rover,
four-door utility.

    Q.   And do you see the vehicle identification
number?

    A.   Yes.

    Q.   What is the vehicle identification number
of the vehicle that was serviced?

    A.   SALMF11454A142490.

    Q.   What if anything is the significance of
that?

DIRECT/Gabriele

     A.   That particular?

     Q.   That VIN?

     A.   That particular VIN, is the same VIN that was on the vehicle the defendant was driving, on 1/25/06.

     Q.   Those are -- those are the same as the photographs 96 though 106?

     A.   Correct, yes, they are.

     Q.   Showing you what is in evidence as People's 156?  What if anything is this?

     A.   That is a picture of the defendant.

     Q.   From where was it recovered?

     A.   From 92 Howland Avenue Teaneck, New Jersey.

     Q.   Detective, I'm showing you what's People's 157.  Do you recognize People's 157?

     A.   Yes, it is a checkbook recovered from 92 Howland Avenue, Teaneck, New Jersey.

     Q.   Where at 92 Howland was this checkbook recovered?

     A.   It was recovered in the bags that were in the hallway closet.

     Q.   Detective, directing you --

              MR. PEARL:  Can I have this marked

1    DIRECT/Gabriele

2         as 157-A?

3              THE COURT:  Mark it 157-A for

4         identification, please.

5              (People's Exhibit 157-A, marked for

6         identification)

7         Q.   Detective, specifically, do you recognize

8    People's 157-A?

9              THE COURT OFFICER:  157-A has been

10        marked for i.d. only.

11        A.   Yes, this was one of the checks from the

12   checkbook.

13              MR. PEARL:  Your Honor.

14        Q.   Is that in the same or substantially the

15   same condition as when you recovered it from 92

16   Howland Avenue?

17        A.   Yes, it is.

18              MR. PEARL:  At this time, people

19        move People's 157-A into evidence.

20              THE COURT:  Officer, if you would

21        show that to Mr. Keahon, please.  Thank you.

22              (Handing)

23              MR. KEAHON:  I have no objection.

24              THE COURT:  Thank you.  That will

25        be marked into evidence as 157-A.

DIRECT/Gabriele

1
2          THE COURT OFFICER: So marked.

3          MR. PEARL:  Thank you.

4          May I have that exhibit when you're

5     ready, officer?

6  BY MR. PEARL:

7          Q.   Detective, what if anything is People's

8     157-A?

9          A.   It's a check written out to cable.

10         Q.   Whose caption is on this check?

11         A.   Lamor Whitehead, of 1155 Will Mohr Street,

12    Apt. 2R, in Brooklyn, New York.

13         Q.   Let's take a look at People's 158.  What

14    if anything do you recognize People's 158 to be?

15         A.   It's a Direct TV bill.

16         Q.   In whose name is this Direct TV bill?

17         A.   Lamor Whitehead, 92 Howland Avenue,

18    Teaneck, New Jersey.

19         Q.   From where was that Direct TV bill

20    recovered, if you recall?

21         A.   That Direct TV bill was recovered from the

22    hallway closet, 92 Howland Avenue, Teaneck, New

23    Jersey.

24         Q.   Showing you what is in evidence as

25    People's 159.  What if anything is this?   And where

DIRECT/Gabriele

was it recovered?

     A.   It was recovered out of the hallway closet, 92 Howland Avenue, Teaneck, New Jersey.  It is two identification cards and two credit cards in the name of the defendant, Lamor Whitehead.

     Q.   The first identification is from where?

     A.   New Jersey.

     Q.   Do you recognize that second identification card?

     A.   Yes, it is a New Mexico driver's license.

     Q.   There were photocopies, you indicated, of two credit cards?

     A.   Yes.

     Q.   One being American Express and one being Chase?

     A.   Yes.

     Q.   Both being in the name of Lamor Whitehead?

     A.   Yes.

     Q.   I'm showing you what is in evidence as People's 160.  What if anything is this?

     Q.   PSEG gas bill?

     Q.   This was recovered from where?

     A.   The home, 92 Howland Avenue, in Teaneck, New Jersey.

```
 1   DIRECT/Gabriele
 2          Q.   In whose name is this gas bill?
 3          A.   Lamor Whitehead, 92 Howland Avenue,
 4   Teaneck, New Jersey.
 5          Q.   Take a look at People's 163 in evidence.
 6   Do you recognize this exhibit?
 7          A.   It's a picture of the home of 92 Howland
 8   Avenue, Teaneck, New Jersey.
 9          Q.   From where was this item recovered?
10          A.   From 92 Howland Avenue, Teaneck, New
11   Jersey.
12          Q.   And what if anything specifically is this
13   exhibit?
14          A.   If I could look at it?   I can't...
15                    (Handing)
16                    THE COURT OFFICER: The witness is
17          being shown 163 in evidence.
18                    THE COURT:   Thank you, officer.
19          A.   It appears it's a customer report for the
20   house, with the description of the house and the
21   price of the house.
22          Q.   And the house address is what?
23          A.   92 Howland Avenue, Teaneck, New Jersey.
24                    MR. PEARL:   Thank you.
25          Q.   I'm showing you what is in evidence as
```

DIRECT/Gabriele

1   People's 164.

2                       MR. PEARL:  Officer, could I get,

3            when you have a chance, People's 24 and 45.

4       Q.   Do you recognize this next exhibit?

5       A.   It's a Nextel bill.

6       Q.   In whose name is this Nextel bill?

7       A.   Lamor M. Whitehead.

8       Q.   Do you see the account number?

9       A.   Yes, I do.

10      Q.   And what is the account number?

11      A.   If I could look at the document, it's a

12   little blurry.

13                      MR. PEARL:  I'm sorry.

14                      THE COURT OFFICER:  The witness is

15           being shown 164 in evidence.

16      A.   The account number is 775957529.

17      Q.   And what if anything is the significance

18   of that account number?

19      A.   That is the account number of the

20   defendant's personal cell phone.

21                      MR. PEARL:  Thank you.

22      Q.   I'll show you next what is in evidence as

23   People's 65.  Do you see that?

24      A.   --

1    DIRECT/Gabriele

2            Q.   Do you recognize's People's 165?

3            A.   Yes, I do.

4            Q.   What if anything do you recognize People's

5    165 to be?

6            A.   It's an invoice for the cutting room.

7            Q.   In whose name is this invoice?

8            A.   Lamor Miller.

9            Q.   What if anything does it say under the

10   client name of Lamor Miller?

11           A.   It says LaLa Records 123-99 Flatlands

12   Avenue, Brooklyn, New York.

13           Q.   Detective, what if anything is the

14   significance of that address, 123-99 Flatlands

15   Avenue, Brooklyn, New York?

16           A.   That address appears on the Gloria Conaty

17   Capital One and E-Loan fraud cases.

18                    MR. PEARL:  Your Honor, at this

19           time I'm showing Det. Gabriele what is in

20           evidence as People's 24.

21           Q.   Detective, this is a Capital One

22   application in the name of Gloria Conaty.  Do you see

23   the address provided by the person using the name of

24   Gloria Conaty?

25           A.   Yes, I do.

DIRECT/Gabriele

1

2          Q.    What if anything was the address provided

3     on that Capital One application?

4          A.    123-99 Flatlands Avenue, Suite 2,

5     Brooklyn, New York.

6          Q.    I'm also showing you what is in evidence

7     as People's 45.   This is an E-Loan application in the

8     name of Gloria Conaty.

9               I'm directing you to Page 2 of this

10    document.   What if anything is the address provided

11    on the E-Loan application in the name of Gloria

12    Conaty?

13         A.    123-99 Flatlands Avenue, Brooklyn, New

14    York.

15         Q.    The name Lamar Miller, are you familiar

16    with that name?

17         A.    Yes, I am.

18         Q.    And who if anyone is Lamar Miller or Lamor

19    Miller?

20         A.    That's another name used by the defendant.

21         Q.    I'm showing you what is in evidence as

22    People's 166.   Do you recognize People's 166?

23         A.    Yes, I do.

24         Q.    What if anything is People's 166?

25         A.    It is a BJ's Wholesale Club membership

DIRECT/Gabriele

card in the name of Desmond DeFreitas.

    Q.   From where was this card recovered?

    A.   92 Howland Avenue, in Teaneck, New Jersey.

    Q.   Specifically where at that location?

    A.   That again was in the closet, in the bags,
in the hallway closet.

    Q.   And who if anyone is Desmond DeFreitas?

    A.   Desmond DeFreitas is a New York City
firefighter, who is the brother of Mr. Nigel
DeFreitas.

    Q.   I show you what is in evidence as People's
167.  Do you recognize this exhibit?

    A.   Yes, I do.

    Q.   And what if anything is this exhibit?

    A.   If I could look at it.  It's a little
blurry on the screen.

    Q.   Detective, before you look at that
exhibit, there are redacted or blackened-out
sections, correct?

    A.   Correct.

    Q.   But for those redacted or blacked-out
sections, is it in the same or substantially the same
condition as when you recovered it from the location?

