1

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK - PART 7
-------------------------------------x
PEOPLE OF THE STATE OF NEW YORK,

                              Case No.:
                              539-07

        -against-

LAMAR WHITEHEAD,


                    Defendant
-------------------------------------x

                TRIAL TRANSCRIPT

                              March 26, 2008
                              210 Center Drive
                              Riverhead, New York


B E F O R E :

        THE HONORABLE JAMES HUDSON,
        Suffolk County Judge

For the People:

        THOMAS J. SPOTA, ESQ.
        District Attorney of Suffolk County
        Economic Crimes Bureau
        North County Complex
        Building 77, Veterans Memorial Highway
        Hauppauge, New York 1788
        BY: RAPHAEL PEARL, ESQ.,
        BY: JODI FRANZESE, ESQ.,
        Assistant District Attorneys

For the Defendant:

        The Law Offices of
        WILLIAM KEAHON, ESQ.
        One Suffolk Square
        Islandia, New York

Reported By:
    Jennifer Maue,
    Senior Court Reporter

FILED

NOV 13 2009

CLERK OF SUFFOLK COUNTY

```
1    People v. Lamar Whitehead
2                  THE CLERK:  Case on trial, People
3        versus Whitehead.  All parties present outside
4        the presence of the jury.
5                  THE COURT:  Thank you.
6                  The court had reserved decision on
7        the defendant's motion for a mistrial based
8        upon the purported failure to turn over Brady
9        material, namely the fact that a witness, a
10       Mr. Taneja, had failed to identify the
11       defendant.
12                 Do you wish to be heard further at
13       this point in time, Mr. Keahon, before the
14       court rules?
15                 MR. KEAHON:  No, your Honor.
16                 THE COURT:  Do the people wish to
17       be heard further?
18                 MR. PEARL:  I think what we said at
19       the side bar was on the record.
20                 THE COURT:  Yes, pursuant to the
21       case of People vs. Robinson, 280 A.D.2d, 687,
22       and after reviewing other cases such as People
23       vs. McDonald, 287 A.D.2d, 655, as well as
24       People vs. Baxley, found at 84 N.Y.2d 208,
25       which states that "Brady material does apply
```

1    People v. Lamar Whitehead

2           not just to exculpatory material but also to

3    material which could be used to impeach the

4    testimony of a witness", that this information

5    does constitute Brady material.

6           The question becomes what is the

7    remedy at this point in time.  Under the case

8    of *People vs. Allen*, 196 A.D.2d, 976, (2'd

9    Dept) 1993, leave for appeal denied 83 N.Y.2d

10   868, and *People v. Franco*, 189 A.D.2d 589 (1st

11   Dept), leave for appeal denied at 81 N.Y.2d

12   970, the court's attention at this time should

13   focus on the overriding need to eliminate

14   possible prejudice to the defendant that could

15   arise from this.

16           Courts have also held that

17   dismissal is generally not appropriate as well

18   as the extreme remedy of a mistrial.  Under

19   the circumstances, considering the evidence

20   that was withheld, the people acted in good

21   faith.  I do not find this to be a willful

22   violation.  Good faith is immaterial in a

23   Brady violation, the court feels that the

24   people will be -- the appropriate remedy is

25   that the people will be directed to have Mr.

People v. Lamar Whitehead

1
2          Taneja ready willing and able to testify, to

3          resume his place on the witness stand, subject

4          to reopening cross-examination, by Mr. Keahon,

5          on the point in question.  The people will not

6          be allowed redirect examination.

7                This cross-examination will consist

8          of the material which was brought to the

9          attention of the court through Mr. Keahon's

10         skillful cross-examination of Det. Gabriele.

11               Your exception to the court's

12         ruling will be noted at this time, Mr. Keahon.

13         MR. KEAHON:  Yes, judge.  It is my

14         understanding that you did find a violation of

15         Brady.

16         THE COURT:  Yes, I did.

17         MR. KEAHON:  Okay.  Your Honor,

18         obviously, I renew my motion for a mistrial.

19         I do not want the witness recalled for me to

20         question him.  The damage has been done.  I

21         should have been provided with the information

22         at the appropriate time prior to the start of

23         the trial so that I had an opportunity to

24         cross-examine in a meaningful way that

25         witness.  The time has gone by, the detectives

People v. Lamar Whitehead

1

2          have spoken with him.  It would be a trap, I

3          believe, that I would be entering into, and it

4          would be damaging and prejudicial to my client

5          to go any further than I have.  And most

6          respectfully, I deny the offer of recalling

7          the witness, and me, the opportunity to

8          cross-examine.

9                  THE COURT:  You mean you're

10         declining the offer.

11                 MR. KEAHON:  Yes.  Thank you.

12                 MR. PEARL:  We did have Mr. Taneja

13         ready willing and able to testify today,

14         coming in from the city.  So the record is

15         clear, from the people's perspective, what Mr.

16         Taneja would have testified to was that not

17         that there was a negative i.d. but that in

18         fact he had too many customers at his business

19         to ever make any kind of i.d. and therefore it

20         was the people's position, it was not a

21         negative i.d. -- there was no nothing, he had

22         no knowledge of anybody because he has too

23         many customers.  That was the reason the

24         people didn't believe we had to notice it.

25                 I think I said it on the record,

```
1   People v. Lamar Whitehead
2         but I can't remember.
3               THE COURT:  It is the court's
4   feeling that case law has evolved and under
5   People vs. Robertson, that such material
6   should be noticed to the defendant.
7               MR. KEAHON:  Judge, respectfully,
8   to comment on what Mr. Pearl has said.  I
9   don't adopt what he says the witness would
10  testify to.  We know the detective testified
11  that he showed him a picture and he couldn't
12  identify him.  That's what this record shows.
13              THE COURT:  Thank you.
14              MR. PEARL:  I did speak to Mr.
15  Taneja.
16              THE COURT:  Well, remember the
17  witness advocate rule, I won't ask you to
18  affirm what a witness would or would not say
19  before the court other than the people
20  followed the court's direction to have this
21  person ready for testimony.
22              I understand your reasons, Mr.
23  Keahon, for declining to accept the court's
24  remedy.  Your exception will be noted.  Thank
25  you.
```

People v. Lamar Whitehead

1
2              Turning then to the second motion
3      for mistrial based upon the comments that were
4      made by the prosecution during the time in
5      which Mr. Whitehead was trying on a jacket.
6      We discussed a cautionary charge to the jury.
7      My understanding, Mr. Keahon, is that you wish
8      to give that cautionary charge, and once
9      again, to emphasize to the jury that your
10     client is under no duty to testify before this
11     court.
12             MR. KEAHON:  Yes, that is my
13     request, judge.
14             THE COURT:  Thank you.  That
15     cautionary instruction will be given as the
16     remedy and the motion for a mistrial is
17     denied.  Your exception will be noted to the
18     court's ruling in that regard, as well.
19             MR. KEAHON:  Thank you, judge.
20             THE COURT:  Is there anything else
21     to place on the record before I bring in the
22     jury?  I'll give the cautionary instruction
23     before receiving any further evidence.
24             MR. KEAHON:  Thank you, judge.
25             I have no objection.

People v. Lamar Whitehead

1
2          Yes, judge -- well, no, I'll do it
3   when they're offered.
4          THE COURT:  Thank you, very much.
5          Is there anything else to place on
6   the record at this time?
7          MR. KEAHON:  No, your Honor.
8          THE COURT:  All right, then.  My
9   compliments to the jury, officer.  Their
10  presence is requested.
11          (The following occurred in open
12  court with the jury present):
13          THE CLERK:  Case on trial, People
14  versus Whitehead.  The jury and all parties
15  are present.  Counsel waive the roll?
16          MR. KEAHON:  I do.
17          MR. PEARL:  I do.
18          THE CLERK:  Thank you.
19          THE COURT:  You'll recall, the
20  people made a request, words to the effect
21  they have no objection as long as they "get
22  the opportunity to cross-examine the
23  defendant.  It is testimony at this point."
24          I charge you that such a remark is
25  contrary to the law and I am strongly

Jennifer Maue, Senior Court Reporter   (631)852-2153

People v. Lamar Whitehead

1
2       emphasizing this to you, trying on a jacket is
3       not testimony.  It is a demonstration for your
4       consideration.  To call it testimony is not
5       correct, and it must not be considered as such
6       by you.  And as I have charged you already in
7       the past, and I will do so in the future, and
8       I do now under our system of law, no defendant
9       has a duty to testify or to call any witnesses
10      or to explain his action in any way in this
11      case.  The defendant may not testify and may
12      not present evidence.  You may not infer
13      anything unfavorable to the defendant from
14      this fact.  That is the law enshrined in our
15      constitution.
16             You must disregard the comment by
17      the prosecutor in this regard.  You cannot
18      consider his comment.  You must strike it from
19      your minds.  You cannot allow it to influence
20      your judgment in any way.  Can all of you
21      follow my instructions?
22                   THE JURY:  Yes.
23                   THE COURT:  Is there anyone who
24      cannot?  I'll ask each one of you
25      individually?

```
 1   DIRECT/Det. Friberg
 2                    (The Jury is polled)
 3                    THE COURT:  Thank you, all.  The
 4         people may proceed and call their next
 5         witness.
 6                    MR. PEARL:  Your Honor, the people
 7         call Det. Friberg.
 8                    (The Witness is sworn)
 9                    THE CLERK:  Detective, state your
10         name for the record, spelling your last name.
11         We need your shield number and your command.
12                    THE WITNESS:  Det. John
13         F-R-I-B-E-R-G, Shield 1229, Command 3212.
14                    THE CLERK:  Thank you.
15                    Thank you.  Good morning, once
16         again, detective.
17                    Although you'll be asked questions
18         by a person at the lectern would you be so
19         kind to face the jury when you give your
20         answers and speak into the microphone.
21   DIRECT EXAMINATION
22   BY MR. PEARL:
23         Q.   Det. Friberg, are you currently employed?
24         A.   Yes, I am.
25         Q.   By whom?
```

```
 1    DIRECT/Det. Friberg
 2              A.    The Suffolk County Police Department.
 3              Q.    And in what capacity are you so employed?
 4              A.    I'm a detective.
 5              Q.    And how long have you been employed by the
 6    Suffolk County Police Department?
 7              A.    Approximately 19 years.
 8              Q.    How long have you been a detective?
 9              A.    Approximately five years.
10              Q.    What is your current assignment?
11              A.    I'm assigned to the Computer Crimes Unit.
12              Q.    And what if anything are your duties and
13    responsibilities with the Computer Crimes Unit?
14              A.    My duties entail investigating any crimes
15    related to computer-related crimes, and also
16    conducting forensic examinations for other units in
17    the police department.
18              Q.    Do you have any training regarding
19    computer forensics?
20              A.    Yes, I do.
21              Q.    Can you please tell the jury your training
22    involving computer forensics?
23              A.    I received numerous -- I've attended
24    numerous training courses, approximately two to three
25    weeks per year.
```

DIRECT/Det. Friberg

Q.    And do you hold any certifications?

A.    Yes, I do.

Q.    Tell the jury what if any certifications you hold?

A.    I have obtained a bachelor's degree in computer information systems, of the two certifications related to computer forensics that I hold, one is from Guidance Software, which is the company that manufactures the forensic software that I utilize most of the time.  That certification is called the ECEC, which is the Encase Certified Examiner Certification.

Q.    Detective, tell the jury how you go about analyzing a computer, generally?

A.    What I do when I analyze a computer, I take the computer, I remove the media from the computer, such as the hard drive.  I then connect that to what is called -- I use a fast block device, it is a write protection device, I connect it to that device so no changes are made to the computer media that I'm analyzing.

Q.    Detective, one second.  You indicated you had removed the hard drive.  What is a hard drive?

A.    The hard drive is the storage area within

DIRECT/Det. Friberg

the computer for long-term storage.

     Q.   Then you indicated you use a fast block device, is that correct?

     A.   Yes.

     Q.   What is a "fast block device"?

     A.   That is the write protection device when I connect it to there, and when I'm going to look at that hard drive or make an image of it, it ensures no changes are made to that media.

     Q.   When you say you make "an image" of the hard drive, what do you mean by that?

     A.   I create an exact duplicate of the information that is available on the hard drive, all the information available on it.

     Q.   Why do you do that?

     A.   So I have an accurate representation of the information that was on the hard drive at the time that I obtained it.

     Q.   When you do your analysis, what specifically are you analyzing?

     A.   I analyze all the data that was available on the hard drive.  I create the image and I look at that duplicate image.

     Q.   When you analyze the computer, you analyze

DIRECT/Det. Friberg

the actual mirror image of the hard drive you made?

    A.   Correct.

    Q.   Why don't you analyze the original hard drive?

    A.   I want to make sure nothing is changed in the hard drive. I want to make sure it is, it is in the same condition as it was when I received it.

    Q.   How do you go about analyzing the mirror image of the hard drive?

    A.   I analyze the mirror image of the hard drive using a computer program Encase for Software. That software allows me to look at all the files and all the data that was on the hard drive, even data from files that have been deleted.

    Q.   When you say "all the data" on the hard drive, what do you mean by that statement?

    A.   Well, like I said, I can look at the data for all the files that are currently still on the hard drive, as well as files that have been deleted. Typically when a file is deleted, the information isn't removed from the hard drive. The index or pointer to that information is just removed, but I can still actually go to the hard drive and look at where that information is stored.

```
1    DIRECT/Det. Friberg
2         Q.    Is there a name for that type of storage
3    on the computer?
4         A.    That type of storage from stuff that has
5    been deleted, or pointers to what has been deleted,
6    that is referred to as unallocated areas of the hard
7    drive.  Allocated areas mean it is allocated to a
8    file.  Unallocated means it is no longer allocated to
9    the file but it is still out on the hard drive.
10        Q.    Detective, did there come a time when you
11   came into possession of a computer system, Serial No.
12   N824CD1005690?
13        A.    Yes.
14        Q.    And when?
15        A.    January 30th of 2006.
16        Q.    And how did you come in receipt of that
17   computer system?
18        A.    I received that from Det. Gabriele.
19        Q.    What type of computer system was it?
20        A.    It is a Gateway laptop computer.
21              MR. PEARL:   Your Honor, may I have
22        People's 151 shown to Det. Friberg?
23              THE COURT:   Yes.  Officer, if you
24        would?
25              (Handing)
```

DIRECT/Det. Friberg

THE COURT OFFICER:  People's

Exhibit 151.

Q.   Detective, do you recognize People's 151?

A.   Yes, I do.

Q.   What if anything do you recognize People's

151 to be?

A.   It is the Gateway laptop that I received

from Det. Gabriele that I was referring to.

Q.   How do you know that to be the same

Gateway laptop that you received from Det. Gabriele?

A.   Because I placed an evidence tag on the

laptop with the case number, my name, the date that I

received it.  It is in my handwriting and the tag is

still on the back of the laptop.

Q.   Can you hold the computer system up and

show the jury where the tag is?

A.   The white tag over here (indicating).

Q.   Let the record reflect my right-hand side

of the computer system, your left-hand side?

A.   Correct.

THE COURT:  The record will so

indicate.

Q.   Is there a serial number on that computer

system?

DIRECT/Det. Friberg

A.   Yes, there is.

Q.   Please read that serial number of that computer system into the record?

A.   It is "N824CD10056690."

Q.   Thank you.  Detective, what if anything did you do with that computer system after coming into receipt of it on January 30th, 2006?

A.   Well, I removed the hard drive from the laptop.

Q.   How did you do that?

A.   There is a lid on the -- on the bottom of the hard drive, of the laptop, here.  I removed the screw from that lid, and the hard drive is underneath that lid.  I disconnected it from the laptop.

Q.   What if anything did you do next?

A.   I created a photocopy of the top of the hard drive, and I connected that hard drive up to a fast block device, and utilizing the Encase for Software, I created a forensic exact image of the data that was available on that hard drive.

Q.   Detective, when you removed the hard drive from that computer system?

A.   Yes.

Q.   Was there any information indicating the

DIRECT/Det. Friberg

manufacturing date of that hard drive?

      A.   Yes, there was.

      Q.   What if anything was the manufacturing date of the hard drive?

      A.   November of 2004.

      Q.   When you received that computer system -- is the computer system in the same condition as when you received it but for having the tag that you placed on it?

      A.   Yes.  Actually, I took the battery out of the case, here, and taped it to the case and then just put this evidence tape on it and my label.

      Q.   What if any component or peripheral systems were associated with that computer system when you received it on January 30th of 2006?

      A.   This laptop computer has a Linksys wireless access card that is inserted into the side of the laptop, here.

      Q.   In fact, when you received that computer system, was the Linksys wireless card inserted as it is today?

      A.   Yes.

      Q.   Have you ever removed that card from the computer system?

DIRECT/Det. Friberg

A.   Yes, I have.

Q.   And can you tell the jury what is a Linksys wireless card?

A.   A wireless access card is just a type of network card that allows you to connect to a network, wireless, so you don't have to plug in the wired cable to it, to connect into a network and perhaps into the Internet after that.

This wireless will talk to wireless access points that are normally hard-wired into other network devices.

Q.   So that computer system was capable of looking into the Internet?

A.   Yes.

Q.   Through a wireless Internet router?

A.   Yes.

Q.   Are you familiar with the term "war driving"?

A.   Yes, I am.

Q.   What if anything is war driving?

A.   War driving is the process of taking a wireless capable device, such as a laptop with a wireless card in it, and driving around and looking for wireless access points.

DIRECT/Det. Friberg

Q. Detective, when you analyzed that computer system, were you able to determine what type of software package was on the hard drive?

A. Yes, it had a Microsoft Windows XP operating system.

Q. How were you able to determine that?

A. That information is stored in the registry files of the hard drive.

Q. Were you able to determine whether Microsoft Windows XP software was installed on that computer system?

A. Yes, I was.

Q. When was it installed?

A. December 29th of 2004.

Q. In fact, is that consistent with the hard drive being manufactured in November of 2004?

A. Yes.

Q. Can you explain why?

A. Typically, the hard drive manufacture is separate from the laptop manfacture. The hard drive is made by one company, and it is sold to the laptop company, in this case Gateway, who then puts it in the laptop and installs the operating system and sells it.

DIRECT/Det. Friberg

Q.   Detective, did there come a time that you searched the mirror image of that hard drive? Correct?

A.   Yes.

Q.   What if anything were you searching that hard drive for?

A.   I was requested to search for information relating to any identity thefts, as well as information relating to the ownership or operation of the laptop.

Q.   And you did that in the manner you previously testified to, about how you analyzed computers?

A.   Yes.

Q.   In reference -- did there come a time when you searched that computer for pictures?

A.   Yes, I did.

MR. PEARL:  Your Honor, may I have this marked as People's 182.

People's 212.

THE COURT OFFICER:  People's Exhibit 212 marked for identification only.

(People's Exhibit 212, marked for identification)

```
 1   DIRECT/Det. Friberg
 2                   THE COURT:  Thank you, officer.
 3   BY MR. PEARL:
 4        Q.   Detective, do you recognize what has been
 5   marked for identification as People's 212?
 6        A.   Yes, I do.
 7        Q.   What if anything do you recognize People's
 8   212 to be?
 9        A.   These are some of the photographs that I
10   recovered off of the image of the laptop that I
11   created in this case.
12        Q.   Are those an exact reproduction of the
13   images that you were able to view on the hard drive
14   of that laptop computer system?
15        A.   Yes.
16                   MR. PEARL:  Your Honor, may I have
17             these three exhibits marked People's 213, 214,
18             and 215.
19                   THE COURT OFFICER: People's 213,
20             214 and 215, for identification only.
21                   THE COURT:  Thank you.
22                   (People's Exhibits 213-215, marked
23             for identification)
24        Q.   Detective, do you recognize what has been
25   marked for identification as 213, 214 and 215 for
```

```
1    DIRECT/Det. Friberg

2    identification?

3           A.   Yes, I do.

4           Q.   What if anything do you recognize those

5    exhibits to be?

6           A.   These are portions --

7           Q.   Generally speaking?

8           A.   -- of files that I recovered off of the

9    image of the hard drive, that I was analyzing in

10   reference to this case.

11          Q.   Once again, those are exact reproductions

12   of the documents that you -- the documents you found

13   on that hard drive system?

14          A.   They are portions of the documents that I

15   recovered off the hard drive.

16          Q.   They're in the same condition as when you

17   printed them out?

18          A.   The parts that remain, yes.

19               MR. PEARL:   Your Honor, People move

20          212 through 215 into evidence.

21               THE COURT:   Thank you.

22               Thank you, officer.  Show them to

23          defense counsel, please.

24               (Handing)

25               MR. KEAHON:   Thank you.
```

DIRECT/Det. Friberg

No objection on 212.  No objection

on 215.  I'd like to be heard on two of the

documents.

THE COURT:  Yes.  See you at side

bar.

(The following occurred at side

bar):

THE COURT:  I'll hear you, counsel.

MR. KEAHON:  Exhibit 214 has no

date so we don't know whether it is within the

time period of the Indictment, or not.

And 213 has a date on it of

September 1, 2005, which is clearly outside

the date.

THE COURT:  Do you wish to be heard

as to any of the other ones at this time while

we're at side bar?

MR. KEAHON:  No, I have no

objection to the other ones.

MR. PEARL:  The only purpose these

exhibits are being offered is for control and

possession of the computer system.  The people

aren't offering it for the truth of anything,

including the date of the computer.  It is a

DIRECT/Det. Friberg

weight question and an admissibility question.

                    THE COURT:  Mr. Keahon, anything

further?

                    MR. KEAHON:  Yes, judge.

                    Who cares, respectfully, whether or

not he has these items on his computer in

September of 2005?  It is not relevant to any

of the proof that we've taken.

                    THE COURT:  Well, something like a

driver's license found at a particular

location, after an event, can still be used to

infer ownership or possession or control at an

earlier time.  The court is inclined to agree

with the people, that the objection goes to

the weight if any the jury will afford this

evidence but not to its admissibility

particularly in light of the redactions which

the court has directed the people, to remove

any that I feel to be possibly prejudicial

information.

                    Over your objection, your exception

will be noted.  They will be admitted into

evidence.

                    MR. PEARL:  Those redactions have

```
 1   DIRECT/Det. Friberg
 2           already been reviewed by Mr. Keahon and they
 3           are all acceptable.  That is my understanding.
 4                   THE COURT:  Thank you.
 5                   (The following occurred in open
 6           court):
 7                   THE COURT:  Officer, the record
 8           will reflect that People's 212 to 215 have
 9           been admitted into evidence.
10                   MR. PEARL:  After those are marked
11           in, may I publish those to the jury using the
12           presenter.
13                   THE COURT:  Yes.
14                   THE COURT OFFICER:  212 through
15           215, marked and received into evidence.
16                   MR. PEARL:  Thank you, officer.
17                   (People's Exhibits 212-215, marked
18           for identification and received in evidence).
19   BY MR. PEARL:
20           Q.   Detective, I'm showing you what's in
21   evidence as People's 212.  You testified these were
22   photographs you found off of the computer system that
23   you were analyzing?
24           A.   Yes.
25           Q.   And is this all the photographs or just a
```

DIRECT/Det. Friberg

sampling of the photographs?

    A.   Just a sample.

         MR. KEAHON:  Could you put it more in focus for me?  Thanks.  Can you make it a little lighter?

    Q.   Detective, what is number one on this document?

    A.   It is a file called Picture 009.JPG.  It was located in the Documents & Setting Owner Profile, My Documents, Picture, Picture Folder.

    Q.   Where was this second photograph recovered from?

    A.   That was the same folder, and it's titled Picture 010.JPG.

    Q.   Where was that photograph, or JPG, recovered from?

    A.   That was the same folder.

    Q.   The next photograph?

    A.   That was the same folder, also.

         MR. KEAHON:  Can you make that a little clearer?

         MR. PEARL:  I don't think it is going to come in any more in focus.  Can you see it.

DIRECT/Det. Friberg

1

2                MR. KEAHON:  Yes, thanks.

3      Q.   The next photograph.   From where did you

4 get that?

5      A.   That was the same folder.

6                MR. PEARL:  Can the jury see?

7                THE JURY:   Yes.

8      Q.   That was -- My Documents, the Owner

9 folder?

10      A.   The Profile is called "Owner".  Then it is

11 My Documents, My Picture, My Pictures, picture

12 folder.

13          That is also in My Documents, same folder.

14          That one is the same folder, also.

15      Q.   Here is the next photo contained in this

16 document?

17      A.   Yes.  That is the same folder.

18      Q.   That photograph?

19      A.   That one is in the same folder also.

20      Q.   That photograph?

21      A.   That one is in the same folder also.

22          That was from the same folder also. And

23 that one also.  And that was the same folder.

24      Q.   That was the same folder also?

25      A.   And that was the same folder.

DIRECT/Det. Friberg

Q.   And if you could slide that over to the left a little?

A.   Actually, that is in the Documents and Setting, Owner, My Documents, My Pictures, Kodak pictures folder.  That is in the Kodak Pictures folder, also.  The top one is the Kodak Pictures folder.  If you can zoom that out a little bit?   A little bit more, please.

That is in the My Pictures picture folder. It is is the My Documents, My Picture, picture folder.  That one is the same as the last one, and that one is the same as the last one also. That's the same as the last one, also.  And that is the same one as the last one.

Q.   Once again, is that all the photographs contained on the computer system?

A.   No, it's not.

Q.   Were there other photographs contained on that computer system depicting that male in the blue suit?

A.   Yes, there were.

Q.   By the way, when you analyzed this computer system, were you able to determine how many users were on that computer system?