    A.   Yes, it's a reproduction.  It's a copy.

DIRECT/Gabriele

Yes, it's in the same condition.

Q.   Detective, what if anything do you recognize People's 167 to be?

A.   It's a subscriber agreement in the name.

Q.   There is a name on it?

A.   Yes.

Q.   Lamar Whitehead?

A.   Yes, there is.

Q.   What if any address was provided by Lamar Whitehead on that subscriber agreement?

A.   905 Cleveland Street, Brooklyn, New York.

Q.   Can I have that back, please.

(Handing)

Q.   What is the significance of 905 Cleveland Street, Brooklyn, New York?

A.   That is the home of Nigel DeFreitas, 905 Cleveland Street.

Q.   Showing you what is in evidence as People's 168.  Do you recognize this exhibit?

A.   Yes, I do.

Q.   What if anything do you recognize this exhibit to be?

A.   It's a retail sales contract in the name of Lamor Whitehead.

DIRECT/Gabriele

Q.   Where did you recover this exhibit?

A.   92 Howland Avenue, Teaneck, New Jersey.

Q.   It indicates it's a purchase agreement under the name of what?

A.   Lamor Whitehead.

Q.   Whose address is?

A.   1305 Park Place, Brooklyn, New York.

Q.   And what is the property address as part of this real estate contract, contract of sale?

A.   92 Howland Avenue, Teaneck, New Jersey.

Q.   In what county?

A.   Bergen County.

Q.   Where is that located?

A.   New Jersey.

Q.   Detective, let me show you 169, directly. Once again, that document contains blackened out, redacted portions?

A.   Correct.

Q.   With the exception of those blackened out, or redacted portions, is it an exact reproduction of the document you recovered from the house at 92 Howland Avenue?

A.   Yes, it is.

Q.   And is there a name and address listed on

DIRECT/Gabriele

that -- document?

    A.  Yes, there is.

    Q.  Is the name Lamar Whitehead on that document?

    A.  No.

    Q.  Is the name Lamar Miller on that document?

    A.  Yes.

    Q.  Is there an address associated with that?

    A.  Yes, there is.

    Q.  What if anything is the address listed for Lamar Miller?

    A.  31 Fleet Walk, Apartment 4F, Brooklyn, New York.

          MR. PEARL:  Thank you.

          Can I have that back, please?

          (Handing)

    Q.  In fact, this document actually says "Brooklyn", correct?

    A.  Correct.

    Q.  The "B" is missing?

    A.  Yes.

    Q.  But the word "Brooklyn" is listed on the top of the document?

    A.  That is correct.

1   DIRECT/Gabriele

2          Q.   What if anything is the significance of 31

3   Fleet Walk Avenue, Brooklyn, New York?

4          A.   31 Fleet Walk, Apartment 4F, New York is

5   the address of Mr. Kylie Copeland.

6          Q.   That is the address provided by Mr.

7   Copeland?

8          A.   Correct.  Correct.

9          Q.   I'm showing you what is in evidence as

10  People's 170.  What if anything is People's 170?

11         A.   It's a picture of a woman, with the name

12  on the top.

13         Q.   Can you read that name from there?

14         A.   I can't read the whole name because it's a

15  little blurry.

16                   MR. PEARL:  To speed things up.

17         Q.   Mary Whitehead, does that refresh --

18         A.   That is correct, yes.

19         Q.   Where if anywhere was this document

20  recovered from?

21         A.   The hallway closet, 92 Howland Avenue,

22  Teaneck, New Jersey.

23                   MR. KEAHON:  What number is that,

24       please.

25                   MR. PEARL:  170.

Jennifer Maue, Senior Court Reporter   (631)852-2153

DIRECT/Gabriele

1

2        Q.   Detective, I'm showing you what is in

3   evidence as People's 171.  Do you recognize this

4   exhibit?

5        A.   Yes, I do.

6        Q.   Are your initials on this exhibit?

7        A.   Yes, they are.

8        Q.   And the date is 1/27/06?

9        A.   Correct.

10       Q.   From where if anywhere did you recover

11  this item?

12       A.   92 Howland Avenue, Teaneck, New Jersey.

13       Q.   From where, specifically?

14       A.   The hallway closet.

15       Q.   What if anything is listed on this

16  exhibit?

17       A.   The name of David Ridenour, with the

18  address of 385 Lexington Avenue, Suite 4B, Brooklyn,

19  New York.

20       Q.   What if anything is the significance of

21  the name David Ridenour?

22       A.   David Ridenour was an individual who was

23  involved in the David Ridenour Maria Macarle fraud

24  case.

25       Q.   Without pulling out the exhibit, there was

DIRECT/Gabriele

1
2   a Capital One application in the name of David

3   Ridenour?

4          A.   Correct.

5          Q.   That address, 385 Lexington Avenue,

6   Brooklyn, New York, Suite 4B, what is the

7   significance of that address?

8          A.   That is the home address of Teisha Lamont.

9          Q.   During the course of your investigation,

10  you indicated you analyzed the defendant's phone

11  records?

12         A.   Correct.

13         Q.   Were you able to determine if defendant

14  had any ties to that address of 385 Lexington Avenue

15  through those phone records?

16         A.   Yes, I did.

17         Q.   What if anything were you able to

18  determine?

19         A.   There were numerous calls from the

20  defendant's personal cell phone, to the home phone of

21  Teisha Lamont, (718)230-4369.

22         Q.   Additionally, you indicated that there

23  were phone calls made during the transportation of

24  the defendant from Riverside Drive to Selden, New

25  York?

DIRECT/Gabriele

A.   That is correct.

Q.   And what if anything was -- one of those phone calls?

A.   One of those phone calls to the phone number (718)230-4369.

Q.   Whose number is that?

A.   That is Teisha Lamont's number at 385 Lexington Avenue, Apartment 4B, in Brooklyn, New York.

Q.   Detective, I'm showing you what is in evidence -- it's hard to read this number, 172?  Do you recognize this exhibit?

A.   Yes, I do.

Q.   What if anything do you recognize People's 172 to be?

A.   It's a business card that I seized from 92 Howland Avenue, Teaneck, New Jersey.

Q.   Your initials, date and shield number are on this exhibit?

A.   Correct.

Q.   Right there, at the bottom?

A.   Yes.

Q.   And you have had an opportunity to examine the back of this exhibit?

DIRECT/Gabriele

A.  Yes.

Q.  And initially, under those series of numbers, there is a phone number.  What is after that phone number?

A.  E-Loan, with a P.O. Box 254948.

Q.  Now, above that, there is -- a series of letters and numbers.  Can you read those into the record, please?

A.  WBAGL6342DP51429.

Q.  Detective, did you have an opportunity to research or examine that number on that -- on the back of that card recovered from the defendant's house?

A.  Yes, I did.

Q.  What if anything did you -- what if anything is the significance of that number?

A.  It appears to be a VIN.

Q.  When you say "appears", why do you use the word "appears"?

A.  Through the investigation, we found that a VIN on one of the fraud cases, was the same number as on the back of that card, with the exception of one number missing off the back of that business card.

Q.  Do you recall which fraud investigation

DIRECT/Gabriele

that was?

    A.   I believe it was the Joseph Sweeney E-Loan case.

    Q.   I'm showing you what is in evidence as People's 40.  The Joseph Sweeney E-Loan application, applied for on 10/13 /04, do you see the bottom of this application?

    A.   Yes, I do.

    Q.   What if anything do you see at the bottom of the application, that is highlighted?

    A.   VIN.

    Q.   It says 2002 BMW 745, I guess?

    A.   Yes.

    Q.   I'm now placing on the presenter People's 172?  In fact, are those numbers similar.

    A.   Yes, they are.

    Q.   Are those two numbers different?

    A.   The VIN on the document from E-Loan, there is a one between the four and the two.  Approximately halfway through the VIN.

    On the business card seized from 92 Howland Avenue, Teaneck, New Jersey, the one does not appear between the four and two.

    Q.   But for that difference, they are exactly

DIRECT/Gabriele

2  the same number?

3          A.   Yes, they are.

4          Q.   And the VIN on People's 40 is actually

5  part of an E-Loan application, correct?

6          A.   That is correct.

7          Q.   And E-Loan is listed on the card of 172,

8  correct?

9          A.   Yes, it is.

10          Q.   Detective, let me show you what is in

11  evidence, as People's 173.  That is the back -- that

12  is an exact reproduction of the back of a business

13  card, correct?