DIRECT/Det. Friberg

      A.   Well, there were -- there was one profile that was actually utilized on that system.

      Q.   What was the one profile on that computer system?

      A.   It was called, "Owner."

      Q.   Are you familiar with the Microsoft Windows XP software package?

      A.   Yes.

      Q.   When you say there was one profile, meaning "Owner", what if anything do you mean by that?

      A.   There is one profile that is utilized on that computer.  There were several other profiles that were not utilized and being logged into. Typically, different users can create their own profiles, and you would notice that if you were starting the Windows XP operating system, you would see a different icon for each user that you could click into, and they would have their own set of My Documents, and their own Desktop, and the like.  This computer only had the Owner Profile utilized.

      Q.   I'm showing you what is in evidence as People's 213?  Do you recognize People's 213.

      A.   Yes.

DIRECT/Det. Friberg

Q.   In fact, in the left-hand corner, do you recognize that handwriting?

A.   At the bottom right-hand corner, that -- yes, my handwriting, my initials, and my shield number.

Q.   What if anything do you recognize People's 213 to be?

A.   That is a file that I recovered off of that computer, or a portion of a file that I recovered off that computer -- that laptop.

Q.   From where specifically did you recover this file?

A.   That file, was in a folder called "Recycler".  That recycler folder is typically -- or it is actually -- it's represented on the computer by the Recycle Bin.  So when you delete a file and it goes to the Recycle Bin, the more formal name in this computer system is actually Recycler, that is the file I found it in.

MR. KEAHON:  Can I have the number.

MR. PEARL:  213.

Q.   What if anything is People's 213, specifically?

A.   That is a file, it was called FAX1.TIF.

```
 1    DIRECT/Det. Friberg

 2    That is an image file.  The top of it -- the front

 3    page appears to be a fax cover sheet and there's some

 4    information on the top of that page that looks like

 5    information that would come over from a fax machine.

 6    The cover page says, "To: Lamar Whitehead."

 7         Q.   What is an "image file"?

 8         A.   An image -- it is a graphical

 9    representation of a file.

10         Q.   Page 2 of People's 213, this was also part

11    of that document?

12         A.   Yes.

13         Q.   But for the redacted portions, it is in

14    the same condition as it was when you printed it out

15    from the hard drive?

16         A.   Yes, it is.

17         Q.   It lists an applicant name of "Lamor

18    Whitehead"?

19         A.   Correct.

20         Q.   Social Security Number ending in 3869.

21    Applicant Address, 92 Howland Avenue, Teaneck, New

22    Jersey?

23         A.   Yes.

24         Q.   This was an additional page of that same

25    document?
```

```
1   DIRECT/Det. Friberg
2          A.   Yes.
3          Q.   But for the redacted portion, it is in the
4   same exact condition as when you printed it out?
5          A.   Yes, it is.
6          Q.   What name does it list on this document?
7          A.   "Whitehead", "Lamor", does that twice, and
8   then "Whitehead", "Lamor Miller".
9          Q.   With the Social Security Number ending in
10  3869?
11         A.   Yes.
12         Q.   Take a look at what is in evidence as
13  People's 214.  Do you recognize this document?
14         A.   Yes, that is a portion of a document that
15  I recovered off of that laptop.
16         Q.   What if anything specifically -- this is a
17  document listing the name "Lamor Whitehead" with the
18  address "92 Howland Avenue, Teaneck, New Jersey"?
19         A.   Yes, it is.
20         Q.   Show you a two-page document that is in
21  evidence as People's 215?   Do you recognize -- just
22  going back to 214, where was 214 recovered from?
23         A.   That was in a folder Documents and
24  Setting/Owner/My Documents.
25         Q.   Finally, I show you what is in evidence as
```

DIRECT/Det. Friberg

People's 215, a two-page document.  Do you recognize Page 1 of this two-page document?

A.    Yes, I do.

Q.    Do you recognize Page 2 of the document?

A.    Yes.

Q.    What if anything do you recognize People's 215 to be?

A.    That was a PDF document that was located on the owner's desktop.  It would have appeared as an icon right on the desktop of the computer.

Q.    What do you mean when you say, "a PDF"?

A.    PDF, is "Portable Document Format". People refer to it as an "Adobe Acrobat" file.

Q.    On the top of the page it listed, "L. Whitehead Profit & Loss Statement, period January 2005 through March 2005"?

A.    Yes.

Q.    And on Page 2, of People's 215, it once again lists a caption, "L. Whitehead", with a profit & loss statement, for the period April 2005 through May 2005?

A.    Yes, it does.

Q.    Detective, once again, was this all of the documents you found on that computer?

DIRECT/Det. Friberg

    A.   No, it was not.

    Q.   Were there any other documents that you found on the computer system, with reference to any kind of poetry and music?

    A.   Yes, there were.

    Q.   And can you tell -- did you print those out?

    A.   No, I did not.

    Q.   What did you do with that on the computer system?

    A.   In the Owner's Profile, My Documents folder, there were three documents in there that had the term "La" or "L-A" as part of the name.  They appeared to be either poems, or music lyrics, or something to that effect.

          MR. PEARL:  Your Honor, may I have these marked as People's 216, 217, 218, 219, 220, and 221 for identification, please.

          THE COURT:  Thank you.

          (People's Exhibits 216-223, marked for identification)

          THE COURT OFFICER: People's Exhibits 216 through 223, marked for identification only.

DIRECT/Det. Friberg

             MR. PEARL:  Thank you.  May I have

        those shown to Det. Friberg, please?

BY MR. PEARL:

        Q.   Detective, take a look at those documents.

Let us know when you've completed reviewing them?

             Detective, do you recognize People's 216

through 223?

        A.   Yes, I do.

        Q.   What if anything do you recognize those

documents to be?

        A.   This first document is just information

that I recovered off of the computer hard drive that

I've documented.  The rest of them are...

        Q.   Generally speaking, now?

        A.   Some of them are documents.  Some of them,

just information about Internet history items.

        Q.   And in fact, are they all documents that

you printed, after analyzing the hard drive of that

laptop computer system?

        A.   Yes, they are.

        Q.   Are they the exact duplications of what

you viewed on the computer screen?

        A.   Yes.

        Q.   In your analysis of that laptop?

```
 1    DIRECT/Det. Friberg

 2              A.   Yes.

 3              Q.   And they're in the same or substantially

 4    the same condition?

 5              A.   Yes.

 6              Q.   How do you recognize those documents?

 7              A.   I placed my initials and shield number on

 8    the bottom of the document.

 9              Q.   Each document?

10              A.   Yes.

11                        MR. PEARL:   Your Honor, at this

12              time, People move 216 through 223 into

13              evidence.

14                        THE COURT:   Officer, show them to

15              Mr. Keahon, please.

16                        (Handing)

17                        MR. KEAHON:   I have no objection,

18              judge.

19                        THE COURT:   Thank you.   The record

20              will reflect that People's 216 through 223

21              have been admitted into evidence.

22                        MR. PEARL:   May I publish those

23              exhibits after they are marked in, on the

24              presenter?

25                        (People's Exhibits 216-223, marked
```

DIRECT/Det. Friberg

1          for identification and received in evidence)

2                         THE COURT OFFICER: People's 216

3          through 223, marked and received into

4          evidence.

5                         MR. PEARL:  May I publish the

6          documents, your Honor?

7                         THE COURT:  Yes.

8          Q.    Detective, I'm showing you what is in

9    evidence as People's 223.  Do you recognize People's

10   223?

11         A.    Yes, I do.

12         Q.    What -- can you see that over the box?

13         A.    Yes.

14         Q.    What if anything do you recognize People's

15   223 to be?

16         A.    This is some information I recovered off

17   the hard drive of the computer that I was analyzing.

18   I recovered it from that area called "Unallocated

19   Clusters", it is data that doesn't have a pointer to

20   it anymore but I was able to search the portion of

21   the deleted data.  This portion is a cookie, what is

22   called "a cookie".

23         Q.    Tell the jury generally speaking what is a

24   "cookie"?

DIRECT/Det. Friberg

A.   Cookies are a little bit of data that a web server will hand down to the client when you view a web page so the people that write the programs for the web page, if they want to store some information on your computer, typically to remember who you are the next time you visit, it will send that information down to your computer.  So the next time your computer visits that web page, that information from the cookie goes back up to the server so they can remember who you are.

Q.   Do you know what an "IP", "Internet Protocol", address is?

A.   An IP address is an address that's assigned to computers when they talk on the Internet. It is like a telephone number so one computer will be able to find another computer that is on the Internet.

Q.   On this server cookie that is in evidence as People's 223, is there an IP address associated with this cookie?

A.   There is an IP address inside that cookie, yes.

Q.   What is the IP address?

A.   72.23.42.61, the information right at the

DIRECT/Det. Friberg

beginning, after the word "server cookie".

    Q.    I think you indicated that was recovered off an unallocated space?

    A.    Correct.

        MR. PEARL:  I'm sorry, detective, I went a little bit out of order.

        (Pause)

    Q.    We'll go back and start at the beginning, 216.  Do you recognize specifically now what is People's 216?

    A.    Yes.  It is two pieces of information that I recovered off of the computer, the hard drive that I was analyzing.

    Q.    Under the number one on the item, item number one, do you recognize what item number one is?

    A.    Yes, that is some information that I received that I recovered out of unallocated clusters.  That information over there denotes that a visitor, a user on that computer, visited a web site.

    Q.    Can you tell the jury, can you tell them using the printout, what web site they used, this computer visited?

    A.    Yes, *www.ancestry.com*.

    Q.    Was there any other information contained

DIRECT/Det. Friberg

within that printout?

    A.   Yes, the full address that they visit has information in there detailing whoever was going to that web site.  Some of the information submitted to that, first name equals Lamar, last name equals Whitehead, and MLLRWH -- WHITEMILLR.com.

    Q.   If somebody went to Yahoo.com to look up the ancestry of Lamar Whitehead?

    A.   That information was submitted, yes.

    Q.   Item number two, what if anything do you recognize item number two, on People's 216, to be?

    A.   That is just some more information that I located on that computer.  That particular information is the details of an icon that was located on the desktop, the owner's desktop.

    Q.   When you say "an icon that was located on the owner's desktop", what do you mean by that?

    A.   When you start up the computer, there is the desktop, the background, where those little images are on your desktop.  This was an icon, or little image on the desktop, that you can click on. If you clicked on it, it would take you to a particular web site.

    Q.   In reference to this shortcut on the

DIRECT/Det. Friberg

1  DIRECT/Det. Friberg

2  desktop, specifically if you click on it, where would

3  the user go on this laptop computer?

4       A.   It would take you to the web site that is

5  denoted there, as http://www.dealertrack.com\credit

6  bureau\cbw.asp?eq=yes:www.dealertrack.com/credit

7  bureau/cbrequest.asp?newrr=yes.

8       Q.   Do you know what *dealertrack.com* is?

9       A.   Yes, it is a web site for a company called

10  Dealer Track.

11       Q.   When you get to that web site --

12                 MR. KEAHON:  I'm sorry, I didn't

13       hear the response.

14                 THE COURT:  You can repeat your

15       answer.

16       A.   It is a web site for a company called

17  Dealer Track.

18       Q.   When you go to the web site, what if

19  anything are you prompted to do?

20       A.   There is -- there is several -- there is

21  just information about the company and information

22  where you can log on.

23       Q.   What do you mean information to log on?

24       A.   There is a link on there.  When I visited

25  that, you could click on it and log onto the web

Jennifer Maue, Senior Court Reporter   (631)852-2153

DIRECT/Det. Friberg

site.  There is a user name and password type of
format.

    Q.  To access into the Dealer Track program,
you use the user name and password?

    A.  Correct.

    Q.  217 in evidence, showing you 217 in
evidence.  Do you recognize People's 217?

    A.  Yes, I do.

    Q.  What if anything do you specifically
recognize 217 to be?

    A.  That is a file that I recovered out of the
desktop -- Documents and Setting Owner Profile Local
Settings Temporary Internet Files Folder.  There is
folders within that folder that store information
that your computer receives when you visit a web
site.

    If you go to a web site, before you get to
view it on your screen, that web page will be
downloaded into that location, and then you can view
it.

    Q.  Specifically, this was a temporary
Internet file, to what Internet site?

    A.  Actually, the full Internet site .I don't
have the full Internet site.  But the web page says

DIRECT/Det. Friberg

E-Loan, loan status.

Q. The loan status it says "Hello, Lamor Whitehead"?

A. Correct.

Q. "Welcome to E-track, a secure environment for you to monitor the status of your loan"?

A. Yes.

Q. Then it goes on to say, just more general information?

A. Yes.

Q. Showing you what is in evidence as People's 218. Do you recognize People's 218?

A. This is another document that I recovered out of the temporary Internet files, folders. And it is, it appears somebody is applying for a loan.

Q. What are the names under the block where it says "first name" and "last name"?

A. "Lamor Whitehead".

Q. E-mail address?

A. Miller white white miller Yahoo.com. The printout doesn't display the rest of it, but the printout behind the page displays Yahoo.com.

Q. Where was this document recovered from?

A. Temporary Internet file folders.

DIRECT/Det. Friberg

Q.   This appears to be for an E-Loan page?

A.   Correct.

MR. KEAHON:   I didn't hear the last question and answer.

THE COURT:   Would you like it read back?

We'll have it read back, then.   If you would be so kind.

(Record read)

Q.   Showing you what's in evidence as People's 219.   Do you recognize People's 219?

A.   Yes, I do.

Q.   What if anything do you specifically recognize People's 219 to be?

A.   That was another web page file I recovered out of the temporary Internet files folder.

Q.   And it had -- some type of MBNA logo.   Can you tell the jury what that means?

A.   Actually, on the way that people write web pages, they'll embed pictures in the web page.   When the picture can't be displayed, sometimes they'll stick in alternative text, so that would appear there, on the original page, there was a logo there for MBNA.

DIRECT/Det. Friberg

Q.   Under the MBNA logo -- word, it says,
"Lamor Whitehead MBNA America your application
reference number is 056501280052."

THE COURT:   Please continue.

Q.   Then it says, "please record this number
for your future reference."

A.   Yes.

Q.   I'm showing you what's in evidence as 220.
Before I do a close-up of it, do you recognize
People's 220?

A.   Yes.  Yes, I do.

Q.   What if anything do you recognize People's
220 to be?

A.   That is information I located on the
computer.  It was found in a file called Index.dat,
This particular Index.cat file tracks people's
Internet history.  So when you go to a web page, it
can make an entry into that Index.cat file just to
keep track of the web surfing history.

Q.   The dates of these files are what?

A.   January 26th, 2005.

Q.   For a series of times on that same date?

A.   Yes.

Q.   And where if anywhere was the user of this

DIRECT/Det. Friberg

1   laptop computer system visiting, as per this

2   document?

3       A.   Https:\\www.dealertrack.com, and there is

4   some other information at the end of it, in reference

5   to Equifax.

6       Q.   These file numbers at the end, do you see

7   that?

8       A.   Yes.

9       Q.   Generally speaking, what are these final

10  numbers?

11      A.   It says, "request i.d." equals, and it is

12  a long, long number.  That type of information is

13  typically an I.D. number, to refer back to a unique

14  transaction.

15      Q.   Within the Dealer Track system?

16      A.   Correct.

17      Q.   I show you People's 221 in evidence.

18  Generally speaking, do you recognize People's 221?

19      A.   Yes, I do.

20      Q.   What if anything do you recognize People's

21  221 to be?

22      A.   This is some data that I recovered out of

23  the unallocated clusters area of the hard drive, for

24  a file that previously has been deleted.  The code

DIRECT/Det. Friberg

that it is written in, is something called HTML, that

is the code that is normally used to write web pages,

and it is some information about your loan

application has been submitted successfully on April

20th, 2000 -- it says, "We will contact you on April

20th, 2005 at your home number, (718)512-5286."

Q.   But for the redacted portions, this is

exactly what you were able to view after you printed

it out from the unallocated space of the hard drive?

A.   Correct.

Q.   I want to show you what is in evidence as

66.  It is a record already in evidence.

Read the second to last number on this

document, please?

A.   I'm sorry.

Q.   The second to last phone number on the

document?

A.   (718)512-5016.

Q.   The last number on Page 1 of 66?

A.   (718)512-5286.

Q.   That is the same phone number that you

recovered off of unallocated space, off the laptop

computer system you were analyzing?

A.   Yes.

DIRECT/Det. Friberg

Q.   Where it says, "We will contact you on

4/20/05 at your home"?

A.   Yes.

Q.   I think I've already showed you People's

223.   The last document is People's 222, that is in

evidence.

Generally speaking, do you recognize

People's 222?

A.   Yes.

Q.   What specifically is People's 222?

A.   That is another cookie that I located on

the laptop computer that I was analyzing.

Q.   Is there an Internet protocol address

associated with this cookie?

A.   Yes, there is one there, embedded into

that top i.d. number.

Q.   Can you read the Internet protocol address

found on this laptop computer you were analyzing?

A.   Sure, it's 24.191.239.112.

MR. PEARL:   Judge, can I have this

final set of exhibits marked.   I think we're

up to 224?

THE COURT:   Correct.

(People's Exhibits 224-231, as

DIRECT/Det. Friberg

1                described, marked for identification)

2                        THE COURT OFFICER: Exhibits 224

3        through 231, marked for identification only.

4                        MR. PEARL:  Thank you.

5                        May I have the exhibits shown to

6        Det. Friberg, please.

7                        (Handing)

8                Q.   Please take a look at those exhibits and

9        when you're done, tell the jury if you recognize them

10       generally speaking?

11               A.   Yes, I do.

12               Q.   Generally speaking, what are People's 224

13       through 231?

14               A.   They all related to items that I recovered

15       from, and information I recovered off of, that laptop

16       that I was analyzing.

17               Q.   Are they exact printout or reproductions

18       of what you were able to view off of the laptop that

19       you were analyzing?

20               A.   Yes.

21               Q.   And you recognize them to be those, how?

22               A.   They have my initials and shield number on

23       the bottom, all of them, portion.

24               Q.   And they're in the same or substantially

```
 1    DIRECT/Det. Friberg
 2    the same conditions as when you printed them out?
 3              A.   Yes.
 4                        MR. PEARL:  Your Honor, at this
 5              time, the people move 224 through 231 into
 6              evidence.
 7                        THE COURT:  Show them to Mr.
 8              Keahon, please.
 9                        MR. KEAHON:  Thank you.
10                        (Handing)
11                        MR. KEAHON:  I have no objection on
12              any of the exhibits.
13                        THE COURT: Thank you, Mr. Keahon.
14              The record will reflect that People's 224
15              through 231 will be admitted into evidence.
16                        MR. PEARL:  Once they are marked,
17              can I publish them to the jury.
18                        THE COURT:  Yes.
19                        THE COURT OFFICER: People's
20              Exhibits 224 through 231, marked and received
21              into evidence.
22                        (People's Exhibits 224-231, marked
23              for identification and received in evidence)
24                        MR. PEARL:  Thank you, officer.
25                        (Handing)
```

Jennifer Maue, Senior Court Reporter   (631)852-2153

DIRECT/Det. Friberg

1

2       Q.   Detective, I'm showing you what is in

3    evidence as People's 224.  Specifically now, do you

4    recognize People's 224?

5       A.   Yes, I do.

6       Q.   Specifically what do you recognize

7    People's 224 to be?

8       A.   That's another cookie that I recovered off

9    the laptop that I was analyzing.

10      Q.   From where was this cookie generated?

11      A.   That cookie was a cookie for E-Loan.

12      Q.   And where if anywhere did you find this

13    cookie on that laptop computer system you were

14    analyzing?

15      A.   The cookies are stored in the location

16    Documents And Settings Owners, documents and settings

17    owners cookies.

18      Q.   What specifically is the cookie that you

19    found on that laptop computer system, if you can read

20    it into the record?

21      A.   The i.d. number 70.23.

22          (Reading)71.44.46961107209929955.

23      Q.   I'd like to show you what -- People's 38

24    in evidence, an E-Loan application in the name of

25    Maria Macarle.

```
 1  ║  DIRECT/Det. Friberg
 2  ║           Is there a cookie associated with this
 3  ║  E-Loan application?
 4  ║           A.   Yes, there is.
 5  ║           Q.   And is that the same cookie that you
 6  ║  located on that laptop computer system that you
 7  ║  recovered from -- that you analyzed?
 8  ║           A.   Yes, it is.
 9  ║           Q.   I'd like to show you what is in evidence
10  ║  as People's 39.  This is an E-Loan application in the
11  ║  name of Nerina Sperl.
12  ║           Do you see a cookie associated with this
13  ║  E-Loan application?
14  ║           A.   Yes, I do.
15  ║           Q.   Once again, I'm showing you People's 224.
16  ║  Is that the same cookie that you found on that laptop
17  ║  computer system you were analyzing?
18  ║           A.   Yes, it is.
19  ║           Q.   Finally, I'm showing you what is in
20  ║  evidence as People's 45, an E-Loan application in the
21  ║  name of Gloria Conaty.  Is there an E -- is there a
22  ║  cookie associated with this E-Loan application in the
23  ║  name of Gloria Conaty?
24  ║           A.   Yes, it is.
25  ║           Q.   Is the cookie that I'm showing you,
```

DIRECT/Det. Friberg

People's 224, is the cookie that you found on that laptop computer system, once again, the same cookie as generated by E-Loan, on the Gloria Conaty E-Loan application?

A.   Yes, it is.

Q.   Detective, I'm going to be showing you now what is in evidence as People's 225.   On this document, your initials are on the top portion of the letters, Page 1?

A.   Correct.

Q.   Do you specifically recognize what this document is?

A.   That's another E-Loan cookie located off of the hard drive that I was analyzing in reference to this.

Q.   Could you please read -- this E-Loan cookie was recovered from where?

A.   Off the hard drive.   It was an allocated file in the cookies folder, the i.d. number 70.23.42.61.1955110910955892.

Q.   Detective, could you tell the jury how a cookie gets onto a computer system?

A.   Yes, when a visitor -- when a user is surfing to a web site, the web site that you go to,

DIRECT/Det. Friberg

can supply this little text file that gets downloaded

with the web page and it's then stored into your

cookies folder.

    Q.   Does the user have to do anything

affirmative to get that cookie to download onto their

computer system, or in fact, even be aware that

cookies are being downloaded onto their computer?

    A.   No.

    Q.   I'd like to show you what is in evidence

as People's 43.   This is an E-Loan application,

dated 2/24/05, in the name of Raymond Sperl?

       There is a cookie associated with that

E-Loan application, in the name of Raymond Sperl from

2/24/05?

    A.   Yes.

    Q.   I'm showing you People's 225.   In fact, is

the cookie from E-Loan recovered off of the laptop

computer, in fact the same cookie on the E-Loan

application in the name of Raymond Sperl?

    A.   Yes, it is.

    Q.   I'd like to show you what is in evidence

as People's 44.   An E-Loan application applied for on

2/22/05, in the name of Gerald Thurman.

       Is there a cookie associated with this

DIRECT/Det. Friberg

E-Loan application in the name of Gerald Thurman?

    A.   Yes, there is.

    Q.   I'm showing you once again People's 225 in evidence.  Is the cookie you recovered off of that laptop computer system, once again, the same cookie as generated by E-Loan on the Gerald Thurman E-Loan application?

    A.   Yes, it is.

    Q.   Detective, I'd like to show you what is in evidence as People's 226.  Your initials are on this document?

    A.   Yes.

    Q.   Do you recognize specifically now what is People's 226?

    A.   Yes, that is some information I was able to recover off the laptop hard drive, just a portion of what was a web page.

    Q.   Specifically, where was it recovered from?

    A.   This information was recovered in something called File Slack.  And File Slack is, after a file is deleted and the information is in unallocated clusters, they give that area to another file so that new file overrides the majority of that information, but there is a small portion of that

DIRECT/Det. Friberg

information that is recoverable.

    A.   Specifically now, what did you recover from that laptop computer system?

    A.   Well, this was HTML code, that is the code that web pages are written in, typically, and this appears to be the beginning of an E-mail message from Capital One Auto Finance, and their E-mail address is *customerservice@capitalone.com*, to *dvdrdnr@yahoo.*

    Q.   Typically, it would have ".com"?

    A.   Typically.  That is as far as -- that is the only information that was left, that other information was overwritten so that is why I was unable to recover the ending of that E-mail address.

    Q.   This was recovered from the laptop computer system, correct?

    A.   Correct.

    Q.   Showing you what is in evidence as People's 228, a Capital One application in the name of David Ridenour.  Do you see the E-mail address provided under the Capital One application?

    A.   Yes, I do.

    Q.   In fact -- can you read that E-mail address into the record, please?

    A.   *Dvdrdnr@Yahoo.com.*

DIRECT/Det. Friberg

Q.    I'd like to show you what is in evidence

as People's 227.   Those are your initials, again, on

the document?

A.    Yes.

Q.    Do you recognize People's 227 that's in

evidence specifically?

A.    Yes, I do.

Q.    Can you tell the jury what it is?

A.    This is some other information that I

recovered from an unallocated area of the hard drive.

It is actually, what I recovered is the HTML code.   I

save it to a file and I open it up in Internet

Explorer.   It views the way people normally would see

it.   I was only able to recover a portion of it but

the information in it, that is viewable, says, "Yahoo

mail welcome, brendaridenour111", and that's what the

user would see when they successfully log onto a

Yahoo E-mail account.

Q.    This is a Yahoo E-mail for

"brendaridenour111"?