14          A.   Yes, it is.

15          Q.   From where was that business card located?

16          A.   92 Howland Avenue, Teaneck, New Jersey.

17          Q.   Okay.  But for being a photocopy, it's an

18  exact reproduction of the back of that business card

19  found at that location?

20          A.   Yes, it is.

21          Q.   January 27th, 2006?

22          A.   Yes, it is.

23                  MR. PEARL:  May I present that to

24          the jury, please?

25                  THE COURT:  Yes.  Certainly,

DIRECT/Gabriele

1

2          counsel.

3                    MR. PEARL:   I'm showing you what is

4          in evidence as 173.

5          Q.   Did you have an opportunity to examine the

6     numbers on the back of this exhibit?

7          A.   Yes, I did.

8          Q.   What if anything is listed on the back of

9     this exhibit?

10         A.   The phone number (718)670-3693.

11         Q.   What is the significance of that phone

12    number (718)670-3693?

13         A.   That was one of the AeroBeep telephone

14    numbers.

15         Q.   Were -- those, one of the numbers that you

16    described previously, by the blocks or John Willson

17    or Henry Black?

18         A.   That is correct.

19         Q.   Do you recall where if anywhere that phone

20    number appears on any of your investigations?

21         A.    That particular phone number appears on

22    the Joseph Sweeney E-Loan case, and also on the

23    Wojcieh Sprint cell phone case.   That particular

24    number, (718)670-3693, appears as the home number

25    listed on the Sprint cell phone case of Wojcieh

1    DIRECT/Gabriele

2    Wachnik.

3          Q.    I'm showing you what is in evidence as

4    People's 49.  This is the Sprint cell phone records

5    in the name of Wojcieh Wachnik?

6          A.    Yes.

7          Q.    It has an address 385 Lexington Avenue,

8    Apt 4B, Brooklyn, New York?

9          A.    Yes, it does.

10         Q.    At the bottom, the phone number listed on

11   People's 49, as home number?

12         A.    (718)670-3693.

13         Q.    Detective, I'm showing you what's in

14   evidence as People's 41, a Wojcieh Wachnik loan

15   application on 10/28/04.  Under the name Wojcieh

16   Wachnik.  Do you see there is a Social Security

17   number listed?

18         A.    Yes.

19         Q.    What is that Social Security number?

20         A.    11-282-6240.

21         Q.    I'm showing you the back of People's 173,

22   the back of that card.  Were you able to identify any

23   other numbers on the back of that business card,

24   found in the defendant's house?

25         A.    Yes, I did.

DIRECT/Gabriele

1

2      Q.   What if anything did you locate on the

3  back of that card?

4      A.   On the third line down, from the top?

5  Right in from 718, you see the numbers 112, 82, 6240.

6      Q.   What if anything is the significance of

7  those nine numbers on that card found in the

8  defendant's house?

9      A.   That is the Social Security number of Mr.

10  Wojcieh Wachnik.

11            MR. KEAHON:  Judge, could we

12        approach one minute, please.

13            THE COURT:  Yes.

14            (The following occurred at side

15        bar):

16            THE COURT: How much longer are you

17        going to be?  The jury is getting restless.

18            MR. PEARL:  Six exhibits and I'm

19        done.

20            THE COURT:  When you're done with

21        your direct, he'll step off.

22            Georgia will go on.

23            MR. KEAHON:  Two things, judge,

24        based upon what has happened this afternoon,

25        I'd ask this court to reconsider permitting in

1    DIRECT/Gabriele

2          Katherine Reid information, the evidence is

3          overwhelming.  Why do we put this issue in

4          this case?   For a reversal based on Molineux.

5                    Every reversal I see at the

6          appellate division is Molineux.

7                    THE COURT:  I thank you for your

8          guidance, Mr. Keahon.  But isn't the genie

9          already out of the bottle?  Ms. Reid has

10         already testified.

11                   MR. KEAHON:  They haven't seen this

12         document.  This is permitting -- putting in a

13         document that shows an alteration taking

14         place.  She's not part of the case.

15                   MR. PEARL:  Her name is used in the

16         voicemails.

17                   MR. KEAHON:  I'm just -- I'm

18         raising it now.

19                   THE COURT:  I know.

20                   You raised it in the past.

21                   MR. KEAHON:  And there is no need

22         for this.  I say that, respectfully.

23                   THE COURT:  I understand.  I did

24         show that it was evidence that the lack of

25         mistake and lack -- evidence of common scheme

DIRECT/Gabriele

1
2       or plan.  We have in the indictment, scheme to
3       defraud, and this is in some ways a unique
4       item in that the material alteration itself
5       can be used to explain how the other frauds
6       physically occurred.
7                   MR. KEAHON:  There is no question,
8       respectfully, that identity has been
9       established, and a common ploy or scheme, with
10      what is in evidence right now.  It has been
11      established.  There is no question about it.
12                  THE COURT:  All right.
13                  This is what I believe would be the
14      fourth argument that I have entertained --
15                  MR. KEAHON:  I know.
16                  THE COURT:  -- application on it.
17      For the reasons set forth, the prior
18      determination of the court, application to
19      preclude this evidence will be respectfully
20      denied.
21                  MR. KEAHON:  My exception is,
22      respectfully, noted.
23                  When he's excused, could you charge
24      I haven't been cross-examining because he's on
25      the stand one more time?  It's not like

DIRECT/Gabriele

1
2          I'm --

3                    THE COURT:  When we finish the

4          direct, I'll ask, I'll say Mr. Keahon, do you

5          wish to inquire at this time or at a later

6          time when the witness is called to the stand?

7          You can say you reserve your right to

8          cross-examine when he testifies.

9                    MR. KEAHON:  Sure, great.

10                   THE COURT:  Thank you.

11                   (The following occurred in open

12         court):

13                   MR. PEARL:  Detective, we'll just

14         get to the last few exhibits.

15                   THE COURT:  You may proceed.

16   BY MR. PEARL:

17         Q.   People's 174, what if anything is People's

18   174?  Do you see 174?

19         A.   It's a credit report.

20         Q.   What do you recognize People's 174 to be?

21         A.   A credit report in the name of Lamor

22   Whitehead.

23         Q.   The Social Security number -- I'll hand it

24   up to you?  It would be easier.

25                   Do you recognize the Social Security

DIRECT/Gabriele

number (handing).

        A.   Yes, I do.

        Q.   Can you just read that Social Security

number into the record, please?

        A.   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.

        Q.   Thank you.  Where was that found?

        A.   92 Howland Avenue, Teaneck, New Jersey.

        Q.   Detective -- I'm showing you what is in

evidence as People's 175.  Do you recognize this

exhibit?

        A.   Yes, I do.

        Q.   What do you recognize this exhibit to be?

        A.   It's a Connecticut identification card in

the name of Lamor Whitehead.  With an address of 371

Main Street, Hartford, Connecticut.

        Q.   How is Hartford spelled on that

identification -- that purported identification from

Connecticut?

        A.   "H A R F O R D".

        Q.   And you have seen this before today,

correct?

        A.   Yes, I have.

        Q.   Is there a picture of a person depicted in

that identification?

1    DIRECT/Gabriele

2         A.   Yes, there is.

3         Q.   Who if anyone is depicted in that

4    identification of, purported i.d. ,from Connecticut?

5         A.   The defendant, Lamor Whitehead.

6         Q.   The address you indicated, 371 Main

7    Street, Harford, Connecticut.

8              What is the significance of that address?

9         A.   That particular address, 371 Main Street,

10   in Hartford, Connecticut, is connected to the Nouri

11   Khabeih case.

12        Q.   I'm showing you what is in evidence as

13   People's 22G.  Do you recognize People's 22G?

14        A.   Yes, I do.

15        Q.   What if anything do you recognize 22G to

16   be?

17        A.   It's a document, purchase document from

18   Massapequa Land Rover, in the name of Nouri Khabeih,

19   with an address of 371 Main Street, Hartford,

20   Connecticut.

21        Q.   In fact, that is the same identification

22   contained on that purported identification from

23   Connecticut in the name of Lamar Whitehead?

24        A.   Yes, the address is the same on both

25   documents with the exception of the "T" missing from

DIRECT/Gabriele

the Connecticut identification card.

    Q.   Specifically, where did you recover People's 175?

    A.   That was recovered from the ledge that was leading into the kitchen.  I don't know how to describe it exactly.

           MR. PEARL:  Judge, can I have 96 through 106?

           THE:  Yes, officer, show them to counsel, please.

           MR. PEARL:  Officer, I got the wrong photographs.

           The small photographs.  133 through 150.

    Q.   I'm showing you what is in evidence as People's 138, what if anything is that?

    A.   That is the Connecticut identification card in the name of Lamar Whitehead.

    Q.   The one that you just identified as People's 175?

    A.   Yes.

    Q.   Where was that identification card recovered?

    A.   A ledge, a half wall that was leading into

DIRECT/Gabriele

the kitchen.