A.    That is a portion of a web page that

somebody would see when they successfully logged into

that E-mail account, that is not specifically an

E-mail, but that's the web page you get when you sign

DIRECT/Det. Friberg

into the E-mail account.

     Q.  I'd like to show you what is in evidence as People's 228.  Do you recognize your initials on this document?

     A.  Yes, I do.

     Q.  Specifically, what is People's 228?

     A.  This is a portion of a web page that I recovered out of an unallocated area of the hard drive that I was analyzing.  This appears to be the E-mail account for *toddghassabian@Hotmail.com*.

     Q.  That was found specifically, where?

     A.  That was in an unallocated area of the hard drive.

     Q.  I'd like to show you what is in evidence as People's 229.  Do you recognize your initials on this document?

     A.  Yes.

     Q.  Specifically, what is People's 229?

     A.  This is a portion of a web page that I was able to recover out of an unallocated area of the hard drive, this says "Yahoo mail, welcome Nerina Sperl".  This is the page -- portion of the page you would see when you successfully log into a Yahoo mail account.

DIRECT/Det. Friberg

         Q.   So the Nerina Sperl Yahoo E-mail page was
on this laptop computer you were analyzing?

         A.   Yes, it was.  I was able to recover a
portion of it.

         Q.   Do you know if this was Nerina Sperl's
laptop computer?

         A.   I don't know that.

         Q.   I'd like to show you what is in evidence
as People's No. 23.  Loan application in the name of
Nerina Sperl.  Was there an E-mail address provided
on this application?

         A.   Yes.

         Q.   Can you tell the jury -- read into the
record what E-mail address was provided on this
Capital One application in the name of Nerina Sperl?

         A.   It shows *nerinasperl@Yahoo.com*.

         Q.   Detective, I'll skip to People's 231.  Do
you recognize this two-page document?

         A.   Yes.

         Q.   Your initials are on Page 1 and Page 2,
both?

         A.   Yes.

         Q.   What if anything specifically do you
recognize People's 231 to be?

DIRECT/Det. Friberg

A.    These are portions of information that I

recovered out of unallocated clusters.  What they

represent are entries in a file called the index.dat

file, that keeps track of files that are in your

temporary Internet files folder.  And there were

numerous entries to this particular -- for this

particular address.

Q.    There are nine numbers that say "Full

Path", with the number "05214501" after it, and then

other language.  Do you see that?

A.    Yes.

Q.    It goes down from Page 1, one, two, three,

four, five, six; Page 2, seven, eight and nine.  You

see those?

A.    Yes.

Q.    What are each of those numbers, when it

says "full path" and there are numbers after it?

A.    That is just information that is generated

by the forensic program that I utilized.  It

indicates where this information was located on the

hard drive, and it needs instances, all of that

information that I've documented there, were

recovered out of unallocated clusters of the hard

drive, unallocated areas of the drive.

DIRECT/Det. Friberg

1

2      Q.   Now, specifically, what is the information

3  provided under "full path", that information under

4  number one?

5      A.   Under number one, the information that

6  it's logging there, is information in reference to a

7  websitelogin.Yahoo.com.

8      Q.   And who -- where is this computer -- this

9  laptop computer system logging into?

10     A.   Yahoo.com.  Further down in that

11  information, you'll also see that the rest of this

12  URL, that it is trying it's -- well, it is

13  mail.yahoo.com, and login=Maria Macarle.

14     Q.   Second, where it says "full path".  Where

15  is this second full path attempting to log into?

16     A.   That details information from Yahoo.com

17  once again.  And information it is trying to get to

18  is mail.yahoo.com, login=Maria Macarle.

19     Q.   Third full path, where is this third full

20  path attempting to log into?

21     A.   Mail.yahoo.com and login=Maria Macarle.

22     Q.   The fourth full path, where is that fourth

23  full path?

24     A.   Mail.yahoo.com, login = maria macarle.

25     Q.   It is at the end?

DIRECT/Det. Friberg

1

2          A.    Yes.

3          Q.    "M-A-R-I", and then on the last line, it

4    finishes up?

5          A.    Yes.

6          Q.    This fifth full path?

7          A.    That is mail.yahoo.com, and login = Maria

8    Macarle.

9          Q.    The sixth full path, where was this laptop

10   computer system attempting to log into?

11         A.    --

12         Q.    Can you see?

13         A.    The login information, there, is Maria

14   Macarle also.

15         Q.    The seventh full path, once again, where

16   would this laptop computer system attempt to log

17   into?

18         A.    Maria Marcale, also.

19         Q.    The eighth full path, where was this

20   laptop computer system attempting to log into?

21         A.    That one is Maria Macarle also.

22         Q.    The ninth full path, where was this laptop

23   computer system attempting to log into?

24         A.    That is Maria Macarle, also.

25         Q.    Showing you what is in evidence as

```
 1    DIRECT/Det. Friberg
 2    People's 27.  Capital One application in the name of
 3    Maria Macarle, do you see an E-mail address provided
 4    on this Capital One application in the name of Maria
 5    Macarle?
 6              A.   Yes.
 7              Q.   Can you put the E-mail address on the
 8    record, please?
 9              A.   The portion that I read says,
10    "mariamacarle@yahoo.co.", I can't make out the last
11    letter.
12              Q.   At Yahoo?
13              A.   Yes.
14              Q.   It says ".co"?
15              A.   Yes.
16              Q.   Finally, let me show you what is in
17    evidence as People's 230.  Do you recognize your
18    initials on People's 230?
19              A.   Yes, I do.
20              Q.   What do you recognize People's 230 to be?
21              A.   That is an entry that I recovered out of
22    File Slack.
23              Q.   What is File Slack?
24              A.   File Slack, it used to be information that
25    was allocated to a file that is unallocated portions,
```

DIRECT/Det. Friberg

and a new file is written over a part of that.  Part
of this data.  But this portion is still recoverable.

Q.   Specifically, what is People's 230 in
evidence?

A.   This is information that was in an
index.net file, in reference to the temporary
Internet files, this also was trying to get
information from the mail.yahoo.com and login =
josephswny.

Q.   That was recovered from the laptop
computer system?

A.   Yes, it was.

MR. PEARL:  Thank you.

THE COURT:  Can we have the lights
on, please?

MR. PEARL:  Thank you, judge.
Detective, thank you very much.

Your Honor, I have no further
questions.

THE COURT:  Thank you.

In light of the time, detective,
I'm going to ask you to step down.  Your
testimony will resume at quarter after two.
Direct you not to discuss your testimony with

People v. Lamar Whitehead

anyone.

THE WITNESS:  Yes.

THE COURT:  Thank you.

(The Witness is excused)

THE COURT: I remind you not to form or express an opinion about the case until it is submitted to you for your deliberations. As I've told you, do not discuss this case or any matter connected to the trial amongst yourselves or with anyone else.  Nor may you allow it to be discussed in your presence.

Don't read or listen to accounts reported in the news media, don't visit or view the place or places where the offense charged was allegedly committed, or any other place involved in this case, and promptly report to the court by way of coming to me personally, through a court officer, any incident within your knowledge involving any attempt to influence any member of the jury.

We anticipate that you will hear the closing arguments of counsel today, as well as be charged on the law today, as well. Thank you very much.

```
 1    People v. Lamar Whitehead
 2                    (The Jury is excused)
 3                    THE COURT:  Is there anything else
 4    to place on the record at this time.
 5                    MR. KEAHON:  No.
 6                    THE COURT:  Thank you, enjoy your
 7    lunch.  And I'll see you all at 2:15.
 8                    MR. KEAHON:  Thank you, judge.
 9                         -o0o-
10
11         A F T E R N O O N    S E S S I O N
12                                        2:00 p.m.
13                                    26 March 2008
14                    THE CLERK:  Case on trial, People
15    versus Whitehead.  All parties are present
16    outside the presence of the jury.
17                    THE COURT:  Before Det. Friberg
18    takes the stand, for your cross-examination,
19    Mr. Keahon, Juror No. 5, Mr. Van Ostrand,
20    informed the court he has airline tickets for
21    this Friday.  I don't want any jurors who are
22    deciding the case, in a precipitous fashion,
23    to feel any kind of  pressure regarding their
24    ultimate determination.  We have three
25    alternates left.  Would you be averse to
```

People v. Lamar Whitehead

1         bringing in Mr. Van Ostrand right now, finding

2         out the details right now.

3                  MR. KEAHON:  No.

4                  THE COURT:  We'll bring in Mr. Van

5         Ostrand.

6                  (The following occurred in the

7         presence of Juror No. 5):

8                  THE COURT:  All rise, please.

9         Juror entering.

10                 Mr. Van Ostrand, thank you very

11       much.  We didn't forget you.  Please have a

12       seat.

13                 Please be seated, everyone.

14                THE COURT:  Now, you have been very

15       patient these past several weeks, but I

16       understand you have airline tickets for

17       Friday.

18                THE JUROR:  Yes.

19                THE COURT:  If I may ask, the

20       nature of the trip.  I hate to ask questions.

21                THE JUROR:   It is a vacation.

22                THE COURT:  You had a vacation

23       planned?

24                There is no way to reschedule that.

```
 1    People v. Lamar Whitehead

 2                     THE JUROR:   We looked.  It would

 3         have cost money to change -- my wife already

 4         took off.

 5                     THE COURT:   Your wife has already

 6         taken off time?

 7                     THE JUROR:  Yes.

 8                     THE COURT:   Do counsel wish to

 9         speak to Mr. Van Ostrand?

10                     MR. PEARL:   No, thank you, your

11         Honor.

12                     MR. KEAHON:   Have a good trip.

13                     THE COURT:   Step outside for just a

14         moment, please.

15                     THE JUROR:   Okay.

16                     THE COURT:   Thank you, very much.

17                     (The Juror is excused)

18                     THE COURT:   Based upon Mr. Van

19         Ostrand's comments, and your own statements,

20         Mr. Keahon, is there a stipulation to

21         discharge Mr. Van Ostrand with the thanks of

22         the court and substitute what is now alternate

23         one, formerly alternate two, Mr. Johnson?

24                     MR. KEAHON:   There is no objection.

25         We gave him the dates how long this case was
```

People v. Lamar Whitehead

going to be pending.  We've exceeded it by a little bit.  I don't think we can force him to lose money on a vacation, judge.

THE COURT:  People?

MR. PEARL:  Can I hold you off on that decision until after cross-examination?

THE COURT:  The court will be obliged if you gave me your answer at this time.

MR. PEARL:  Okay.  Yes, judge.

THE COURT:  The court is consenting thereto.  Mr. Johnson is the new Juror No. 5.

We'll bring in Mr. Van Ostrand, thank you.

Mr. Van Ostrand, words can't convey the gratitude of the court and the attorneys in this matter for your sacrifice in the past two months, sitting as a juror in this case. There is a limit to the sacrifice we can expect of you.  You'll be discharged with the thanks of the court.  I want to thank you so much again.

The obligations that I imposed upon you regarding this case with anyone are hereby

People v. Lamar Whitehead

1   

2  lifted.  The only prohibition is you cannot

3  discuss this case or have any contact with

4  your fellow jurors until this matter is

5  resolved.  Please take with you the thanks of

6  court.  Counsel wishes to thank you, as well.

7  MR. KEAHON:  You were great, thank

8  you.  Enjoy the trip.

9  MR. PEARL:  Thank you.

10  THE COURT:  Follow the officer's

11  instructions.

12  (The Juror is excused)

13  THE COURT:  Are we ready to

14  continue, then.

15  MR. KEAHON:  Yes.

16  THE COURT:  Bring in the jury,

17  please, their presence is requested.

18  THE COURT OFFICER:  Jury is

19  entering.

20  THE COURT:  All rise, please.

21  (The following occurred with the

22  jury present):

23  THE CLERK:  Case on trial, People

24  versus Whitehead.  The jury and all parties

25  are present.  Counsel waive the roll.

CROSS/Det. Friberg

```
1                    THE COURT:  The record will reflect

2          the substitution of Alternate Juror No. 2 for

3          Juror No. 5.  Thank you very much, once again.

4                    Are you ready for your

5          cross-examination?

6                    MR. KEAHON:  Yes, I am.

7                    THE COURT:  We'll recall the

8          witness.

9                    THE CLERK:  Det. Friberg, you're

10         reminded you're still under oath.

11                   THE WITNESS:  Yes.

12                   (The Witness resumes the stand)

13                   THE COURT:  Good afternoon,

14         detective, you may resume your seat.

15                   You may inquire, Mr. Keahon.

16                   MR. KEAHON:  Thank you, very much.
```

CROSS-EXAMINATION

BY MR. KEAHON:

```
     Q.   Good afternoon, detective?

     A.   Good afternoon.

     Q.   Detective, you and I have never discussed

this case, have we?

     A.   No.

     Q.   I just introduced myself to you out in the
```

```
 1    CROSS/Det. Friberg

 2    hallway a few minutes ago?

 3             A.    Yes.

 4             Q.    We never have talked on the phone at all

 5    about this case?

 6             A.    No.

 7             Q.    Detective, you told us that you received a

 8    computer, a Gateway computer.  I think you told us,

 9    on January 30th of 2006?

10             A.    Correct.

11             Q.    Do you know where that computer was prior

12    to you receiving it from Det. Gabriele?

13             A.    From conversations with Det. Gabriele,

14    yes.

15             Q.    And where was it?

16             A.    It was removed from 92 Howland Avenue in

17    Teaneck, New Jersey.

18             Q.    Do you know what date it was taken?

19             A.    No, I do not.

20             Q.    If I suggested to you it was taken on

21    January 27th of 2006, would that refresh your

22    recollection?

23             A.    No, that wouldn't refresh my recollection.

24             Q.    From the date that it was taken from that

25    address, to the date of January 30th, the date you
```

CROSS/Det. Friberg

received it, do you know where that computer was?

     A.   No.

     Q.   Do you know who had custody of it?

     A.   No.

     Q.   Do you know whether or not it was in the
Property Bureau of the Suffolk County Police
Department, or whether or not it was being kept by
Det. Gabriele?

     A.   I don't know where it was prior to it
being given to me.

     Q.   You indicated on January 30, 2006, you got
a Gateway computer, yes?

     A.   Yes.

     Q.   Did you do a report on April 21st of 2006,
indicating that on January 30th of 2006, Det.
Gabriele responded to the Computer Crimes Section
with a SONY laptop computer?

     A.   Yes, I did create that report.

     Q.   Did he respond to your unit with a SONY
laptop computer?

     A.   No, he did not.

     Q.   Did you ever change that report?

     A.   No, I did not.

     Q.   When did you first realize that you had

CROSS/Det. Friberg

made a mistake?

     A.   Probably a couple of days ago.

     Q.   And who drew that to your attention?

     A.   I had been reviewing my notes that I had taken, and noticed that the error was in there.

     Q.   I'm sorry?

     A.   I noticed the error was in my report as I was reviewing my note.

     Q.   The report you did was typewritten.

     A.   Correct.

     Q.   It was done on April 21st of 2006.

     A.   I don't know the exact date but if you want, I can look it up.

             MR. KEAHON:  Yeah.

             I have my notes on the back.

     Q.   If you just look at that paragraph that is starred?  Do you recall it was done April 21st of 2006?

     A.   Correct.

     Q.   You first discovered that you had indicated it was a SONY laptop computer that you did work on, a couple of days ago you realized, it was, correct?

     A.   I didn't do work on a SONY laptop.  I did

CROSS/Det. Friberg

work on a Gateway laptop, but a couple of days ago, I

noticed it was incorrect.

     Q.   Did the district attorney draw your

attention to that?

     A.   I don't believe he did.

     Q.   Did you discuss that with him?

     A.   I believe I made a comment a couple of

days ago.

     Q.   Detective, this computer that you

examined, was it password protected?

     A.   I don't know if it was or not.

     Q.   Well, what does it mean when we say a

computer is "password protected"?

     A.   You can be password protected in several

different ways.  The most common way is when you

start the operating system, when it asks you to log

on.  Sometimes it will request a password from you.

     Q.   So if it is not password protected, anyone

that has custody of that computer can turn it on and

put any information they want on it?

     A.   That would be a fair statement.

     Q.   As a matter of fact, a person could take

information from one computer, download it and upload

it onto another computer, can't they do that?

CROSS/Det. Friberg

A.  Yes.

Q.  How would you tell if there was -- that computer was password protected?

A.  It could be done several ways.  You could make -- there is information in the registry, stored in the registry.  That would indicate the last time a password was changed.  If you had started up the computer and a password screen was presented to you, that is another way.

Q.  You never booted up that computer, did you?

A.  No.

Q.  The district attorney's office never requested of you to determine whether or not that computer was password protected?

A.  I don't believe they ever asked me if -- to determine that, no.

Q.  Det. Gabriele is the individual that brought the computer to you?

A.  Yes.

Q.  Did he ever ask you if that computer was password protected?

A.  I don't recall whether he asked, or not.

Q.  Do you recall him ever asking you to check

CROSS/Det. Friberg

to see if in fact it was password protected?

     A.   I don't recall him asking me that, or not.

     Q.   You went through a number of exhibits with the assistant district attorney.  Did you find associated with those exhibits, a user name for the person that was actually using the computer at the time?

     A.   I'm not sure I understand the question. There were many exhibits.  I don't know which one you're referring to.

     Q.   Well, if somebody goes on the computer and attempts to enter a web page, or get a web page, do they have to put a user name into the computer?

     A.   There are profiles that are created on the computer.  This particular computer had the particular profile of "Owner."

     Q.   Well, if there is no password protection, anyone that entered that computer would enter as an owner, am I correct?

     A.   In this instance, yes.

     Q.   I'm sorry?

     A.   In this instance, yes.

     Q.   So all of the testimony you gave about owner file, owner file, owner file, if this computer

CROSS/Det. Friberg

1    was not password protected anyone can enter, yes?

2         A.   Yes.

3         Q.   Anyone can seek information from it, yes?

4         A.   Yes.

5         Q.   And everything that you would see from the

6    computer, would indicate "owner file"?

7         A.   Anything that -- anything that was still

8    currently an allocated file.  The information that I

9    saw, was from the owner profile.

10        Q.   So my answer is yes?

11        A.   Well, the unallocated files that I

12   recovered, they weren't associated with any

13   particular profile.

14        Q.   Okay.  But the -- the ones that weren't

15   unallocated would always reflect owner file if there

16   was no password for the computer?

17        A.   In this instance, yes.

18        Q.   "In this instance, yes".

19        A.   Yes.

20        Q.   Okay.  Now, you were given by Det.

21   Gabriele, when he -- he provided you with a list of

22   victim names, Social Security numbers, street

23   addresses, and IP addresses relating to his

24   investigation, am I correct?

CROSS/Det. Friberg

     A.   Yes.

     Q.   He asked you to search the computer
looking for something associated with that list that
he gave you?

     A.   Yes.

     Q.   Now, on the exhibits.  That you've spoken
to us about, was there any user name entered into the
computer, to get those exhibits?  Onto the computer?

     A.   I don't think I understand that, the way
the question is worded.

     Q.   I probably did it inartfully because I'm
not that familiar with computers, but let me try it
again.

          There were a number of exhibits that have
been displayed for the jurors?

     A.   Yes.

     Q.   You know from the list that you were
given, from Det. Gabriele, the names that he was
looking for?

     A.   Yes.

     Q.   We know the names that you found and the
exhibits they were on, and they have been displayed
for this jury?

     A.   Yes.

CROSS/Det. Friberg

        Q.    Is there any indication of a user name

connected to any of those victim exhibits that are in

evidence?

        A.    No, most of them were from the owner

profile.

        Q.    Which we know, again, would be anyone

using the computer?

        A.    Correct.

        Q.    Did you review all of the deleted material

on the hard drive?

        A.    Not all of the deleted material.

        Q.    I also thought you can't delete anything

from the hard drive.

        A.    For a period of time, it is there.   It is

overwritten when the hard drive needs other

additional storage space.

        Q.    Were there some documents that you made

more readable in form?

        A.    Yes.

        Q.    And were they any of the exhibits that

we've seen in evidence?

        A.    Yes.

        Q.    So, there are items that were on the

computer, that you found on the hard drive, that you

CROSS/Det. Friberg

made more readable in form?

    A.   Yes.

    Q.   The district attorney had asked you on his direction examination, if each of those items that are in evidence, are exactly as they appeared on the hard drive.

    A.   --

    Q.   I think you answered yes.

    A.   Yes.

    Q.   Was that incorrect?

    A.   Technically, it was incorrect.

    Q.   Did you ever run simulations of the hard drive as if you were running it as an operator as opposed to an analysis?

    A.   No.

    Q.   These cookies that you talked about.  Was there any person logging information on those cookies?

    A.   That I could identify, no.

    Q.   The cookies that you spoke about on direct examination, and the jurors had a chance to see, you looked to see if there is any persons logging information contained within the cookie and you didn't find any?

CROSS/Det. Friberg

A.   That I was aware of, no.

Q.   Is there a registration -- of who registered the operating system of this computer?

A.   There is that information, yes.

Q.   Do you have the name of the person that registered this computer?

A.   That computer is registered automatically when it was -- when it was created by the manufacturer.  So it has default registration information on it.  It doesn't have a person's name.

Q.   Could you take me through that one more time?

A.   Sure.  When some computer manufacturers, when they manufacture the computer, they set it up so that the end user doesn't have to go through the registration process online and put in information. When that's done, the information that is stored in the registration area for that, is information that the manufacturers put in when they manufacture the laptop.  So it is not a particular person's name or a business name.  It is standard information that the manufacturer puts in there.

Q.   So there is no name associated with that computer?

CROSS/Det. Friberg

    A.    Correct.

    Q.    People's 212 is a bunch of pictures with a guy that doesn't dance well, right?

    A.    I don't see him dancing, though, so.

        MR. PEARL:  Objection.

        THE COURT:  Sustained.

    Q.    This is one of the pictures that you found on the computer?

    A.    Two of them, yes.

    Q.    Did it appear like it was a birthday party, all of these pictures?

    A.    Yes.

    Q.    With balloons?

    A.    I believe some of the pictures I observed had balloons in them.

    Q.    Did it appear the birthday party was for a gal about 91 years of age?

    A.    It appeared that it was a birthday party for two people.

    Q.    How old?

    A.    One was 90 years of age, and one, I believe, was the defendant.

    Q.    Did it indicate that the 90 year old that was celebrating her birthday with my client, was his

CROSS/Det. Friberg

grandmother?

     A.   Yes, it did appear so.

     Q.   It kind of looked like he was MCing the party, didn't it?

     A.   And he was also one of the celebrants.

     Q.   Dancing, yeah.  And these had a date on the computer of May 2nd of 2005?

     A.   Yes.

     Q.   We talked about People's 213.  Do you recall that?

     A.   Yes.

     Q.   That has a fax sheet with a date of 9/1/05?

     A.   I believe that is what is written in the date.

     Q.   How did that fax sheet get on the computer?

     A.   I don't know.

     Q.   Then the two documents below it -- and that one, which are part of the same exhibit, have a date of December 1st of 2005, right?

     A.   I believe so.

     Q.   213 -- that was 213, I'm sorry?  The next document is 214.  People's 214.

CROSS/Det. Friberg

        A.    Yes.

        Q.    Do you recall that?

        A.    Yes.

        Q.    I didn't blow it up for you to see, but
you recall that?

        A.    Yes.

        Q.    What date was this put on the computer?

        A.    I believe that was -- I believe that was
September of 2005.  I can check my notes if you would
like the exact date.

                    THE COURT:  Sure, if you would.

                    MR. KEAHON:  And I have no

            objection if you keep your notes out.  Any

            time you need to do it, just check.

                    THE WITNESS:  Sure.

        A.    The computer reported the date of that
being created on the computer, September 26th of
2005.

        Q.    September of 2005?

        A.    Yes.

        Q.    The next exhibit is People's 215.  It is a
two-page exhibit.  Do you recall this, sir?

        A.    Yes.

        Q.    What was the date that was created on?

CROSS/Det. Friberg

1

2          A.    That was September 27th of 2005.

3          Q.    September 27th of 2005.

4          A.    Correct.

5          Q.    Were you told that the indictment covered

6     the dates of September 2004 to March of 2005?

7          A.    No, I didn't.  I wasn't aware of the

8     dates.

9          Q.    My next exhibit is 216.  Do you recall

10    telling us about this one?

11         A.    Yes.

12         Q.    216 -- what did you say this was?

13         A.    The top item was an entry that I recovered

14    out of unallocated clusters, that was previously in

15    an index.dat file that showed a visit to the

16    Ancestry.com web site, and the bottom one is a

17    representation of the icon on the desk top.  To

18    Dealer Track.

19         Q.    Okay.  Let's talk about the top one.  What

20    date was that one?

21         A.    If you can zoom that in for me.

22         Q.    Sure?

23         A.    The date of that visit was, I believe, is

24    November of 2005 -- a little bit to the left, please.

25    11/29/05.

CROSS/Det. Friberg

Q.   11/29 of 2005?

A.   Yes.

Q.   The second part of it you told us was, what, I apologize?

A.   That is an Internet shortcut that was sitting on the desktop, a shortcut to the Dealer Track web site.

Q.   Okay.  I think you told us that you actually went on the Dealer Track web site?

A.   I have, yes.

Q.   And it doesn't permit you to find out anybody's credit reports, does it?

A.   I didn't actually log into the Dealer Track web site.  I don't have a user name or password for the web site, to use.