    Q.   I'm showing you 139.   That is the location
you just described?

    A.   Yes.

           MR. PEARL:   Detective, I misled the
jury, I'm sorry.   There are two exhibits.

    Q.   179, that is in evidence.   Do you
recognize this exhibit?

    A.   Yes.   It's a Rent-A-Center agreement.

    Q.   In whose name is this agreement?

    A.   Lamor Whitehead.

    Q.   What is the address listed for Lamor
Whitehead?

    A.   92 Howland Avenue, Teaneck, New Jersey.

    Q.   Finally, detective, I'm showing you what
is 176-A & B.   Take a look at those exhibits,
detective, and tell the jury if you recognize those
exhibits?

    A.   Yes, I do.

    Q.   What if anything do you recognize
176-A -- from where if anywhere did you recover 176-A
and -B?

    A.   In the hallway closet, 92 Howland Avenue,
Teaneck, New Jersey.

DIRECT/Gabriele

Q.   What if anything do you recognize 176-A and 176-B to be?

A.   Both of them are W-2 and earnings summary forms.  W-2 forms.

Q.   Okay.  And in whose name -- start with 176-A.  In whose name is 176-A?

A.   176-A, the name printed on the paper, is a Katherine Reid, 940 Prospect Place, Brooklyn, New York.

Q.   Is there anything of significance after the name Katherine Reid?

A.   Could you rephrase that?  What are you talking about what's --

Q.   Is there any other names listed on that document?

A.   Yes, there are.

Q.   Tell the jury what if any other information is listed on that document?

A.   The name of Lamor Whitehead, 1305 Park Place, Brooklyn, New York, is taped over the name of Katherine Reid of 940 Prospect Place, Brooklyn, New York.

Q.   Are there other areas of that document that are taped over?

DIRECT/Gabriele

1

2      A.   Yes, there are -- there are three other

3  locations on the document -- excuse me, four other

4  locations on the document that have pieces of paper

5  taped over them.

6      Q.   176-B, what if anything is 176-B?

7      A.   176-B is again, 2003 W-2 form in the name

8  of Lamor Whitehead.

9           MR. PEARL:  May I have those

10          exhibits?

11     Q.   Detective, I'm showing you what is 176-A

12  in evidence.  You indicated the name -- first of all,

13  the condition that this document is in.  Is it in the

14  same exact condition as when you recovered it from

15  the defendant's home, 1/27/06?

16     A.   Yes, it is.

17     Q.   Initially, you indicated there was a name

18  of Katherine Reid?

19     A.   Yes, I did.

20     Q.   And an employer name of Aeillo Eye Care?

21     A.   Yes, there is.

22     Q.   You indicated there was another name,

23  correct?

24     A.   Yes.

25     Q.   There's a piece of paper taped over,

DIRECT/Gabriele

Katherine Reid's name, and an address in the name of
Lamar Whitehead, 1305 Park Place, Brooklyn, New York.

And an employer address of SONY Music
Inc., 55 Madison Avenue, New York, New York?

A.   That is correct.

Q.   You also indicated there were other areas
that were cut over?

A.   Yes.

Q.   I'm showing you -- there is another area,
Lamor Whitehead, 1305 Park Place, Brooklyn, New York
11213?

A.   Yes.

Q.   There was information under that?

A.   Yes, there was.

Q.   Additionally, there is a Social Security
number listed on this document, correct?

A.   Yes, there is.

Q.   That Social Security number is
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?

A.   That is correct.

Q.   Were you able to determine if there was a
Social Security number under that?

A.   Yes, there was.

Q.   A different Social Security number?

DIRECT/Gabriele

1
2          A.   Yes, a different Social Security number

3     from the one on the presenter now.

4          Q.   Det. Gabriele, what if anything is the

5     significance of the name Katherine Reid in this

6     specific investigation?  Did it turn up anywhere else

7     in this specific investigation?

8          A.   In our specific investigation?

9          Q.   Yes.

10         A.   No, it does not.

11         Q.   Did you listen to the AeroBeep

12    investigation?

13         A.   Excuse me, yes, it does.  There is a voice

14    recording who indicates that -- the female name on

15    the tape is Katherine Reid.

16         Q.   I'm showing you what is in evidence as

17    176-B.

18              What if anything is 176-B?

19         A.   It appears to be a photocopy of the

20    previous document with all of the taped-over portions

21    indicated on the new document.

22         Q.   Now, detective, during the course of your

23    investigation, were you able to determine if there

24    were any other documents that had information that

25    had been altered?

DIRECT/Gabriele

A.    --

Q.    I'm directing your attention specifically to -- in reference to David Ridenour?

A.    Yes.

Q.    Can I have People's -- People's 28, please?

Q.    Detective, People's 28 in evidence, a Con Edison bill contained within the David Ridenour Capital One account.  You previously testified you recognize this Con Edison bill?

A.    Yes, I did.

Q.    And from where did you recognize this Con Edison bill?

A.    That Con Edison bill, in the name of David Ridenour, with the address of 385 Lexington Avenue, Apartment 4B, in Brooklyn, New York, matches exactly to a Con Edison bill, that was recovered from the defendant's vehicle on 1/25/06, with the exception of the David Ridenour address and name on the top, which was not on the top of the one recovered out of the vehicle on 1/25/06.

Q.    And the -- have you also seen this similar bill with the name of Maria Macarle on it?

A.    Yes.

DIRECT/Gabriele

1

2          MR. PEARL:  Thank you, detective.

3  Your Honor, just for the record, I'm making

4  sure I moved in all my exhibits, including 86,

5  177, 109, and I have no further questions at

6  this time.

7          (People's Exhibits 86, 177, and

8  109, previously marked for identification,

9  received in evidence)

10         THE COURT:  Thank you.  You'll be

11 recalling this witness to the stand?

12         MR. PEARL:  One final time, your

13 Honor.

14         THE COURT:  Mr. Keahon, do you wish

15 to cross-examine at this time or reserve your

16 right to cross-examine the final time the

17 witness testifies?

18         MR. KEAHON:  Judge, it was

19 discussed earlier, due to the number of times

20 this witness is testifying, I'll cross-examine

21 him when he's finished with his direct.

22         THE COURT:  Thank you.

23         Thank you very much, detective.

24 You may stand down at this time.

25         I direct you not to discuss your

Jennifer Maue, Senior Court Reporter   (631)852-2153

People v. Lamar Whitehead

1
2          testimony with anyone since you're being
3          recalled to the stand.
4                    THE WITNESS:  Yes, your Honor.
5                    THE COURT:  Thank you.
6                    (The Witness is excused)
7                    THE COURT:  Ladies and gentlemen of
8          the jury, at this point in time you'll be
9          given a recess before the next witness is
10         called.  Thank you very much, again, for your
11         kind attention.  Do not form an opinion about
12         the case.  Do not discuss the case or allow it
13         to be discussed.  Do not listen or view
14         anything about the case.  Please report any
15         inappropriate contacts.  Thank you very much
16         once again.
17                   (The Jury is excused)
18                   THE COURT:  Thank you.  Would
19         counsel like to take a five minute recess
20         before Ms. Fortune is called to the stand?
21                   MR. PEARL:  Thank you, your Honor,
22         yes.
23                   MR. KEAHON:  Yes.
24                   THE COURT:  The court will take a
25         brief recess.

Jennifer Maue, Senior Court Reporter    (631)852-2153

1    People v. Lamar Whitehead

2                      (Brief recess)

3                      MR. KEAHON:  Judge, can we

4        approach.

5                      THE COURT:  Yes, certainly.

6                      (Side bar discussion held off the

7        record)

8                      THE COURT:  Let's bring back the

9        jury.

10                     THE COURT OFFICER: The jury is

11       entering.

12                     (The following occurred with the

13       jury present)

14                     THE COURT:  Thank you, please be

15       seated.

16                     THE CLERK:  Case on trial, People

17       versus Whitehead.  All parties present.  The

18       jury is present.  Counsel waive the roll.

19                     THE COURT:  Ladies and gentlemen,

20       other aspects of this proceedings in this case

21       will take up the remainder of the afternoon.

22       Rather than detain you until 5:00 and send you

23       back home, until a few moments before then, to

24       bring in another witness, we'll discharge you

25       for the day and once again, discuss with your

1   People v. Lamar Whitehead

2       family the extension of this case. There will

3       be no trial on Friday or Monday. The matter

4       would wrap up next week. It will not go

5       beyond that. We're trying to wrap it up this

6       week, and we're talking about literally a day,

7       two days. It's one of those things,

8       considering the time you have all expended in

9       this case, the old adage about for the want of

10      a nail, a shoe was lost, et cetera. Remember

11      my admonitions once again.