Q.   Well, from the information that is on that document, what were you able to enter?

A.   That is just, like, the main page where you can log onto the Dealer Track web site as to a log-on area for you.

Q.   What does it tell you on the web page?

A.   I don't recall everything that was on the web page.  I saw it was Dealer Track's web site.

Q.   It doesn't give you anybody's personal

CROSS/Det. Friberg

informationn on that page?

     A.   No.

     Q.   217.  You recall this?

     A.   Yes.

     Q.   And that is an E-Loan?  Right?

     A.   Yes.

     Q.   It says "Hello Lamar Whitehead, welcome to E-Track."  It's to monitor the status of your loan, right?

     A.   Correct.

     Q.   His loan, right?

     A.   Yes.

     Q.   No one else's loan?

     A.   I don't know who applied for it, but that is whose name it's in.

     Q.   Is there anything in that document that indicates that it was anything other than his loan?

     A.   No.

     Q.   What's the date of that?

     A.   Let me look for that.  That is December 16th of 2005.

     Q.   December 16th of 2005.  The next one is 218?  What's this.

     A.   That is an E-Loan application.

```
 1    CROSS/Det. Friberg
 2           Q.   For who?
 3           A.   Lamar Whitehead.
 4           Q.   I think you said it had an E-mail address?
 5           A.   Yes.
 6           Q.   What was the E-mail address?
 7           A.   "Mllrwhitewhitemllr", the code behind that
 8    page says "Yahoo.com".  The E-mail address
 9    "milrwhitewhitemllr".
10           A.   I believe it is to "mllrwhitewhitemllr".
11           Q.   There is no "I", there is two "Ls"?
12           A.   I believe so.
13           Q.   Okay. What is this again?
14           A.   That appears to be an E-Loan application
15    web page.
16           Q.   For who?
17           A.   "Lamor Whitehead".
18           Q.   Is there anything in this document that
19    indicates it is for anybody other than himself?
20           A.   No.
21           Q.   What is the date of this?
22           A.   That is 12/16 of 2005.
23           Q.   12/16 of 2005?
24           A.   Correct.
25           Q.   I show you People's 219.  What do we have
```

CROSS/Det. Friberg

1

2    here?

3         A.    That looks like the MBNA application for

4    "LAMOR WHITEHEAD."

5         Q.    What is the date of that?

6         A.    That is 12/16/05, also.

7         Q.    12/16/05?

8         A.    Yes.

9         Q.    This next document is 220.  What is that,

10   sir?

11        A.    Those are entries from the index.dat file

12   showing visits to the Dealer Track web site on

13   January 26th of 2005.

14        Q.    Does it indicate who the user is on this

15   document?

16        A.    Not that I can tell, no.

17        Q.    221, People's 221, what is this?

18        A.    That was an application, a web page that

19   was recovered from an unallocated cluster in

20   reference to a loan application.  The code behind

21   that web page says it was for Capital One Auto

22   Finance.

23        Q.    What is the date?

24        A.    The date that it says in the code, is

25   April 20th of 2005.

CROSS/Det. Friberg

1  CROSS/Det. Friberg

2          Q.   April 20th?

3          A.   Yes.

4          Q.   Who was the user of the computer on this

5  document?

6          A.   I don't know.

7          Q.   I'm sorry?

8          A.   I don't know.

9          Q.   People's 222, do you recall what that was,

10  sir?

11          A.   Yes, that was a cookie that was recovered

12  off of that computer.

13          Q.   We talked about the cookie not having any

14  person or individual's log-in information on it,

15  right?

16          A.   Not that I was able to tell, no.

17          Q.   Who was on the computer when this document

18  was created?

19          A.   I don't know.

20          Q.   I'm sorry?

21          A.   I don't know.

22          Q.   Can you see that, sir?

23          A.   Yes.

24          Q.   This is People's 223.   What is this, sir?

25          A.   That is a cookie I recovered from the

```
 1    CROSS/Det. Friberg
 2    unallocated area of the computer.
 3          Q.    And the date on this?
 4          A.    There is no date attached to unallocated
 5    data.
 6          Q.    No date?
 7          A.    Correct.
 8          Q.    Who was the user when this document was
 9    created?
10          A.    I can't tell.
11          Q.    Going back to the last document, 222.
12    When was this document created?
13          A.    That took, if you could move it to the top
14    left, so I can identify it a little bit better.
15          Q.    Sorry.  Should I hand it up to you?
16          A.    No, that's fine.  The date that cookie was
17    created on that computer, was January 3rd of 2005.
18          Q.    And the user on that?
19          A.    I can't tell.
20          Q.    Exhibit 224.  That was a cookie created on
21    February 16th of 2005?
22          Q.    And the user?
23          A.    I can't determine the user.
24          Q.    225?  I'm sorry.  225, sir?
25          A.    That was a cookie created on December 16th
```

CROSS/Det. Friberg

of 2005.

Q.    December?

A.    Correct.

Q.    16th of 2005?

A.    Yes.

Q.    Who was the user to create this?

A.    I can't tell who the user was that created that.

Q.    226.

A.    That is information that came out of the unallocated area of the hard drive.

Q.    When was that created?

A.    There is no dates attached to unallocated data.

That is File Slack.  Likewise there is no dates attached to that.

Q.    Who was the user to create this?

A.    I can't tell.

Q.    Do you recognize this, sir?

A.    Yes, that was from an unallocated area of the hard drive.

Q.    When was it created?

A.    There is no dates attached with unallocated areas.

CROSS/Det. Friberg

Q. Who was the user?

A. I don't know.

Q. 228?

A. That was information that came out of the unallocated area.

Q. The date it was created?

A. I may be able to tell by looking at the entire page. If you want me to take a look.

MR. KEAHON: Sure, why don't I hand it up to you.

THE COURT: Officer, if you would assist counsel, please.

MR. KEAHON: Thanks very much.

(Handing)

A. This doesn't have a date on it, either.

Q. I'm sorry?

A. It has no date on it.

Q. And who was the user when this is created?

A. I don't know.

Q. 229?

A. That is information from the unallocated area with no dates, no user that I could determine.

Q. No date, no user?

A. Correct.

Jennifer Maue, Senior Court Reporter   (631)852-2153

CROSS/Det. Friberg

Q.   230.   What is that?

A.   If you can move it over to the left so I
can catch the beginning of that.

Q.   Sure.

Q.   That was some data that I recovered from
File Slack, which was an entry in an index.dat file
that just displays somebody attempting to log into
mail.yahoo.com with the log-in josephswny?

Q.   And what date?

A.   I was unable to determine a date.

Q.   Who was the user?

A.   I don't know.

Q.   I'm sorry?

A.   I don't know.

Q.   What prevented them from logging in?

A.   I don't know what prevented them from
logging in, or not.   Just from that information, I
can see there was an attempt.   I don't know whether
it was successful, or not.

Q.   Was there anything else on the computer to
go with this, sir, to assist you in making a
determination if they were successful or not
successful?

A.   There was nothing else I could find.

CROSS/Det. Friberg

1

2     Q.   That was it?

3     A.   On josephswny, yes.

4     Q.   And no date?

5     A.   Correct.

6     Q.   And no user?

7     A.   Correct.

8     Q.   231, this was the one where we had Full

9     Path, and it is like 1, 2, 3, 4?

10    A.   I believe there are nine there all

11    together, yes.

12    Q.   What date was this created, sir?

13    A.   What date did I create that document?

14    Q.   No, what date was it created on the

15    computer?

16    A.   I was not able to determine that.

17    Q.   Who was the user?

18    A.   I was not able to determine that.

19         MR. KEAHON:   Could we have the

20    lights back on.

21         THE COURT:   Thank you, officer.

22    Thank you very much, detective.   I appreciate

23    you coming in.

24         THE WITNESS:   Thank you.

25         MR. KEAHON:   Oh excuse me, make

CROSS/Det. Friberg

1    sure.  I apologize.

2                         (Pause)

3                         MR. KEAHON:  That's it.  Thanks.

4                         THE COURT:  Thank you, Mr. Keahon.

5    Any redirect.

6                         MR. PEARL:  Just briefly, thank

7    you.

8    REDIRECT EXAMINATION

9    BY MR. PEARL:

10        Q.   Detective, Mr. Keahon asked you a question

11   about you made documents more readable.  Do you

12   remember that question?

13        A.   Yes.

14        Q.   What do you mean you made a document more

15   readable?

16        A.   I just printed it in a format that is

17   commonly displayed when a viewer of the document

18   actually sees the document.  The way data is stored

19   on a hard drive is just zeroes and ones.  That is not

20   very readable, and that is not the way the end user

21   observes it.  I recovered the HTML code, the code

22   that creates that page the way that the user normally

23   sees it.  That is not that readable by the normal

24   user.  I saved the code, gave it an HTML extension,

```
 1    CROSS/Det. Friberg
 2    and I viewed it in Internet Explorer, and then I
 3    printed that version.  It is essentially the same
 4    information that the user would see.
 5              Q.   Technically, you actually were correct,
 6    correct?
 7              A.   Correct.
 8                        MR. PEARL:   Would you like it read
 9         back?
10                        MR. KEAHON:   Could we have the last
11         question and answer read back, please?
12                        THE COURT:   Ms. Maue, if you would
13         be so kind.
14                        (Record read)
15                        MR. KEAHON:   I didn't hear it.
16         Again, I'm sorry.
17                        (Record read)
18                        MR. KEAHON:   I object.  Ask it be
19         stricken.
20                        THE COURT:   Sustained.  Leading.
21         The jury is to disregard the last remarks of
22         the prosecutor and the witness.
23                        You may continue, Mr. Pearl.
24    BY MR. PEARL:
25              Q.   Detective, with reference to People's 222,
```

CROSS/Det. Friberg

it was a cookie, beginning with 24?

    A.   Okay.

    Q.   Without putting the lights off and putting
it on the presenter, are you aware of what Nigel
DeFreitas' IP address is?

    A.   I'd have to refresh my memory.

    Q.   Is there something that would refresh your
recollection?

    A.   There is, but I don't know if I have it
with me.

    Q.   Okay.  I'll move onto the next question.

        In reference to People's 223, there was an
IP address 70.2343.261.  Do you know what Michael
Redman's IP address is?

    A.   Not without looking at some other
documentation.

    Q.   Detective, I'll move on to People's 224
and 225.  These are the E-Loan cookies, one of them
ending in the number 926, and the other one ending in
the number 955?

    A.   Yes.

    Q.   You'll recall I asked you questions
referring to other documents in evidence, Capital One
and E-Loan?

CROSS/Det. Friberg

A.   Yes.

Q.   And the same cookies were on both of those documents?

A.   Yes.

Q.   What if anything is the significance of cookies found on the defendant's laptop as well as the same cookie appearing on the various?

MR. KEAHON:   Could I be heard, please.

THE COURT:   Thank you, I'll see counsel at side bar.

(The following occurred at side bar)?

THE COURT:   Again, with the significance.   Don't ask the witness to testify to that.

And I think we're -- you have the witness on the stand for an hour and a half so I think we're reemphasizing direct.

MR. PEARL:   It was Mr. Keahon asked a few questions.

THE COURT:   Right.   But redirect is not to reemphasize direct.   It is to come to new areas.   It is not to reemphasize the

CROSS/Det. Friberg

1          points you feel were damaged on

2          cross-examination.  It is to cover new areas

3          on redirect, that were not covered on direct,

4          that the cross-examiner created a false

5          impression, or opened up a door to a new area.

6                    MR. PEARL:  That's what I thought I

7          was doing.

8                    THE COURT:  When I said "briefly",

9          we're beyond the "briefly" now.

10                   MR. PEARL:  That is a huge meaning.

11                   MR. KEAHON:  The other thing, I ask

12         that the question and answer be stricken.  He

13         posed it as the defendant's computer.

14                   THE COURT:  The witness never

15         answered it so.

16                   MR. KEAHON:  Strike the question

17         then.

18                   THE COURT:  I'll strike the

19         question, sustain the question as to form.

20                   MR. PEARL:  Can I ask the question

21         again, based on your expertise in computer

22         forensics, do you have an opinion as to the

23         cookie appearing on the laptop computer and on

24         various loan applications?  If you want me to

CROSS/Det. Friberg

1
2          pull the loan applications, I'll pull the loan
3          applications.
4                    MR. KEAHON:  I'll object.
5                    THE COURT:  What is the anticipated
6          answer?
7                    MR. PEARL:  That the computer was
8          involved in making that loan transaction.
9                    THE COURT:  It goes to the ultimate
10         question.  So keep away from that, sustain
11         the objection.
12                   MR. KEAHON:  Strike the question.
13                   THE COURT:  Yes.
14                   (The following occurred in open
15         court):
16                   THE COURT:  The jury will disregard
17         the last comment of the prosecutor.  Thank
18         you.  You may continue, Mr. Pearl.
19                   MR. PEARL:  Thank you.  I have no
20         further questions.
21                   THE COURT:  Thank you.  Any recross
22         within the limited parameters of the redirect.
23                   MR. KEAHON:  No, thank you.
24                   THE COURT:  Thank you very much,
25         detective, you may stand down.

People v. Lamar Whitehead

1

2              THE COURT:  Thank you.

3              (Pause)

4              THE COURT:  Thank you.

5              Ms. Franzese, Mr. Pearl?

6              MR. PEARL:  Thank you, your Honor,

7      the people rest.

8              THE COURT:  At this point in time,

9      ladies and gentlemen of the jury, it is

10     necessary for the court to consult with

11     counsel before we proceed.  Remember my

12     admonitions.

13              I remind you not to form or express

14     an opinion about the case until submitted to

15     you for deliberations.  As I've told you, do

16     not discuss this case or any matter connected

17     to the trial amongst yourselves or with anyone

18     else.  Nor may you allow it to be discussed in

19     your presence.

20              Don't read or listen to accounts

21     reported in the news media, don't visit or

22     view the place or places where the offense

23     charged was allegedly committed or any other

24     place involved in this case, and promptly

25     report to the court by way of coming to me

```
1   People v. Lamar Whitehead
2           personally, through a court officer, any
3           incident within your knowledge involving any
4           attempt to influence any member of the jury.
5                   (The Jury is excused)
6                   THE COURT:  The people having
7           rested.
8                   Mr. Keahon?
9                   MR. KEAHON:  Yes, judge.  I have a
10          motion to make, that is to dismiss the charges
11          again my client for failure to establish my
12          client's guilt in a prime facie case.
13                  THE COURT:  Thank you.
14                  People?
15                  MR. PEARL:  Your Honor, Mr. Keahon,
16          the people argue the evidence is overwhelming,
17          and we established each and every element in
18          the light most favorable to the people, which
19          the court is required to view the evidence at
20          this time, and we clearly established all the
21          elements of the crime to the satisfaction.
22                  THE COURT:  Thank you.
23                  I take it you also are moving to
24          dismiss on the failure to prove the
25          defendant's guilt beyond a reasonable doubt,
```

People v. Lamar Whitehead

1  as well?

2          MR. KEAHON:  Yes.

3          THE COURT:  Considering the

4  evidence adduced at trial in the light most

5  favorable to the non-movant, as the court is

6  obliged to do, I find that the people have

7  established each and every element of the

8  crimes alleged in the Indictment before the

9  court, both on a prime facie basis, and proof

10  beyond a reasonable doubt standards, for the

11  purpose of this motion.

12          Your applications will be denied

13  and your exception will be noted for the

14  record, Mr. Keahon.

15          MR. KEAHON:  Thank you, judge.

16          THE COURT:  Thank you.  Do you wish

17  a brief recess before we proceed?

18          MR. KEAHON:  Yes, judge, I do need

19  that.

20          THE COURT:  Consult, then, with Mr.

21  Whitehead.  The court will take a brief

22  recess.  Keep it short as possible.

23          (Brief recess)

24          THE CLERK:  Case on trial, People

People v. Lamar Whitehead

1
2          versus Whitehead.  All parties are present
3          outside the presence of the jury.
4                    THE COURT:  Thank you.
5                    Can we have the door closed for
6          just a moment, please?
7                    THE COURT OFFICER:  Yes, sir.
8                    THE COURT:  Thank you.
9                    Outside of the presence of the
10         jury, the court having ruled on defense
11         counsel's motions after the people had rested,
12         Mr. Keahon, the court may ask what are your
13         expectations at this juncture?
14                   MR. KEAHON:  To rest.
15                   THE COURT:  Are you ready with your
16         closing?
17                   MR. KEAHON:  I am, your Honor.
18                   THE COURT:  Are the people ready
19         with their closing?
20                   MR. PEARL:  I am.  I ask for a few
21         minutes' break so I can pull exhibits
22         beforehand.
23                   THE COURT:  After Mr. Keahon's
24         closing, we'll have a brief recess.  Because
25         of the expected length of time, the jury will

```
 1    People v. Lamar Whitehead
 2            be informed to come back after your closing,
 3            at 9:00 o'clock tomorrow morning.
 4                    My compliments to the jury.
 5                    THE COURT OFFICER:  Jury is
 6            entering.
 7                    THE COURT:  All rise, please.
 8                    (The following occurred with the
 9            jury present):
10                    THE COURT:  Thank you.  Please be
11            seated.
12                    THE CLERK:  Case on trial, People
13            versus Whitehead.  All parties are present,
14            including the jury.
15                    THE COURT:  The people have rested.
16            Mr. Keahon?
17                    MR. KEAHON:  We rest.
18                    THE COURT:  Thank you.
19                    Ladies and gentlemen of the jury,
20            the reason you don't have your notebooks is
21            because the attorneys are about to make
22            closing arguments to you.  As I instruct you
23            on the law, what the attorneys say is not
24            evidence.  That is why you do not have your
25            notebooks.  After the conclusion of the
```

CLOSING/Mr. Keahon

closing summations, we'll take note of the
time.  You'll either be charged on the law at
the time, or if it is late, I'll discharge you
for the day and ask you to come back at 9:00
o'clock tomorrow morning, at which time you'll
be charged on the law and commence your
deliberations.

Mr. Keahon, do you wish to address
the jury?

MR. KEAHON:  I do so.

THE COURT:  You may do so at this
time.

MR. KEAHON:  I speak first.  So I
think I can speak for everybody in this
courtroom, we apologize for the delays.  We
thank you so much for your service.  I think
you all realize that this system of justice
does not work without people such as
yourselves, who are willing to put up with
what you put up with.  We've tried to do the
best that we can do, all of us.  The court has
had a long calendar every morning.
Emergencies happen.  But I think you've seen
all the parties involved, here, ready to go as

CLOSING/Mr. Keahon

soon as we could.  And I speak for everybody,
I just want to thank you very much for your
efforts in this case.

Seven weeks, that is a long time
defending someone on these serious charges,
with these serious consequences.  It keeps you
up very late at night and it gets you up early
in the morning.  I know they're as tired as I
am.

You come into this courtroom, and
never having sat in judgment of another
individual that has been charged with a crime,
and I know that you expect that justice will
be done.  Each of us, have had a friend, a
member of the family, that have been accused
of a crime.  And when that happens, their
rights under which we work, an accused's
rights, become so important to each of us
individually.  Because when it happens to you,
a member of your family or close friend, you
demand fairness in the case.  You demand
fairness from the judge, from the prosecutors,
and most of all, from the jury.

Those rights that I speak to you

CLOSING/Mr. Keahon

about, are the presumption of innocence, the burden of proof, and the fact that if the accused does not take the witness stand, you cannot consider that in any way in reaching your verdict. By your oath as jurors, you have promised to embrace those rights, and to apply them. Those rights are your rights, as they are Lamar Whitehead's rights. The presumption of innocence, the judge will tell you, is present right now, has been present every day in this courtroom, and will continue to be applied by you, even during your deliberations. The presumption of innocence.

We're unlike most countries in the world. We presume someone innocent. We don't presume them guilty.

The burden of proof is at this table right here. The accusation has been made. A plea of not guilty has been made. So the burden of proof never shifts over to this table. My client has not testified. By your oath as jurors, you have promised that you will not let that enter in any fashion into your deliberations. It is not the judge in

CLOSING/Mr. Keahon

this case that will reach a verdict.  It is
not Det. Gabriele that will reach a verdict in
this case.  It is not the prosecutors, and it
certainly is not me.  It is twelve of you.
From many different backgrounds, with very
different life experiences, people who
individually and collectively, bring so much
to this process that you really don't get
tricked.  You don't get fooled.  One person
sitting as a factfinder, maybe.  But twelve of
you, with everything that you've experienced
in your lives?  The things that you've dealt
with, the people that you have spoken with and
the people that have tried to persuade you to
do certain things.  When you bring that into
this courtroom, that is all you need.

          I spoke to you in the beginning of
this case, that all you really need is your
common sense, your logic, and your past
experiences in life.  You do it every day.
You, sir.  Sir.  Ma'am.  Each of you.  And
that is what will help you reach the right
decision in this case.

          What you want to see I'm sure, is

CLOSING/Mr. Keahon

credible evidence.  Believable evidence that you can accept, that will help you make a decision in this case.  I think and I hope that you found during the course of this case, that people really -- that have testified at this trial, really haven't been honest with you.

They haven't taken that oath seriously.  There have been witnesses that have taken that witness stand -- I hope you find -- that have intentionally lied notwithstanding that oath.  I wish I would have said it to you in the beginning of this case when you had the note box.  Just jot a little note down on each witness on how you felt about what they were saying and how they were saying it.  Because I think that we all probably have a mechanism within ourselves, whether it is in our heart, our stomach, our brain, I don't know, but something triggers within ourselves, letting us know that whoever is speaking to us, is lying to us, is mistaken, was trying to fool us.  And ask yourselves, did you have that feeling when

CLOSING/Mr. Keahon

Valerie Rodriguez testified?   Honestly.   You can take back the things, she testified the things she said.   Ask yourself the same question about Nigel DeFreitas, the questions you had in your mind and what you were thinking when he was testifying.   The same for Anita Bryant.   These are their witnesses. They put them forward as truthful, accurate, and honest individuals.   And I think it is fair to say that when you heard their testimony -- when you heard their testimony, I'm hoping that many of you felt they were not being honest with you.   They were not respecting that oath.

Those are decisions you have to make.   And the judge is going to talk to you about reasonable doubt.   If you have a reasonable doubt, you cannot convict.   Well, what is reasonable doubt?   I think you find it is basically what those words say.   It is a doubt based upon reason:   When you say to yourself, I am not convinced that Valerie Rodriguez told us the the truth.   I'm not.   I had a reasonable doubt as to her testimony.

CLOSING/Mr. Keahon

Reasonable doubt, I think you'll find, is a
doubt you can attach a reason to and actually
talk to your fellow jurors about it.  And they
say, well, why is it you don't want to
convict?  And you say, well, I have some
reasonable doubts and this is what they are.
Throughout this case, is there any one of you
that can say, I didn't have a gut feeling,
that this case wasn't being done right?   That
it wasn't really being fair?  The things that
you saw happening in this courtroom?   Would
you want it to be your kid, if he was sitting
next to me, or your nephew, or your sister?
Or any close friend of yours, the things that
we saw happening in this courtroom?  You knew
it wasn't right.  You know it wasn't the way
it was supposed to be.  You think about that.
Because once again, we talk about rights and
what we do.

          The only way it works, is if you
treat this young man at my table, as you would
someone very close to you on trial.  And then
you demand that it be done the right way, and
there is nothing wrong with that.  You owe me

CLOSING/Mr. Keahon

nothing.  You owe them nothing.  The only
thing any of you owe, by this jury service, is
to be fair, to not favor one side or the
other, and call it as you see it.  And at the
end of this case, no matter what your verdict,
no one can ask you or demand of you why you
voted a certain way.  Your verdict is your
verdict.  You don't have to stand up and give
me an answer as to why your verdict was what
it was, and certainly not to the district
attorney's office nor to the judge.

It's what you felt.  And that's why
we have twelve of you, and alternates, sitting
on a jury.  Because you owe nothing to us.
There is no allegiance to me or to the
prosecution.  If they put on a case such as
they have, with the things that you've seen
and heard, you have every right to say, you
know what?  I reject it.  You have that power.
Then maybe the next time, they do it the right
way.  That's the only way that makes them do
it the right way.  But they count on you
accepting it.

Like the fellow that did the

CLOSING/Mr. Keahon

handwriting.  His answer was, I never make a
mistake, and I'm right.  Can you -- any one of
you ever say that?  A good percentage of the
time, a lot of us are wrong.

Det. Gabriele, is there any
question in any of your minds, that when he
started this investigation, it was his belief
that that young man was guilty?  And he went
down a path to establish and prove it.  Never
wavering.  But you know what?  Det. Gabriele
is not the judge.  And he is not the jury.
And you have every right to look at the manner
in which each witness conducted themselves.
The impact they made on you, their body
language, their facial expressions.  Their
personality.  All of those things tell you, or
give us an idea, can I trust this person?

We heard, in addition to Mr.
DeFreitas and Ms. Bryant, Anita Bryant, Ms.
Valerie Rodriguez.  We heard from Ms. Georgia
Fortune.  They had all the documents, all the
records, from the last two years.  When did
they make a determination that it is necessary
to call the young lady?  Two weeks ago.

CLOSING/Mr. Keahon

Almost finished the trial.

          MR. PEARL:  Judge, objection.

          THE COURT:  Overruled.