12              You may not form an opinion about

13      this case until it's finally submitted to you

14      for your deliberations. You may not discuss

15      this case or any matter connected with the

16      trial among yourselves nor with anyone else.

17      Do not read or listenn to accounts or

18      discussion of the case reported by the news

19      media or on the Internet. You may not visit

20      or view the place or place where the offenses

21      charged were allegedly committed or any other

22      place discussed during the course of the

23      trial. Promptly report to this court any

24      incident within your knowledge of an attempt

25      by any person to contact or influence a member

Jennifer Maue, Senior Court Reporter   (631)852-2153

People v. Lamar Whitehead

1

2          of this jury.  Do not discuss with any person

3          the receiving or accepting of payment or

4          benefit in consideration for supplying any

5          information concerning the trial.

6                    Once this -- discuss with your

7          families, sitter, the extra time, the effect

8          it will have on you, and we'll discuss it

9          tomorrow if it creates difficulties.

10                   The case will continue tomorrow

11         morning at 11:00 o'clock.  Thank you all very

12         much.

13                   (The Jury is excused)

14                   THE COURT:  Thank you.  Please be

15         seated.

16                    At this time, we'll recall --

17                   MR. KEAHON:  I need a few minutes,

18         judge.

19                   THE COURT:  Whenever you're ready

20         to go.

21                   The court will stand in recess to

22         allow you to work on your cross-examination.

23                   MR. KEAHON:  Thank you.

24                   THE CLERK:  Remain seated, come to

25         order.  Case on trial continued.  All parties

CROSS/Fortune - *In Limine* Hearing

1
2         present.

3                         THE COURT:  This is a continuation

4         of the hearing *in limine* to determine the

5         threshold issue of Mr. Whitehead's signature

6         via the testimony of Ms. Georgia Fortune.

7                         Are you ready to conduct your

8         cross-examination?

9                         MR. KEAHON:  I am, your Honor.

10                        THE COURT:  We'll recall Ms.

11        Fortune to the stand.

12                        (The Witness resumes the stand)

13                        THE COURT:  Ms. Fortune, follow the

14        officer's instructions.  You can resume your

15        seat.

16                        THE CLERK:  Ms. Fortune, I remind

17        you, you're testifying under oath.

18     CROSS-EXAMINATION

19     BY MR. KEAHON:

20        Q.   Good afternoon, Ms. Fortune.

21        A.   Hello, how are you?

22        Q.   I'm fine, thank you, and yourself?

23        A.   Good.

24        Q.   Ms. Fortune, you told us that you were 31

25     years of age?

CROSS/Fortune - *In Limine* Hearing

1

2      A.    Yes.

3      Q.    And you're employed at the present time?

4      A.    Yes, I am.

5      Q.    And what do you do, ma'am?

6      A.    Um -- I prefer --

7              THE WITNESS:  Excuse me, judge.

8              MR. PEARL:   Just to make it -- my

9      request, it's an objection but more of a

10     request, to keep it as general as possible.

11     Based on prior D.V. history, we prefer not to

12     have Ms. Fortune disclose her work address or

13     workplace on the record.

14     A.    I work in human resources.

15     Q.    I'm sorry?

16     A.    I work in human resources.

17     Q.    And is that with a school?

18     A.    No.

19     Q.    With a corporation?

20     A.    Yes, it is.

21     Q.    How long have you been doing that, ma'am?

22     A.    It's about two and a half years?  Going on

23     two and a half years.

24     Q.    Can you tell me when is the first time

25     that you were contacted by the district attorney's

CROSS/Fortune - *In Limine* Hearing

office?

     A.   I was contacted on -- it was very recent. I would say within a week or two?  A week or two?

     Q.   Could it have been within the last two days?

     A.   When I was contacted again, yes.  Um...

     Well, could you basically clarify that question, because I mean are you speaking of the original contact, when I was originally contacted?

     Q.   When was that?

     A.   I was contacted about, probably about a week ago --

     THE WITNESS:  Could you hear me.

     Q.   Yes, I can.  One week ago?

     A.   Yeah, about a week ago, not exactly a week ago.  I don't remember offhand, but yeah.

     Q.   That contact, was it by phone or in person?

     A.   The first contact was by the telephone.

     Q.   And who was it that called you?

     A.   Det. Gabriele.

     Q.   What did he tell you?

     A.   In the conversation, he asked if I knew a Lamar Whitehead.  I said, why?

CROSS/Fortune - *In Limine* Hearing

He said, "I want to know if you know Lamar Whitehead", and I told him "Yes, I do know Lamar Whitehead, but why are you asking?" And he told me that he was a detective, and currently he's on trial, and they have my name down as a witness, I believe?

Q. What else did he say to you?

A. He asked if -- he asked -- I'm trying to remember the exact conversation.

I believe he asked if --

MR. PEARL: Judge, I'm going to object as to relevance to the issue.

THE COURT: Thank you. Offer of proof, Mr. Keahon?

MR. KEAHON: Yeah, I think there is nothing wrong with asking what he said to her as the predicate to get her in here. I think I'm entitled to know that.

THE COURT: But if you would articulate it for the record. Are you saying did he voice any threats or promises?

MR. KEAHON: Yes.

THE COURT: The objection will be overruled.

THE WITNESS: That means I can

CROSS/Fortune - *In Limine* Hearing

continue.

THE COURT:  Answer the question,
I'm sorry.

A.   He asked if, if-if-if I can basically come
down, I guess, and testify.  If I can -- if I see any
documents, can I determine Lamar Whitehead's
handwriting and be able to testify, basically.

THE WITNESS:  Should I keep going?

THE COURT:  Wait for the next
question, thank you.

Q.   What did you say to that?

A.   I told him "Oh, no."

Q.   You told him no?

A.   I told him, "This is a chapter in my life
that is closed and I prefer not to."  I think I told
him I don't want to.

Q.   What did he say?

A.   He just basically asked me again.  I told
him I don't want to.

Q.   What happened next?

A.   I'm subpoenaed.

Q.   Who served the subpoena?

A.   Det. Gabriele, and it was another person,
but I don't remember their name.  That individual's

CROSS/Fortune - *In Limine* Hearing

name.

Q.   Did Det. Gabriele ask you if you had any written communications, letters, from my client?

A.   Yes, he did.

Q.   And when he asked you if you had received any letters, what did you tell him?

A.   -- letters?  I told him I've had letters from the individual. He asked if I ever had letters, and I said, I did receive letters.

Q.   Did he ask you to search for them?

A.   He asked if I can, if I can locate them, yes.

Q.   Did you locate any letters?

A.   I wasn't able to.

Q.   Did he ask you if you had received any cards from my client?

A.   Yes, he did.

Q.   What did you tell him?

A.   I told him I have received cards from him at one point in time.

Q.   Did he ask you if you still had them?

A.   He asked if I had, still had them.

Q.   What did you say?

A.   I told him I was uncertain.  There were a

CROSS/Fortune - *In Limine* Hearing

couple of things I threw out, but a couple of things

I saved.  But, again, I've moved and I'm uncertain if

I have them.

     Q.  So you were unable to find any cards that

my client had sent to you?

     A.  Correct.

     Q.  When I speak about "cards", I'm talking

about holiday cards or birthday cards?  Did you find

any of those items?

     A.  Any of the postcards?  No, I did not.

     Q.  When were you served with a subpoena?

     A.  When I was served with subpoena... it

was -- the subpoena was served to me Friday?

     Q.  This past Friday?

     A.  Yes, this past Friday.

     Q.  And you appeared on -- did you have a

conversation with Det. Gabriele, when he served you

with the subpoena?

     A.  Yes, I had a conversation.

     Q.  Did you talk about your ability to

identify any handwriting at that time?

     A.  No, you just asked me -- the same question

he asked me on the telephone, and when I was

subpoenaed, I'll have you look at a couple of things,

CROSS/Fortune - *In Limine* Hearing

1

2  would you be able to identify it.

3          Q.   He told you he was going to have you look

4  at a few things?

5          A.   Yes.

6          Q.   Did he bring anything with him to show

7  you?  Any handwriting allegedly done by my client?

8          A.   That Friday?  I do not recall.

9          Q.   How much time did he spend with you on

10 Friday?

11         A.   I do not have an exact answer for that.

12         Q.   Approximately?

13                 MS. FRANZESE:  Objection, your

14         Honor, as to relevance, outside the scope of

15         the hearing.

16                 THE COURT:  Overruled.  You can

17         answer the question if you can.

18         A.   I -- I would say within the realm of an

19 hour, or maybe a little less.  It may be less.  I

20 would assume within the realm of an hour.