          MR. KEAHON:  To call the young lady two weeks ago, Det. Gabriele.  Serves her with a subpoena.  A week ago Friday.  She comes in to see him the following Monday and they say to her, take a look at these documents.  We want you to identify his handwriting.  You remember her testimony.  She dated him for a year.  They went out.  She saw his handwriting.  I said, well, where did he live?  Where did he go to school?  What are his family members' names?  I don't know, I don't know, I don't know.  Did you go out to dinner with him?  Yes, a couple of times.  Did he go to your house, yes, a couple of times.  Did he ever send you cards?  Well, yes.  He sent me a holiday card and a birthday card.  I said, you told us you started dating him in November -- at the end of 2002 to the end of 2003.  When is your birthday?  She said my birthday's in November.  I said, did he send you a birthday card in November?  I don't

CLOSING/Mr. Keahon

remember.  Did he send you a Christmas card in

2002?   I don't remember.  Did he send you a

birthday card at the end of next year when you

broke up?  I'm not sure.  He certainly didn't

send you a Christmas card because you broke

up.  Yes, we broke up.  I said it was the

pre-printed card?  Yes.

This is the person they bring in.

Within two weeks of the end of this case, to

identify handwriting on documents they have

had for two years.  These are the things that

create reasonable doubts.  Things that you can

say when you're back there, you know, this is

silly.  What they are doing, and what they

did.  They're counting on you.  And I have to

say this:  They are known as assistant

district attorneys.  I am a defense attorney.

Most jurors, most people, don't

like attorneys.  Especially defense lawyers.

They think they are going to be slick and

tricky, and I said to you when we started this

case, I said I promise you, my questions will

not be slick and they won't be tricky.

They'll be the same questions any

CLOSING/Mr. Keahon

one of you would ask, standing behind that podium, hearing the answers from that witness stand.

I hope you agree I'm not slick and tricky. I hope you believe that I'm prepared, and I take very seriously what I do.

Unfortunately most guys, as you get older and older, you get a little bit better because you do it a lot. But it seems, and I've seen, as you get older and older, a lot of guys take it for granted, and they forget that somebody's life is on the line and they walk through it because they are supposed to be good. I hope you don't find that I've walked through this.

I was starting to say just because they have the title of district attorneys doesn't give them any more credibility than I have. We take the same oath as other attorneys to act in a proper fashion, to fight for our respective cause, and to do it the right way.

But unfortunately, some jurors, they think that the young fella is arrested

CLOSING/Mr. Keahon

and charged and indicted, there must be the

proof, or we wouldn't be here.  We wouldn't be

here, in a courtroom like this, with a judge

like this.  And with talented prosecutors

fighting every day.

But you and I know, and you have

told me in jury selection, innocent people get

charged with crimes, innocent people get to

this stage of the proceeding, and

unfortunately, innocent people sometimes get

convicted.

When we talk about the witnesses,

and the judge will talk to you about it also,

when you're judging the credibility of a

witness, look to see if they are gaining a

benefit from the prosecution.  Have they been

promised something?  Have they been promised

no jail?  Have they been promised dismissal of

the charges.  Why isn't that something you

would want to consider?  Can they do that?

Yeah, sure, they can do it.  I would like to

have the ability to call a witness and say by

the way, you got no problem, on anything.  I

can't do it.  They can.  And they did do it in

CLOSING/Mr. Keahon

1
2         this case.
3                  They did it with Valerie Rodriguez.
4         You saw there was a proffer agreement where
5         she could be prosecuted.  They read her her
6         rights, and then Det. Gabriele went through
7         his thing.  We want him, we want him, we want
8         him, and you're okay.  We'll put you in the
9         grand jury and we'll give you immunity, and
10        that is the ability they have, and that's what
11        they did.  They put Nigel DeFreitas in the
12        grand jury.  Immunity.  Two times.  I can't
13        give immunity to anybody.
14                 Anita Bryant.  She gets arrested.
15        They make a plea agreement with her.  She has
16        to plead to one felony.  She has to plead to
17        one misdemeanor.  But, if she's willing to
18        testify against him, then the agreement which
19        you saw in evidence says they'll dismiss the
20        felony and they'll give her a conditional
21        discharge on the misdemeanor, meaning no jail,
22        no probation.
23                 But it goes even further than that.
24        Because notwithstanding what that agreement
25        said, that you saw in evidence, Ms. Bryant

CLOSING/Mr. Keahon

1

2          said, no, that is not her understanding.  Her

3          understanding from the district attorney's

4          office is that all charges will be dismissed.

5          That's what she said to you.

6                    Yet, they put an agreement on the

7          screen saying that if she testifies against

8          him and cooperates, they'll dismiss the felony

9          but the misdemeanor conviction is still there,

10         and she'll get a conditional discharge.  So

11         which is it?  What they say it is or what she

12         says it is?

13                    The computer.  You heard me say to

14         Det. Gabriele, that computer, did you do a

15         background on it, that was taken out of that

16         92 Howland Avenue?  Did you find out when it

17         was put together?  When it got to this

18         country.  Where it was sold and to whom it was

19         sold?  Yes, I did.  I said, you did that,

20         Det. Gabriele, because I demanded that you do

21         it during this trial.  Isn't that true?  And

22         he said yes.  And I said prior to that, you

23         made no effort at all.  To find out where,

24         when, and how that computer came into this

25         country, or when.  Because you have all those

CLOSING/Mr. Keahon

1   loan victims, in September, October, November,

2   December.  What computer were they done on?

3   How could they not make that effort?  Why does

4   it take myself to make that demand?

5          I know you guys aren't detectives.

6   But one of the first things you would have

7   done is, how do we attach that computer to Mr.

8   Whitehead?  Let's find out.  We know the

9   brand.  We know the serial number.  Let's

10  contact Gateway.  When was it manufactured?

11  Where was it sold?  In what retail store and

12  who bought it?  Every one of you would have

13  done that.  They choose not to.  How can that

14  not be important?

15         We heard Mr. Taneja testify.  He

16  was the AeroBeep fella.  Remember, there was a

17  big -- a lot of emphasis put on, those two

18  blocks of ten and, thirteen voicemail box

19  numbers, and Mr. Taneja came in here and he

20  testified on direct.  I don't think I asked

21  him any questions at all.  I'm not sure.

22         And then, when I'm cross-examining

23  Det. Gabriele, I stumbled on something.  I

24  said to him, "Mr. Taneja, when you spoke to

CLOSING/Mr. Keahon

him, what did you do?"

"I showed him the picture."

"You showed him a picture?   Of
who?"

"Of Mr. Whitehead."

I said, "Did you make any notes or
reports that you did that?"

"No.  Well, did he identify him?"

"No."

I said, "Don't you think that is
something I should be told?"

I don't know what his answer was.
I said, "Are you aware of anybody that ever
told me about this?"

Now, talk about fairness, folks.
You have a fellow that is on trial, they show
a witness -- one of the main witnesses in the
case his picture, and he can't identify him
and they don't tell me?  You wouldn't like
that done to you or yours.

You know, you can't trust this
case.  How many times during this trial did
you shake your heads or put your hair down, or
head down, and say, I can't believe it?   We

CLOSING/Mr. Keahon

1

2          have Mr. Wall come in, from Kings Cycles.  The

3          only thing he did was identify Anita Bryant as

4          going in to do the scam.  We had Mr. Tunde

5          Ojo, from Kwik Digital fax, which we heard so

6          much about from Det. Gabriele.  We find out

7          that Mr. Pearl and Det. Gabriele make a visit

8          to him.  Next day -- they come back a second

9          day.  Then they go see another employee.  Of

10         Mr. Ojo.  But he doesn't come in here and say

11         "That's the guy".

12              Gilda Tricaro, one of the first

13         witnesses from Baron Honda.  She came in here

14         and I believe it was her testimony and you can

15         ask for it to be re-read, anything we say as

16         attorneys on summation, as the judge told you,

17         is not evidence.  And if your recollection is

18         different than ours, yours controls.  If

19         you're unsure, you have every right, you can

20         say I'm not sure Keahon is right on what Mr.

21         Tricaro said.  Send a note to the judge:

22              "Can we specifically have what if

23         anything Ms. Tricaro said about Valerie

24         Rodriguez having access or not having access

25         to the Dealer Track program?"

CLOSING/Mr. Keahon

      It's my recollection that Ms. Tricaro came here under oath, an employee of Baron Honda, her own son was a victim, and she said Valerie Rodriguez never had access to the Dealer Track program.

      Valerie Rodriguez's testimony. Page 105.  Sit back, relax as best you can, it is five or six minutes:

      (The following was read to the jury by Mr. Keahon):

      *Question:   Well, am I correct that you've testified in the grand jury that you only had access to those credit reports on the computer, for 30 days?*

      *"Answer:   Yes, approximately 30 days.*

      *"Question:   Am I correct that your testimony in the grand jury, was that you only have access to those credit reports for 30 days, right?*

      *"Answer:   Yes.*

      *"Question:   You didn't have, as you've told us, the password until sometime in November, that is what you told us, right?*

CLOSING/Mr. Keahon

"Answer:   I believe so.

"Question:   We have had a series of identity theft victims testify in this courtroom to purchasing cars at the end of August, the beginning of September, the middle of September, the end of September, the beginning of October, the middle of October. Are you aware of that?

"Answer:   No.

"Question:   There came a point in your testimony yesterday, Ms. Rodriguez, that you told the jury about working at home, and that my client saw you working and that you explained to him what you were doing and you explained to him about the Dealer Track program.  Do you remember testifying to that?

"Answer:   Yes.

"Question:   You said he was fascinated.

"Answer:   Yes.

"Do you recall during that testimony I got up and I asked the court what time period you were speaking about it, do you remember when I did that at that point?

CLOSING/Mr. Keahon

           "Answer:    No.

           "Question:   Do you recall,
indicating the time period you're talking
about, when you testified that my client was
fascinated after you explained to him about
the Dealer Track program was November, or
December?   Of 2004?   Do you recall
testifying to that.

           "Answer:    Yes.

           "Question:    Yesterday?

           "Answer:    Yes.

           "Question:    So that conversation
could have been in November or December based
upon your testimony yesterday, right?

           "Answer:    Yes.

           "Question:    Do you recall if the
event that took place as you've testified to
in your apartment when you were working on the
Dealer Track program, and you first explained
to Lamar when he was there, what you were
doing, and he was fascinated, if that was in
November or December?

           "When was it after that that he
asked you for leads?   Was it a week after

1   CLOSING/Mr. Keahon

2          *November or December?  Was it two weeks?   Was

3          it three weeks?*

4                  *"Answer:   Maybe even a day or two*

5          *later.*

6                  *"Question:   Okay.  You've read*

7          *your grand jury testimony, you've told us,*

8          *right?*

9                  *"Answer:  Yes."*

10                 *"Do you recall, at Page 25, Line 18*

11         *being asked this question:*

12                 ***"'Quote, 'He asked you to do***

13         ***something for him'.***

14                 ***"'Yes'.***

15                 ***"'Question:   What did he ask you***

16         ***to do'.***

17                 ***"'Answer:  He asked me once,***

18         ***probably two weeks after, I explained to him***

19         ***about the system.'***

20                 ***'He asked me for some leads.'"***

21                 *"Answer:   Yes.*

22                 *"Is that testimony accurate, that*

23         *you gave in the grand jury?*

24                 *"Answer:  I'm not sure of the time*

25         *so yes.*

CLOSING/Mr. Keahon

"*Question:   You didn't tell the jury you weren't sure of the time, did you?*

"*Answer:   No.*

"*You were asked that question and gave a specific answer did you not, ma'am?*

"*Answer:   Yes.*

"*Question:   You told them that it was two weeks after.   You indicated, 'He asked me once probably two weeks after I actually explained to him about the system.   He asked me for some leads.*

"*Answer:   Right, yes.*

"*Question:   If you explained it to him in November or December, two weeks after would be December, January.*

"*Answer:   I don't know.   It could have been November.   It could have been December.   If it was the beginning of November, then I guess the middle of that month or the end of, towards that month, it was then.*

"*Question:   So it could have been the middle, toward the end of November, right?*

"*Answer:   Yes.*

CLOSING/Mr. Keahon

"Question:   Then you testified
yesterday that after he -- after he asked you
for leads, at a later time he called you and
asked you for the password.

"Answer:   Yes.

"Question:   And that was two weeks
after that?

"Answer:   Yes.

"Question:   Ms. Rodriguez, in
November or December, you explained to him
what the Dealer Track program is, correct?

"Answer:   Yes.

"Two weeks after that, he asked you
for the leads.

"Answer:   Yes.

"Question:   Two weeks go by and he
calls you, by your testimony, and asked you
for the password?

"Answer:   Yes.

"Question:   Did you tell him the
password was changed?

"Answer:   Yes.

"Question:   You never told the
district attorney's office or law enforcement

CLOSING/Mr. Keahon

that the password was ever changed, did you?

"Answer: Yes, I mentioned it.

"Question: Who did you mention it to?

"Answer: To -- because they asked me how -- did it ever change, how frequent did it change? So I made reference to the detectives, or Mr. Pearl that...

"Question: Well? Go ahead, I'm sorry.

"Answer: Sorry.

"Question: You had a chance.

"Answer: I'm not even saying at that time that it changed. I said that because I wanted to get off the topic.

"Question: So it hadn't changed.

"Answer: Not to my knowledge.

"Question: But didn't you just tell me that you told the detectives and the district attorney that it had changed?

"Answer: Yes, it did change. At one point, it did.

"Question: Didn't you just tell me now, that it never changed?

1    CLOSING/Mr. Keahon

2                  "Answer:  I didn't say that.  I

3        said at the time, when I was talking to him,

4        to my knowledge it did not change.  I told

5        them that.

6                  "So it changed sometime after that.

7                  "Answer:   It did in fact change.

8                  "Question:   When?

9                  "Answer.   I guess it would be safe

10       to say January."

11                 She testified to you folks, she

12       worked there from September to December.  She

13       wasn't working there in January.

14                 "Question:  If he's calling you in

15       the end of November or December, and he's got

16       the password, and he's asking you if it

17       changed, then he didn't have the password

18       because it didn't change.  It didn't change

19       until January?

20                 "Question:  You told us that the

21       password changed in January, yes?

22                 "Answer:  I believe so.

23                 "You told us, ma'am, that you had

24       the discussion with him about the Dealer Track

25       program in November or December, and that two

CLOSING/Mr. Keahon

1
2          weeks after that, he asked you for leads.   And
3          that sometime after that, he calls and asked
4          you for the code, right?
5                    "Answer:   Yes.
6                    "Question:   And then as part of
7          that conversation, he asked you if the code
8          was changed.
9                    "Answer:   Yes.
10                   "Question:   Did the detectives
11         ever ask you for permission to examine your
12         computer?
13                   "Answer:   No.
14                   "Question:   To determine what was
15         done on the computer if it was done, if it was
16         done?
17                   "Answer:   No.
18                   "Question:   Each time you logged on
19         your computer, a record of that is made within
20         the computer, is it not?
21                   "Answer:   I'm sorry, I'm just
22         thinking back to the other questions that you
23         asked me regarding them asking me to look over
24         my computer.   I'm not sure.
25                   "Question:   I'll go back.

```
 1   CLOSING/Mr. Keahon
 2                Did the detectives assigned to this
 3        case, or the district attorney, ever ask you
 4        for permission to examine that desktop
 5        computer?
 6                "Answer:   I'm not sure.   I think,
 7        I remember -- um, telling them that the
 8        computer -- we don't have anymore.   So
 9        possibly.
10                "Question:   When did that computer
11        go?
12                "Answer:   I don't know.   My mom
13        got a new one. I'm sorry.
14                "Question:  You couldn't use two
15        computers?
16                "Answer:  I'm sorry, it's not that.
17        I take it back.
18                "Question:  So your Mom didn't get
19        a new computer.
20                "Answer:  I'm not sure.  I don't
21        remember.  I think it was a new monitor not
22        the computer itself.
23                "Question:  So you still have the
24        computer.
25                "Answer:  Yes.
```

CLOSING/Mr. Keahon

1

2          *"Question:  Well, has anybody ever*

3      *asked you for permission to examine it?*

4          *"Answer:  No.*

5          *"Question:  To see when you went on*

6      *the computer, what you did on the computer?*

7          *"Answer:  No.*

8          *"Question.  When you used that*

9      *password or didn't use the password.*

10         *"Answer:   No.*

11         *"Question:   They could make a*

12     *chart of what is on your computer.*

13         *"Answer:   No answer."*

14          Nigel DeFreitas's -- testimony.

15     We'll skip him for a minute.  I read to you

16     some of the testimony of Ms. Rodriguez.

17          Let me cover a few more points so I

18     don't bore you.

19          Experts.  The fingerprint expert.

20     On direct examination, she never mentioned to

21     you, nor did the district attorney ask

22     questions about that known print of my client.

23     The print that had all the white lines going

24     through it, which you didn't see in the

25     unknown that they were comparing it to.  No

CLOSING/Mr. Keahon

mention of that on direct examination.

On cross-examination, halfway through it, I said, ma'am, on the known print of Lamar Whitehead, we see these lines going through that don't appear in the unknown.  I said, "What are they?"

She said, and there was silence for 10 seconds.  She said "Oh, those are creases.  They are only temporary."

I said, "Temporary"?  She says "Yes, they are just temporary."

I said, "Can they be temporary for ten years?"  She says yes.

And then she said, "But Mr. Keahon, I can fingerprint your client right now in court, in front of this jury, to see if those creases are still there."

What am I supposed to do with that?  Run away, or say okay, do it.  So we did it.  She fingerprinted him right here in front of you folks.  And the print came back with the creases.  Same as the original one, and different than what they claim to be the unknown.  That was the match.

CLOSING/Mr. Keahon

1
2          MR. PEARL:  Objection.  That was
3     not the testimony.
4          THE COURT:  Overruled.  Overruled.
5          MR. KEAHON:  Once again, if you
6     think I'm misstating anything, go back to her
7     testimony where they had the chart with the
8     known, the unknown, I asked her about the
9     creases.  She said they are temporary.  I said
10    how temporary?  Can they be there for ten
11    years?  Hesitates.  Yes.  Looked to see if
12    there was an immediate challenge.  She said
13    Mr. Keahon, I can fingerprint him right here,
14    in this courtroom, to see if they're still
15    there.  And she did, and they still were
16    there.
17          I don't know that any of us are
18    called experts.  They call themselves experts.
19    And they don't want to be challenged at all.
20    You know what?  Too bad.  What am I supposed
21    to do say, "Oh, you're right?  You're an
22    expert."
23          I asked about -- "Are there any
24    standards whatsoever by which you folks do
25    this stuff?"

CLOSING/Mr. Keahon

No.  Do you have to find so many
matches in order for you to say I could form
an opinion and conclusion?  No. Is it all
subjective?  Yes.  Is it all subjective.  By
you?   Yes.  Are there any standards or data,
statistical data that you go to to see what is
going on?  No.

Mr. Luber, the handwriting expert,
goes through all of his background, they put
the stand in front of you.  They put that big
chart up, with what they claim are knowns, and
purported known as.  And he spends about 30
seconds with you, telling you why there is a
match.  I ask him on cross-examination:

Are there any standards you work
under?  Is there -- any data that you use?
Is it all subjective?  And remember he said,
"It's all up here."

And I said, "Can I see it?"  And
then I had him come down, and I went through
the chart with him, and I think we went over
about 40 differences in the known, unknowns.
And he stood to the side, and you know, he
said very smugly, "That is a difference?"

CLOSING/Mr. Keahon

"Yes, that is a difference".  Not a big deal.

So I'm figuring okay, on redirect, he's really going to slam it to me and show us why no big deal.  But he doesn't.  They don't ask him any more questions on redirect.  It is merely he says he doesn't make a mistake, and Mr. Keahon, you're a fool for doing this.  But if I take him through -- picture you as me, and there is an expert, and you put some work into it.  You've gone through all this stuff. You see differences, and you say isn't that different?  Isn't that different?  Isn't that different?  And the witness goes, different but -- wouldn't you expect them to stand up and say, "You know what?  Mr. Keahon is a jerk.  Tell him why it is not a big deal, and let's straighten this out."  They didn't even make an attempt.

They just want you to say, "You know what?  I said it.  Believe it."  And that is arrogant.  You saw it, and you know it.

Am I supposed to be a good boy and just go home?  You know, if I didn't get up

CLOSING/Mr. Keahon

and ask questions on cross-examination, this
case would have been a stampede for
conviction.  Can you imagine what you folks
would have thought?  You would have thought
everything they did was right.  What a killer
of a case.  It is overwhelming.

You know, the horrible thing is
people get arrested and charged with crimes.
They don't know who is a good lawyer.  Every
lawyer says they are good.  "Oh, that's my
specialty.  You should have me."  Can you
imagine what happens in this criminal justice
system?  With the guys that take the money and
walk through the deal and don't want to get up
and fight?  I am proud of this system.  I'm
proud to be a part of it.  I think it works.  I
did what they did for 12 years, and I think
I'm very fortunate to do what I do now.

Now you're going to have to listen
to Mr. DeFreitas.

You are what they called a captured
audience.  There is nowhere to go.

I don't have all that much longer,
I really don't.  If anybody needs a break

CLOSING/Mr. Keahon

1       raise your hand -- I hope it's ten minutes,

2       maybe?   Twelve?

3           Mr. DeFreitas:

4           *"Question:  Did the detectives come*

5       *to your house and show you a search warrant.*

6           *"Answer:   No.  I wouldn't let them*

7       *in my house until they showed me the search*

8       *warrant they stayed outside my house.*

9           *"Question:   I think you told us on*

10       *direct examination, that they knocked on the*

11       *door or rang the bell.*

12           *"Answer:   My brother was going*

13       *away and as he was leaving, a few cop cars*

14       *came.*

15           *"The Court:   Sir, please answer.*

16           *"Answer:  Police cars approached*

17       *the house.  I heard through the window what*

18       *was going on.  I came to the door and there*

19       *they had my brother and myself.  They said,*

20       *are you Nigel DeFreitas?  Are you Desmond*

21       *DeFreitas?  And that is where they stayed*

22       *outside.*

23           *"Question:  So when the detectives*

24       *first arrived at your house, they knew the*

CLOSING/Mr. Keahon

     name Nigel DeFreitas?

               "Answer:  Yes.

               "Question:  They knew the name

     Desmond DeFreitas.

               "Answer:  Yes.

               "Question:  Didn't, on direct

     examination, you indicate that they wanted to

     come in and you wouldn't let them in until

     they showed you a search warrant?

               "Answer:  Until they showed me the

     warrant, yes.

               "Question:  So they identified

     themselves as the detectives.

               "Answer:  Yes.

               "Question:  They were in cars that

     looked like detectives, unmarked vehicles,

     right?

               "Answer:  Yes.

               "Question:  They showed you their

     identification, did they not?

               "Answer:  Yes.

               "Question:  You told them you're

     not coming in the house without a search

     warrant.

CLOSING/Mr. Keahon

"*Answer: Yes.*

"*Question:  They produced the*
*search warrant.*

"*Answer: Yes.*

"*Question:  Are you suggesting to*
*us that the detectives did not speak with your*
*brother for a period of time?*

"*Answer:  They spoke with my*
*brother.*

"*Question:   Where did they do*
*that?   Did they do this in apartment or did*
*they do that in his apartment.*

"*Answer:  They did that outside my*
*house.*

"*Question:  Did your brother come*
*back into the house.*

"*Answer:  Come back into the house?*
*I can't recall.  I'm not sure.  He might have.*
*I don't know.*

"*Question: Do you know whether or*
*not they took a statement from your brother?*

"*Answer:  No.*

"*Question:  No, you don't know, or*
*no, they didn't answer.*

CLOSING/Mr. Keahon

"Answer:  No, I don't remember they did.

"Question:  You told us that your brother was going away on vacation.  He was going to the Bahamas, wasn't he?

"Answer:  I have no idea where he was going.  He was going away.

"Question:  He was going with the girlfriend.

"Answer:  That is how the whole thing started.  I don't know where he was going.  The girlfriend was there, with him.

"Question:  And they were about to go to the airport.

"Answer:  Yes.

"Question:  As far as your brother's upstairs apartment, how many rooms were contained up there?

"Answer:  Three rooms.

"Question:  What are they?

"Answer:  Three bedrooms.

"Question:  Three bedrooms, a living room, and a kitchen?

"Answer:  A living room, bedroom,

CLOSING/Mr. Keahon

kitchen.

"Question:  Was there someone else
living there at the time beside yourself and
your brother?

"Answer:  Yes.

"Question:  Who was that?

"Answer:   Chris Cole.

"Question:  Is Chris Cole a male or
a female.

"Answer:  Male.

"Question:  How old was Chris Cole?

"Answer:  I have no idea, might be
33, I'm not sure.

"Question:  What does he do for a
living?

"Answer:   He's a bouncer.  He's a
security guard.

"Question:  Where did he work at
the time?

"Answer:  I don't know.

"Question:  What vehicles were at
the residence at that time?

"Answer:   My brother's vehicle,
and my vehicle.

1　CLOSING/Mr. Keahon

2　　　　　　　　*"Question:　What was your*

3　*brother's vehicle in 2005?*

4　　　　　　　　*"Answer:　I don't know if he had*

5　*his Tahoe then.　I can't recall.*

6　　　　　　　　*"Question:　It was a Jeep Grand*

7　*Cherokee, wasn't it?　Maroon.*

8　　　　　　　　*"Answer:　Yes."*

9　　　　　　　　You'll see later on, when I accuse

10　him and Kylie Copeland and his brother, of

11　doing an identity fraud on that Jeep Grand

12　Cherokee, he switches off to it is not his

13　brother.