21         Q.   So he comes on Friday, he serves you with

22 a subpoena.  He tells you he wants you to look at

23 some items to identify as the handwriting of Lamar.

24 What else does he say in that -- up to an hour?

25         A.   Well, I basically told him I don't want to

CROSS/Fortune - *In Limine* Hearing

testify.  So the gist of our conversation although I

was subpoenaed and served was, I don't want to

testify.  So that's what we were basically going back

and forth with, and he explained what a subpoena

means.

Q.   Okay?

A.   So...

Q.   And what happened on Monday?   You came

out on Monday.

A.   Are you asking me if I came out on Monday.

Q.   Yes?

A.   Yes, I came out on Monday.

Q.   Who did you meet with on Monday?

A.   I sat with Det. Gabriele and... District

Attorney Raphael, and I'm not sure of her last name,

but her first name is Jodi.

Q.   Sure?

A.   I'm sorry.

Q.   I said sure, yes.  You got the name

correct?

A.   Okay.

Q.   What did you do with her?

A.   They basically -- we spoke about

the -- what they basically need me to do in terms of

CROSS/Fortune - *In Limine* Hearing

1
2   identify the handwriting, and I guess if I can
3   identify anything else.  And I'll be meeting
4   with -- I guess the judge, and I guess whatever else
5   needs to take place that exact date.
6       Q.   How much time did you spend with him on
7   Monday?
8       A.   Well, I could basically say, almost a
9   whole day, because I didn't get to come downstairs
10  until later that afternoon.
11      Q.   Right?  Did they have you look at a number
12  of items?
13      A.   Yes.
14      Q.   As you looked at those items, were they
15  the same items that you were shown in court?
16      A.   Yes.
17      Q.   Anything in addition to those items that
18  were in that book?
19      A.   No, just in terms of the handwriting, no.
20  Exactly was in that book.
21      Q.   How long did you spend going through that
22  book, looking at the items?
23      A.   I don't have an -- an actual time.
24      Q.   Approximately?
25      A.   Honestly, I really didn't -- I really

CROSS/Fortune - *In Limine* Hearing

didn't time it.  I was there all day?   So I

wouldn't --

Q.   Okay?

A.   I wouldn't have an answer, I'm sorry.

Q.   Well, when you were sitting with Mr.

Pearl and Det. Gabriele, and Jodi, did you go through

that book in front of them?

A.   Yes.

Q.   Did they ask you as to each specific page

in the book, if you could identify it as being the

handwriting of Lamar?

A.   Yes.

Q.   Was Det. Gabriele taking notes?

A.   --

Q.   As to what you were indentifying and what

you weren't indentifying?

A.   He -- he had a piece of paper and a pen in

his hand.  I can't answer if he was actually taking

note.

Q.   Was he writing?

A.   He was writing.

Q.   And was he writing as you would indicate

when you could or couldn't identify certain items?

A.   Yes.

CROSS/Fortune - *In Limine* Hearing

Q.   What about Mr. Pearl?   Was he doing the same?

A.   Which -- is that Raphael Pearl.

Q.   The good-looking fella at the front table?

A.   Oh, yes.   Also.   I didn't know.

Q.   What about Jodi, Jodi Franzese.   She was taking notes, as well as speaking with you, or was it just Mr. Pearl and Det. Gabriele?

A.   From what I saw, it was Mr. Pearl and Det. Gabriele.

Q.   Did they have you sign anything after reviewing that book?

A.   I don't recall signing anything.

Q.   You told us that you met Lamar when you were 15 or 16 years of age?

A.   Yes.

Q.   And where were you living?

A.   We were -- I lived, 940 Prospect.

Q.   I think you indicated that Lamar lived there also?

A.   Yes.

Q.   Who did he live there with?

         MS. FRANZESE:   Objection as to relevance.   Outside the scope of the hearing.

CROSS/Fortune - *In Limine* Hearing

            THE COURT:  Overruled.  Familiarity
with the defendant's handwriting, walks hand
in hand with long-standing acquaintance.  So
I'll allow cross-examination on this question
on the basis of the relationship of the
defendant with the witness, because it also
could have a bearing on the possible issue of
bias.  So I'll allow it.

            You can answer the question.

A.    Okay.  His family?

Q.    Yes?

A.    His family.

Q.    Who was in his family?

A.    In particular, if I remember correctly, it
may have been his -- I remember there was a brother,
a mother and a sister.

Q.    A brother, mother and sister?

A.    I believe so.  Yes.

Q.    What was his brother's name?

A.    I don't remember the brother's name.

Q.    What about his mother?

A.    I don't remember the mother's name.

Q.    What about his sister's name?

A.    I don't remember the sister's name.

CROSS/Fortune - *In Limine* Hearing

1

2      Q.   I think you told us when you met him, when

3   you were 15 or 16, your family didn't permit you to

4   date?

5      A.   No, I wasn't allowed to date at that age.

6      Q.   I think you also told us that you moved

7   from that location?

8      A.   I did.

9      Q.   At what age?

10     A.   We lived there probably about a year and a

11  half.  It wasn't very long I lived at that -- the

12  location.

13     Q.   Okay.  Then you moved to where?

14     A.   I moved to Eastern Parkway, and shortly

15  after, my parents purchased a house in another area.

16     Q.   Where?

17     A.   In Flatbush.

18     Q.   I think you told me that Lamar also moved

19  out?

20     A.   Yes.

21     Q.   Where did he move to?

22     A.   I don't recall.  I don't know.

23     Q.   You didn't date him when you were 17?

24     A.   No.

25     Q.   18?

1    CROSS/Fortune - *In Limine* Hearing

2          A.   No.

3          Q.   19?

4          A.   No.

5          Q.   20?

6          A.   No.

7          Q.   21?

8          A.   No.

9          Q.   22?

10         A.   No.

11         Q.   23?

12         A.   I have to sit there and count my age now.

13         Q.   You told us you were 31?

14         A.   Uh-hum.

15         Q.   I think you told  us you stopped dating

16    him in 2002, wasn't that your testimony yesterday?

17         A.   That was when we met again.  We used to

18    see each other at clubs and different areas around a

19    part of 2002.

20         Q.   Your testimony yesterday wasn't that you

21    stopped dating him at the end of 2002?

22         A.   No, it was not.

23         Q.   So you first got together again with him

24    in 2002?

25         A.   The late part of 2002.

CROSS/Fortune - *In Limine* Hearing

Q.   So from the time you were 15 or 16, you moved a year and a half after that, you didn't date him at all, and then about six years ago you ran into him again, and I think you told us you would go to clubs, 2002?

A.   Yes.

Q.   Did you start dating him in 2002?

A.   The late part of 2002, yes.

Q.   Where was he living?

A.   He lived off of -- on Flatlands?

Q.   I'm sorry?

A.   I'm not exactly sure the name -- it was off of Flatlands, an apartment complex.

Q.   Were you ever there?

A.   I have been there.

Q.   Was it -- was he living with his parents?

A.   I haven't seen -- I didn't see any parents, no.

Q.   Who was he living there with?

A.   I believe by himself.

Q.   Was it a high rise?

A.   Meaning a tall building.

Q.   Yes?

A.   Yes.

CROSS/Fortune - *In Limine* Hearing

Q.   What floor did he live on?

A.   The second floor?

Q.   What was his telephone number back then?

A.   I don't remember the telephone numbers.

Q.   How many times did you go to that apartment?

A.   (Shakes head)

Q.   Once?   Twice?

A.   Approximately -- it wasn't a lot?  I don't have the exact amount.

Q.   Approximately?

A.   Not a lot.  About four times.

Q.   How many rooms were in the apartment?

A.   Don't remember -- I don't remember.

Q.   Was there more than one bedroom?

A.   I don't remember.

Q.   Did you ever see anybody else there, any of the four times you went?

A.   No, I have not.

Q.   What type of vehicle was he driving in 2002?

A.   At that time, I remember a red Mercedes.

Q.   Was it a two seater or a big sedan?

A.   It's not a big sedan.

CROSS/Fortune - *In Limine* Hearing

Q.   When did you actually, I think you told us
you began dating the end of 2002.

A.   (Nods)

Q.   In 2002, did you receive any cards from
him?

A.   I don't recall exactly if I received any
cards from him exactly in 2002, or any exact dates.

Q.   What about letters?   In 2002?

A.   (No verbal response)

Q.   If you don't recall, you don't recall?

A.   I don't recall the exact dates of the
letters, no.

Q.   Now, if you started dating him the end of
2002, when did you stop dating him?  I think you told
us you dated him for about a year?

A.   A little over a year.  Very little over a
year.

Q.   Sometime toward the end of 2003?

A.   Yes.

Q.   What month is your birthday?

A.   November.

Q.   If your birthday is in November and you
began dating him the end of 2002, and you stopped
dating him in 2003, you didn't get any birthday cards

CROSS/Fortune - *In Limine* Hearing

from him, did you?