14　　　　　　　　But on Page 42:

15　　　　　　　　*"Answer:　My vehicle or my*

16　*brother's vehicle.*

17　　　　　　　　*"Question:　Brother's vehicle, it*

18　*was a Jeep Grand Cherokee, wasn't it, maroon?*

19　　　　　　　　*"Answer:　Yes.*

20　　　　　　　　*"Question:　Burgundy?*

21　　　　　　　　*"Answer:　Yes.　He drove a Jeep*

22　*Grand Cherokee.*

23　　　　　　　　*"Question:　As a matter of fact,*

24　*when he left to go to the airport, he was in*

25　*that vehicle with his girlfriend, was he not?*

Jennifer Maue, Senior Court Reporter　(631)852-2153

CLOSING/Mr. Keahon

"Answer:  I can't recall.  He might have been.

"Question:  Did you tell us on direct examination, that Lamar Whitehead had been at your house all the time?

"Answer:  Yes.

"Question:  Did that start the year 2000, 2001, 2002?

"Answer:  He was at my house all the time.

"Question:  You've told us that there was a period of time for about a year when he was out in New Mexico, at college, right?

"Answer:  Yes.

"Question:  Other than that, from the year 2002 to 2005, taking out that one year whenever it was, because you don't have a recollection, is it a fair statement that he was a good friend of your brother's?

"Answer:  Yes.

"Question:  And he was at your house all the time other than the year you say he was in New Mexico?

CLOSING/Mr. Keahon

           *"Answer:  Pretty much.*

           *"Question:  In January of 2005, he was still a frequent visitor to your house?*

           *"Answer:  Yes, I think so.*

           *"Question:  He'd come by to hang out with your brother?*

           *"Answer:  Yes.*

           *"Question:  Desmond, your brother, do you know how many phones he may have had in 2004?*

           *"Answer:  No.*

           *"Question:  Now, that Jeep Grand Cherokee that we talked about, that burgundy Jeep that your brother was driving, back in 2005, when did he first get that car?*

           *"Answer:  He drove it around.  I don't know if it was his."*

           You heard the previous testimony where he said it was.

           *"Question:  Did he drive it in 2002?*

           *"Answer:  Yes, he drove it around in 2002.*

           *"Question:  2003?*

CLOSING/Mr. Keahon

"*Answer:  I think so.*

"*Question:  2004?*

"*Answer:  I don't remember.*

"*Question:  It was parked at your house every one of those years, wasn't it?*

"*Answer:  I don't know.*

"*Question:  Did your brother have a registration for that vehicle.*

"*Answer:  I have no idea.*

"*Question:  Well, how often did your brother drive that vehicle, in 2002, 2003, 2004 and 2005?*

"*Answer:  I don't know.*

"*Question:  What was the last time you saw your brother drive that vehicle?*

"*Answer:  Maybe -- I can't recall. I don't even know.  He hasn't had it in so long.*

"*Question:  Two weeks ago, it was parked at your house, was it not.*

"*Answer:  I have no idea.*"

"*Question:  What do you mean you have no idea?  You live at that house.*

"*Answer:  My brother doesn't drive*

```
1   CLOSING/Mr. Keahon
2            that car.  He has his own car.
3                    "Question:  Two weeks ago, was that
4        car parked at your house?
5                    Answer:   I have no idea.
6                    "Question:  You told us your
7        brother drove that car in 2002, right?
8                    "Answer:  Yes.
9                    "Question:  What year car did he
10       have in 2002?
11                   "Answer:  He would drive my car.
12                   "Question:  When you had your car,
13       what other car would he drive?  He had no
14       other car, did he?
15                   "Answer:  He'd ask friends.
16                   "Question:  That was his car,
17       wasn't it?
18                   "Answer:  I don't know.  I don't
19       think so.  No, it wasn't."
20                   "Question:  You and Kylie Copeland
21       and your brother did an identity fraud
22       on -- you and Kylie Copeland and your brother
23       did an identity fraud, didn't you?
24                   "Answer:   No.
25                   "Question:  Did you get a call from
```

CLOSING/Mr. Keahon

Lamar Whitehead's Mom, on January 25th of
2006?   Telling you guys, you and your
brother, that he had been arrested.

        "Answer:  No, I never spoke to
Lamar's Mom.  She never called me up.

        "Question:  Do you know his Mom?

        "Answer:  I know his Mom.

        "Question:  Have you seen her
before today?

        "Answer:  Yes, I have.

        "Question:  Where is she seated?

        "Answer:  She's seated in the back.

        "Question:  Did she call you on
January 26th, 2006, the day he got arrested?
I misspoke it was January 25th -- to tell you
that he was arrested.

        "Answer:  Not that I recall.

        "Question:  Didn't you go the next
day, you and your brother, go the next day, on
the 26th of January, to Teaneck, New Jersey?

        "Answer:  I have never been to his
house, to Teaneck, New Jersey.

        "Question:  Do you know he has a
house in Teaneck, New Jersey?

CLOSING/Mr. Keahon

"Answer:  Do I know he has?

"Question:  Yes.

"Answer I've heard.

"Question:  When did he purchase the house.

"Answer:  I have no idea.

"Question:  Was it in 2005?

"Answer:  I can't remember.

"Question:  Did your brother, Desmond, have a key to that house?

"Answer:  I have no idea.  I don't know.

"Question:  Did your brother go there on January 26th of 2006?"

My client was arrested on January 25 of 2006, he was in jail, and they did the search warrant on the house on January 27th of 2006.

"Question:  Did your brother go there on January 26th of 2006?

"Answer:  I don't know."

You'll recall, I asked Det. Gabriele, after Nigel DeFreitas testified, did the district attorney or did Nigel DeFreitas

CLOSING/Mr. Keahon

or anyone talk to you about that maroon Grand
Cherokee Jeep?  That I accused him of identity
fraud with Kylie Copeland and his brother?
No.

Now, you all heard what was in that
record.  You don't think anybody spoke to Det.
Gabriele and said, maybe we should look into
this?  Or did they choose not to?  How do you
not?  How do you not say to Mr. Keahon, here
comes a smack, and you put a witness on the
stand and you say, that Grand Cherokee Jeep,
maroon, belonged to somebody else, here is the
registration, here is the proof and now,
jurors, you can't believe what Mr. Keahon
says.

He chose not to.  I mean, how do
you not do that?  If somebody -- if you were
prosecuting this case, and some lawyer got up
and accused one of your witnesses of being in
cahoots with Kylie Copeland and his brother,
Desmond, doing a fraud on this case, they did
so much work on this case, they couldn't prove
to you what his brother initially says was his
vehicle and then switches, they couldn't prove

CLOSING/Mr. Keahon

to you that Keahon is full of it, you can't
trust him?

You know, they can do all their
charts, and you're going to get a lot of them
in summation, and you're going to have power
point presentations and diagrams and arrows
going eighteen different ways.  But you know
what, it is baloney.  It doesn't prove who
was on the phone.  It doesn't prove who was on
the computer.  It doesn't prove anything
beyond a reasonable doubt.

Det. Gabriele says that they find
Desmond DeFreitas' personal i.d. with the
picture at Lamar's house.  After my client is
arrested.  On January 25th of 2006.  They find
it on the 27th, 2006.  Det. Gabriele says he
found it in a bag, but you have no idea what
was in any bags.  You have no idea what if any
of this evidence was found in that house, or
where, in this house.

And in this day and age, 2008, we
have people walking on planets, the moon,
everything else, all this scientific stuff, I
said, aren't you guys required to take a video

CLOSING/Mr. Keahon

camera and videotape of the search that you
do?  And the items that you found and where
you found them?  His answer, no, we're not
required to do it.  Well, you know what?
They rely so much on you accepting them
because they say they're a detective.  Why do
they have to do that?  Why have you folks
guess?  Why have a guy like me say things and
not be able to answer it, when they can say,
video, that's what we did.  There is the bags.
We picked this out.  That is a killer for
Lamar.  Here comes another one.  There is
another one.  Mr. Keahon, be my guest.
Cross-examine that.  Or do it with the car.

The sleeve.  The secret zipper
sleeve.  It was stuck over here with the
damaging Rhonda Ghassabian note in it, or
something, and this here and that there, and
that there.  You know what?  Because they
rely on you folks saying he's not going to
mislead us.

You know what?  You don't know him.
You owe no duty to him.  And the only way this
stuff gets done right, for those of you that

CLOSING/Mr. Keahon

1

2          have friends that might get in trouble, do it

3          the right way.  Don't count on us being the

4          strong conservative Suffolk County juror, that

5          we okay everything that you want to do.

6                    I swear that is the only thing that

7          changes anything.  You tell them:  Do it the

8          right way.  Don't count on me.

9                    Please listen very carefully to the

10         judge's charge on what circumstantial evidence

11         is.  This charge is kind of complicated.  I

12         don't understand it, and I have been doing

13         this 35 years because it is the way the law is

14         written, and the judge has to give these

15         specific instructions.  So it is real

16         complicated.  But listen to the charge on

17         circumstantial evidence.

18                    You're going to hear that you can't

19         base an inference on an inference.  You cannot

20         infer proof of a circumstantial fact from

21         proof of another circumstantial fact, and the

22         judge will explain that in detail.  Some of

23         you will almost go to sleep.  Okay.

24                    Det. Gabriele says he recovers a

25         Connecticut non-governmental i.d. from the

CLOSING/Mr. Keahon

         house, and the address on it says

         "H-A-R-F-O-R-D, Connecticut".  They say that

         is the same address as a fraud case, but it is

         not.  It is not Hartford, Connecticut, but

         they'll tell you it's my client.  They will

         tell you he was on a motorcycle, he was in a

         car.  So what?  It is proof of nothing.

                 This is it, we're on the last one.

                 You're going to hear next from the

         prosecutor and the judge will give you the

         law.  Then you will begin your deliberations.

         I hope there are those of you on this jury

         that don't trust this case, and that there are

         those of you who feel lies have been told to

         you, under oath, that witnesses have

         intentionally misled you, or evidence has been

         been misstated or hidden.  And when you

         discuss this case amongst yourselves, if you

         believe this case has not been proven to your

         satisfaction, please do not give in to the

         pressures of others on the jury.  And don't

         let the time restraints force you to a quick

         verdict.  If you truly believe in your hearts,

         after thinking about all the evidence that you

CLOSING/Mr. Keahon

1

2          don't trust this case, you have problems with

3          it, and you got reasonable doubts, obviously,

4          listen to the other jurors.  But after

5          listening to them, if you still feel that way,

6          stand strong.  Because a week from now, you

7          can't call me and say, Mr. Keahon, you know, I

8          think I made a wrong decision.  There is no

9          backsies in this one.

10                 Discuss it fully, and after fully

11         discussing it, if you still feel that it is

12         not proven, stick to your guns.  And if, as

13         jurors, you cannot reach a decision, send a

14         note to the judge saying we can't reach a

15         decision.  We can't agree.  The judge may say,

16         go back out, try it again.  So you do.  You go

17         back in and discuss it again.  If after doing

18         it the second time, or the third time, you

19         say, Hey, look, I'm not budging.  I've

20         listened to all of you.  I am not giving up my

21         position.

22                 Send another note.  And you know

23         what?  If we have to re-try this case again,

24         maybe they'll do it the right way.

25                 You have been great.  You really

People v. Lamar Whitehead

1      have.  Thank you very much.

2                    THE COURT:  Thank you, Mr. Keahon.

3                    Ms. Franzese, Mr. Pearl, the jury

4      will be given a brief recess before your

5      closing arguments.  Thank you.

6                    I remind you not to form or express

7      an opinion about the case until it is

8      submitted to you for deliberations.  As I've

9      told you, do not discuss this case or any

10     matter connected to the trial amongst

11     yourselves or with anyone else.  Nor may you

12     allow it to be discussed in your presence.

13                   Don't read or listen to accounts

14     reported in the news media, don't visit or

15     view the place or places where the offense

16     charged was allegedly committed or any other

17     place involved in this case, and promptly

18     report to the court by way of coming to me

19     personally, through a court officer, any

20     incident within your knowledge involving any

21     attempt to influence any member of the jury.

22                   (The Jury is excused)

23                   THE COURT:  The court will take a

24     brief recess.

```
 1    People v. Lamar Whitehead
 2                    (Brief recess)
 3                    THE CLERK:  Case on trial, people
 4         versus Whitehead.  All parties are present
 5         outside the presence of the jury.
 6                    THE COURT:  The court noticed that
 7         a certain exhibit was set up.
 8                    Officer, what is the number on
 9         that?
10                    THE COURT OFFICER:  79, your Honor.
11                    THE COURT:  Thank you.
12                    Notwithstanding the fact that it
13         had been admitted into evidence, in light of
14         the court's subsequent rulings, if the people
15         would be so kind as to redact the term
16         "personal cell phone".
17                    MR. PEARL:  Already done, judge.
18                    That is an i.d. chart.
19                    MR. KEAHON:  I have one that says
20         "personal cell phone."
21                    MR. PEARL:  It is not in evidence.
22         None of these are in evidence.
23                    MR. KEAHON:  If it is a chart he's
24         going to use even though it is not in
25         evidence....
```

People v. Lamar Whitehead

          MR. PEARL:  I have to redact it,

even though it's marked for identification.

          THE COURT:  Gentlemen, gentlemen,

we're speaking out of turn right now.

          Mr. Keahon, you have been apprised

that your colleague is intending to use

audiovisual aids, certain charts during his

summation.

          Do you wish to be heard?

          MR. KEAHON:  Yes, judge.  As to one

of the ones marked 181, it has Lamar

Whitehead's personal cell phone.  That is the

only thing I have a problem with on that one.

          And 182, it has the same thing.  It

is the only thing I have a problem with on

that one, and that's it.

          THE COURT:  Thank you.

          Mr. Pearl?

          MR. PEARL:  Judge, if I use them.

To be honest, I don't know what I'm using yet.

In reference to the chart, other than this

one.

          It is an identification chart.

It's not in evidence.  Anything on there I

People v. Lamar Whitehead

suggest is fair comment of the evidence,
therefore, I should be permitted to use the
chart as is.

THE COURT:  Mr. Keahon, would you
dispute it is the right of your adversary to
characterize the telephone in question, or to
call it, and submit to the jury, it is in fact
your client's personal cell phone?

MR. KEAHON:  I'll stand on the
record I've made.

THE COURT:  Thank you.  Then you
don't wish to respond to the court's question.

MR. KEAHON:  No, I don't want to
waste time, judge.

THE COURT:  Thank you.

MR. KEAHON:  I think I repeatedly
said why I don't think it should be done.

THE COURT:  The well-settled rule
on the use of non-evidentiary items is whether
or not it would be prejudicial or improper to
say, and if it's improper subject to fair
comment by the remarks of an advocate, it also
can be subject to a non-evidentiary
demonstrative device.

```
1   People v. Lamar Whitehead
2                   The question ultimately is one of
3       prejudice. And not being privy to all of your
4       colleague's demonstrative devices, we'll have
5       to rule on them one at a time.  If you feel
6       one of them falls outside of that parameters,
7       and prejudices your client, I'll hear the
8       objection at that point this time.
9                   Otherwise, your colleague has the
10      right to make reference to such items.  The
11      jury will be admonished they do not constitute
12      evidence.
13                  Thank you, your exception is noted,
14      Mr. Keahon.
15                  MR. KEAHON:  Thank you, judge.
16                  THE COURT:  Thank you.  Are we
17      ready to proceed?
18                  MR. PEARL:  Yes, your Honor.
19                  THE COURT:  Thank you.  My
20      compliments to the jury.
21                  If you notice the jury become
22      discomfitted during your closing argument,
23      perhaps you would suggest a break.  Your
24      colleague offered that to the jury during his
25      summation, you'll extend the same courtesies,
```

CLOSING/Mr. Pearl

1
2          about an hour and a half is the longest that
3          someone can go before expressing an interest
4          for a recess, to stretch their legs.
5                    THE COURT OFFICER:  The jury is
6          entering.
7                    THE COURT:  All rise, please.
8                    (The following occurred with the
9          jury present):
10                   Thank you.  Please be seated.
11                   THE CLERK:  Case on trial, People
12         versus Whitehead, the jury and all parties are
13         present.  Counsel waive the roll.
14                   THE COURT:  Thank you all once
15         again.  At this time the people may address
16         the jury and make their closing remarks.
17                   MR. PEARL:  Thank you, your Honor.
18                   May it please the court, Mr.
19         Keahon, ladies and gentlemen of the jury,
20         before I go into my closing, let me start by
21         saying in voir dire, I remember telling you
22         we'd be taking this case to the first day of
23         Spring.  I was wrong.  We are now well a week
24         after Spring.  So I thank you on behalf of
25         everybody in this courtroom, particularly on

CLOSING/Mr. Pearl

behalf of Assistant District Attorney Franseze
and myself.  We truly thank you because I know
it has been a long trial, and you guys all put
in a lot of time and effort and attention.  So
thank you.

The bad news after that, is my
closing might last an hour hour and a half.
Hopefully, not longer.  If it does and anybody
feels discomfort and needs a rest, raise your
hand, and the judge will grant it.

Seven weeks ago, and perhaps over
50 witnesses ago, I told you in opening
statements that each of you would have the
opportunity to bear witness to one man's greed
and arrogance, and the damage that one man's
greed and arrogance can inflict on law abiding
citizens.  I suggest what you've seen from the
evidence here, ladies and gentlemen is this
man's greed, and this man's arrogance.

When Mr. Keahon talks about Jeff
Luber being arrogant, think about this
defendant's greed and arrogance.  The greed.
I can take anything I want.  I don't have to
pay for it.  And the arrogance is that I'm so

CLOSING/Mr. Pearl

smart, nobody will ever catch me.  I'm smarter than everybody.

Now, you saw how this defendant's greed and arrogance affected seventeen of your fellow Suffolk County residents.  And this defendant's greed and arrogance didn't stop at the borders of Suffolk County.  You saw how he extended into Brooklyn.  You saw how Nouri Khabeih, the Brooklyn resident, was victimized by this defendant.  That's counts nine and ten of the Indictment, Land Rover Massapequa deal.

This defendant, using Nori Khabeih's identity, attempted to steal a $55,000 Range Rover.  You saw how this defendant extended beyond the borders of New York State.  He stole the identities, I suggest to you, of David Ridenour, of Rhonda Ghassabian, both from Tennessee -- the person-to-person transactions, ladies and gentlemen of the jury, where the defendant, stealing the identity, starts with Rhonda Ghassabian -- Nerina Sperl.  He then steals the identity of Rhonda Ghassabian.  He sets up a person-to-person transaction.  This was with

CLOSING/Mr. Pearl

1
2          a Porsche Cayenne.  This is where the
3          defendant is to have money deposited into one
4          account and money withdrawn in the other.
5          Greed and arrogance, its my money.  I deserve
6          it.  I didn't work for it, but I deserve it.
7                    That's for Rhonda Ghassabian and
8          Nerina Sperl's count.
9                    The David Ridenour, Maria Macarle
10         is encompassed within count six of the
11         indictment.  That is a person-to-person
12         transaction, where the defendant sets up a
13         stolen identity with Maria Macarle, that is
14         where he uses his co-defendant, Anita Bryant.
15         Make no mistake, that many co-defendants in
16         this case, Anita Bryant, Teisha Lamont, Kylie
17         Copeland.  You want to consider Valerie
18         Rodriguez a co-defendant, fine.  That is the
19         ring leader, ladies and gentlemen.  He's the
20         one that is manipulating all of them.
21                    He even extended into the state of
22         Florida, with Christina Brooks.  You saw, they
23         all took the stand.  They came in and they
24         testified.  It is one of these
25         person-to-person transactions, Maria Macarle,

CLOSING/Mr. Pearl

Christina Brooks, I think this is the 57
thousand dollars check he's deposited into one
account, and he's trying to take the one,
because its my money.  I didn't work for it,
but it is mine.

You saw how Anita Bryant testified
she went into the bank and she tried to
withdraw 17 thousand dollars at his request.
That, ladies and gentlemen is what greed and
arrogance is defined as.  Not Jeff Luber.

This is a thirty-four count
Indictment comprised of 29 separate identity
thefts.  It took over 50, 55 witnesses to be
able to put forth the evidence, so we can
prove the defendant's guilt beyond a
reasonable doubt.  If -- I did a closinging
argument and I went over every single crime,
I'd keep you here for another seven weeks.  I
won't do that.

However, there are charts in
evidence, 190 to 209, with the exception of
192 or 193, you can ask the judge for them.
They detail many of the identity thefts, with
the phone spray analysis, these chart, as well

CLOSING/Mr. Pearl

1          as the other charts, you can take them into

2          your deliberations.

3                  What I'm going to do, is review,

4          however, a few counts.  I want to review with

5          you counts two and three, Maria Macarle, count

6          eight.  Nerina Sperl Rhonda Ghassabian, counts

7          nine and ten, Nouri Khabeih, and count sixteen

8          overlaps with that, that is the Sprint cell

9          phone in the name of Wojcieh Wachnik.

10                 Before I get -- Mr. Keahon is

11         right.  There is going to be a power point.

12         There is going to be arrows, not bells and

13         whistles.  The reason there is a power point

14         presentation, ladies and gentlemen, is because

15         that's the evidence.  Mr. Keahon spent an hour

16         hour and ten minutes, I can't recall, one

17         piece of evidence he talked about.  He just

18         glossed over it.

19                 And Mr. Keahon did mention being

20         slick and tricky.  Let me suggest to you what

21         is slick and tricky.  Slick and tricky, is

22         when you put a witness on the stand, Nigel

23         DeFreitas.  You make up something about a

24         fabricated Cherokee that was stolen with an

CLOSING/Mr. Pearl

1
2    identity theft, with Kylie Copeland, and your

3    brother Desmond, and yourself.  There is no

4    evidence to suggest it.  You just asked a

5    witness, the witness says no, and then you get

6    in front of jury and you argue like it

7    actually happened.  There is no in evidence

8    the record to suggest that a Cherokee was

9    stolen.

10           I suggest to you it is a figment of

11   the defense, of their imagination.  The

12   purpose of it, ladies and gentlemen, is

13   because this, that, right here, is where the

14   evidence is.  If he can get you thinking over

15   here, about this -- this Cherokee, that may or

16   may not be stolen, he's done his job.  Because

17   you're not thinking about the evidence.

18           This Power Point, and the evidence

19   before you, is hopefully going to bring you

20   right back to the evidence.

21           This is the case of People vs.

22   Lamar Whitehead.  As Assistant District

23   Attorney Franseze and I told you in opening

24   statements, there is an expression, all roads

25   lead to Rome.  This is a case where all

CLOSING/Mr. Pearl

1
2          evidence leads to Lamar Whitehead.

3                        So where does this case begin?  We

4          now all know.

5                        MR. PEARL:  Judge, can we dim the

6          lights.

7                        THE COURT:  Yes, certainly.

8                        If we could dim the lights, please,

9          officer.

10                        MR. PEARL:  We all know where it

11          began.  It began at Baron Honda.  Those are

12          the exhibits in evidence, one through 12.

13          What we know, this is the exception with Nouri

14          Khabeih, is -- what we know, is that everybody

15          that purchased a car at Baron Honda, had a

16          couple of things in common.

17                        They did purchase cars at Baron

18          Honda during the same time frame, and they all

19          had excellent credit.  These are all victims,

20          Maria Macarle, Nerina and Raymond Sperl,

21          Joseph Sweeney, Wojcieh Wachnik, that is the

22          only person where we don't have an exhibit.

23                        Ms. Tricaro testified -- Mr.

24          Wachnik testified he purchased the vehicle

25          from Baron Honda during that same time frame,

CLOSING/Mr. Pearl

1
2          around the Fall of 2004.