                MR. PEARL:   Objection, form.

                THE COURT:   You can answer the

      question.

      A.   I've gotten birthday cards from him, as

well as Valentine's Day cards, and Christmas cards.

If you're asking me specific dates, I don't know.

                MR. KEAHON:   Let's stay with it a

      minute.

      Q.   You started dating him the end of 2002,

you told us?

      A.   (Nods)

      Q.   You end up dating him the end of 2003?

      A.   (Nods)

      Q.   You told us your birthday's in November,

yes?

      A.   Would you like me to answer, or are you

answering.

      Q.   I made a statement and I said "yes", with

a question mark?

      A.   I thought you was asking me.  Yes.

      Q.   You didn't receive any birthday card in

2002 or 2003, did you?

                MS. FRANZESE:   Objection, your

```
 1    CROSS/Fortune - In Limine Hearing
 2            Honor, asked and answered.
 3                    THE COURT:  Overruled, parsing the
 4            question but permissible.
 5        A.    That is not correct.
 6        Q.    Did you receive a birthday card in 2002?
 7        A.    I don't recall exactly when I received the
 8    birthday card.  It could be 2002 or 2003.
 9        A.    --
10        Q.    Okay, but I did receive cards?
11        Q.    I'm talking about a birthday card.  How
12    many did you receive?
13        A.    I don't recall.
14        Q.    So -- was it the type of birthday card
15    that was pre-printed, and he would sign, "Lamar",
16    "Love, Lamar"?
17        A.    It was a pre-printed card, yes.  They were
18    pre-printed cards.
19        Q.    Did he send you an Easter card?
20        A.    No.  I don't recall seeing an Easter card.
21        Q.    Valentine's Day card?
22        A.    I did receive a Valentine's Day card.
23        Q.    One?
24        A.    Yes, one.
25        Q.    That would be 2003.
```

CROSS/Fortune - *In Limine* Hearing

     A.   Yes.

     Q.   Christmas card?

     A.   It was a holiday card -- yes.

     Q.   And you received one?

     A.   Yes.

     Q.   I'm sorry?

     A.   I believe it's one, yeah.

     Q.   And for what year?

     A.   I don't recall the year.

     Q.   Okay.  The Valentine's Day card, and the holiday card, as well as the birthday card that you told us about, they were all pre-printed that you would buy in a stationary store, am I right?

     A.   Correct.

     Q.   And he would say to you, your first name, and he would sign "Lamar"?

     A.   They were pre-printed, and he did sign, yes.  Correct.

     Q.   Now, for that year-period that you dated him, the end of 2002 to the end of 2003, did you ever meet any member of his family?

     A.   No.

     Q.   Were you in 2000 -- the end of 2002, to the end of 2003, were you living by yourself?

CROSS/Fortune - *In Limine* Hearing

    A.    No.

    Q.    Well, you were 26, 27 at the time.  Were
you living at home with your family?

    A.    I, um, a portion I lived -- I lived with
someone.

    Q.    I'm sorry?

    A.    I lived with someone and I lived at home.

    Q.    When you say you "lived with someone", a
boyfriend?

    A.    No.

    Q.    Oh?

    A.    A female.

    Q.    Did any member of your family ever meet
Lamar?

    A.    Yes.

    Q.    Who would that be?

    A.    My brother, my sister.  My mother, my
stepfather.  And my friend -- a few of my friends.

    Q.    Did you ever meet any friends of, friends
of Lamar during that period?

    A.    Well.

    Q.    Did he ever introduce you to anybody?

    A.    No.

    Q.    From the end of 2002, to the end of 2003,

1    CROSS/Fortune - *In Limine* Hearing
2    did you ever go out on a date with him?
3         A.    We went out to eat -- we went out to eat.
4    He has been to my home to eat.  That is basically it.
5    I mean...
6         Q.    Out to eat or to your house to eat?
7         A.    He'd been to my house.
8         Q.    How often did you do that?
9         A.    He'd been to my house several times so I
10   can't count the several times -- the amount of times
11   he has been to my house, my home.
12        Q.    How often during that year period did you
13   go out to eat, to dinner?
14        A.    It was not often.
15        Q.    How many times in that year?
16        A.    I don't have a number, amount.
17        Q.    You told us on direct that you went to
18   college?
19        A.    I did.
20        Q.    And you graduated?
21        A.    (Nods)
22        Q.    Congratulations.
23              What college did you go to?
24        A.    Long Island University.
25        Q.    Where did Lamar go?

CROSS/Fortune - *In Limine* Hearing

      A.   I don't know where he actually attended. But -- I don't know where he actually attended.

      Q.   Well, when you were dating him in 2002, the end of 2002, the end of 2003, had he told you he had been to college already?

      A.   He has told me.

      Q.   Where did he tell you he went?

      A.   He told me he went to school -- I guess a scholarship in North Carolina.  But I don't know the exact name of the college.  I don't...

      Q.   Other than going out to dinner a few times and having him to your house a few times, where else did you go with him?

      A.   ....

      Q.   No other places?

      A.   No, not that I recall, no.

            MR. KEAHON:  I'm almost finished, ma'am.

            (Pause)

      Q.   Do you know what high school he went to?

      A.   I don't recall high school.

      Q.   Do you wear glasses, ma'am?

      A.   I have reading glasses.

      Q.   You didn't have them on yesterday.

CROSS/Fortune - *In Limine* Hearing

    A.   No.  They are used for the computer.

    Q.   What is your eyesight?

    A.   I don't know.

    Q.   Are they prescription glasses?

    A.   Yes.

    Q.   You didn't use them yesterday when you looked at those documents, did you, when you were with Mr. Pearl?

    A.   No, I did not.  I didn't have them.

          THE WITNESS:  Can I use the bathroom?

          MR. KEAHON:  I'm just about finished.  I think I am.  Just give me one sec.

          THE COURT:  Yes.

    Q.   We talked about holiday cards, birthday cards, a Valentine's Day card, he never wrote you a letter, did he?

    A.   He's written -- he, like, notes, if that's what you consider a letter.  But notes.  Are you asking of a full page letter?  Letter?

    Q.   Yes?

    A.   No.

    Q.   When you say he's written you "notes",

CROSS/Fortune - *In Limine* Hearing

what kind of notes?

    A.   Like, Post-It notes?

    Q.   I'm sorry?

    A.   Post-It note.

    Q.   You mean on the little yellow piece of paper?

    A.   It doesn't necessarily have to be a yellow piece of paper, but you know.

    Q.   Would he send those to you in the mail?

    A.   No.

    Q.   Well, how is it that he would give you a Post-It?

    A.   No, he would leave -- he left Post-Its before on my car.  It was incidents when they had the black-out and he couldn't find me, he left a note on -- "You're not at your house.  Call me when you can."

    Q.   How many times did he leave the Post-It?

    A.   Just a couple of times.  It wasn't....

           THE WITNESS:  I need to go to the bathroom.

           THE COURT:  We have to take a break, if you're not finished Mr. Keahon.  The witness has requested a brief recess.

CROSS/Fortune - *In Limine* Hearing

1                    We're going to take a brief recess

right now.

                    THE WITNESS:  Is this the last

question?

                    THE COURT:  I direct you not to

discuss your testimony with any person.

                    Officer, if you would attend.

                    (Brief recess)

                    THE CLERK:  Ms. Fortune, I remind

you, you're testifying under oath.

                    THE WITNESS:  Thank you.

                    THE COURT:  You may continue your

examination.

                    MR. KEAHON:  Thank you, judge.

BY MR. KEAHON:

       Q.   Was there anything distinctive about his

handwriting?

       A.   That I've noticed.

       Q.   Yeah?

       A.   In my -- in my -- yeah.  To me, yes.

       Q.   What was that?

       A.   It would be the certain way he writes

letters.

       Q.   What letters?

CROSS/Fortune - *In Limine* Hearing

   A. Particularly the "Y" and the "G".

   Q. I think you said he wrote them the same way?

   A. They were similar to -- yeah.

   Q. And that's it?

   A. Sometimes when he -- started, I guess a word, it will be the first two letters that may be capital, and then also the way he wrote a little bit sloppy as though he was in a rush.  But those things are things I noticed.

   Q. When did you ever actually see him write anything?  Never?

   A. I have --

      MR. PEARL:  Objection.

      MS. FRANZESE:  Objection, your Honor.