3                    And Mr. Tricarico said they

4          couldn't locate that file.  We know there is

5          Briton Lawler, Brookhaven Town Supervisor

6          Brian and Brenda Foley.  Brian Smith, the

7          serviceman at Baron Honda, Michael Nolan, an

8          attorney in Suffolk County.  Gloria Conaty, a

9          U.S. postal worker, Gerald Thurman, Eric

10         Besso, another well-respected attorney, here

11         in Suffolk County, Kathleen March, Thomas

12         Palladino, and Michael Tricarico, there is an

13         asterisk around his name, because he's the

14         only person other than Nerina Sperl. That

15         didn't purchase a car at Baron Honda, his

16         mother Gilda, the controller at Baron Honda,

17         ran his credit when he was looking to buy the

18         Durango, but his information was put into the

19         Dealer Track program.

20                   The other thing all these victims

21         have in common is they are all Suffolk County

22         residents.  That is a significant factor,

23         ladies and gentlemen of the jury, because when

24         the judge charges you, you're going to hear,

25         with the exception of counts nine and ten,

CLOSING/Mr. Pearl

1
2      that this defendant on or about the dates,
3      assumed the identity of the various victims as
4      Suffolk County residents.
5              Every one of these victims, who
6      testified, are Suffolk County residents.  And
7      the two that didn't testify, Gerald Thurman
8      and Brenda Foley, there are stipulations in
9      evidence, it is undisputed they didn't give
10     anybody permission to use their personal
11     indentifying information, and they were
12     Suffolk County residents at the time they
13     purchased the vehicle.
14             What we know, ladies and gentlemen,
15     is that when these individuals purchased
16     vehicles, they all filled out credit
17     applications.  Maria Macarle, She gave her
18     name, date of birth, Social Security number
19     ending in 4880.
20             Raymond and Nerina Sperl, once
21     again, name, date of birth, Social Security
22     number.  Then you had Brian and Brenda Foley.
23     These are all the credit applications, all in
24     evidence, 1-A through 12-A.  Once again, all
25     their personal identifying information.

```
 1    CLOSING/Mr. Pearl
 2                    The judge is going to charge you,
 3          that the defendant assumed these victims'
 4          identities, as Suffolk County residents, by
 5          using their personal indentifying information.
 6          The judge will tell you that only means a
 7          person's name.  In this case the defendant
 8          uses their name, date of birth, and Social
 9          Security number.
10                    What do we know from the evidence?
11          That the defendant's access to Baron Honda was
12          Valerie Rodriguez.  This defendant's
13          girlfriend.  What do we know?  She is the
14          defendant's girlfriend, from April 2004 to mid
15          2005.  She testified around February they
16          broke up, there was kind of an on and off
17          relationship, I think through March and April.
18          As you recall, this chiefly came out through
19          the cross, the defendant had a twofold purpose
20          for Valerie:  I'm not going to degrade this
21          court about what the defense did to Valerie
22          with that first purpose.  But we now know what
23          the second purpose was.  The second purpose
24          was access to the Dealer Track program.
25                    We know from Valerie's testimony
```

CLOSING/Mr. Pearl

1  CLOSING/Mr. Pearl
2         that the defendant was given four or five
3         leads.  She didn't remember the names, she
4         didn't remember who, but leads are a person's
5         credit report.  Their names, their personal
6         indentifying information.  I suggest, what
7         does she tell you?  That this defendant
8         specifically requested people with scores of
9         700 or better because something about him
10        being a mortgage broker.  Once again, ladies
11        and gentlemen of the jury, I suggest to you
12        there is no evidence on the record that
13        suggests this defendant ever worked as a
14        mortgage broker, nothing.  I suggest to you he
15        was never a mortgage broker.  He wanted those
16        leads with 700 and better scores, and we know
17        700 means you have very good to excellent
18        credit.
19              Why did the defendant need leads
20        that high?  I suggest because the cars that he
21        was stealing?  They weren't Hondas.  They
22        weren't 1991 Acuras like maybe some of us
23        drive, they were high-end automobiles,
24        Porsches, 745 BMWs.  In the Joseph Sweeney
25        case, we have Range Rovers, Hummers, all cars

CLOSING/Mr. Pearl

well above 50 thousand dollars.  To get that

kind of financing, you need excellent credit.

Valerie's testimony.  Mr. Keahon

was kind enough to read it back during his

closing.  He was fascinated with the Dealer

Track program.  She kept the password and user

name by her desktop computer.  Whether she did

that or gave it to him, ladies and gentlemen,

you decide.  Remember, his access to the

Dealer Track program was through Valerie.

Remember, she says how this

defendant called her and requested the

password and user name from her.

Ladies and gentlemen, I suggest we

know, Valerie Rodriguez, her testimony is

corroborated.  We know it because the

defendant's cell phone records portray him,

Exhibits 48, and here's the spray analysis

chart, during the time frame when Valerie says

they were dating?  A 144 calls to Valerie's

home.  Sandra Rodriguez, you recall, was

Valerie's mother.

Ladies and gentlemen, as you would

expect from somebody who wants to commit an

CLOSING/Mr. Pearl

1
2          identity crime, the witness tells us that the
3          defendant wanted the user name and password to
4          the Dealer Track program.
5                    What do we find in the defendant's
6          house?  This is 86, from the law offices of
7          Igororak, to Mr. Whitehead.  Look at the
8          exhibits.
9                    This is the last page.  What do you
10         see, EJRegis467Inacole.
11                   When you read back Valerie's
12         testimony, she tells you EJRegis was her
13         supervisor.  He used his name in the password
14         along with digits and a password with
15         "Inacole", I think she testified to.  He had
16         the password on his documents.
17                   What do we know the defendant did
18         with that user name and password, ladies and
19         gentlemen?  We know because the defendant's
20         computer, people's 151, is in evidence.  Det.
21         Friberg has just finished testifying.  The
22         defendant accessed the Dealer Track -- he had
23         the Internet shortcut.  He had an actual
24         shortcut on his desktop, to get immediately to
25         Dealer Track.  And what did he do with that?

1    CLOSING/Mr. Pearl

2            He accesses the Dealer Track about a dozen

3        times up there.  All on January 26th of 2005,

4        ladies and gentlemen.

5            Ladies and gentlemen the defense

6        briefly touched on -- the Dealer Track

7        information was only in there 30 days that

8        Valerie testified.  I suggest it is

9        interesting he uses Valerie as truthful when

10       he wants her, for that 30-day period, but

11       everything else she says isn't to be believed.

12       The fact that this defendant would war drive

13       when she was in the car.  The fact that he got

14       leads from her and he asked for passwords, all

15       that is not true.  But the one fact, about 30

16       days, it has to be true.

17           But put that aside, ladies and

18       gentlemen.  What we know is he was accessing

19       the Dealer Track program web site with that

20       password and user name.

21           How else do we connect this

22       defendant to the crimes?

23           Ladies and gentlemen, you have

24       voice identifications. I'm not going to play

25       those tapes, at least not all the tapes.

CLOSING/Mr. Pearl

You'll hear a few, but we know that all of the

contact numbers, on the various loan

applications, the Chase E-Loan, Capital One,

Commerce, all come back to AeroBeep &

VoiceMail Services, located in New York, New

York.  Kris Taneja testified he told you no

i.d. is needed to purchase these blocks of

numbers.  You can walk off the street and

they'll give you a set of numbers.

What we do know is this block of

numbers starting and that phone number found

on the defendant's computer, were all bought

by the same person, purportedly a person by

the name of John Willson, of One Union Avenue.

We know Det. Gabriele investigated but

couldn't find a John Willson with that

spelling.  He couldn't find a One Union Avenue

with a residence.

Same with Henry Black, ladies and

gentlemen, same set of numbers, and it is

interesting that the Henry Black account, what

I suggest is a fraudulent account, the contact

number (914)730-9240, is one of the numbers

listed, right there.  He used his -- the

CLOSING/Mr. Pearl

1
2          contact number as one of the fraudulent
3          numbers he purchased.
4                    Then you also have the Anthony
5          Williams.  This Anthony Williams, and this
6          Anthony Williams.  All these numbers appear,
7          on the various fraudulent applications, ladies
8          and gentlemen.
9                    So what do we know?  Look at
10         (212)592-0134.  What we know is it is found on
11         the David Ridenour Capital One fraud account.
12         It is on the Maria Macarle Internet fraud
13         account.  I'll ask Ms. Franzese to get ready
14         to play that recording.
15                    It is voice identified by Valerie,
16         Nigel, Anita, and Georgia Fortune.
17                    Let's listen to the tape.
18                    (The Tape plays)
19                    MR. PEARL:  There is the David
20         Ridenour, the Capital One account, there is
21         the phone number.  The David Ridenour Yahoo
22         account e-mail that was found, I suggest, on
23         the defendant's computer.
24                    This is the second page of the
25         First Internet Bank application.  There is

```
 1  CLOSING/Mr. Pearl
 2           that phone number, once again, (516)394-0555.
 3                     This is one of the phone numbers
 4           found in the John Willson block, this contact
 5           phone number was used in the Brian Foley Chase
 6           fraud account, Exhibit 18, and the contact
 7           phone number on the Brian Foley M&T fraud
 8           account.  Once again, it is voice identified
 9           by Valerie, Nigel, Anita and Georgia.
10                     The defense never argues any of
11           those weren't able to verify the defendant's
12           voice.  I suggest you heard those enough, you
13           probably have them memorized.  But it is
14           clearly the same male voice.  I suggest it is
15           that defendant's voice.
16                     MR. KEAHON:  I have to object to
17           what I didn't argue.
18                     THE COURT:  Thank you.  Sustained.
19           Please continue, Mr. Pearl.
20                     MR. KEAHON:  Can we tell the jury
21           to disregard that, please.
22                     THE COURT:  Thank you, I will.
23                     The jury will disregard the last
24           remark of the people. Commenting on defense
25           counsel's behavior.  Thank you.
```

CLOSING/Mr. Pearl

1

2                    You may continue, Mr. Pearl.

3                    MR. PEARL:  Can we play the (516)

4          number, please.

5                    (The Tape plays)

6                    MR. PEARL:  On many levels, we know

7          that is a fraud.  For the Empire Blue Cross

8          and Blue Shield, they use the AeroBeep number,

9          and it's the same voice as the first number.

10                   As a side note, ladies and

11         gentlemen, the M & T fraud account, there were

12         only four accounts that use M & T.  Brian

13         Foley, Briton Lawlor, Brian Smith and Michael

14         Nolan.

15                   Remember, James Eriksen testified

16         all those accounts were done over the phone.

17         And on the only paperwork where the defendant

18         was forced to use the phone?  We only have

19         male applicants.

20                   When the defendant has the

21         anonymity of the Internet, he can be a female

22         or he can be a male.  It is perfect for

23         somebody that is going to commit identity

24         theft.

25                   The third number, ladies and

CLOSING/Mr. Pearl

1
2    gentlemen, is the (718)670-3693 number.  It is

3    the contact phone number for the Joseph

4    Sweeney E-Loan fraud account and the Wojcieh

5    Wachnik Sprint fraud account.  Once again,

6    identified by Valerie, Nigel, Anita and

7    Georgia.

8              Can we play that last recording?

9              (The Tape plays)

10             MR. PEARL:  Ladies and gentlemen, I

11   suggest to you, it is obvious at this point in

12   the trial, those are the three same male

13   voices.  Once again the defendant's own phone

14   records betray him.  In that time frame, from

15   1/1/04 to 4/24 of 2005, the defendant is

16   calling in to that --

17             MR. KEAHON:  I object, "the

18   defendant is calling in".

19             THE COURT:  Overruled.  Note your

20   exception.

21             MR. PEARL:  What I suggest is the

22   personal cell phone is calling into that

23   AeroBeep voicemail number three times, as well

24   as calling into all of those other AeroBeep

25   numbers.

CLOSING/Mr. Pearl

1

2          Ladies and gentlemen, this is the

3     Joseph Sweeney, E-Loan account.   There is that

4     (718)670-3693 number.   Here is the Wojcieh

5     Wachnik Sprint phone records, Exhibit 49.

6          Once again, there is that phone

7     number, in conjunction with that 385 Lexington

8     Avenue.   That I suggest we know exactly whose

9     address that is now.

10         What happens again, ladies and

11    gentlemen, the defendant I suggest is so

12    arrogant, he thinks people are not going to

13    pick up on his mistake.   His mistake, one of

14    his many mistakes, is he uses what he knows.

15    He uses AeroBeep because he knows it.   He has

16    his own AeroBeep account.   It is right there,

17    ladies and gentlemen, Exhibit 67-A through D.

18         Lamar Whitehead, he has a

19    Yahoo -- he has a Yahoo e-mail address,

20    Larick26@Yahoo.com,   which shows him using

21    what he knows.   He knows how to use Yahoo.

22         1305 Park Place, in Brooklyn, New

23    York.   We know, ladies and gentlemen, that

24    that is the defendant's address.

25         In evidence as People's 168, the

CLOSING/Mr. Pearl

1

2          real estate contract that was recovered from

3          the paperwork the defendant, I suggest,

4          hoarded.  His address is 1305 Park Place,

5          Brooklyn, New York, when he was buying 92

6          Howland Avenue.

7                    The defendant's own cell phone,

8          ladies and gentlemen, once again betrays him.

9          Defendant is in possession of this cell phone

10         when he's arrested on January 25, 2006.  In

11         his house, ladies and gentlemen, is the phone

12         bill of $1575.44 phone bill for that account

13         number.  Once again, as I've already stated,

14         the defendant's personal cell phone, I suggest

15         is calling into all those AeroBeep numbers,

16         all the phones in yellow?

17                    Why would the defendant be calling

18         into John Willson, Henry Black and Anthony

19         Williams' accounts?  I suggest the answer is

20         obvious.

21                    So ladies and gentlemen, that is

22         general.  But at this point, I'd like to go

23         into some of the specific counts.

24                    I'd like to start with Maria

25         Macarle E-Loan, Exhibit 38, counts two and

CLOSING/Mr. Pearl

three.  Count two, charges the defendant that
on or about February 15th of 2005, this
defendant assumed the identity of Maria
Macarle as a Suffolk County resident, and he
did that by using her personal indentifying
information, and he obtained property, goods,
and services in excess of $2,000.  That is the
identity theft under New York Penal Law
Section 190.80(1).

Count three, ladies and gentlemen,
is a second theory to what the defendant did.

Once again, most of the elements
are the same.  That on or about February 15th,
2005, in this case, Maria Macarle, the
defendant assumed her identity as a Suffolk
County resident.  They both have the elements
of knowingly and with intent to defraud.

Ladies and gentlemen, why else
would you buy something in another person's
name if you didn't intend to defraud?

And the last element, on 190.80(3),
is that the defendant committed or attempted
to commit a Class D felony or higher.

The judge will charge you that a

CLOSING/Mr. Pearl

1
2         Class D felony or higher is always grand
3         larceny in the third degree.  So it is the
4         defendant using those stolen i.d.'s,
5         attempted, committed, or attempted to commit,
6         grand larceny in the third degree, and
7         committed or attempted to steal something in
8         excess of $3,000.
9               Ladies and gentlemen, the value is
10        never in question.  Like we said before, these
11        are all high-end cars, everything is well over
12        two and $3,000.
13              That is People's 38, the
14        application in the name of Maria Macarle.  The
15        date, 2/15/05, this defendant assumed the
16        identity of Maria Macarle, and asked and
17        actually received in this case, a loan from
18        E-Loan in the amount of $15,000 dollars or
19        approximately.  The motorcycle cost around 13
20        and change.
21              The defendant assumed Maria
22        Macarle's name by using her -- identity, by
23        using her name and Social Security number, her
24        personal indentifying information.
25              As a side note, the defendant used

CLOSING/Mr. Pearl

1          that e-mail address, Maria Macarle Yahoo.com.
2                  What else do we know, ladies and
3          gentlemen?
4                  King Cycle paperwork is in
5          evidence, 72.  There it is, ladies and
6          gentlemen.  You know this is the case where
7          Anita Bryant is the defendant's co-defendant.
8          She tells you, number one, she signed this
9          paperwork.  Ladies and gentlemen, take this
10         paperwork in the back and take the paperwork
11         in the back, of the Christina Brooks and Maria
12         Macarle checks, People's 29, I believe, those
13         Capital One checks, and look at the signature
14         on these Maria Macarle's -- Anita Bryant's
15         signature, and the signatures of Christina
16         Brooks and David Ridenour.  Clearly, they are
17         different people.
18                 What does Anita Bryant tell you?
19         She uses the name Maria Macarle, at 436 Cozine
20         Avenue.  She tells you the defendant used to
21         live right off of Cozine Avenue.  She uses
22         that number because the defendant gives it to
23         her, (718)670-3713.
24                 We know the salesman is Frank Wall.

CLOSING/Mr. Pearl

1
2          What does Frank Wall tell us, ladies and
3     gentlemen?  Well, he tells us that Anita
4     Bryant and a male purchased that motorcycle on
5     March 30, 2005.  He corroborates Anita Bryant.
6          He also tells us a male called in
7     that day, he couldn't recall, he said maybe
8     the day before, to set up the sale of the
9     motorcycle, and he prepared the motorcycle.
10    He corroborates Anita Bryant.
11          Mr. Keahon spent a long time
12    talking about Valerie and Nigel.  This case
13    isn't built on one witness, two witnesses,
14    three witnesses.  There are 55 witnesses that
15    I suggest are all corroborated by the physical
16    evidence.
17          When the judge charges you on
18    witness credibility, he'll tell you I suggest
19    that you could look at whether or not the
20    evidence corroborates the witness to determine
21    if they are credible, or not.
22          Remember Frank Wall told you that
23    the male purchased other items:  The helmet,
24    the gloves.  Like Anita tells you, there it is
25    on the receipt, exactly what Anita and Frank

CLOSING/Mr. Pearl

1

2          Wall tell you.

3                     What does Anita tell you?  What do

4          we know about Anita.  She's i.d.ed by Det.

5          Gabriele, who does what I suggest is some

6          excellent detective work, by putting that

7          Florida license picture on Crime Stoppers.

8          She's identified and ultimately arrested.

9                     Anita testified that the defendant

10         was with her at King Cycles and Commerce Bank.

11                    Henry Waite's testimony, I suggest,

12         corroborates Anita, as well.  He tells you

13         this, that the Florida license was left behind

14         and that the person using that Florida

15         license, I think, in the name of Maria

16         Macarle, ran out, or left the bank.  That is

17         exactly what Anita told you on the stand.

18                    We also talked about how Frank Wall

19         corroborates Anita.  What do we know?  The

20         defendant's cell phone calls Anita Bryant

21         three times.  I suggest, if you look at the

22         phone records, you'll see most if not all

23         those calls are in March 2005, right around

24         the time of the sale of the motorcycle.

25                    What else?  People's 109.  Anita

```
 1    CLOSING/Mr. Pearl
 2              Bryant's -- her name is found on a document in
 3         the defendant's house.  The sticker is over
 4         it, suggesting though it is in a cellophane
 5         envelope, this clear plastic covering, under
 6         that it will say "Lamar Whitehead", and his
 7         date of birth.
 8              What else do we know, ladies and
 9         gentlemen?
10              Here's a piece of evidence the
11         defendant just can't get around.
12              Once again, I suggest his personal
13         cell phone records, betray him.
14              He's calling in to Kings Cycles, on
15         March 30th of 2005, just like Frank tells you.
16         It is completely corroborative.
17              If that is not enough, ladies and
18         gentlemen, we have Police Officer Frank
19         Gallagher.  Remember the defense indicated
20         that Det. Gabriele had his mind set, and he
21         was just railroading the defendant.  Well,
22         Det. Gabriele tells you he didn't get this
23         case until May 5th of 2005, because of a
24         complaint by Maria Marcale.
25              He doesn't get the defendant's name
```

CLOSING/Mr. Pearl

1

2     until June 2nd, on or about June 2nd, 2005.

3     Because a police officer, Frank Gallagher, he

4     stops the defendant on the motorcycle that's

5     stolen with Maria Macarle's identity.  The

6     defendant is in possession of stolen proceeds,

7     ladies and gentlemen.  Do you need any more

8     evidence than that?  It is Exhibit 69.

9                 There is the motorcycle.  These are

10    the pictures, ladies and gentlemen.

11                The defendant's in possession of

12    the stolen merchandise.

13                What do we know, ladies and

14    gentlemen?  We know it is a stolen motorcycle.

15    There is the VIN number.  There is the VIN

16    number from the Kings Cycle paperwork.

17                There is the VIN number from the

18    E-Loan -- fraudulent E-Loan account, in the

19    name of Maria Macarle.

20                Every piece of evidence in this

21    case, every witness who testified, is

22    corroborated by each other.

23                What else do we know?  As if that

24    is not enough, with counts two and three, I

25    suggest ladies and gentlemen, it is getting to

CLOSING/Mr. Pearl

1
2          the point where it is overwhelming.

3                     Then we have Det. Friberg testify
4          on computer evidence.  We know from the
5          exhibits, and Det. Friberg testified, the
6          defendant had Nigel DeFreitas's IP on his
7          computer.

8                     The cookie, which I suggest ladies
9          and gentlemen is the DNA of computers.  As
10         Det. Friberg told us, it is a unique
11         indentifying number generated by E-Loan, and
12         sent to the computer, that makes this
13         application.  The user doesn't even know that
14         sometimes a cookie is being put on their
15         computer.  What we know, as well, is that
16         Maria Macarle at Yahoo dot com is used on the
17         E-Loan.  This is the E-Loan paperwork.  There
18         is the cookie, ladies and gentlemen.  It is an
19         exact match.

20                    This is the evidence from Det.
21         Friberg, its hard to see, but there is the
22         defendant accessing the Maria Macarle Yahoo,
23         from his personal laptop, I suggest.

24                    Ladies and gentlemen, that is the
25         IP -- that is the cookie that was taken off

CLOSING/Mr. Pearl

1
2          the defendant's computer.  An exact match.
3                    How do we know it's the defendant's
4          laptop, ladies and gentlemen?  People's 15.
5                    What do we know about the
6          defendant's laptop?  One, it is recovered from
7          the defendant's -- what I suggest is the
8          defendant's house, in Teaneck.  Here is the
9          laptop, ladies and gentlemen, People's 151.
10         Det. Friberg tells you that the laptop case,
11         is found in the defendant's -- the Range Rover
12         the defendant is in possession of when he's
13         arrested.  Remember, there was personal
14         paperwork of the defendant found in that
15         laptop case. It is a perfect fit, ladies and
16         gentlemen, the laptop and the laptop case.
17                   The wireless Internet card, ladies
18         and gentlemen.  Is in the computer.  What do
19         we know about this wireless Internet card that
20         Det. Friberg told you?  It allows the
21         defendant to hook into the Internet.  That, I
22         suggest, is war driving.  Once again, this
23         computer is filled with the defendant's
24         personal information.
25                   There is the defendant's house.

CLOSING/Mr. Pearl

     There is the computer.  This is the computer that was found in the defendant's house.  Mr. Keahon wants a videotape?  Well, there he goes, he has some photographic pictures of all the evidence.  Evidence establishing that it's the defendant's computer.

     Well, ladies and gentlemen, if I drop my wallet, when you pick it up, how would you determine it is my wallet?  You open it up, look in it, see pictures of my kid, my credit cards, which I suggest is exactly what you do when you find a computer, for any item on it, the defendant keeps pictures of himself and his family.

     On the computer, ladies and gentlemen, is the profit and loss statement of Lamar Whitehead.  On the computer, is a credit application in the name of Lamor Whitehead, with his present address of 92 Howland Avenue in Teaneck, New Jersey, right where the computer was seized from.

     On his computer, in his documents folder, was Lamor Whitehead vs. Mortgage Electronic Systems, where he lists, he's Lamor

CLOSING/Mr. Pearl

1    Whitehead, and his address.

2              What do we know about the web sites

3    visited by the defendant?  You couldn't ask

4    for anything better, ladies and gentlemen.

5    Who goes to Ancestry.com and looks up the

6    ancestry of Lamar Whitehead, John Willson,

7    Henry Black?

8              We also have the Dealer Track icon

9    on his desktop.  We have the defendant

10   accessing Dealer Track.

11             Nothing on this computer comes back

12   to anyone but the defendant and the victims,

13   ladies and gentlemen.

14             There it is, ladies and gentlemen.

15   There is the Ancestry.com Lamar

16   Whitehead -- Miller White White Miller

17   Yahoo.com.  That is his second Yahoo e-mail

18   address.  He's quite familiar with how to use

19   Yahoo e-mail, I suggest to you.

20             There is, once again, the shortcut

21   to the Dealer Track program.  And this is what

22   the defendant did when he had access to the

23   Dealer Track with that password, we now know

24   he had from People's 86.  He accessed Dealer

CLOSING/Mr. Pearl

1     Track.

2           Let's move on, ladies and

3     gentlemen -- let's go back.  Ladies and

4     gentlemen, it is overwhelming, counts two and

5     three.  That this defendant committed the

6     identity theft using the name of Maria

7     Macarle.

8           Remember, all these counts, are

9     cross-referenced because the AeroBeep numbers

10    are all bought in the same block, by the same

11    number.  So the Maria Macarle phone number and

12    another number bought in that same block,

13    shows up on Nerina Sperl.  So they all

14    criss-cross.

15          What do we know about the Nerina

16    Sperl fraud?  This is count eight.  This is

17    People's 23.  This is the person to person

18    transaction of Nerina Sperl.  The date, 2/15

19    of 2005.  The personal indentifying

20    information of Nerina Sperl is used, her name

21    and Social Security number.

22          Once again, that Yahoo e-mail

23    address.

24          This is it, ladies and gentlemen.

1    CLOSING/Mr. Pearl

2           There it is.  That is her name, Social

3           Security number, her date of birth, and there

4           is -- there is her -- that Yahoo e-mail.

5                  The defendant made an application

6           for a 55 thousand dollars loan, which is well

7           over the $3,000 threshold of the attempted

8           grand larceny in the third degree.  Remember,

9           this one didn't get funded.  So this an

10          attempted grand larceny.  Remember, "committed

11          or attempted to commit grand larceny in the

12          third degree."  He attempted to get the

13          $55,000 loan.

14                 There we go again.  There is the

15          cookie and the IP address.  We've gone through

16          this.  The cookie, the DNA of the computer

17          world, is found on the defendant's computer.

18          The Capital One check, payable to the order of

19          Rhonda Ghassabian, $55,000.  Nerina Sperl.

20                 Certainly, have you ever seen

21          anybody write a check with the word "zero

22          cents"?  I suggest it is a unique identifying

23          marker of the defendant.  This was recovered

24          from the defendant's house, his checkbook,

25          which is in evidence.  Take a look at it,

CLOSING/Mr. Pearl

1
2      "zero cents".  You don't need to be Jeff
3      Luber.  I suggest that is a perfect match.
4                  The defendant's jacket, ladies and
5      gentlemen.  He had that moment in the
6      courtroom, which is kind of like the
7      fingerprint moment, when the defendant puts
8      the jacket on in the courtroom.  We know that
9      the jacket is recovered from the defendant's
10     Range Rover.  Those exhibits, 96 through 106.
11     There, is his Range Rover.  There is the
12     jacket in the back.  Right with the gas can
13     and that laptop case.
14                 Remember the defendant put this
15     jacket on in the courtroom.  Ladies and
16     gentlemen, I suggest to you, it was a perfect
17     fit.  Did you notice the one thing the
18     defendant did when he put the jacket on, he
19     put the jacket on and pulled up the sleeves.
20     Like he's worn that jacket a thousand times.
21     I suggest he did that because he has worn that
22     jacket a thousand times.  What do we find in
23     the pocket of the defendant's jacket?
24                 I'll grab People's 126.  Ladies and
25     gentlemen, this is literally what was found in

CLOSING/Mr. Pearl

1
2        defendant's jacket.  It is right there.  What

3        is better, the defendant gift-wrapped, he

4        literally gift-wrapped this evidence for us.