   Q. What have you seen him write?

   A. I've seen him on the phone just taking notes of whatever I guess conversation he's having.

   Q. How many times did that happen?

   A. A few times.

   Q. When you say "a few", one or two?

   A. A little bit more.

   Q. Three, four?

CROSS/Fortune - *In Limine* Hearing

A.   Probably a little bit more.

Q.   Where was he on the phone?

A.   At my house.

Q.   I'm sorry?

A.   At my house, in front of my stoop, my parents' stoop.

Q.   Was he using your phone or his phone?

A.   No.  He was on his own phone.

Q.   And you were watching the notes he took?

A.   (Shrugs)

Q.   Is that right?

A.   Yes, some of them.

Q.   Any other times you see him write anything?

A.   Other than those times, I don't recall.

Q.   Okay.  So maybe a couple of times on the stoop and a couple of times in your house?

A.   Yes.

Q.   And he was on the phone making notes, right?

A.   Yes.  Taking notes.

MR. KEAHON:  Thank you very much.

THE COURT:  Any redirect?

MR. PEARL:  Just one.

1   REDIRECT/Fortune - *In Limine* Hearing

2   REDIRECT EXAMINATION

3   BY MR. PEARL:

4       Q.   Ms. Fortune, do you have -- any graduate

5   education?

6       A.   Yes.

7       Q.   And what kind of degree do you have?

8       A.   I -- was attending Columbia University, a

9   degree in Masters of Arts in organizational

10  development.

11      Q.   From Columbia University?

12      A.   Yes.

13              MR. PEARL:  Thank you.

14              THE COURT:  Any cross within the

15          limited parameter of redirect?

16              MR. KEAHON:  I have nothing.

17              THE COURT:  Ms. Fortune, you may

18          stand down.

19              (The Witness is excused)

20              THE COURT:  Does counsel wish to

21          make arguments prior to the ruling on

22          admissibility -- the foundation of the

23          documents in question?

24              MR. KEAHON:  No, judge.

25              THE COURT:  People?

People v. Lamar Whitehead

           MR. PEARL:  Rely on the testimony.

           THE COURT:  Thank you.

           MR. KEAHON:  I request the notes
taken by Mr. Pearl and Det. Gabriele.

           MR. PEARL:  There were no notes
taken during any of the two meetings we had
with Ms. Fortune.

           THE COURT:  Thank you.

           The standard of admission pursuant
to *People vs. Clark*, 122 A.D.2d 389, leave
appeal to deny at 668 N.Y.2d 913, is when the
witness, in authenticating a document, has
seen the person in question write at least
once.

           In this case the court finds that
the witness, Georgia Fortune, has demonstrated
a familiarity with the defendant's handwriting
by virtue of her seeing him write documents on
various occasions and having received
documents from the defendant, which were
acknowledged by him.

           When shown People's 153 A, B, C, E,
H, J, K, O, U, X, Z, AA, CC, DD, and EE, she
stated that in her opinion they were in the

1    People v. Lamar Whitehead

2         defendant's handwriting.

3              People's 153 D, F, G, L, M, N, P,

4         Q, R, S, T, V, W, Y, BB, F F, were not

5         identified by the witness.

6              Accordingly, the court finds

7         pursuant to *People vs. Fields*, that the

8         people's exhibits, designated as

9         People's -- 153-A, through EE, as noted

10        herein, has been established as genuine

11        exemplars of the defendant's handwriting and

12        may be used by the people before the trier of

13        fact to compare against the questioned

14        document.

15             Your exception will be noted, Mr.

16        Keahon.

17             MR. KEAHON:  Judge, I have one

18        thing to note for the record if I could.

19             THE COURT:  Yes, certainly.

20             MR. KEAHON: 153-O, P, and Q, and

21        perhaps R, are all part of the same exhibit.

22        And they all -- each of those exhibits

23        contains -- an alleged signature of my client.

24             153-O, she says -- that is the

25        first or second page of the document.  She

People v. Lamar Whitehead

says it's his.

THE COURT:  Yes.

MR. KEAHON:  The signatures that
follow in P, Q, and R, I think it's a four or
five-page document, she says it's not.

MR. PEARL:  I think it's P and Q
only, and I don't think it goes into R.

MR. KEAHON:  Oh.

THE COURT:  When she was
affirmative, or just could not identify.  But
in any event.

MR. KEAHON:  She said no.

THE COURT:  In any event, though,
Mr. Keahon, the question at this point in time
is a mere gatekeeping function by the court.
Familiarity was established.  She identified
it and that satisfies the requirements as far
as the people bringing it forward before the
jury.  What you bring to the court's attention
at this time is subject to your
cross-examination.

MR. KEAHON:  Thank you.

THE COURT: Is there anything else
to place on the record at this time?

People v. Lamar Whitehead

1

2          MR. KEAHON:  No.  Just so I have

3      the order straight.

4          MR. PEARL:  That's what I was going

5      to do.

6              Tomorrow, I'll bring in Georgia

7      Fortune, Mr. Luber, and we'll have detective

8      Friday -- Det. Gabriele and Det. Freiberg.

9          MR. KEAHON:  We'll never get to

10      Freiberg.

11          MR. PEARL:  I'm hopeful.  I'm still

12      hopeful for Thursday, judge.

13          THE COURT:  This is in anticipation

14      of the people's last witnesses.

15          MR. KEAHON:  Yes.

16          MR. PEARL:  I'm an optimist.

17          THE COURT:  Thank you.

18          MR. KEAHON:  Judge, I believe we'll

19      probably get done with Ms. Fortune.  I believe

20      we'll both have an hour, hour and a half with

21      Mr. Luber.  And then I am doing Det. Gabriele.

22          MR. PEARL:  Then I'll finish up

23      Det. Gabriele tomorrow.

24          MR. KEAHON:  So you'll do another

25      direct of him.

People v. Lamar Whitehead

            MR. PEARL:  Very short, to finish one of the charts.

            MR. KEAHON:  He'll be after Luber.

            MR. PEARL:  Yes, because then the handwriting will be in.

            MR. KEAHON:  Okay.

            THE COURT:  It does appear that the jury indicates that we will be able to have a sufficient number available if we go into next week, as well.

            MR. KEAHON:  I think for Thursday, we'll have Det. Gabriele and Freiberg.

            If we rest, then we've done what we said, haven't we?  With the jurors.

            THE COURT:  That is correct.

            Is there anything else to place on the record at this time?

            MR. PEARL:  Judge, there was an error in the order of protection I submitted to the court yesterday.  I had the expiration date and the issuance date, the year reversed. I'm going to ask the court to reissue that same order of protection based on the same application,

People v. Lamar Whitehead

1

2          THE COURT:  Do you wish to be heard

3     further, Mr. Keahon?  Or I'll rely on the

4     remarks made yesterday.

5          MR. KEAHON:  I do, sir.

6          THE COURT:  You wish to be heard

7     further.

8          MR. KEAHON:  No.

9          THE COURT:  Thank you.

10          To correct a typographical error,

11     the court will issue the amended order with

12     all of the essential terms heretofore with the

13     new expiration date written therein.

14          The record will also reflect that

15     Mr. Keahon will sign on behalf of Mr.

16     Whitehead.  As agent on behalf of Mr.

17     Whitehead and the court will allow you to do

18     that, as well, if you wish.

19          THE CLERK:  On the "X".

20          Let the record reflect the

21     defendant is being served with a copy of the

22     amended order of protection.

23          THE COURT:  The record will so

24     indicate.

25          Is there anything else to place on

People v. Lamar Whitehead

1
2          the record at this time?

3                    MR. KEAHON:  No.  I was just asking

4          Jodi, my other document that I was given, I

5          don't think has the indentifying -- it

6          doesn't.

7                    MS. FRANZESE:  It doesn't.

8                    I have exactly what you have.  I

9          don't have a small copy of that.  That came in

10         as is.  I was planning on copying something

11         myself onto the sheet that you have.

12                   MR. PEARL: Judge, I went through

13         Det. Freiberg's entire file today.  I took all

14         his personal handwritten notes.  I photocopied

15         it and made sure Mr. Keahon has it at least a

16         day in advance.

17                   THE COURT:  The court is most

18         obliged to you.  Let the record reflect Mr.

19         Keahon praised the prosecution.

20                   MR. KEAHON:  I did.

21                   THE COURT:  The court will stand

22         adjourned.  Mr. Whitehead, see you tomorrow

23         morning, 11:00 o'clock.

24                   (Trial adjourned to Wednesday,

25         March 19, 2008, 11:00 o'clock a.m.)

1    People v. Lamar Whitehead

2

3                    C E R T I F I C A T E

4

5              I, JENNIFER MAUE, a Senior Court

6    Reporter, do hereby certify, that the

7    foregoing matter is a true and accurate

8    transcription of my shorthand notes.

9              IN WITNESS WHEREOF, I have hereunto

10   set my hand.

11

12              _____

13                   JENNIFER MAUE

14

15

16

17

18

19

20

21

22

23

24

25