5               This is how it was found, in the

6        jacket, 126-A.  You open it up, ladies and

7        gentlemen, you keep opening it, it is the

8        paper -- but he gift-wrapped it -- it's a

9        traffic summons in the name of Lamar

10       Whitehead.  It's not his jacket, but what is

11       in his jacket.  It has his name and date of

12       birth.  Literally, ladies and gentlemen, he

13       gift-wrapped this piece of evidence for us.

14              What do we know is on this

15       document?  Well, in the paperwork, Nerina

16       Sperl, Porsche Cayenne, 2004.  It is the same

17       vehicle identification number.  Rhonda

18       Ghassabian, testified that is her date of

19       birth, that is her Social Security number.

20       Why does the defendant have a Tennessee

21       resident's personal indentifying information

22       in his jacket pocket?

23              If that is not enough for you,

24       ladies and gentlemen, Jeff Luber, the

25       handwriting expert, analyzed the -- you'll see

CLOSING/Mr. Pearl

1  
2       this Jayson Wilco notary stamp, on a lot of

3       the paperwork.

4               Nobody testified from the

5       Department of State but in evidence, is

6       People's 190?  Is an affidavit from the

7       department of state, Jayson Wilco, with the

8       number, that doesn't exist.  It is a

9       fraudulent notary stamp, ladies and gentlemen.

10      It is on a lot of the paperwork.  That, I

11      suggest, is another way they all criss-cross

12      each other.

13              So what do we know?  The

14      defendant's handwriting is authenticated by

15      Jeff Luber on that paperwork.  Kwik Digital,

16      ladies and gentlemen.  What do we know about

17      the Kwik Digital document?  Tunde Ojo

18      testified.  He came in.  What does he tell

19      you?  The Paperwork is faxed from Kwik

20      Digital.  Everything from Kwik Digital was

21      faxed from his address.  He told you he faxed

22      paperwork from Kwik Digital during the same

23      time frame as these identity thefts.  Kwik

24      Digital cards are found in the defendant's

25      Range Rover, and his home.  Once again, he

CLOSING/Mr. Pearl

1
2       hoards paperwork.  Because of that, he leaves
3       a trail.  There they are, Exhibit 94 and 95,
4       ladies and gentlemen.
5               But ladies and gentlemen, there
6       still is more evidence.  The cookie on the
7       Nerina Sperl case comes back to the
8       defendant's laptop.  Nerina Sperl's e-mail is
9       found on the defendant's computer.  Why is the
10      defendant's computer accessing Nerina Sperl a
11      Yahoo.com?  They have no knowledge of each
12      other --
13              I shouldn't say that.  The
14      defendant has knowledge of her personal
15      indentifying information, Nerina Sperl has no
16      knowledge of this defendant.  Let's move on to
17      count -- once again, I submit to you, it is
18      overwhelming evidence as to count eight.
19              We'll move on to the Nouri Khabeih,
20      counts nine and ten.  Count nine is identity
21      theft in the first degree.  The defendant is
22      charged once again, under 190.80(3), the
23      defendant assumed the identity of Nouri
24      Khabeih.  This is a little different, ladies
25      and gentlemen.  This is within the

CLOSING/Mr. Pearl

jurisdiction of Suffolk County.  He assumed
the identity of Nouri Khabeih by using Nouri
Khabeih's name, his personal indentifying
information, and with that, this defendant
committed or attempted to commit, a class D
felony or higher.

The attempt to commit grand larceny
is the attempt to steal that $55,000 Range
Rover from Land Rover of Massapequa.

Count ten, is attempted grand
larceny in the second degree.  That charges
the defendant on or about -- and this is
around October 14th of 2004, once again within
the jurisdiction of Suffolk County, the
defendant attempted to steal that Range Rover
from Land Rover of Massapequa.

Ladies and gentlemen, there is a
stipulation in evidence that within the
jurisdiction of Suffolk County, Land Rover of
Massapequa is within 500 yards of the Suffolk
County border, and it is in Nassau County.
Clearly, it is an adjoining county.

Ladies and gentlemen, the judge
will tell you that the power to prosecute is

CLOSING/Mr. Pearl

1
2    because we are within 500 yards of Suffolk
3    County. That element is a given. So what do
4    we know, ladies and gentlemen? This is the
5    paperwork from Land Rover Massapequa.
6           The defendant's fingerprints are
7    all over this paperwork, ladies and gentlemen.
8    This is exhibit 21. Karen Ensalata tells us,
9    she's the fingerprint expert. This goes back
10   to what I consider -- from what I suggest the
11   defendant is trying to divert your attention.
12   What was the whole questioning about the FBI?
13   It was meant to try to bring you over here.
14   The fingerprints are devastating. The
15   defendant has four fingerprints on this
16   paperwork. How does the defendant's
17   fingerprint get on the paperwork? They can't
18   answer that question, so we'll try to district
19   you with the FBI, just like with the Cherokee
20   that he does with Nigel DeFreitas.
21          Once again, the right thumb is on
22   the outside of the manila folder.
23          The left thumb, the outside of the
24   manila folder. The right index is inside the
25   manila folder. The left thumb, is on the

CLOSING/Mr. Pearl

1
2        GEICO paperwork.  Remember, Det. Miller
3        testified the defendant is right-handed.
4        Let's look.  Ladies and gentlemen, this is
5        just like if you were going to come in and
6        drop paperwork down and you wanted to open up
7        the paperwork?  You're a right-handed person.
8        You pick up the paperwork.  You leave the left
9        thumb imprint.
10                 Just like a right-handed person,
11       with a little piece of evidence that once
12       again corroborates the rest of the testimony.
13                 Ladies and gentlemen, that is the
14       right thumb.  This was for demonstrative
15       purposes.
16                 It is Exhibit 93.  Remember, these
17       are only 10 matching points.  Ms. Ensalata
18       told you there were 23 matching points.  If
19       that wasn't enough, the thumb print that she
20       took in this courtroom, she testified to, was
21       a match to that print, ladies and gentlemen.
22                 What do we know?  Robert O'Shinsky,
23       Land Rover.  He tells you in October 2004, in
24       this time frame, there was an attempted sale
25       of a $55,000 Range Rover.  A young male

CLOSING/Mr. Pearl

1

2          attempted to set up the deal indicating he was

3          purchasing the vehicle for his aunt.  Remember

4          that testimony?  He talked about a young male.

5          He didn't talk about a male with an accent,

6          like the real Nouri Khabeih.  He talked about

7          a young male.

8                    What else do we know, ladies and

9          gentlemen?  Well, once again, see this

10         fraudulent notary stamp, again?  What do we

11         have?  Nouri Khabeih, 371 Main Street,

12         Hartford, Connecticut.  What do we find,

13         ladies and gentlemen?  In his house, take a

14         look at the pictures, defendant once again

15         puts his picture on the evidence for us, right

16         here, ladies and gentlemen, People's 175.  The

17         defendant uses 371 Main Street, "Harford".

18         Because he's a poor speller doesn't mean that

19         he didn't do this transaction, ladies and

20         gentlemen.  I suggest you'll see he's a poor

21         speller in many areas.  How do you get around

22         that evidence, ladies and gentlemen?  This

23         random Connecticut address turns up in his

24         house, with his picture on the i.d.?  You

25         couldn't ask for better evidence.

1    CLOSING/Mr. Pearl

2                    Hartford is spelled incorrectly.

3    This corroborates the testimony of Anita

4    Bryant.  She told you she received those

5    fraudulent i.d.'s from the defendant:  A

6    license, New York State license, and the

7    Florida license.  She also testified to the

8    Christina Brooks license.  This defendant, I

9    suggest, has a fraudulent identification for

10   this house in Connecticut.  We know it is

11   wrong, because he spells "Hartford" wrong.

12                   As if it is not enough, ladies and

13   gentlemen, we have another piece of evidence.

14   He uses that (718)512-5016 number, the

15   AeroBeep phone number Henry Black account,

16   take a look at the spray analysis chart.  The

17   defendant's cell phone calls into that number.

18                   What do we know, ladies and

19   gentlemen?  The Sprint cell phone

20   (346) 623-1549, is count sixteen.  What we

21   know, ladies and gentlemen, is the Sprint cell

22   phone is in the name of Wojcieh Wachnik.

23                   Between 10/14 of 2004 and 10/25 of

24   2004, that phone -- this phone, ladies and

25   gentlemen, People's 152, we know it is the

CLOSING/Mr. Pearl

phone. We find it in his house, because the
electronic serial number is right on the
phone. Once again, he has a phone that was
used with the stolen i.d. of Wojcieh Wachnik
in his house. It crosses over with the Land
Rover of Massapequa deal.

There is the electronic serial
number, ladies and gentlemen. If you want to
look, you find it right on that phone.

That cell phone was opened with
that phone number and that address. We know
that is Teisha Lamont's address. AeroBeep
with voice i.d. Once again, it is a confirmed
fraud account.

The evidence from the defendant's
house, ladies and gentlemen. All comes from
these bags. What do we know? We know it is a
certified certified deed, copy of a deed and
appraisal, real estate contract, utility bill,
Rent-A-Center paperwork. Here it is, ladies
and gentlemen. The deed, the gas bill, the
Rent-A-Center paperwork, all addressed to
Lamar Whitehead, at 92 Howland Avenue.

Defendant's Range Rover towing

CLOSING/Mr. Pearl

1
2          receipt, which is in evidence, the service on
3          the Range Rover and traffic summons.  There it
4          is, ladies and gentlemen, 7/27.  It has the
5          license plate DCN-7725.
6                   On 7/27, the defendant is in
7          possession of the Range Rover.  He tows it to
8          this place in Manhattan, and there, that car
9          is towed there.  We know despite the fact
10         there is a different plate number on that car
11         now, ladies and gentlemen, remember now there
12         is a Pennsylvania plate.  We know that is the
13         same car.  Because the police took the VIN
14         number off it.  An exact match.
15                  So what evidence do we recover from
16         the defendant's house?  David Ridenour
17         paperwork, ladies and gentlemen.  He has Mr.
18         Ridenour, a Tennessee resident, paperwork in
19         his house.
20                  With that, Apartment 4-B.  Once
21         again, we know now that that is Teisha
22         Lamont's, ladies and gentlemen, that is her
23         phone number.  Anita Bryant confirms her voice
24         in the AeroBeep accounts.  The two phone
25         accounts, Lucia Green and Kathleen Leads, that

CLOSING/Mr. Pearl

1
2       is Teisha Lamont, his little sister.  The

3       defendant's personal cell phone calls in 85

4       times, ladies and gentlemen.  When he's

5       arrested and 1:25:06, who was the first person

6       he calls?  His sister, Teisha.  He wants his

7       sister to pick up his Range Rover.

8               Exhibit 37.  Other paperwork.  This

9       is just random paperwork that connects him to

10      the rest of the identity thefts, ladies and

11      gentlemen.  I won't go through every one.

12      We've already been here an hour and a half.

13              Lamor Miller.  La-La Records,

14      123-99 Flatlands Avenue.  The address used on

15      Gloria Conaty's Capital One fraud, count 26,

16      and the Gloria Conaty E-Loan account.

17              The business card found in the

18      defendant's house.  As an E-Loan.  What do we

19      know about this business card, ladies and

20      gentlemen?  He wrote the vehicle

21      identification number for the one on the

22      Joseph Sweeney E-Loan, ladies and gentlemen, I

23      suggest this is one of the actual grand

24      larcenies, where this car went off the lot, a

25      BMW 745I.  He has a vehicle VIN on business

CLOSING/Mr. Pearl

1

2          cards at his house.  Counts 11 and 12.

3                        We already talked about the

4          Connecticut i.d.

5                        The back of another business card

6          in the defendant's house, ladies and

7          gentlemen.  This is great.  He has the phone

8          number, that AeroBeep number.  I suggest,

9          clearly, that is his handwriting, there, where

10         he calls in from his personal phone.  AeroBeep

11         phone number would be the Joseph Sweeney

12         E-Loan, Wojcieh Wachnik identified by all four

13         people, again.

14                        Right there.

15                        Wojcieh Wachnik, Social Security

16         number.  The number on the back of this

17         business card found in the defendant's house.

18                        Con Ed bills, ladies and gentlemen.

19         Here is interesting evidence.  Recovered

20         from -- well, the template recovered from the

21         defendant's vehicle.

22                        This is the Con Ed bill in the name

23         of David Ridenour.  The Con Ed bill in the

24         name of Maria Macarle.  It is hard to read,

25         Exhibits 27 and 28.  Both faxed from Kwik

CLOSING/Mr. Pearl

1
2          Digital, the same bill, the same account
3          number.   The same information on the Con Ed.
4                    Here is the template, ladies and
5          gentlemen, found in the defendant's vehicle,
6          the same bill.   The personal identifying
7          information used on the fraudulent Maria
8          Macarle and David Ridenour accounts.   The
9          information is found in the defendant's
10         vehicle.
11                   Now, we know, ladies and gentlemen,
12         that this defendant likes to cut and paste,
13         and that is his common plan and scheme, that
14         is his M.O.
15                   The Power Point doesn't do justice
16         to People's 176-A.   Katherine Reid testified.
17         The defendant was actively in the process of
18         cutting and pasting documents, ladies and
19         gentlemen.   He left this evidence behind for
20         us.
21                   Here, the defendant didn't talk
22         about this, ladies and gentlemen, it is
23         devastating.   Here is the final product that
24         put the cut and paste from the photocopy
25         machine, you get the final product.   This is

```
 1    CLOSING/Mr. Pearl
 2            exactly, ladies and gentlemen, what the
 3            defendant did with those Con Ed bills.  What a
 4            coincidence, Katherine Reid's name is used
 5            with the AeroBeep number, (212)561-1482.
 6                    Jeff Luber, the handwriting expert.
 7            What does he tell us?  This was his chart,
 8            ladies and gentlemen.  Mr. Keahon doesn't
 9            think it is a match.
10                    Well, let's look at the three.
11            Like Georgia Fortune told you, the defendant
12            writing with two capital letters in the
13            beginning of the word?  Zero cents is all over
14            the questioned documents, and the known --
15            what I suggest is the known handwriting of
16            Lamar Whitehead.
17                    Look at the Brooklyns, ladies and
18            gentlemen.  They are almost perfect matches.
19            You don't need to be Jeff Luber.  I suggest
20            you can make the determination.  Ladies and
21            gentlemen just to talk about what I suggest is
22            this defendant's phonetic challenge.  He can't
23            spell the word "thousand dollars" right on
24            Hillside Rides, no one verified the
25            handwriting of the defendant, Mr. Keahon made
```

CLOSING/Mr. Pearl

1

2          this big -- the defense argued about George

3          Fortune who was called in the last two weeks.

4          This is one of the verified handwriting

5          exemplars of the defendant.  Ladies and

6          gentlemen, a check signed by Lamor Whitehead.

7          This is zero cents.  Here is a Western Union

8          template, signed by Lamar Whitehead. We know

9          the defendant's a rapper.  La-La Records at

10         123-99 Flatlands Avenue.  This is some of his

11         rap music.  This is what Jeff used to verify

12         the defendant's handwriting on all the

13         questioned documents.

14              What do we know?  The Moneygram,

15         Exhibit 36, count five of this Indictment,

16         defendant handwriting.

17              The Maria Macarle, Christina Brooks

18         check, Exhibit 29, counts two and four.

19         Defendant's handwriting.

20              Defendant's handwriting.  That zero

21         cents all over again.  This I-check deposit,

22         into accounts opened by Anita Bryant.  The

23         defendant wanted her to withdraw from that

24         $17,000.  The Joseph Sweeney check, the

25         Hillside Rides.  The defendant's handwriting.

```
 1    CLOSING/Mr. Pearl
 2                    The fax cover sheet on the Maria
 3          Macarle First Internet Bank, for count five.
 4          Defendant's handwriting.
 5                    Fax from Kwik Digital.
 6                    The Briton Lawlor check, ladies and
 7          gentlemen.   Count 17.
 8                    We know that Kylie Copeland
 9          a -- this is what led to Kylie Copeland's
10          conviction.  His fingerprint was on the check.
11          What does Mr. Luber tell us, defendant's
12          handwriting, the same "cents", just like in
13          all the other documents, ladies and gentlemen.
14                    What else do we know about this
15          defendant's connection to Kylie Copeland,
16          ladies and gentlemen?  There was that
17          document, remember it said 31 Fleet Walk
18          Avenue, in Brooklyn, New York?  Well, remember
19          Det. Gabriele -- I don't have the exhibit in
20          front of me, Det. Gabriele testified that that
21          is the address Kylie Copeland provided at the
22          time of his arrest?  It turns up on paperwork,
23          once again, in the defendant's house, with his
24          name "Lamor Miller", and the address provided
25          by Kylie Copeland.
```

```
 1   CLOSING/Mr. Pearl
 2                   Det. Friberg analyzed the
 3        defendant's laptop with the wireless Internet
 4        card.  It corroborates Valerie Rodriguez'
 5        testimony of the defendant's war driving.
 6                   Nigel DeFreitas and Michael
 7        Redman's IP addresses on the defendant's
 8        computer, E-Loan cookies, the DNA of this
 9        case, are found on the defendant's computer.
10                   There is the cookie, ladies and
11        gentlemen.  There -- this is the E-Loan
12        paperwork.  Gerald Thurman cookie.  Gloria
13        Conaty, and Raymond Sperl, 2005.  Raymond
14        Sperl, also, was victimized in 2000.  All on
15        the defendant's laptop.
16                   Yahoo e-mails on the defendant's
17        computer.  David Ridenour, Brenda Ridenour,
18        Tod Ghassabian, Nerina Sperl, Joseph Sweeney.
19        Here they are, David Ridenour's on his
20        computer from the Capital One records.  Brenda
21        Ridenour one eleven, on his computer.  She's
22        from Tennessee, just like David Ridenour.
23                   Tod Ghassabian, another one of our
24        friends from Tennessee.
25                   Nerina Sperl, there it is, from the
```

```
 1   CLOSING/Mr. Pearl
 2           bank paperwork.
 3                   Joseph Sweeney, that is from the
 4           E-Loan paperwork, that AeroBeep.
 5                   Remember, ladies and gentlemen, it
 6           is spelled Joseph S-W-N-Y?  Joseph S-W-N-Y
 7           he's accessing Joseph Sweeney's e-mail
 8           account, that he opened, on his computer.
 9           Ladies and gentlemen, count 1 of this
10           indictment is scheme to defraud in the first
11           degree.  I suggest to you the evidence has
12           proven the defendant is guilty beyond a
13           reasonable doubt.
14                   We've shown that this defendant
15           engaged in a systematic and ongoing course of
16           conduct, Be engaging in a scheme with the
17           intent to defraud.  He uses people's
18           identities to try to steal from other persons.
19           And he obtained property in excess of $1,000
20           dollars from at least one person.
21                   Ladies and gentlemen, the judge
22           will tell you a person, as defined in the law,
23           can be a human being.  It could be a public or
24           private corporation.  The identifiable person
25           there's many E-loans.  This defendant stole
```

CLOSING/Mr. Pearl

          that motorcycle using a funded check from

          E-loan.   Identity theft in the first degree,

          is 190.80(1), counts 2, 11 and 15.   The

          evidence shows the defendant assumed the

          identity of Maria Macarle, which is count two;

          Count 11, Joseph Sweeney; count 15, Wojcieh

          Wachnik.

                    These were three funded cars,

          ladies and gentlemen, totalling well over 100

          thousand dollars unaccounted for.   Well, a

          $15,000 dollars motorcycle was ultimately

          recovered.

                    He assumed the identity of the

          victim, used their personal indentifying

          information, their name, Social Security

          numbers, knowingly and with intent to defraud.

          I suggest it is clear from the scheme this

          defendant was engaged in, he obtained property

          in excess of $2,000.   All of the automobiles

          are in excess, well in excess of $2,000.

                    Every count in this indictment is

          190.80(3).   This defendant assumed the

          identity of the various victims, as a Suffolk

          County resident, with the exception of Nouri

CLOSING/Mr. Pearl

Khabeih, by using their personal indentifying information.

He did so knowingly and with the intent to defraud, and then he committed or attempted to commit a Class D felony or higher.  If he attempted to steal anything in excess of $3,000, it's grand larceny in the third degree.

If a person attempts to steals something in excess of $3,000, all it means is he did more than just planning and preparation.  He came dangerously close to completion.  The theft need not have been completed, ladies and gentlemen, but for these financial institutions picking up on the fraud, I suggest each and every one would have been funded, ladies and gentlemen.  Just -- it was well beyond the planning and preparation phase.  He went well beyond that.

So what do we know, ladies and gentlemen?  We have multiple identity thefts. We have Valerie Rodriguez who testified. Anita Bryant.  Nigel DeFreitas, Georgia Fortune, they all identified this defendant's

CLOSING/Mr. Pearl

1

2          voice.  Valerie Rodriguez had him war driving.

3          The co-defendant tells you what he was doing.

4          Tunde Ojo, from Kwik Digital, told you a

5          person matching this defendant's description

6          was at Kwik Digital.

7                     Robert O'Shinsky, Frank Wall, Chris

8          Taneja of AeroBeep.  Ken Scales, remember Ken

9          Scales' testimony on cross-examination?  A

10         male was calling into many of these fraudulent

11         applications?  That came out on cross.  Have a

12         readback.  He corroborates.

13                     Karen Ensalata, the expert.  Jeff

14         Luber, the handwriting expert.  Dan Jensen,

15         who tells us about the electronic serial

16         number on the phone.  The phone is found in

17         the defendant's house.  Det. Friberg finds the

18         cookies on the defendant's computer, as well

19         as the Yahoo e-mail address.  All the search

20         warrant items from the home, and the

21         defendant's car, all lead back to the

22         defendant.  All roads lead to this defendant,

23         ladies and gentlemen.

24                     Ladies and gentlemen, I suggest

25         this case is overwhelming.  We proved this

1    CLOSING/Mr. Pearl

2              case well beyond a reasonable doubt, to the

3              point where I suggest there is no doubt.

4                   I asked you to hold to your oaths,

5         Assistant District Attorney Franseze and I

6         have proved this case to you and we ask you to

7         do your job now, and take this one-man crime

8         spree that is Lamar Whitehead, and find him

9         guilty on each and every count.

10             Thank you.

11             THE COURT:  Thank you, Mr. Pearl.

12             Ladies and gentlemen, in light of

13        the hour, it is 25 to seven, and the length of

14        the court's charge to you on the law, you'll

15        be recessed till tomorrow morning, at 9:00

16        o'clock.

17             At which time I will charge you on

18        the law, and then you'll retire for your

19        deliberations.  Notwithstanding the fact that

20        both sides have rested and you have heard the

21        eloquence of both counsel, the admonitions

22        remain in full force and effect.

23             I remind you not to form or express

24        an opinion about the case until submitted to

25        you for deliberations.  As I've told you, do

People v. Lamar Whitehead

1
2          not discuss this case or any matter connected
3          to the trial amongst yourselves or with anyone
4          else.  Nor may you allow it to be discussed in
5          your presence.
6                    Don't read or listen to accounts
7          reported in the news media, don't visit or
8          view the place or places where the offense
9          charged was allegedly committed or any other
10         place involved in this case, and promptly
11         report to the court by way of coming to me
12         personally, through a court officer, any
13         incident within your knowledge involving any
14         attempt to influence any member of the jury.
15         Thank you, once again, for your patience and
16         your hard work.
17                    I'll see you tomorrow morning at
18         9:00 o'clock.
19                    (The Jury is excused)
20                    THE COURT:  Thank you.  Please be
21         seated.  We'll wait for the door to close.
22                    Thank you, officer.  Outside the
23         presence of the jury, is there anything to
24         place on the record at this time?
25                    MR. KEAHON:  No, your Honor.

People v. Lamar Whitehead

1

2                         MR. PEARL:  No.

3                         THE COURT:  The record will reflect

4          that the court did have a conference with

5          defense counsel and the people regarding the

6          proposed charge.  In light of the hour,

7          immediately before the court charges the jury

8          tomorrow, you have copies of the court's

9          proposed charge in your possession at this

10         time, which after our conference I did

11         incorporate certain suggestions by defense

12         counsel and by the people.

13                         I'll hear specific objections to

14         same prior to the charge being administered.

15                         9:00 a.m., thank you very much.

16         The court wishes to compliment Mr. Keahon and

17         Mr. Pearl for their outstanding eloquence in

18         their closing arguments before the court.  It

19         does credit to the profession of law.

20                         Thank you.  Thank you.

21                         Mr. Whitehead, I'll see you

22         tomorrow morning, 9:00 o'clock.

23                              -oOo-

24

25

```
 1    People v. Lamar Whitehead

 2

 3

 4                        C E R T I F I C A T E

 5

 6         I, JENNIFER MAUE, a Senior Court

 7    Reporter, do hereby certify, that the

 8    foregoing matter is a true and accurate

 9    transcription of my shorthand notes.

10              IN WITNESS WHEREOF, I have hereunto

11    set my hand.

12

13

14                    JENNIFER MAUE

15

16

17

18

19

20

21

22

23

24

25
```